CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
DONALD A. ECKLUND
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
decklund@carellabyrne.com

Attorneys for Plaintiff

[Additional counsel appear on the signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL WIGGLESWORTH, Individually and on Behalf of All Others Similarly Situated, )<br>)<br>)<br>) | No. <br><br>CLASS ACTION |
| Plaintiff, )<br>) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. )<br>) | |
| MAIDEN HOLDINGS, LTD., ARTURO M. RASCHBAUM, KAREN L. SCHMITT and JOHN M. MARSHALECK, )<br>)<br>)<br>) | DEMAND FOR JURY TRIAL |
| Defendants. )<br>) | |

Plaintiff Michael Wigglesworth, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Maiden Holdings, Ltd. ("Maiden" or the "Company") press releases, U.S. Securities and Exchange Commission ("SEC") filings,  analyst reports, media reports and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of Maiden common stock between March 4, 2014 and November 9, 2018 (the "Class Period"), against Maiden and certain of the Company's former executive officers seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R.

§240.10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.     Venue is proper in this District pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  In addition, defendants reside and/or transact business in this District.  The Company maintains the primary offices of its U.S. subsidiary in this District.

## PARTIES

4.     Plaintiff Michael Wigglesworth purchased Maiden common stock during the Class Period, as set forth in the certification attached hereto and incorporated herein by reference, and suffered damages.

5.     Defendant Maiden is a Bermuda-based holding company that provides specialty reinsurance through its subsidiaries.  During the Class Period, shares of Maiden common stock traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MHLD."

6.     Defendant Arturo M. Raschbaum ("Raschbaum") was the Chief Executive Officer ("CEO") and President of Maiden until his retirement, effective September 1, 2018.

7. Defendant Karen L. Schmitt ("Schmitt") was the Chief Financial Officer ("CFO") of Maiden from May 13, 2014 until her retirement, effective September 1, 2018.

8. Defendant John M. Marshaleck ("Marshaleck") was the CFO of Maiden until May 13, 2014.

9. Defendants Raschbaum, Schmitt and Marshaleck are referred to herein as the "Individual Defendants."

10. During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing Maiden's operations and finances and made the materially false and misleading statements described herein. The Individual Defendants had intimate knowledge about core aspects of Maiden's financial and business operations, including its major contracts and revenue sources. In addition, the Individual Defendants were personally involved in overseeing the Company's risk management and underwriting policies and practices. They were also intimately involved in deciding which disclosures would be made by Maiden.

## BACKGROUND

11. Defendant Maiden is a Bermuda-based holding company that provides reinsurance services through its subsidiaries. Reinsurance is the process by which one insurance company insures policies underwritten by another insurance company, allowing that company to mitigate its risk in the event of adverse

developments that may cause policy losses. The insurance company pays premiums to the reinsurance company and, if a loss triggered under the reinsurance policy develops, the insurance company can "cede" the agreed upon amount of loss to the reinsurer.

12.    Because Maiden is a reinsurance company, the reliability of the underwriting procedures and processes it uses to evaluate the underlying policies it reinsures are critical to the Company's success. It is of central important to investors that Maiden accurately assess and disclose potential risks and liabilities related to these underlying policies and, further, that the Company appropriately price its reinsurance policies to account for such risks, establish adequate loss reserves, and avoid adverse developments and unexpected losses.

13.    Maiden has two reportable operating segments: (i) Diversified Reinsurance; and (ii) AmTrust Reinsurance. The Diversified Reinsurance segment consists of a portfolio of predominantly property and casualty reinsurance business focusing on regional and specialty property and casualty insurance companies. The AmTrust Reinsurance segment includes all business ceded by AmTrust Financial Services, Inc. ("AmTrust").

14.    AmTrust and Maiden are closely related entities, with Maiden noting in financial filings that it "may be deemed an affiliate of AmTrust." AmTrust was founded in 1998 by the brothers Michael Karfunkel ("M. Karfunkel") and George

Karfunkel ("G. Karfunkel").  The company underwrites and provides various niche property and casualty insurance products.

15.     Similarly, Maiden was formed in 2007 by M. Karfunkel, G. Karfunkel, and M. Karfunkel's son-in-law, Barry Zyskind ("Zyskind"), primarily to provide reinsurance services to AmTrust.  Zyskind is the current Chairman of the Board of Maiden (the "Board"), as well as the CEO, President, and Chairman of AmTrust.  Members of the Karfunkel family are also principal stockholders of AmTrust and owned or controlled about 49% of AmTrust's outstanding common shares as of December 31, 2016.

16.     During the Class Period, AmTrust was Maiden's largest customer, and the companies engage in substantial commercial dealings with one another. Most notably, Maiden reinsured a large portion of AmTrust's portfolio, and the AmTrust Reinsurance segment made up the majority of Maiden's revenues.  For example, as of December 31, 2016, the AmTrust Reinsurance segment made up over 70% of Maiden's net premiums written and net premiums earned and, pursuant to a reinsurance agreement between the parties, the Company can reinsure 40% of AmTrust's written premiums net of reinsurance with unaffiliated reinsurers.

17.     As AmTrust was Maiden's largest and most important client, it was especially critical that the Company appropriately assess and disclose to investors

the potential risks and liabilities of the AmTrust policies that it reinsures and that Maiden appropriately account for these risks in its pricing and loss reserves.   In light of AmTrust's importance, the companies' close and historical relationship and ongoing business dealings, and the nature of reinsurance underwriting, Maiden received detailed policy data that allowed it to know the truth about the risks and likelihood of loss associated with the AmTrust insurance policies it reinsured before and during the Class Period, whether or not these risks were accurately disclosed to investors or the public.

18.   For example, defendant Schmitt, Maiden's CFO, has stated that Maiden received a "lot of detailed actuarial data from AmTrust" in order to set its "own reserves" for reinsured AmTrust policies.   Similarly, Maiden's CEO, defendant Raschbaum, has stated that "Maiden maintains a robust process of working with our clients" – including AmTrust, the Company's most important client – "to better understand the underlying dynamics of their loss development," which "includes active and ongoing claims management with additional case reserves posted by our claims professionals as necessary and auditing activities, as well as account-specific actuarial analyses that all help to shape our view of ultimate exposure."   In fact, the companies' businesses are so closely interrelated that, when defendant Raschbaum was asked by an analyst during an earnings conference call if AmTrust and Maiden should reach "consensus" on setting the

appropriate reserves for overlapping segments of their portfolios, defendant Raschbaum responded, "Absolutely."

19.     Throughout the Class Period, defendants misrepresented the quality and nature of Maiden's underwriting and risk management policies and practices and the risks of its reinsurance portfolio. In particular, defendants misleadingly claimed that they were subjecting AmTrust's insurance portfolio to robust analysis and cross-checks to ensure that the Company had appropriately priced the risk of reinsuring AmTrust's insurance portfolio.  In truth, the Company had failed to employ sufficient underwriting and risk management protocols and had largely abdicated its responsibility to ensure that its AmTrust Reinsurance segment priced policies commensurate with the risk assumed by the Company.  These failures subjected the Company, and investors, to catastrophic losses.  As those losses were realized, the price of Maiden stock declined precipitously.

**MATERIALLY FALSE AND MISLEADING STATEMENTS
ISSUED DURING THE CLASS PERIOD**

20.     The Class Period began on March 4, 2014.  On that date, Maiden filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2013 (the "2013 10-K").  The 2013 10-K contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.

21.    For the fourth fiscal quarter, Maiden reported operating earnings of $23.3 million and net premiums written of $445.9 million.  For 2013, Maiden reported operating earnings of $87.5 million and net premiums written of $2.1 billion.    During 2013, the Company recorded an estimated net favorable development on prior year loss reserves of $1.4 million.

22.    The 2013 10-K represented that Maiden employed sophisticated and dependable risk management processes based on detailed data from its reinsurance customers in order to appropriately price policies, set loss and loss adjustment expense ("LAE") reserves and avoid unexpected adverse developments, which would allow the Company to provide predictable operating results and shareholder returns.    For example, the 2013 10-K stated that Maiden "specialize[s] in reinsurance solutions that *optimize financing and risk management* by providing coverage within the more predictable and actuarially credible lower layers of coverage and/or *reinsuring risks that are believed to be lower hazard, more predictable* and generally not susceptible to catastrophe claims."

23.    Similarly, the 2013 10-K stated that Maiden's "Business Strategy" was its "*Dedication to Predictable and Stable Results*," which was purportedly achieved by:  "(1) focusing on traditional, lower volatility lines of business that are more predictable and thus, produce *more stable long-term operating results* and require less capital to achieve those results; and (2) placing emphasis on working

layer and pro rata reinsurance participations where *data is more abundant and results are more predictable*." The 2013 10-K also stated that Maiden's subsidiaries maintained an "efficient operating platform that target [sic] lines of business and types of contracts that are more predictable than the market as a whole, *allowing stability of earnings over time*."

24. In addition, the 2013 10-K represented that Maiden utilized comprehensive and robust risk management systems, procedures and controls to ensure that risks were accurately assessed and accounted for on an ongoing basis. The 2013 10-K stated in pertinent part:

> Central to the reinsurance business is the assumption and management of risk. *Our risk management discipline therefore focuses on both quantitative and qualitative elements as the means to achieve targeted shareholder returns through a balanced analysis and assessment of these elements*. The quantitative aspect of our risk management practice focuses on understanding and controlling a broad array of risk parameters in order to achieve desired returns. Our business model further mitigates the risk inherent in our business by focusing on lines of business which are less volatile and thus, require less capital to support the exposures generated by those lines of business. The qualitative aspect of our risk management practice focuses on identifying and assessing risks, and taking the necessary steps to reduce or mitigate risks, or those risks that could threaten the achievement of our business objectives.

> We believe that *we have developed a strong risk management culture within Maiden* through the establishment of various processes and controls which focus on our risk exposures. We are continually reviewing and enhancing these processes and developing additional processes that may be necessary to achieve our business strategies and objectives within our risk management practice. Specific risk

management practices that have been or are being developed to meet our risk management goals include:

- Tracking portfolio volatility over time;

- Identifying risk mitigation opportunities and implementing them as appropriate;

- Understanding the capital required to support the underwriting portfolio and individual contracts;

- Monitoring and managing exposure by line of business and geographic concentration;

- Monitoring and limiting catastrophe aggregates and concentrations;

- Monitoring and managing operational risks across the organization; and

- Identifying, monitoring and managing emerging risks as they develop.

Our Enterprise Risk Management ("ERM") Committee, which consists of members of the Company's executive management, *focuses primarily on identifying correlations among our primary categories of risk, developing metrics to assess our overall risk appetite, establish appropriate risk parameters and tolerances, performing an annual risk assessment and continually reviewing factors that may impact our organizational risk*. This risk governance structure is complemented by our internal audit department, which assesses the adequacy and effectiveness of our internal control systems and coordinates risk-based audits and compliance reviews and other specific initiatives to evaluate and address risk within targeted areas of our business. *Our ERM is dynamic, with periodic updates being made to reflect organizational processes, as well as staying current with changes within our industry and the global economic environment*.

25.    Similarly, the 2013 10-K represented that Maiden utilized a robust,

disciplined and client-focused underwriting risk management system that relied on

detailed actuarial data and independent analyses of the underlying policies the Company reinsured as overseen by the Company's CEO, defendant Raschbaum. The 2013 10-K stated in pertinent part as follows:

*Underwriting Risk Management*

Internal underwriting controls are established by our underwriting executives who are the Chief Underwriting Officer of Maiden Bermuda, and the President of Maiden US, working in close coordination with our Chief Executive Officer. Underwriting authority is delegated to the managers in each business segment and to underwriters in accordance with prudent practice and an understanding of each underwriter's capabilities. Our policy is to grant each underwriting team a specified limit, consistent with our operating guidelines. Our targeted performance goals and guidelines are regularly reviewed by management to reflect changes in market conditions, interest rates, capital requirements and market-expected returns.

We have a ***disciplined approach to underwriting and risk management*** that relies heavily upon the collective underwriting expertise of our management and staff. This expertise is in turn guided by the following underwriting principles:

- ***we will underwrite and accept only those risks we know and understand***;

- ***we will perform our own independent pricing and risk review on all risks we accept; and***

- ***we will accept only those risks that are expected to earn an appropriate risk-adjusted return on capital commensurate with the risk the present***.

Before we review any program proposal, ***we consider the appropriateness of the client, including the quality of its management, its financial stability and its risk management strategy***. In addition, ***we require each program to include significant information on the nature of the perils to be included and detailed***

*exposure and loss information*, including rate changes and changes in underwriting and claims handling guidelines over time. We often conduct an on-site audit of the client's operations prior to quoting. If a program meets our underwriting criteria, we then develop a proposal which contemplates the prospective client's needs, that account's risk/reward profile, as well as our corporate risk objectives. We have fully integrated our internal claims, underwriting and pricing actuarial staff into the underwriting and decision making process. *We use in-depth actuarial, claims and exposure analyses to evaluate contracts prior to quoting. We underwrite and accept property and casualty reinsurance business, accident and health reinsurance business and certain specialty property insurance business. In general, we seek to underwrite reinsurance business that historically is lower in volatility and more predictable than other classes of reinsurance business* such as catastrophe reinsurance, which we generally seek to avoid. As part of our risk management process, we seek to identify those casualty and specialty exposures that are most likely to be simultaneously influenced by significant events. These exposures are then jointly tracked to ensure that we do not develop an excessive accumulation of exposure to that particular type of event.

26.    The 2013 10-K also stated that Maiden determined the amount of appropriate loss reserves by "using *prudent actuarial methods after reviewing all information* known to us at the date they are recorded."

27.    In particular, the 2013 10-K highlighted the dependability and reliability of Maiden's AmTrust Reinsurance segment, stating that the "the underlying experience of the book has significant seasoning" and that extra precautions had been taken to properly assess risks related to relatively new parts of the business. Likewise, the 2013 10-K stated that Maiden's "actuarial analysis of *[the AmTrust Reinsurance] book of business is more refined* in that it utilizes a combination of monthly and quarterly data instead of contract period data in

totality." The 2013 10-K also stated that "the **refinement of the data** . . . allows for greater use of the loss development method earlier on in the maturity of the book than would ordinarily occur."

28.     The statements by defendants detailed in ¶¶22-27 are referred to herein as the "10-K Underwriting and Risk Control Statements."

29.     The 2013 10-K was signed by and contained certifications of defendants Raschbaum and Marshaleck stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

30.     On May 12, 2014, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). For the quarter, Maiden reported operating earnings of $25.6 million, net premiums written of $709.9 million, a net loss ratio of 67.0% and that its reserve for loss and LAE had increased by 4.9% year-over-year.

31.     The Q1 2014 10-Q stated that Maiden "specialize[s] in reinsurance solutions that optimize financing by providing coverage within the **more predictable and actuarially credible** lower layers of coverage and/or reinsuring risks that are believed to be **lower hazard, more predictable** and generally not

susceptible to significant claims from natural catastrophes."  The Q1 2014 10-Q also stated that Maiden "continue[s] to maintain [its] adherence to **_disciplined underwriting_** by declining business when pricing, terms and conditions do not meet [its] underwriting and pricing standards."  These statements by defendants are referred to herein as the "10-Q Underwriting and Risk Control Statements."

32.     The Q1 2014 10-Q was signed by and contained certifications of defendants Raschbaum and Marshaleck stating that the financial information contained in the Q1 2014 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

33.     On August 11, 2014, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the quarter, Maiden reported operating earnings of $28.2 million, net premiums written of $540.9 million, a net loss ratio of 65.7% and that its reserve for loss and LAE had increased by 2.3% year-over-year.  In addition, the Q2 2014 10-Q contained substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

34.     The Q2 2014 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q2 2014 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

35.     On November 10, 2014, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, Maiden reported operating earnings of $29.3 million, net premiums written of $605.5 million, a net loss ratio of 67.2% and that its reserve for loss and LAE had increased by 17% year-over-year.   In addition, the Q3 2014 10-Q contained substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

36.     The Q3 2014 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q3 2014 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

37.     On March 13, 2015, Maiden filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, Maiden reported operating earnings of $34.6 million and net premiums written of $601.9 million.  For 2014, Maiden reported operating earnings of $117.7 million and net premiums written of $2.5 billion.  During 2014, the Company recorded estimated net adverse development on prior year loss reserves of $18.8 million, or 1.0%, of prior year net loss and LAE reserves.   In addition, the 2014 10-K contained substantially similar representations as the 10-K Underwriting and Risk Control Statements.

- 15 -

38.    The 2014 10-K was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the 2014 10-K was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

39.    On May 11, 2015, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the quarter, Maiden reported operating earnings of $26.6 million, net premiums written of $797.0 million, a net loss ratio of 64.8% and that its reserve for loss and LAE had increased by 7.4% year-over-year.  In addition, the Q1 2015 10-Q contained substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

40.    The Q1 2015 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q1 2015 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

41.    On August 10, 2015, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, Maiden reported operating earnings of $28.4 million, net premiums written of $629.6 million, a net loss ratio of 67.8% and that its reserve for loss and LAE had increased by 18.2% year-over-year.  In addition, the Q2 2015 10-Q contained

substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

42.     The Q2 2015 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q2 2015 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

43.     On November 9, 2015, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Maiden reported operating earnings of $25.8 million, net premiums written of $599.2 million, a net loss ratio of 67.2% and that its reserve for loss and LAE had increased by 11.1% year-over-year.  In addition, the Q3 2015 10-Q contained substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

44.     The Q3 2015 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q3 2015 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

45.     On March 1, 2016, Maiden filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, Maiden reported operating earnings of $26.4 million and

net premiums written of $488.4 million.  For 2015, Maiden reported operating earnings of $107.2 million and net premiums written of $2.5 billion.  During 2015, the Company recorded estimated net adverse development on prior year loss reserves of $74.9 million, or 3.3%, of prior year net loss and LAE reserves, compared to net unfavorable development of $18.8 million, or 1.0%, in 2014 and net favorable development of $1.4 million, or 0.1%, in 2013.  In addition, the 2015 10-K contained substantially similar representations as the 10-K Underwriting and Risk Control Statements.

46.     Moreover, the 2015 10-K contained additional representations that Maiden utilized comprehensive and robust risk management systems, procedures and controls to ensure that risks were accurately assessed and accounted for on an ongoing basis.  For example, the 2015 10-K stated in pertinent part:

> Our Enterprise Risk Management ("ERM") Committee monitors and oversees the risk environment and provides direction to mitigate, to an acceptable level, the most significant and material risks that may adversely affect the Company's ability to achieve its goals. The Committee facilitates ***a culture of continuous improvement of the Company's capabilities around managing its strategic risks***. The ERM Committee establishes appropriate risk parameters and tolerances, performs risk assessments, continually reviews factors that may impact our organizational risk and develops and implements strategies and action plans to mitigate key risks.

> Maiden's ERM program is designed to achieve the following:

> * Establish a process to assess strategies and business decisions on a risk/reward basis;

- Establish a risk governance structure with clearly defined roles and responsibilities;

- Identify and assess all material risks from internal and external sources;

- Manage risks within Maiden's risk appetite; and

- Effective review and reporting of major loss events.

Specific risk management practices that have been or are being developed to meet our risk management goals include:

- Scenario/stress testing to assess the level of a specific risk and mitigation effects;

- Setting risk tolerances that we use to monitor and limit risk;

- Tracking expected portfolio volatility over time;

- Identifying risk mitigation opportunities and implementing them as appropriate;

- Understanding the capital required to support the underwriting portfolio and individual contracts;

- Monitoring and managing exposure by line of business and geographic concentration;

- Monitoring and limiting catastrophe aggregates and concentrations;

- Monitoring and limiting terrorism aggregates and concentrations;

- Monitoring and managing operational risks across the organization;

- Monitoring and managing the Company's exposure to cyber threats; and

- Identifying, monitoring and managing emerging risks as they develop.

Maiden's ERM framework reflects the ***'three lines of defense' approach to risk management***, which involves risk owners having responsibility for identifying and managing risks, the ERM Committee providing global tools and policies, and internal audit performing independent reviews.  The Maiden Board of Directors has overall responsibility for oversight of the ERM program.

47.     The 2015 10-K also stated that the risk management culture at Maiden flowed from the "top" of the organization and extended "entity wide," which allowed the Company to continually review and fine-tune its risk management processes to ensure their effectiveness.  The 2015 10-K stated in pertinent part as follows:

> ***Maiden has a strong risk management culture set by the tone at the top, the Chief Executive Officer ("CEO")***, which is then established entity wide through various processes and controls which focus on our risk exposures.  Maiden ***continually develops, reviews, and enhances these processes*** which we believe to be necessary to achieve our business strategies and objectives within our risk management practice.
>
> There is involvement from all Maiden employees and risk owners are required to assist with the identification of risks, creation of appropriate responses to risks, and maintain them within the risk appetite and tolerances that the ERM Committee believes are necessary to achieve our business strategies and objectives.
>
> The ERM Committee focuses primarily on identifying interactions among our primary categories of risk, developing metrics to assess our overall risk appetite, establishing appropriate risk parameters and tolerances, monitoring those tolerances, establishing and determining actions, if deemed necessary, in the event of a tolerance breach, performing ***ongoing risk assessment and continually reviewing factors that may impact our organizational risk***.  Maiden's internal audit department assesses the adequacy and effectiveness of our risk management framework and mitigating

controls and coordinates risk-based audits to evaluate and address risk within targeted areas of our business.

This risk governance structure is complemented by our internal audit department. The core functions of this department are 1) assess the adequacy and effectiveness of our internal control systems; 2) coordinates [sic] risk-based audits and compliance reviews; and 3) carry out other initiatives to evaluate and address risk within targeted areas of our business. Our ERM is dynamic and constantly evolving to reflect changes to our organizational processes, global economic environment as well as implementing the latest industry standards.

Our management's internal ERM efforts are overseen by the Company's Audit Committee. This Committee, comprised solely of independent directors, assesses whether management is addressing risk issues in a timely and appropriate manner. Internal controls and ERM can provide a reasonable but not absolute assurance that our control objectives will be met. The possibility of material financial loss remains in spite of our ERM efforts.

48. Similarly, the 2015 10-K stated that Maiden utilized a robust, disciplined and client-focused underwriting risk management system that relied on detailed actuarial data and independent analyses of the underlying policies the Company reinsured. The 2015 10-K stated in pertinent part:

*Underwriting Risk Management*

Internal underwriting controls are established by our underwriting executives who are the Chief Underwriting Officer of Maiden Bermuda, and the President of Maiden US, working in close coordination with our CEO, our Chief Financial Officer ("CFO") and the President of Maiden Bermuda. Underwriting authority is delegated to the managers in each business segment and to ***underwrite in accordance with prudent practice and an understanding of each underwriter's capabilities***. In accordance with our underwriting guidelines, underwriting authorities are delegated to underwriting teams as well as individual underwriters. Our targeted performance goals and guidelines are regularly reviewed by management to reflect

- 21 -

changes in market conditions, interest rates, capital requirements and market-expected returns.

49.     In particular, the 2015 10-K highlighted the dependability and reliability of Maiden's AmTrust Reinsurance segment, stating that the "majority of the exposure in the underlying book of business has *significant seasoning*, and allows for a *significant amount of credibility* in using parameters derived from historical experience to calculate reserve estimates."   Likewise, the 2015 10-K stated that Maiden's "actuarial analysis of *this book of business is more refined* in that it utilizes a combination of quarterly and annual data instead of contract period data in totality."   The 2015 10-K also pointed to "[a]dditional data detailing items such as class of business, state, claim counts, frequency and severity is available, further enhancing the reserve analysis," which, "[b]ecause of the *refinement of the data*, . . . allows for greater use of the loss development method earlier on in the maturity of the book than would ordinarily occur."

50.     The 2015 10-K was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the 2015 10-K was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

51.     On May 10, 2016, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").   For the quarter, Maiden reported operating earnings of $28.3 million, net premiums written

of $792.8 million, a loss ratio of 65% and that its reserve for loss and LAE had increased by 6.9% year-over-year.  In addition, the Q1 2016 10-Q contained substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

52.    The Q1 2016 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q1 2016 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

53.    On August 9, 2016, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, Maiden reported operating earnings of $28.4 million, net premiums written of $650.4 million, a loss ratio of 66.8% and that its reserve for loss and LAE had increased by 2.9% year-over-year. In addition, the Q2 2016 10-Q contained substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

54.    The Q2 2016 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q2 2016 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

55.     On November 8, 2016, Maiden filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Maiden reported operating earnings of $30.2 million, net premiums written of $690.7 million, a net loss ratio of 66.6% and that its reserve for loss and LAE had increased by 4.9% year-over-year.   In addition, the Q3 2016 10-Q contained substantially the same representations as the 10-Q Underwriting and Risk Control Statements.

56.     The Q3 2016 10-Q was signed by and contained certifications of defendants Raschbaum and Schmitt stating that the financial information contained in the Q3 2016 10-Q was accurate and "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of" Maiden.

57.     The statements referenced in ¶¶21-56 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts that were known to defendants or recklessly disregarded by them:

(a)     that Maiden lacked adequate underwriting processes and risk management controls necessary to accurately price its reinsurance policies, set appropriate loss reserves and avoid excessive losses;

(b)     that Maiden failed to take steps necessary to properly assess and cross check the insurance portfolio of AmTrust, its largest client and a related

- 24 -

entity, to ensure that its reinsurance of AmTrust's portfolio was properly priced and did not expose the Company to the risk of excessive losses;

(c)     that Maiden failed to conduct appropriate independent reviews, actuarial analyses and audits of the policies underlying its AmTrust Reinsurance segment, which would have revealed that the risk of loss from these policies was significantly understated; and

(d)     as a result of (a)-(c), Maiden was subject to materially heightened risk of financial loss, reserve charges and diminished prospects.

58.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") required the 2013 10-K, 2014 10-K and 2015 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose that they did not maintain adequate underwriting processes and risk management controls was a violation of Item 303 because it was a known trend and uncertainty that was likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations.

59.     Then, on February 14, 2017, while auditing firm KPMG LLP ("KPMG") was in the midst of an end-of-year audit of AmTrust's 2016 financial results, Maiden was forced to disclose a *$120 million* reserve charge.  In a press

release announcing the charge, Maiden stated that the loss reserve charge stemmed primarily from its commercial auto business, and included a provision to strengthen reserves as well as adverse developments realized during the fourth quarter.

60.    On this news, the price of Maiden common shares declined nearly 10% to close at $17 per share on February 15, 2017, on abnormally high volume of over 1 million shares traded.

61.    Earlier in 2016, AmTrust had abruptly switched auditors, from BDO USA LLP ("BDO") to KPMG.  Thus, KPMG was for the first time conducting an annual audit of AmTrust's financials.  Later, the SEC would suspend three former BDO accountants for improper conduct with respect to their audit of AmTrust's financials.  At the time, BDO also served as Maiden's auditor.

62.    On February 27, 2017, Maiden issued a press release announcing its financial results for its fiscal fourth quarter and year ended December 31, 2016. For the quarter, Maiden reported a net *loss* of $69.7 million and a ***loss ratio of 84.5%***, an approximately 20% year-over-year increase.   As to the previously announced reserve charge, the release stated that $52 million of the charge stemmed from Maiden's AmTrust Reinsurance segment due to adverse developments in the segment's commercial auto and general liability lines of business.  In addition, the release stated that another $11.5 million of the charge

stemmed from Maiden's reinsurance of National General Holdings Corp., another related insurance company within the Karfunkel insurance empire.

63.     On February 28, 2017, Maiden held an earnings conference call to discuss its operations and earnings results.  During the conference call, defendants revealed that the Company's annual report for fiscal 2016 might be delayed.  The next day, Maiden issued a press release confirming that it would, in fact, be delaying the filing of its annual report in order to complete an ongoing audit.  On March 2, 2017, Maiden filed with the SEC a request to delay the deadline to file its annual report on Form NT 10-K.

64.     On this news, the price of Maiden common stock dropped significantly on unusually high trading volume.  By March 3, 2017, Maiden stock closed at $15.35 per share, a decline of 7.5% from the stock's closing price on February 27, 2017.

65.     However, because investors did not know the full truth about Maiden's faulty underwriting practices and failure to appropriately price its reinsurance policies, account for risk and independently assess and audit the AmTrust policies it reinsured, the price of Maiden stock remained artificially inflated.  Furthermore, on the February 28, 2017 earnings call, defendants misrepresented the severity and extent of the problems, characterizing the fourth quarter adverse development as limited to particular lines of business that the

Company was effectively remediating. For example, in her prepared remarks, defendant Schmitt stated that "*[w]e believe we have put these issues behind us*." Similarly, in his prepared remarks, defendant Raschbaum stated that, "[w]ith regard to the largest line reinsured, workers' compensation, *we see no significant changes in risk profile*, as AmTrust remains focused on the lower-severity, smaller commercial accounts." These statements and others like them were materially false and misleading when made because, as defendants knew or recklessly disregarded, Maiden's failure to maintain adequate underwriting processes and risk management controls increased the risk of loss across the Company's portfolio.

66.    On March 6, 2017, Maiden belatedly filed its annual report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K contained substantially the same false and misleading statements and failure to make required disclosures about Maiden's underwriting and risk management practices and processes and the Company's actions to appropriately price policies, establish loss and LAE reserves, avoid unexpected adverse developments and provide predictable results as those contained in the 2015 10-K and detailed in ¶¶45-49.

67.    On March 24, 2017, Maiden announced that its auditor, BDO, had resigned.

68.    Then, on April 11, 2017, *The Wall Street Journal* published an explosive report entitled "Secret Recordings Play Role in SEC Probe of Insurer AmTrust."   The report described how a former BDO employee had covertly monitored AmTrust personnel and claimed to have uncovered accounting misconduct that was being carried out through AmTrust's offshore affiliates. Specifically, the whistleblower accused AmTrust of overstating its profits and financial health by understating what it may need to pay policyholders in the future.  The report also stated that the whistleblower claimed to have emails, secret recordings, AmTrust bank statements and other internal documents supporting his contentions and had teamed up with a group that had helped expose the Madoff Ponzi scheme.   The report also stated that multiple investigations had been launched into potential accounting improprieties at AmTrust by the SEC, the Federal Bureau of Investigation and the New York Department of Financial Services.

69.    The allegation that AmTrust had understated its policy risks had negative implications for Maiden.  As the Company's primary source of revenues was derived from the reinsurance of AmTrust insurance policies, Maiden stood to suffer substantial losses if those policies paid out unexpectedly large claims. Furthermore, the allegations cast doubt on the robustness of Maiden's underwriting policies and procedures and risk management practices and the sufficiency of its

loss reserves.  On this news, the price of Maiden stock dropped once again, falling 8.6% to close at $12.75 per share on April 11, 2017, on abnormally large volume of 2.8 million shares traded.

70.   On May 8, 2017, Maiden issued a press release announcing its financial results for the quarter ended March 31, 2017.  For the quarter, Maiden reported non-GAAP operating earnings of $22.6 million, net premiums written of $900.5 million and a loss ratio of 67.4%.  The release also stated that the aggregate combined ratio for the quarter was 100.9%, which reflected "the impact of more conservative initial expected loss ratios for the AmTrust master quota share as well as higher than anticipated losses in the quarter from select casualty lines."

71.   The next day, Maiden held an earnings conference call to discuss its operations and earnings results.  In his prepared remarks, defendant Raschbaum stated that Maiden had recorded "more conservative initial loss picks for the most recent underwriting year" and had experienced "a modestly higher-than-anticipated level of loss activity from prior periods."  He went on to explain, "Maiden realized total net adverse development from prior years of approximately *$17 million* for the quarter, with around 2/3 emanating from the AmTrust segment and 1/3 from Diversified."

72.     On this news, the price of Maiden common stock declined over 7% to close at $10.95 per share on May 9, 2017, on abnormally high volume of 1.6 million shares traded.

73.     However, because investors did not know the full truth about Maiden's faulty underwriting practices and failure to appropriately price its reinsurance policies, account for risk and independently assess and audit the AmTrust policies it reinsured, the price of Maiden common stock remained artificially inflated.  Furthermore, on the May 9, 2017 earnings call, defendants misrepresented the severity and extent of the problems, characterizing the first quarter adverse development as limited to particular lines of business that the Company was effectively remediating and, further, that the results demonstrated a turnaround from the Company's fourth quarter problems.  For example, in his prepared remarks, defendant Raschbaum stated that the "results during the first quarter of 2017 have ***improved significantly***" since the prior quarter.  This statement and others like it were materially false and misleading when made because, as defendants knew or recklessly disregarded, Maiden's failure to maintain adequate underwriting processes and risk management controls increased the risk of loss across the Company's portfolio and such failures had not been remediated.

74.    On August 8, 2017, Maiden issued a press release announcing its financial results for the quarter ended June 30, 2017.  For the quarter, Maiden reported a net *loss* of $22.4 million and a loss ratio of *74.1*%.  In addition, the Company reported a net adverse development of *$56 million* for the quarter, $29.4 million of which stemmed from Maiden's AmTrust Reinsurance segment.  The press release further disclosed that the new loss developments were not related to the prior loss trends, thereby revealing that the problems were more widespread across the Company's portfolio than previously disclosed.

75.    The next day, Maiden held an earnings conference call to discuss its operating and earnings results.  During the call, defendants stated that the adverse loss developments stemmed from underwriting years going all the way back to 2011 and negatively impacted a significant portion of the Company's portfolio, including its most important business lines in the AmTrust Reinsurance segment, workers compensation and general liability.  Analysts responded with frustration on the call, with one noting "investor concerns" about Maiden's underwriting "process" in light of the two reserve charges in three quarters.

76.    On this news, the price of Maiden common stock plummeted *26.7%* to close at $7.73 per share on August 9, 2017, on abnormally high volume of 2.1 million shares traded.

77.     However, because investors did not know the full truth about Maiden's faulty underwriting practices and failure to appropriately price its reinsurance policies, account for risk and independently assess and audit the AmTrust policies it reinsured, the price of Maiden common stock remained artificially inflated.  Furthermore, on the August 9, 2017 earnings call, defendants misrepresented the severity and extent of the problems, characterizing the adverse developments as a one-off issue that had been remediated and did not signal risks across the larger portfolio.  For example, in his prepared remarks, defendant Raschbaum sought to reassure investors that there was no "systemic underlying issue across the entire portfolio" and that the Company had "responded appropriately to the elevated claims activity and latency in the quarter."  He continued, "Notwithstanding the adverse development, we've continued to enjoy growth in invested asset, strong cash flow and overall growth in gross and net premiums written. Despite the adverse development, our balance sheet remains strong with only a modest drop in second quarter book value from $12.19 per share to $11.95 per share."  Later, in response to an analyst question, defendant Raschbaum represented that "*[t]he issues in this quarter are pretty unique to the quarter*."  This statement and others like it were materially false and misleading when made because, as defendants knew or recklessly disregarded, the improperly

priced risk in Maiden's portfolio was not unique to the quarter and the Company was poised to suffer additional losses in diverse portions of its portfolio.

78.     On November 8, 2017, Maiden issued a press release announcing its financial results for the quarter ended September 30, 2017.  For the quarter, Maiden reported a net *loss* of $63.6 million and a loss ratio of *81.6*%.  In addition, the Company reported a net adverse development of *$77.7* million, once again primarily emanating from the Company's AmTrust Reinsurance segment.

79.     On this news, the price of Maiden common stock plummeted *21.7%* to close at $6.58 per share on November 9, 2017, on abnormally high volume of 2.5 million shares traded.

80.     However, because investors did not know the full truth about Maiden's faulty underwriting practices and failure to appropriately price its reinsurance policies, account for risk and independently assess and audit the AmTrust policies it reinsured, the price of Maiden common stock remained artificially inflated.  Furthermore, during a November 9, 2017 earnings call to discuss the results, defendants misrepresented the severity and extent of the problems, characterizing the adverse developments as a one-off issue that had been remediated and did not signal risks across the larger portfolio.  For example, in his prepared remarks, defendant Raschbaum highlighted "a number of favorable

trends" that he claimed "will ultimately strengthen returns as we return to more stable underwriting results," stating in pertinent part:

> *Overall, the impact of the prior period development and the cat losses do mask a number of favorable trends observed in the quarter*, including a continued strengthening of our investment earnings, strong growth in our Diversified segment emanating from both our U.S. platform and our international insurance services brand and insurance solutions business, primarily in Europe, growth in unrealized gains, solid growth in invested assets and reduced share count reflecting active share repurchases in the quarter. *These continuing trends will ultimately strengthen returns as we return to more stable underwriting results*.

81.     These statements and others like them were materially false and misleading when made because, as defendants knew or recklessly disregarded, Maiden's failure to maintain adequate underwriting processes and risk management controls across its portfolio was leading to increasing losses, not an imminent return to "stable underwriting results."

82.     On February 27, 2018, Maiden issued a press release announcing its financial results for the quarter and year ended December 31, 2017.  For the quarter, Maiden reported a net *loss* of *$133.6* million and a loss ratio of *93.1*%.  In addition, the Company reported a net adverse development of *$171* million stemming from the Company's workers' compensation line of its AmTrust Reinsurance segment and from two accounts in its commercial auto line of business within the Diversified Reinsurance segment.   The Company also announced it was actively considering strategic initiatives.

83.    On this news, the price of Maiden common stock fell **16.7%** to close at $6.00 per share on February 28, 2018, on abnormally high volume of 2.5 million shares traded.

84.    However, because investors did not know the full truth about Maiden's faulty underwriting practices and failure to appropriately price its reinsurance policies, account for risk and independently assess and audit the AmTrust policies it reinsured, the price of Maiden common stock remained artificially inflated.   Furthermore, during a February 28, 2018 earnings call to discuss the results, defendants misrepresented the severity and extent of the problems, characterizing the adverse developments as having been remediated by an improvement in underwriting processes and representing that Maiden would turn the corner in the coming quarters.   For example, defendant Raschbaum stated in pertinent part:

> Notwithstanding the impact of loss development, ***there are a number of favorable trends, which we believe will benefit performance in 2018***.  Strategically, we believe that ***we are on track to see profitable growth in our Diversified portfolio in 2018***.
>
> \*       \*       \*
>
> ***As we look ahead to 2018, we believe the steps taken in the fourth quarter position Maiden for a return to profitability***.  While there can always be some level of variation in loss emergence, we do not expect anything of the magnitude of the actions we've taken in the fourth quarter.  Going forward, we're focused on returning to more stable underwriting performance and overall profitable results.  We believe that even with modest underwriting profitability, our ability to

produce double-digit returns on equity and strong premiums per share
for our shareholders is realistic.

85.     Following this conference call, defendants continued to make
materially false and misleading statements and conceal the extent of the poor
policies that Maiden had underwritten.  For example, on May 9, 2018, Maiden
issued a press release announcing its financial results for the quarter ended March
31, 2018.  The Company reported a modest return to profitability for the quarter,
claiming it had generated $13.7 million in net income.  Defendant Raschbaum was
quoted in the release as stating that the quarterly results were a harbinger of
sustained improvement:

> "We are pleased to start the year with a profitable first quarter.
> Underwriting results primarily reflect the impact of higher initial
> current year loss ratios, a modest level of adverse development and
> higher G&A expenses.  Revenue in the quarter was influenced by a
> continued moderation of premium from our largest client, AmTrust,
> and in the Diversified segment from several accounts terminated over
> the last 12 months.  ***Business development in the quarter was strong
> across the Diversified segment which should favorably impact future
> quarters.   We remain committed to maintaining disciplined
> underwriting and enhancing profitability***."

86.     These statements and others like them were materially false and
misleading when made because, as defendants knew or recklessly disregarded,
Maiden was on the brink of suffering catastrophic losses because of its failure to
maintain adequate underwriting processes and risk management controls
throughout the Class Period.

87.     On August 9, 2018, Maiden issued a press release announcing its financial results for the quarter ended June 30, 2018.  The release revealed that Maiden had not turned the corner, but rather had continued to sustain losses, suffering a net loss of $5.9 million for the quarter.  The release disclosed that Maiden had suffered an adverse prior year loss development of $28.4 million in its AmTrust Reinsurance segment and $8 million in its Diversified Reinsurance segment, even as the Company's revenues shrank due to lost business from AmTrust.  The release also stated that defendants Raschbaum and Schmitt would be retiring.

88.     On this news, the price of Maiden common stock fell *41.3%* to close at $4.40 per share on August 9, 2018, on abnormally high volume of 2.5 million shares traded.

89.     Shortly thereafter, in a series of announcements, Maiden disclosed that it had entered into a number of agreements to sell a large portion of its business to competitors, effectively divesting the Company's U.S. reinsurance treaty operations.   After these divestures, Maiden was left with significantly reduced business.

90.     Then, on November 9, 2018, Maiden issued a press release announcing its financial results for the quarter ended September 30, 2018.  The release disclosed that the Company had sustained a massive *$308.8 million* net loss

during the quarter.  The Company revealed that it had suffered a *$210.4 million* adverse prior year loss development in just its AmTrust segment.  The release also revealed that the sale of Maiden's business assets had resulted in an impairment loss of *$74.2 million*, providing further confirmation that Maiden had dramatically overstated the value of its book of business.

91.    On this news, the price of Maiden common stock fell *31.8%* to close at $2.40 per share on November 12, 2018 (the next trading day), on abnormally high volume of 2.9 million shares traded.

92.    On January 3, 2019, Maiden announced that it had amended its quota share agreement with AmTrust, which would result in Maiden returning approximately $700 million in gross unearned premium to AmTrust.  Rather than a return to profitability, the shoddy underwriting practices of Maiden, in particular with respect to related-party AmTrust, had eviscerated the value of the Company and left the Company's shareholders holding the bag.   In addition, Maiden disclosed that, as part of its renegotiated deal, the Company had agreed to pay *an additional five points* of ceding commission to AmTrust for a dramatically slimmed down book of business.  Typically, cedants that inflict heavy losses on their reinsurers are obliged to offer significant reductions in ceding commissions.  Maiden's acceptance of an even worse deal with an entity that had just caused it to suffer hundreds of millions of dollars in losses, rather than simply terminating the

agreement, evidences the improper extent to which Maiden was improperly beholden to AmTrust, its largest and most important client.

93.     As of January 4, 2019, Maiden common stock was trading at just $1.62 per share, more than ***90% below*** the Class Period high of $18.85 per share.

94.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class (as defined below) purchased Maiden common stock at artificially inflated prices and suffered significant losses and were damaged thereby.

## NO SAFE HARBOR

95.     Defendants' "Safe Harbor" warnings accompanying Maiden's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

96.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Maiden who knew that the FLS was false.  In addition, the FLS

were contradicted by existing undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

97.    As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of Maiden common stock, as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Maiden, their control over, and/or receipt or modification of Maiden's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Maiden, participated in the fraudulent scheme alleged herein.

98.     The adverse developments at issue also impacted the Company's most important revenue streams and derived from its most important customer, AmTrust, with whom Maiden is closely related.   Furthermore, Maiden has expressly stated that the Company's risk management and underwriting processes began with and were overseen by the Individual Defendants as the Company's top executives during the Class Period and, further, that these processes involved extremely detailed analyses of the policies underlying Maiden's reinsurance contracts.   As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION

99.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Maiden common stock and operated as a fraud or deceit on purchasers of Maiden common stock.   As detailed above, when the truth about Maiden's misconduct was revealed over time, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's price. The declines in the price of Maiden common stock were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by

changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

100.   At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Maiden's business, operations and financial condition, as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Maiden common stock to be artificially inflated.  Plaintiff and other Class members purchased Maiden stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

101.   At all relevant times, the market for Maiden common stock was an efficient market for the following reasons, among others:

(a)     Maiden stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q, filed on November 9, 2018, the Company had approximately 82.9 million common shares outstanding as of November 2, 2018, demonstrating a very active and broad market for Maiden common stock;

(c)     Maiden was qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established issuers for whom less scrutiny is required;

(d)     as a regulated issuer, Maiden filed periodic public reports with the SEC;

(e)     Maiden regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(f)     unexpected material news about Maiden was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

102.   As a result of the foregoing, the market for Maiden common stock promptly digested current information regarding Maiden from publicly available sources and reflected such information in Maiden stock price.   Under these

circumstances, all purchasers of Maiden common stock during the Class Period suffered similar injury through their purchases of Maiden common stock at artificially inflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

103.   This is a class action on behalf of all purchasers of Maiden common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

104.   Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Maiden common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

105.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Maiden common shares were actively traded on the NASDAQ.  These shares are held by hundreds or thousands of individuals located geographically throughout the country.

106.   Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

107.   Plaintiff incorporates ¶¶1-106 by reference.

108.   During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

109.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by the use of the means or instrumentality of interstate commerce, the mails or facility of a national securities exchange:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Maiden common stock during the Class Period.

110.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Maiden common stock.  Plaintiff and the Class would not have purchased Maiden common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

111.   By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

112.   As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Maiden common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

113.   Plaintiff incorporates ¶¶1-112 by reference.

114.   During the Class Period, defendants acted as controlling persons of Maiden within the meaning of §20(a) of the Exchange Act.  By virtue of their share ownership, executive and Board positions and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power

to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements plaintiff contends were false and misleading as detailed herein.

115.    The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.  In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

116.    Maiden controlled the Individual Defendants and its other officers and employees.

117.    By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

118.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 11, 2019          CARELLA, BYRNE, CECCHI, OLSTEIN,
                                    BRODY & AGNELLO, P.C.
                                   JAMES E. CECCHI


                                        /s/ James E. Cecchi
                                   _____
                                        JAMES E. CECCHI

- 49 -

5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/999-1700
973/994-1744 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)

Attorneys for Plaintiff