THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN
One Gateway Center, Suite 2600
Newark, NJ  07102
Telephone:  973/313-1887
973/833-0399 (fax)
lrosen@rosenlegal.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
ALEXANDER M. MENDOZA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com
amendoza@rgrdlaw.com

Co-Lead Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re MAIDEN HOLDINGS, LTD. SECURITIES LITIGATION | ) ) ) | Master File No. 1:19-cv-05296-RMB-JS |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | PLAINTIFFS' AMENDED COMPLAINT FOR VIOLATION OF |
| ALL ACTIONS. | ) ) ) | THE FEDERAL SECURITIES LAWS |
| | ) | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW ..................................................................1

JURISDICTION AND VENUE ..........................................................................10

PARTIES................................................................................................................11

    Plaintiffs...............................................................................................................11

    Defendants ..........................................................................................................12

FACTUAL BACKGROUND ..............................................................................19

    Maiden Holdings, Ltd.........................................................................................19

    The AmTrust Quota Share Agreement ...........................................................22

    Accurate Loss Reserves and Relevant Financial Metrics Are Critical
        to Maiden's Business ...........................................................................23

    Maiden's Loss Ratio Was a Critical Reported Metric ..................................25

    Maiden Consistently Under-Reserved for Its AmTrust Business ................28

    AmTrust Earned Premium Growth Outpaced the Growth in Reserves,
        and Allowed Defendants to Conceal Their Improper Reserving
        Practices.................................................................................................31

    The Company's Loss Reserves and Loss Ratios Were Materially
        Understated Throughout the Class Period...........................................34

RELEVANT GAAP...............................................................................................37

    Investors Rely on the Accuracy and Reliability of Public Financial
        Statements to Make Investment Decisions .........................................39

    GAAP Required that Maiden Set and Maintain Sufficient Loss
        Reserves.................................................................................................41

4812-7962-7451.v1

**Page**

Professional Standards Required that Maiden Adequately Consider
Historical Information to Estimate Reserve Levels ............................42

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..........................43

THE TRUTH EMERGES ...........................................................................99

ADDITIONAL ALLEGATIONS OF SCIENTER ............................................107

    Insider Trading.............................................................................107

    Executive Compensation ............................................................108

    Securities Offerings ....................................................................110

THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...............111

APPLICABILITY OF THE PRESUMPTION OF RELIANCE ..........................112

CLASS ACTION ALLEGATIONS ..............................................................114

LOSS CAUSATION/ECONOMIC LOSS .....................................................116

COUNT I..................................................................................................120

COUNT II ................................................................................................122

PRAYER FOR RELIEF .............................................................................124

JURY DEMAND .......................................................................................125

**INTRODUCTION AND OVERVIEW**

1.     Co-Lead Plaintiffs Boilermaker-Blacksmith National Pension Trust and Taishin International Bank Co. Ltd. (collectively, "Plaintiffs") hereby bring this action on behalf of themselves and all other persons or entities who purchased or otherwise acquired the common stock of Maiden Holdings, Ltd. ("Maiden" or the "Company") between February 19, 2014 and November 9, 2018, inclusive (the "Class Period"), and were damaged thereby (the "Class").  Excluded from the Class are Maiden, Arturo M. Raschbaum ("Raschbaum"), Maiden's former Chief Executive Officer ("CEO"), and Karen L. Schmitt ("Schmitt") and John M. Marshaleck ("Marshaleck"), Maiden's former Chief Financial Officers ("CFOs") (collectively, "Defendants"), present or former executive officers of Maiden and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).  Plaintiffs seek to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     Plaintiffs allege upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon the ongoing investigation of their counsel, Robbins Geller Rudman & Dowd LLP and The Rosen Law Firm, P.A. (collectively, "Counsel").  This investigation includes, *inter alia*, a review and analysis of: (a)

public filings by Maiden with the U.S. Securities and Exchange Commission ("SEC"); (b) public reports and news articles; (c) research reports by securities and financial analysts; (d) securities prices and price movements; (e) transcripts of investors calls and conferences in which Defendants participated; (f) consultation with forensic and economic experts; (g) interviews with former Maiden employees; and (h) other publicly available material and data identified herein. Counsel's investigation of the facts underlying this action continues, and Counsel further believes that relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.      Maiden was founded in June 2007 to provide reinsurance solutions, products and services to U.S. and European insurance companies that specialize in products offering coverage at low limits or insuring risks that are believed to be low hazard, predictable and generally not susceptible to catastrophe claims. The founding shareholders of Maiden included George Karfunkel ("G. Karfunkel"), Michael Karfunkel ("M. Karfunkel") and M. Karfunkel's son-in-law, Barry Zyskind ("Zyskind"). At the time of Maiden's founding, G. Karfunkel, M. Karfunkel and Zyskind were executive officers and/or directors of AmTrust Financial Services, Inc. ("AmTrust"). At all relevant times, the Karfunkel family and Zyskind maintained

significant beneficial ownership of Maiden stock, and Zyskind served as Maiden's Chairman of the Board of Directors (the "Board").

4.     In 2007, AmTrust and Maiden entered into an agreement by which Maiden would receive approximately 40% of certain premiums paid by AmTrust insurance customers (the "AmTrust Quota Share Agreement").   In exchange, Maiden agreed to pay AmTrust a commission based on the volume of premiums and assume 40% of the policy liabilities associated with such policies.  In March 2013, the parties amended the AmTrust Quota Share Agreement, in part, to extend the relationship until July 2016.  The AmTrust Quota Share Agreement automatically renewed for successive three-year periods unless either Maiden or AmTrust terminated the agreement by issuing advanced notice to the other party not less than nine months prior to the expiration of any such three-year period.

5.     The AmTrust Quota Share Agreement was a critical contract for Maiden and its investors.  Between 2007 and 2016, Maiden reported that its net earned premiums, attributable to the AmTrust book of business, grew from $247 million to $1.8 billion.  By 2016, moreover, the $1.8 billion in AmTrust net earned premiums accounted for 72% of Maiden's consolidated net earned premiums (or revenue) of $2.5 billion.

6.     The liability for unpaid losses and loss adjustment expenses (or "loss reserves") Maiden established – particularly for the substantial business assumed

from AmTrust – is critical information to the Company and its investors.  In essence, each dollar added to loss reserves in a given reporting period is an equal dollar removed from operating income.   In accordance with Generally Accepted Accounting Principles ("GAAP"), an insurer's loss reserves must reflect the ultimate cost of settling claims that the insurer will be liable for.  Insurance companies must establish reserves that are sufficient to cover claims-related costs that will arise from claims already filed by their insureds, as well as the costs associated with claims that may have been incurred but have not yet been reported ("IBNR").  Further, the strength of an insurer is often determined by investors, prospective insurance customers and rating agencies based on the insurer's surplus, which is the amount by which its assets exceed its liabilities (the largest of which typically being loss reserves).  As alleged herein, Defendants were motivated to understate Maiden's loss reserves against the AmTrust business in order to inflate the Company's reported net income, overstate its profitability ratios and create the appearance that it was well-capitalized.

7.     Because AmTrust was such a critical customer and accounted for well over 50% of Maiden's annual net earned premiums throughout the Class Period, it was critical that the Company appropriately assess the potential risks and liabilities of the business assumed from AmTrust, including for the purpose of accounting for and disclosing loss reserves.   And, throughout the Class Period, Defendants

- 4 -

informed investors that they had done just that.  Defendants regularly made assurances to investors that, in determining the reserves for the AmTrust business, they received a "lot of detailed actuarial data from AmTrust" and that Maiden "maintains a robust process" of analyzing AmTrust premium liabilities "to better understand [AmTrust's] loss development," including "active and ongoing claims management."   Throughout the Class Period, moreover, Defendants assured investors that Maiden regularly conducted audits of the AmTrust book of business to ensure investors, *inter alia*, that reserves and profitability ratios were reliable.

8.    During the Class Period, Defendants made false and misleading statements to investors, claiming that its reserves, profitability ratios and reserving methodologies for the AmTrust business were adequate, prudent and disciplined. On March 4, 2014, for example, Maiden's 2013 Form 10-K claimed "[w]e have a disciplined approach to underwriting and risk management."  Between 2013 and 2016, the Company reported total net income of $295.2 million and reported loss ratios for AmTrust, all of which masked Maiden's practice of deliberately or recklessly under-reserving for AmTrust-related claims.  Unknown to investors, the Company's stated net income and loss ratios were false and misleading because Maiden was anything but disciplined in setting its reserves for the AmTrust business. When Defendants set the Company's loss reserves for AmTrust insurance claim losses, they estimated the loss ratios for its most recent accident years would be in

the 50% range for earned premiums, all the while knowing, or recklessly disregarding, that Maiden's AmTrust book of business had experienced historical loss ratios between 70% and 80% on its more seasoned accident years.

9.     During 2017 and 2018, Defendants' improper reserving practices began to materialize in the form of substantial adverse loss development charges (*i.e.*, charges to reflect the fact that its loss reserves for prior accident years were deficient).  At the same time, Defendants downplayed the purportedly unexpected adverse loss development charges and falsely assured investors that the charges were events isolated to the current period and further problems would likely not arise.  For instance, on August 9, 2017, Defendants sought to quell investor concerns by claiming a $29.4 million AmTrust adverse loss development was "unique to [this] quarter [and we] don't believe [AmTrust adverse losses] systematic . . . we'll keep watching it."  Due to years of fraudulent loss reserve accounting, however, the Company would be forced to disclose tens-of-millions-of-dollars of additional AmTrust adverse loss developments quarter after quarter in subsequent periods.  Defendants' false and misleading Class Period statements regarding their reserve discipline, loss and combined ratios and net income were the direct result of Defendants' intentional or reckless under-reporting of loss reserves for the AmTrust business.

4812-7962-7451.v1

10.     Not only did Defendants know of or have access to claim and loss reserve data that indicated they were grossly under-reserving for the AmTrust business, but they were motivated to commit securities fraud.  During the Class Period, Defendants conducted public offerings of over 12 million shares of Maiden stock, for net proceeds exceeding $300 million.  In June 2017, Maiden conducted a public offering of debt for net proceeds of $110 million.  The offering documents for each of these Class Period offerings incorporated by reference the Company's SEC filings, which contained false and misleading statements about Maiden's loss reserves, loss ratios and net income.  But for misleading investors about the status of Maiden's operating results during these offerings, Maiden would have received less public financing on materially worse terms.  Defendants Raschbaum and Schmitt took advantage of the artificial inflation in Maiden's stock price – directly the result of Defendants' unlawful conduct – by engaging in over $1.2 million in unusual and suspicious insider trading.  Defendants Raschbaum, Schmitt and Marshaleck were further motivated to mislead investors because receipt of millions of dollars of their executive compensation depended on hitting specific income and loss ratio targets during the Class Period.

11.     It was only after the Class Period that Maiden disclosed the full details of its historical experience with incurred losses associated with the AmTrust book of business.  Specifically, the Company's post-Class Period SEC filings revealed

that throughout the Class Period, Defendants had access to, or were aware of, historical claims and actuarial data from AmTrust indicating that for every $1.00 of earned premium under the AmTrust Quota Share Agreement, Maiden would incur claims-related costs of approximately $0.70 to $0.80.

12.     Nonetheless, in setting their reserves, Defendants had estimated Maiden would incur claims-related costs of approximately $0.50 on its most recent accident year vintages of AmTrust ceded net earned premiums.  Defendants engaged in this deceptive conduct throughout the Class Period, all the while knowing of or recklessly disregarding the prior history of AmTrust claims-related costs ultimately falling in the $0.70 to $0.80 range.  These reckless or deliberate under-estimates directly led to the increasing and crippling adverse loss developments announced by Maiden during 2017 and 2018.  Indeed, shortly after the AmTrust quota share net premium growth rate flattened out in 2015, Maiden began recognizing hundreds of millions of dollars in adverse development charges for the business it assumed from AmTrust.

13.     As the Company disclosed these charges and investors realized that Maiden had been misrepresenting its risk profile and profitability, the Company's publicly traded securities experienced significant stock price drops.  After the close of the market on February 14, 2017, Maiden announced that it was taking a reserve charge of approximately $120 million, $52 million of that amount attributable to

2011-2014 underwriting years in the AmTrust Reinsurance segment.  As a result of this disclosure, the Company's common stock price dropped by 10% on February 15, 2017, on abnormally high trading volume.

14.     After the market close on February 28, 2017, Maiden issued its press release for its 2016 financial results, confirming the $52 million adverse development charge against AmTrust earned premiums and reporting AmTrust's loss ratio for the fourth quarter of 2016 ("4Q 2016") to be 76.1%, or 10% higher than what had been reported the prior year.  As a result of this news, the Company's common stock price dropped 6.4% the next day, on abnormally high trading volume.

15.     After the market close on August 8, 2017, Maiden issued its press release for its second quarter of 2017 ("2Q 2017") financial results.  The Company reported it had suffered an additional net adverse development charge of $29.4 million against AmTrust earned premiums and caused Maiden to report a net loss of $22.4 million (or $55.3 million less than the Company's reported net income for the second quarter of 2016 ("2Q 2016")).  As a result of this news, the Company's stock price plummeted 31.3% the next day, from $9.55 to $6.56 per share, on abnormally high trading volume.

16.     On November 8, 2017, the Company announced another adverse development for the AmTrust Reinsurance segment of $61.1 million.  On this news, Maiden's stock price dropped another 21% on abnormally high trading volume.  On

- 9 -

February 27 and 28, 2018, Maiden announced yet another $139 million in adverse developments for the AmTrust Reinsurance segment. On February 28, 2018, the Company' stock price suffered a 16.6% stock price drop. By November 9, 2018, the Company had disclosed another $238.8 million in adverse development for AmTrust and additional stock price declines.

17.     Between February 2017 and November 2018, as Maiden reported repeated material adverse development charges caused by Defendants' deliberate or reckless under-reserving for AmTrust losses, the Company's stock price dropped from $16.50 per share to under $2.50.

## JURISDICTION AND VENUE

18.     Plaintiffs assert claims on behalf of themselves and the Class under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction over the Exchange Act claims is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as conduct giving rise to the violations of the Exchange Act alleged herein occurred in this District, including the dissemination of false and misleading statements into this District. Defendants reside or transact business within this District, and Maiden maintains the primary offices of its U.S. subsidiary,

Maiden Reinsurance North America, Inc. ("Maiden NA"), at 6000 Midlantic Drive, Suite 200 South, Mount Laurel, New Jersey, 08054.

20.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

21.    Lead Plaintiff Boilermaker-Blacksmith National Pension Trust ("Pension Trust") is a collectively bargained and jointly trusteed Labor-Management Trust that provides benefits primarily to union members located in 100+ local lodges of The International Brotherhood of Boilermakers.  Pension Trust was founded in 1960, is headquartered in Kansas City, Kansas, and has over $7.0 billion in assets. The Pension Trust purchased Maiden common stock during the Class Period, and suffered damages as a result of Defendants' unlawful conduct.  ECF No. 15-2.

22.    Lead Plaintiff Taishin International Bank Co. Ltd. ("Taishin Bank") is a commercial banking institution headquartered in Taipei, Taiwan.  The bank offers services for personal banking, micro-enterprises, corporate finance and corporate trusts.  Taishin Bank is the trustee of client trust accounts – and the nominal owner of the trust property of those accounts – that purchased Maiden preferred stock

during the Class Period and suffered damages as a result of Defendants' unlawful conduct.  ECF No. 27-3.

**Defendants**

23.    Defendant Maiden is a Bermuda-based holding company, with principal executive offices located at 94 Pitts Bay Road, Pembroke HM 08, Bermuda.  Maiden maintains the primary offices of its U.S. subsidiary, Maiden NA, at 6000 Midlantic Drive, Suite 200 South, Mount Laurel, New Jersey, 08054. Maiden provides reinsurance to its customers through its wholly-owned subsidiaries, including Maiden NA.   During the Class Period, Maiden's business primarily focused on serving the needs of regional and specialty insurers in the United States, Europe and other global markets by purportedly offering innovative reinsurance solutions to support the insurers' capital needs.   Throughout the Class Period, Maiden's common stock traded on the NASDAQ Global Select Market – an efficient market – under the ticker symbol "MHLD."

24.    Defendant Arturo M. Raschbaum was the CEO and President of Maiden from November 2008 through September 2018.   In August 2018, the Company announced that Raschbaum would be "retiring" from Maiden and, on September 30, 2018, he signed a separation agreement in which Raschbaum agreed to forfeit all his outstanding equity in exchange for a release payment of $2.2 million. Throughout the Class Period, Raschbaum regularly participated in the Company's

- 12 -

earnings calls and certified the purported accuracy of the Company's financial statements.  At all relevant times, Raschbaum had ultimate authority and control over the Company's public statements, including the contents of regulatory filings, and whether and how to communicate the contents of the filings to the investing public.

25.    Between 1994 and 2008, Raschbaum held several leadership positions with GMAC Insurance Holdings, including president of GMAC Insurance and president of GMAC RE.  Raschbaum has long served on the board of governors of the Property Casualty Insurers Association of America.  Accordingly, throughout the Class Period, Raschbaum was intimately familiar with loss reserve methodology and GAAP rules governing how loss reserves are established and disclosed.

26.    According to Maiden's Code of Business Conduct and Ethics, it was vital that Raschbaum communicate open, clear, consistent, accurate and appropriate information to the investing public.  In order to facilitate Raschbaum's responsibilities, the Company maintained an internal audit department ("IAD"), which was responsible for assisting Raschbaum to report reliable and accurate financial results.  In performing internal audit reports, the IAD had full, free and unrestricted access to all activities and records (in paper and electronic format) necessary to ensure the Company was reporting accurate financial results.  The IAD's ultimate responsibility was to provide senior management (including

Raschbaum) and the Company's audit committee with the information necessary to execute its and management's ultimate responsibility of ensuring that Maiden's Class Period financial results were open, clear, consistent and accurate.

27.    Defendant Karen L. Schmitt served as the CFO of Maiden from May 13, 2014 through September 2018.  Prior to May 2014, Schmitt had worked at Maiden NA for at least 15 years, maintaining a close working relationship with Raschbaum.   In August 2018, the Company announced that Schmitt, like Raschbaum, would be retiring from Maiden, but would remain on as an executive vice president until March 1, 2019.  After the announcement of her "retirement," it was revealed that Schmitt signed a separation agreement, in which she agreed to forfeit unvested performance restricted share units in exchange for release payments of $2.0 million on August 31, 2018, and $1.3 million in March 2019.  Between May 2014 and August 2018, Schmitt regularly participated in the Company's earnings calls and certified the purported accuracy of the Company's financial statements. During that same time period, Schmitt had ultimate authority and control over the Company's public statements, including the content of regulatory filings, and whether and how to communicate the contents of the filings to the investing public.

28.    Between 1999 and 2008, Schmitt held several executive positions with GMAC RE, including CFO.  Prior to 1999, Schmitt held positions as Chief Actuary and Senior Vice President of TIG Holdings, Vice President of American

- 14 -

Reinsurance and various positions at Prudential Property and Casualty. Schmitt is a fellow at both the Casualty Actuarial Society and the Canadian Institute of Actuaries, and is a Chartered Enterprise Risk Analyst and Chartered Financial Consultant. Accordingly, throughout the Class Period, Schmitt was intimately familiar with loss reserve methodology and GAAP rules governing how loss reserves are established and disclosed.

29.     According to Maiden's Code of Business Conduct and Ethics, it was vital that Schmitt communicate open, clear, consistent, accurate and appropriate information to the investing public. In order to facilitate Schmitt's responsibilities, the Company maintained an IAD, which was responsible for assisting Schmitt to report reliable and accurate financial results. In performing internal audit reports, the IAD had full, free and unrestricted access to all activities and records (in paper and electronic format) necessary to ensure the Company was reporting accurate financial results. The IAD's ultimate responsibility was to provide senior management (including Schmitt) and the Company's audit committee with the information necessary to execute its and management's ultimate responsibility of ensuring that Maiden's Class Period financial results were open, clear, consistent and accurate.

30.     Defendant John M. Marshaleck served as the CFO of Maiden between August 2009 and May 13, 2014. Marshaleck served as a director of several of the

Company's wholly-owned subsidiaries between 2009 and his retirement in 2014. Prior to serving as CFO, Marshaleck had served as Chief Operating Officer ("COO") of Maiden from January 2009.  Between February 19, 2014 and May 13, 2014, Marshaleck participated in the Company's earnings calls, and certified the purported accuracy of the Company's financial statements.  During that same time period, Marshaleck had ultimate authority and control over the Company's public statements, including the content of regulatory filings, and whether and how to communicate the contents of the filings to the investing public.

31.     Marshaleck was a director of Maiden Insurance beginning in 2009 and a director of Maiden Global Holdings beginning in 2010.  Between 1983 and 2008, Marshaleck held several executive positions with GMAC RE, including President, CFO and COO.  Accordingly, throughout the Class Period, Marshaleck was intimately familiar with loss reserve methodology and GAAP rules governing how loss reserves are established and disclosed.

32.     According to Maiden's Code of Business Conduct and Ethics, it was vital that Marshaleck communicate open, clear, consistent, accurate and appropriate information to the investing public.  In order to facilitate Marshaleck's responsibilities, the Company maintained an IAD, which was responsible for assisting Marshaleck to report reliable and accurate financial results.  In performing internal audit reports, the IAD had full, free and unrestricted access to all activities

- 16 -

and records (in paper and electronic format) necessary to ensure the Company was reporting accurate financial results.  The IAD's ultimate responsibility was to provide senior management (including Marshaleck) and the Company's audit committee with the information necessary to execute its and management's ultimate responsibility of ensuring that Maiden's Class Period financial results were open, clear, consistent and accurate.

33.   For allegations relating to false and misleading statements made between February 20, 2014 and May 12, 2014, "Defendants" refers to Maiden, Raschbaum and Marshaleck, collectively.  For allegations relating to false and misleading statements made after May 12, 2014, "Defendants" refers to Maiden, Raschbaum and Schmitt, collectively.  Defendants Raschbaum, Schmitt and Marshaleck are referred to herein as the "Individual Defendants."

34.   During the Class Period, Defendants operated Maiden as hands-on managers overseeing the Company's operations and finances and made the materially false and misleading statements alleged herein.  As detailed herein, Defendants directly participated in the day-to-day operations and affairs of the Company at the highest levels, were privy to confidential proprietary information regarding the Company and had intimate knowledge of the core operations and financial performance of Maiden, including knowledge of critical contracts and sources of premium revenue – particularly with, and from, AmTrust.  Defendants

were personally involved with and knowledgeable of the Company's risk management and underwriting policies and practices. Defendants were also fully involved with and responsible for deciding which disclosures Maiden would make to the investing public. Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company discussed herein.

35. Throughout the Class Period, Defendants were responsible for ensuring the accuracy of Maiden's public filings and other public statements, and they personally attested to and certified the accuracy of Maiden's financial statements. The Individual Defendants participated in preparing, reviewing, approving and/or certifying consolidated financial statements for Maiden during the Class Period that purported to conform with applicable regulatory requirements and GAAP. These financial statements were filed with the SEC, and disseminated to the public, through *inter alia*, Company press releases, reports on Form 8-K, quarterly reports on Form 10-Q and annual reports on Form 10-K, and in other communications with investors, credit rating agencies, bank lenders and securities analysts. The financial information contained therein misrepresented that Maiden's financial statements were accurate.

## FACTUAL BACKGROUND

**Maiden Holdings, Ltd.**

36.    Throughout the Class Period, Maiden primarily focused on serving the needs of regional and specialty insurers in the United States, Europe and select other global markets by providing reinsurance solutions designed to support their capital needs.   Maiden specialized in reinsurance solutions that purportedly optimized financing and risk management by providing coverage within the more predictable and actuarially credible lower layers of coverage and/or reinsuring risks that are believed to be lower hazard, more predictable and generally not susceptible to catastrophe claims.  Maiden provided its reinsurance through several wholly owned subsidiaries, including Maiden Reinsurance Ltd. and Maiden U.S., and maintained operations in Bermuda, the United States, Europe and other geographic markets.

37.    Because Maiden is a reinsurance company, the reliability of the underwriting procedures and processes it uses to evaluate the underlying policies it reinsures are critical to the Company's financial success.  It is of central importance to investors that Maiden accurately assess and disclose potential risks and liabilities related to these underlying policies.  Of no less importance, it was critical for Maiden to appropriately price its reinsurance policies to account for such risks, establish adequate loss reserves and minimize adverse development charges in future periods.

38.     Maiden has two reportable operating segments: (i) Diversified Reinsurance; and (ii) AmTrust Reinsurance.  The Diversified Reinsurance segment consists of a portfolio of predominantly property and casualty reinsurance business focusing on regional and specialty property and casualty insurance companies.  The AmTrust Reinsurance segment includes all business ceded by AmTrust to Maiden.

39.     AmTrust and Maiden are closely related entities, with Maiden noting in financial filings that it "may be deemed an affiliate of AmTrust."  AmTrust was founded in 1998 by the brothers M. Karfunkel and G. Karfunkel.  AmTrust underwrites and provides various niche property and casualty insurance products.

40.     Similarly, Maiden was formed in 2007 by M. Karfunkel, G. Karfunkel and Zyskind, primarily to provide reinsurance services to AmTrust.  At all relevant times, Zyskind was the Chairman of the Board, as well as the CEO, President and Chairman of AmTrust.  At all relevant times, members of the Karfunkel family were principal stockholders of AmTrust and owned or controlled about 50% of AmTrust's outstanding common shares.

41.     During the Class Period, AmTrust was Maiden's largest customer, and the companies engaged in substantial commercial dealings with one another.  Most notably, Maiden reinsured a large portion of AmTrust's portfolio, and the AmTrust Reinsurance segment made up the majority of Maiden's revenues.  For example, as of December 31, 2016, the AmTrust Reinsurance segment made up over 70% of

- 20 -

Maiden's net earned premiums and, pursuant to a reinsurance agreement between the parties, the Company could reinsure 40% of AmTrust's written premiums net of reinsurance with unaffiliated reinsurers.

42. As AmTrust was Maiden's largest and most important client, it was especially critical that the Company appropriately assess and disclose to investors the potential risks and liabilities of the AmTrust policies that it reinsured and that Maiden appropriately accounted for these risks in its pricing and loss reserves. In light of AmTrust's importance to Maiden, the companies' close and historical relationship and ongoing business dealings and the nature of reinsurance underwriting, Maiden claimed to have received detailed policy data from AmTrust that would have allowed it to know the truth about the risks and likelihood of loss associated with the AmTrust insurance policies it reinsured before and during the Class Period.

43. For example, defendant Schmitt, Maiden's CFO, stated that Maiden received a "lot of detailed actuarial data from AmTrust" in order to set its "own reserves" for reinsured AmTrust policies. Similarly, Maiden's CEO, defendant Raschbaum, stated that "Maiden maintains a robust process of working with our clients" – including AmTrust, the Company's most important client – "to better understand the underlying dynamics of their loss development," which "includes active and ongoing claims management with additional case reserves posted by our

claims professionals as necessary and auditing activities, as well as account-specific actuarial analyses that all help to shape our view of ultimate exposure."  In fact, the companies' businesses were so closely interrelated that, when Raschbaum was asked by an analyst during an earnings conference call if AmTrust and Maiden should reach "consensus" on setting the appropriate reserves for overlapping segments of their portfolios, defendant Raschbaum responded, "Absolutely."

**The AmTrust Quota Share Agreement**

44.    With respect to a quota share reinsurance arrangement (also known as pro-rata reinsurance, proportional reinsurance or participating reinsurance), the reinsurer shares a proportional part of the original premiums of the reinsured.  In return, the reinsurer (here, Maiden) assumes a proportional share of the losses incurred by the cedant (here, AmTrust).  The reinsurer pays the company a ceding commission, which is generally based on the ceding company's cost of acquiring the business being reinsured (including broker commissions, premium taxes, assessments and miscellaneous administrative expenses) and may also include a profit sharing arrangement.  Under quota share arrangements, ceding commission can be adjustable and subject to minimum and maximum levels based upon loss experience which potentially reduces earnings volatility under such arrangements.

45.    On July 1, 2007, Maiden and AmTrust executed the AmTrust Quota Share Agreement.  The agreement allowed Maiden to reinsure particular types of

insurance policies held by AmTrust.  In exchange for AmTrust ceding premiums to

Maiden, the Company was required to pay a commission of approximately 30%, to

AmTrust.   The agreement was set for a term of three years and automatically

renewed but for advanced notification of termination by either party.

46.     Under the terms of the AmTrust Quota Share Agreement, Maiden was

entitled to access to "all papers, books, accounts, documents, claims files and other

records" of AmTrust.   This right of access existed throughout the term of the

agreement and continued to exist after termination.  Defendants repeatedly informed

investors that Maiden had the right to audit AmTrust's records regarding ceded

premiums and used this access to obtain critical information regarding the risk

profile of the ceded AmTrust book of business.

**Accurate Loss Reserves and Relevant Financial
Metrics Are Critical to Maiden's Business**

47.     As a reinsurance Company, Maiden's success depends not only on

growing premiums, but also on its ability to accurately assess and manage risk and

estimate liabilities for the policies it shares in under its reinsurance agreements.  In

most cases, time elapses between the occurrence of an insured loss, the reporting of

the loss to Maiden and the Company's eventual payment of that loss.  To recognize

liabilities for the ultimate payment of all policy losses and related expenses, insurers

like Maiden must establish loss reserves as balance sheet liabilities with

corresponding income statement charges (expense) representing estimates of

amounts that will be paid in the future.  For Maiden, reported loss reserves were one of the most important measures of its financial health, as they represent expected future losses that the Company will be required to pay out for claims on the insurance policies it had reinsured as of the date of Maiden's publicly filed financial statements.

48.    The establishment of loss reserves is meant to ensure that a sufficient portion of the premiums received in connection with a line of business will be available to ultimately cover the claims filed and related expenses that relate to that line of business.  Loss reserves are required to be established for both known and unknown losses which have been incurred as of the financial reporting date on all policies active or expired.  At a minimum, the reserves consist of provisions for: (a) reported but unpaid claims (called case reserves); (b) estimates of claims not yet reported; and (c) loss adjustment expenses ("LAE") associated with claim settlement, such as claim investigation and legal fees.  In order for the level of the reserves established in connection with a given group of policies to be adequate, the reserves must be based upon actuarial analysis of accurate underlying data concerning historical claims experience and expectations within each insurance business line.

49.    Providing the appropriate level of reserves directly impacts Maiden's financial reporting.  For every dollar Maiden uses to establish a loss reserve, the

Company is required to deduct one dollar from its operating income and net income before taxes. When Maiden does not establish an adequate loss reserve, or improperly reduces existing reserves that are required to adequately provide for losses on insured risks, it is overstating its net income and understating liabilities. If any of Maiden's loss reserves are inadequate, it is required to increase them, resulting in a commensurate reduction in net income in the period in which the inadequacy is identified and corrected. Loss reserves are thus a key metric that drives Maiden's profitability.

**Maiden's Loss Ratio Was a Critical Reported Metric**

50.     In addition to closely following Maiden's loss reserves and net income, analysts tracking the Company's performance also paid close attention to Maiden's reported loss ratios, which are measures of an insurance company's estimated incurred claim losses relative to the net premiums earned on the same policies. Maiden consistently reported two key loss ratios in its quarterly and annual earnings press releases during the Class Period:

(a)     **Net loss and LAE ratio**, or simply the "**loss ratio**." Calculated by dividing the Company's incurred net losses (case reserves, IBNR losses and LAE) by the sum of net earned premiums in the applicable reporting period. For example, if a company earns $1,000 in premiums on a group of policies, but pays out of reserves a total of $600 for incurred losses on the same policies, the loss ratio

is expressed as 60%.  The loss ratio is important to investors as it indicates, from an underwriting perspective, whether a company is incurring and paying more in claims than it is receiving in actual premiums on those same claims.  An increasing loss ratio over time means a company is paying out a bigger and bigger share of the premium it earns, in claims expense.  Maiden reported loss ratios for both the Diversified Reinsurance and AmTrust Reinsurance segments during the Class Period.

(b)     **Combined ratio**.  This ratio is calculated by adding up Maiden's incurred net losses, commission, acquisition and general and administrative expenses for a particular period, and dividing that sum by the net earned premiums in the same reporting period.  Accordingly, the combined ratio includes additional expenses that the loss ratio does not, and is important to investors because it indicates whether or not the company is actually earning a profit on its entire core insurance operations, without taking into account any investment returns it may have achieved on the premiums it invested.  A combined ratio of more than 100% means that an insurance company had more losses plus expenses than net earned premiums, and therefore, lost money on its core insurance operations.  Maiden reported the combined ratio for both the Diversified Reinsurance and AmTrust Reinsurance segments during the Class Period.

51.     According to the Company's SEC filings, throughout the Class Period, Maiden considered four groups of information in determining reserves and loss and combined ratios for the AmTrust business:  (a) information obtained from internal or external sources to make meaningful estimates of likely future performance; (b) loss and exposure information provided by the ceding company, AmTrust, to derive meaningful estimates of loss; (c) historic loss development as being indicative of future loss development and trends; and (d) significant emergence (or lack thereof) of losses or types of losses that are not represented in the information supplied by ceding companies.

52.     For fiscal year ("FY") 2012 through FY 2018, Maiden reported the following consolidated loss and combined ratios as of December 31 in the Company's annual reports filed with the SEC:

| Year | Loss Ratio | Combined Ratio |
|------|-----------|----------------|
| 2012 | 69.5% | 99.5% |
| 2013 | 67.0% | 97.6% |
| 2014 | 66.1% | 98.0% |
| 2015 | 66.9% | 99.3% |
| 2016 | 70.6% | 103.2% |
| 2017 | 78.8% | 113.3% |
| 2018 | 92.3% | 127.7% |

53.     For FY 2012 through FY 2018, Maiden reported the following AmTrust loss and combined ratios as of December 31 in the Company's annual reports filed with the SEC:

| Year | Loss Ratio | Combined Ratio |
|------|-----------|----------------|
| 2012 | 68.0% | 95.8% |
| 2013 | 66.0% | 95.7% |
| 2014 | 64.9% | 95.4% |
| 2015 | 63.8% | 95.3% |
| 2016 | 66.5% | 98.4% |
| 2017 | 78.4% | 110.8% |
| 2018 | 94.4% | 126.8% |

**Maiden Consistently Under-Reserved
for Its AmTrust Business**

54.    GAAP requires that insurance companies develop and disclose loss development tables in their annual filings.  **Loss development** is the difference between the liability an insurance company initially recorded for incurred losses for an "accident year" (the year the insured loss occurs) and the re-estimated liability for that same accident year, in later reporting periods.  Loss development tracking by policy type or business line is important as it is not unusual for losses incurred in a particular accident year to have claims continued to be filed, settled or paid-out over several years, and different types of policies or business lines often have different settlement timeframes.

55.    To track and update loss development over subsequent financial reporting periods, insurers construct and update a schedule called a "loss development table" for each separate line of business.  The loss development table compares the amount incurred for each accident year, as re-estimated at each FY end.  For example, an insurer may track and reevaluate loss development for the pool

- 28 -

of 2010 year accidents associated with workers compensation policies at subsequent 12-month intervals over the course of the next five years.  This means the insurer will examine (and re-examine) the loss development of the accident year 2010 policy losses a year later in 2011, again in 2012 and so on until 2015.  As claims for accident year 2010 losses are subsequently received, paid or adjusted, the company will accumulate data that will help it refine its estimate of the ultimate cost of the losses incurred in the prior accident year 2010.  These subsequent period refinements are re-estimates of the original reserve requirement, and are each recorded in the loss development table.  This historical loss experience data is particularly important as it allows the insurer to continually assess the accuracy of its earlier accident year loss reserve estimates against the actual subsequent period claim payouts.  This information is vital as it allows a company to more accurately predict and set more appropriate loss reserves going forward.

56.    If the cost of settling claims stemming from the original accident year are determined to be higher than had been expected in the prior year (*i.e.*, higher than the original reserve estimate), increased reserves are required to cover such "deficiencies" or an "**adverse development**."   Fewer or smaller claims than originally expected are referred to as "redundancies" or a "**favorable development**."

57.    These changes in the required reserves to reflect adverse development during a reporting period also had a corresponding negative impact on Maiden's loss

- 29 -

ratio and combined ratio.  If Maiden underestimated its prior year reserve estimate, the increase in loss and LAE necessary in the current FY to recognize the "adverse development" also unfavorably increased loss expenses and thus, the numerator of the loss ratio, resulting in a higher loss ratio and lower operating and net income.

58.     After the Class Period, the Company disclosed in SEC filings its loss development history for the AmTrust business, broken down by the various business lines of AmTrust's policies for which Maiden received ceded net premiums.  As the pink shading in the consolidated table below reflects, Defendants had grossly underestimated their AmTrust reserves between 2012 and 2018 (in $1,000s):

| AmTrust QS - Sum of Disclosed Biz Lines | Adverse (Favorable) Development | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Accident Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2012 - 2018 |
| 2008 | $ 7,801 | $ 2,997 | $ 799 | $ 1,588 | $ 3,778 | $ 1,277 | $ 1,925 | $ 20,165 |
| 2009 | $ 21,003 | $ (3,756) | $ 10,759 | $ (301) | $ 946 | $ 4,134 | $ 2,964 | $ 35,749 |
| 2010 | $ 28,108 | $ 23,473 | $ (4,617) | $ 9,602 | $ (828) | $ 5,783 | $ 4,372 | $ 65,893 |
| 2011 | $ 16,392 | $ 40,639 | $ 25,018 | $ (3,535) | $ 22,384 | $ 5,616 | $ 4,044 | $ 110,558 |
| 2012 | | $ 60,347 | $ 22,503 | $ 33,754 | $ (7,363) | $ 8,349 | $ 40,372 | $ 157,962 |
| 2013 | | | $ 33,707 | $ 35,380 | $ 30,181 | $ 25,083 | $ 45,215 | $ 169,566 |
| 2014 | | | | $ 1,926 | $ 51,686 | $ 73,403 | $ 74,841 | $ 201,856 |
| 2015 | | | | | $ 4,462 | $ 101,751 | $ 59,929 | $ 166,142 |
| 2016 | | | | | | $ 54,318 | $ 105,122 | $ 159,440 |
| 2017 | | | | | | | $ 92,029 | $ 92,029 |
| 2018 | | | | | | | N/A | N/A |
| Total (CY) | $ 73,304 | $ 123,700 | $ 88,169 | $ 78,414 | $ 105,246 | $ 279,714 | $ 430,813 | $ 1,179,360 |

59.     The loss development table indicates that during the Class Period, Maiden's loss reserves had been understated by hundreds of millions of dollars between December 31, 2013 and December 31, 2018.  Not only does the loss development table reflect a pattern of deliberate or reckless under-reserving over time, but the magnitude of the adverse developments experienced by Maiden

between 2012 and 2018 ranged anywhere from $73 million for the year ended 2012,

to $430 million during 2018.

**AmTrust Earned Premium Growth Outpaced
the Growth in Reserves, and Allowed Defendants
to Conceal Their Improper Reserving Practices**

60.   While Maiden was enjoying a huge increase in new reinsurance

premiums from AmTrust during the first half of the Class Period, exposing the

Company to increased liability for new claims, the Company failed to adequately

increase loss reserves in proportion to this growth in premiums.  Between 2011 and

2015, AmTrust quota share annual net premium earned, as a percentage of the

Company's annual consolidated net premium earned, grew significantly and then

flattened out in 2016:

| Year | AmTrust Net Premium | Consolidated Net Premium | % of Maiden's Consolidated Net Premiums |
|------|---------------------|--------------------------|------------------------------------------|
| 2011 | $558 million | $1,552 million | 36% |
| 2012 | $727 million | $1,803 million | 40% |
| 2013 | $988 million | $2,000 million | 49% |
| 2014 | $1,378 million | $2,251 million | 61% |
| 2015 | $1,684 million | $2,429 million | 69% |
| 2016 | $1,843 million | $2,567 million | 72% |
| 2017 | $1,909 million | $2,732 million | 70% |

61.   Between 2011 and 2014, the rate of growth of AmTrust earned

premiums, year-over-year ("YOY"), increased substantially.  However, in 2015, the

rate of growth of AmTrust earned premiums also flattened out significantly:

| Year | AmTrust Net Premium | YOY Growth |
|---|---|---|
| 2010 | $445 million | N/A |
| 2011 | $558 million | 25% |
| 2012 | $727 million | 30% |
| 2013 | $988 million | 35% |
| 2014 | $1,378 million | 39% |
| 2015 | $1,684 million | 22% |
| 2016 | $1,843 million | 9% |
| 2017 | $1,909 million | 3% |

62.     As noted by *Barron's* in a May 31, 2014 article entitled "Balance-Sheet

Risk Makes AmTrust Shares Vulnerable":

> [P]oorly controlled reserving can prove to be a snakebite to an insurer if growth slows – triggering a double whammy as underwriting losses demand new capital while rendering earnings less attractive to investors.

> \*     \*     \*

> **THE REINSURANCE RELATIONSHIP** between AmTrust and Maiden is substantial, with AmTrust passing along 40% of most premiums and losses to Maiden.  Yet AmTrust's year-end balance sheet showed about $1.9 billion in assets receivable from Maiden, while the latter's balance sheet reported corresponding liabilities due AmTrust to be worth less than $1.5 billion.  That $400 million variance seems to lie mainly in the companies' different reserve estimates for policyholder losses not yet reported to the insurers.  But such a large disagreement invites the question whether Maiden is understating its liabilities . . . .

> \*     \*     \*

> AmTrust's [head of investor relations] says both sets of books are correct, with the difference arising from the fact that Maiden estimates yet-to-be-reported losses independently of AmTrust.

63.     So long as a company's, like Maiden's, net earned premiums are

increasing at a significant rate YOY, an insurer can mask unreasonably aggressive

reserving practices by smoothing out adverse developments on relatively smaller liabilities booked in prior periods (*i.e.*, when total net earned premiums were less than they were during the earlier phase of rapid growth).  If that growth rate stops, however, an insurer can no longer mask the earnings impact of adverse developments associated with more aggressive reserving practices.  Indeed, this is precisely what happened to Tower Group International ("Tower") in 2013 and 2014 – when its stratospheric premium growth rate halted after Tower could no longer grow through acquisition.  As the May 2014 *Barron's* article noted, "[s]hares of Tower toppled 90% in the past year after the insurer confessed it was under reserved and undercapitalized, meaning it lacked wherewithal to meet anticipated claims."

64.    So long as AmTrust premiums continued to grow during the Class Period, Defendants were able to mask unfavorable trends in loss ratios and reserves. When AmTrust premium growth flattened out, the fact that Defendants had been misrepresenting the profitability of the AmTrust Reinsurance segment would ultimately materialize through a string of reported adverse development expenses. By 2017, after Maiden's AmTrust net earned premium growth rate stalled (and would no longer grow because AmTrust was in the middle of an accounting scandal for its own reserve practices), Maiden's improperly aggressive assumptions for calculating AmTrust quota share reserves could no longer be hidden from the investing public.

**The Company's Loss Reserves and Loss Ratios**
**Were Materially Understated Throughout the Class Period**

65.    Defendants repeatedly informed investors that Maiden had access to
AmTrust claims and loss data as part of the process of determining loss reserves and
loss ratios during the Class Period.   In addition, Defendants repeatedly assured
investors that AmTrust was very cooperative in providing Maiden with detailed
actuarial data for the purpose of allowing Maiden to establish its loss reserves and
loss ratios.

66.    Throughout the Class Period, Maiden consistently established
inadequate loss reserves by knowingly employing artificially low loss ratio
assumptions in the 50% range.   However, the historical AmTrust data to which
Defendants claimed Maiden had access revealed that the loss ratio for the AmTrust
business, as it matured, actually fell in the range of between 70% and 80%.   This
known, erroneous application of a 50% loss ratio for early accident years had the
effect of materially understating the Company's loss reserves and reported loss ratios
and, thus, overstated the profitability of Maiden.

67.    After the Company filed its 2016 Form 10-K with the SEC, the
commission sent Maiden a letter informing it that the SEC believed that Maiden had
not complied with new loss development disclosure rules in its 2016 Form 10-K.
Specifically, the SEC informed Maiden that the Company was required to further
disaggregate its disclosures for reserves and loss adjustment expenses by the

- 34 -

individual lines of business within the AmTrust Reinsurance segment, as the new disclosure rules required.  Maiden initially declined to provide additional disclosure to the SEC, but ultimately agreed, producing some disaggregated data (for years 2007 through 2016) in letter format on September 17, 2017.  When Maiden belatedly reported its historical loss development tables by individual AmTrust business lines in the Company's 2017 Form 10-K (filed March 1, 2018), however, the numbers in the tables had changed significantly.

68.    In the Company's 2017 Form 10-K, filed with the SEC on March 1, 2018, Maiden revealed what its actual historical incurred losses had been for both the AmTrust book of business and its underlying individual business lines since 2008.  This was the first time the Company disclosed this level of information to investors in Maiden's periodic SEC filings, because the historical incurred losses for both the AmTrust Reinsurance segment and its individual business lines had changed after Maiden responded to the SEC's 2017 inquiries.

69.    After Maiden filed its 2017 Form 10-K with the SEC on March 1, 2018, it then became possible to calculate the history of Maiden's cumulative incurred losses for each accident year as a percentage of AmTrust net earned premiums for accident years ending 2008 through 2017.  While Maiden publicly reported its loss ratio for a particular accounting period for the overall AmTrust business, the accident year loss ratio is a progressive measure of the cumulative losses to date for

- 35 -

a particular accident year, in each subsequent year.  Defendants' accident year loss ratio picks from 2011 through 2017 for the AmTrust quota share business, for accident years all the way back to 2008, were as follows:

| AmTrust QS: WC, CA, GL & Other SC/SP | Incurred Loss + LAE/Earned Premiums, as of December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Accident Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2008 | 68.5% | 71.7% | 72.9% | 73.2% | 73.9% | 75.4% | 76.0% |
| 2009 | 62.0% | 70.4% | 68.9% | 73.2% | 73.0% | 73.4% | 75.1% |
| 2010 | 59.5% | 69.8% | 78.3% | 76.6% | 80.1% | 79.8% | 81.9% |
| 2011 | 50.9% | 65.4% | 74.8% | 78.5% | 78.2% | 79.6% | 82.2% |
| 2012 | | 48.6% | 63.3% | 69.2% | 71.8% | 72.8% | 76.1% |
| 2013 | | | 52.1% | 55.4% | 60.5% | 62.1% | 67.2% |
| 2014 | | | | 55.3% | 55.2% | 60.4% | 67.6% |
| 2015 | | | | | 55.9% | 56.3% | 63.2% |
| 2016 | | | | | | 56.4% | 59.6% |
| 2017 | | | | | | | 62.1% |

70.     As the above-table demonstrates, by reading accident year rows from left to right, it is clear that Defendants knew of or claimed to have access to data showing a clear pattern that incurred losses for each accident year in the AmTrust book of business would eventually balloon from the low- to mid-50% range in the first year or two of a particular accident year claims process, to the 70% to 80% range as the Company obtained more historical information regarding the true loss profile of the AmTrust book of business.  As of December 31, 2013, for example, Defendants had data indicating that prior accident year loss ratios (that is, 2008 through 2012), were actually in the range of 63.3% to 78.3%.

71.     As the loss ratios in the table above illustrate, Maiden had a consistent pattern of establishing artificially low loss reserves in the early years of an accident

year's claims administration, followed by a significant increase to the loss reserves in the later years of loss development, when more data made it harder to justify or conceal the inadequate reserves.  Throughout the Class Period, Defendants had all the AmTrust loss development data for previous years demonstrating that the accident year loss ratio would end up at 75% or higher for any particular year. Despite this knowledge, Defendants repeated this pattern of setting inadequate reserves year after year during the Class Period.  The AmTrust book of business was, at best, a 75% accident year loss ratio business, not a 50% range accident year loss ratio business (let alone 48.6%).   Indeed, Defendants should not have been announcing a current year loss ratio for the AmTrust business in the 60% range when years of past history showed that incurred losses and LAE, as a percentage of net earned premiums, would be materially higher than that loss ratio announced to the investing public.

## RELEVANT GAAP

72.    Throughout the Class Period, Maiden repeatedly violated GAAP by misrepresenting its loss reserves and net income.  As a result, Maiden's Class Period financial statements were inaccurate and could not be relied upon.

73.    Like all public companies registered with the SEC, Maiden is required to file publicly available quarterly and annual financial statements and disclosures with the SEC that are prepared in accordance with GAAP.  GAAP consists of the

rules, conventions and practices recognized and employed by the accounting profession and public companies for the preparation of financial statements. The SEC has stated that financial statements not prepared in compliance with GAAP are "presumed to be misleading and inaccurate."

74.    Financial statements filed with the SEC are required by Regulation S-X (17 C.F.R. 210.4-01(a)(1)) to conform to GAAP. Regulation S-X further provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading and inaccurate" despite footnotes or other disclosures. In addition, Regulation S-K (17 C.F.R. Part 229) provides direction on the form and content of information, other than financial statements, included in registration statements and other periodic filings with SEC.

75.    The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board ("FASB"). In 2009, the FASB announced the launch of its Accounting Standards Codification ("ASC"), declaring it to be "the single source of authoritative nongovernmental U.S. generally accepted accounting principles." The FASB has also established its Statement of Financial Accounting Concept No. 8, "Conceptual Framework for Financial Reporting" ("Concept Statement No. 8") that sets forth, among other things, accounting principles and assumptions that guide recognition, de-recognition and

disclosure, as well as the classification and presentation of information in financial statements.

76.     The GAAP provisions violated by Defendants, and discussed in detail at ¶¶72-85, were straightforward, unambiguous and did not involve complex or novel accounting issues.   Additionally, Defendants committed these GAAP violations repeatedly during the Class Period.

**Investors Rely on the Accuracy and Reliability of Public Financial Statements to Make Investment Decisions**

77.     As set forth in Concept Statement No. 8, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concept Statement No. 8, OB2 states:

> The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity.   Those decisions involve buying, selling, or holding equity and debt instruments and providing or settling loans and other forms of credit.  (Footnote omitted.)

78.     Concept Statement No. 8, OB4 addresses the principle that investors "need information about the resources of the entity, claims against the entity, and how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources."  (Footnote omitted.)

79.     Additionally, Concept Statement No. 8, OB5 states:

Many existing and potential investors, lenders, and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need.  Consequently, they are the primary users to whom general purpose financial reports are directed.

80.     The FASB also sets forth the conceptual framework to be applied to

"Information about a Reporting Entity's Economic Resources, Claims, and Changes

in Resources and Claims," in Concept Statement No. 8, OB12, stating:

General purpose financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims.  Both types of information provide useful input for decisions about providing resources to an entity.

81.     Additionally, §13 of the Exchange Act requires, in part, companies like

Maiden to:

[D]evise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

\*       \*       \*

(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets . . . .

15 U.S.C. §78m(b)(2)(B).

**GAAP Required that Maiden Set and
Maintain Sufficient Loss Reserves**

82.     Maiden, like all other insurance and reinsurance companies, is required

to establish and record a liability known as a "loss reserve" on its balance sheet to

cover the cost of all known and unknown claims incurred but unpaid as of the date

of the financial statements.  Loss reserves must be sufficient to cover all losses from:

(a) currently known individual claims (referred to as "case reserves"); (b) presently

unknown losses from claims that are reasonably likely to have been IBNR; and (c)

LAE, which reflect the costs associated with the payment and settlement of claims

other than the amount of loss itself, such as the cost of investigating and litigating

claims.    Insurance  companies  use  historical  experience  and  various  actuarial

methods to estimate and reserve for both known and unreported claim losses, as well

as LAE.

83.     GAAP, chiefly ASC Topic 944, *Financial Services – Insurance*,

codifies this reserve requirement.  For example, ASC 944-40-25-1 and 944-40-25-2

address the recognition of insurance claim costs and provide:

**25-1**  Both of the following shall be accrued when insured events occur:

a.      A liability for unpaid claims (including estimates of costs
for claims relating to insured events that have occurred but have not
been reported to the insurer)

b.      A liability for claim adjustment expenses; that is a liability
for all costs expected to be incurred in connection with the settlement
of unpaid claims.

**25-2**  The estimated liability for unpaid claims includes the amount of money that will be required for future payments on both of the following:

     a.    Claims that have been reported to the insurer

     b.    Claims relating to insured events that have occurred but have not been reported to the insurer as of the date the liability is estimated.

## Professional Standards Required that Maiden Adequately Consider Historical Information to Estimate Reserve Levels

84.    GAAP required that Maiden consider relevant factors such as past experience and historical trends when estimating the ultimate cost establishing reserves for claims settlement.  Specifically ASC 944-40-30-1 prescribes that "[t]he liability for unpaid insurance claims,"

shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), ***using past experience adjusted for current trends, and any other factors that would modify past experience***.  (Emphasis added.)

85.    Additionally, the American Institute of Certified Public Accountants' ("AICPA") Audit and Accounting Guide, *Property Liability Insurance Entities*, describes that an insurance company's historical adequacy or inadequacy of reserves is one of the most important factors informing the setting of sufficient loss reserves:

Claim Adjustment and Estimation

              *      *      *

For most insurance entities, the philosophy intended for individual claim reserving falls between the examples previously described.  ***For purposes of establishing an appropriate financial***

- 42 -

***statement reserve, the most important factors to consider are (a) the historical adequacy or inadequacy of total reserves***, (b) the consistency in the reserving approach followed by the entity, and (c) the availability of an actuarial or a statistical analysis of reserves.[1]

86.　As alleged herein at ¶¶54-76, *supra*, Defendants had access to and knowledge of historical loss data clearly indicating that Maiden's reserve approach with respect to the AmTrust book of business was unreasonably aggressive, inconsistent, failed to provide adequate reserves and, thus, violated GAAP. Additionally, as alleged above, Defendants deliberately or recklessly understated loss reserves and loss ratios in order to hide Maiden's growing financial risks evidenced by premiums outpacing growth in reserves, in violation of GAAP.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

87.　After the market close on February 19, 2014, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2013 ("4Q 2013") and FY 2013.  As CEO and CFO of Maiden, Raschbaum and Marshaleck reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release.  The press release reported ***reserve for loss and loss adjustment expenses of $1.957 billion as of December 31, 2013, and net income of $102.8 million for FY 2013***.

---

[1]　American Institute of Certified Public Accountants, Audit and Accounting Guide, *Property Liability Insurance Entities*, January 1, 2013, 4.23 (emphasis added).

88.     On February 20, 2014, Maiden conducted an earnings conference call

for analysts and investors to discuss the Company's 4Q 2013 and FY 2013 results.

Raschbaum and Marshaleck participated in the call.  During his opening remarks,

Raschbaum stated:

> The majority of the premium increase in 2013 has come from our
> largest client, AmTrust, which ceded $1.2 billion of premiums to
> Maiden.  That was an increase of 39%.  Much of AmTrust's premium
> growth has resulted from continued rate level increases in the US for
> most lines of business, with workers' compensation experiencing the
> most substantial increase.  ***Combined ratios from the AmTrust Quota
> Share segment are essentially in line with the 2012 year, with a
> combined ratio of 95.7% for the year compared to 95.8% in 2012***.

> Our active client diligence process, which includes underwriting,
> accounting and claims auditing, actuarial reviews, and other activities,
> give us confidence in the high quality of the business we are receiving
> from our largest client [*i.e.*, AmTrust].  We expect continued profitable
> growth at AmTrust with the addition of the renewed business associated
> with the recently announced Tower renewal rights transaction, which is
> expected to close later this year.

89.     During the February 20, 2014 earnings call, Marshaleck reported that

Maiden's consolidated "***combined ratio for the fourth quarter of 2013 totaled

97.3% compared with 103.7% [for] fourth quarter of 2012***.  If we exclude the losses

from Superstorm Sandy in the fourth quarter of 2012, the combined ratio would have

been 97.3%, the same as in the fourth quarter of 2013."

90.     Defendants' February 20, 2014 conference call statements concerning

the Company and AmTrust's profitability ratios were materially misleading when

made because they gave investors the misleading impression that the AmTrust book

of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2013, Defendants had utilized initial loss ratios of 48.6% to 52.1% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

91.     On March 4, 2014, the Company issued its 2013 annual financial results on SEC Form 10-K.  Raschbaum and Marshaleck signed the 2013 Form 10-K pursuant to the requirements of the Exchange Act.  The 2013 Form 10-K repeated the loss and combined ratios for Maiden and AmTrust, which Raschbaum and Marshaleck disseminated to analysts and investors during the 4Q 2013 earnings call. These statements regarding the Company's profitability ratios were materially misleading for the same reasons stated in ¶90.

92.     The 2013 Form 10-K also reported ***a consolidated reserve for loss and loss adjustment expenses of $1.957 billion as of December 31, 2013, and net income of $102.8 million for FY 2013***.

93.     The Company's reported 2013 consolidated loss reserve and net income, as reported in the February 19, 2014 press release and in the 2013 Form 10-K (filed March 4, 2014), were materially false and misleading when made because Maiden had not sufficiently reserved for AmTrust liabilities in 2013.   Had Defendants applied the Company's past history of the AmTrust business generating a loss ratio of approximately 75% (versus the reported 66.0%) its loss reserves for the $1.1 billion AmTrust net earned premiums as of December 31, 2013 would have been approximately $99 million higher and its operating income (functional equivalent of earnings before interest, taxes, depreciation, and amortization ("EBITDA")) would have been $99 million lower.   But for Defendants' unlawful conduct of deliberately or recklessly under-reserving for AmTrust liabilities during the Class Period, Maiden would have reported higher loss reserves and materially lower net income.

94.     Raschbaum and Marshaleck also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which stated that the 2013 Form 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which***

***such statements were made, not misleading with respect to the period covered by***

***this report***."  These certifications were materially false and misleading when made

because the Company was not accurate in reporting its loss and combined ratios,

consolidated loss reserves and net income.

95.    The 2013 Form 10-K also contained several statements concerning

Defendants' purported underwriting discipline, which further misled investors to

believe that the AmTrust business was more profitable and stable that it actually

was.  For instance, Defendants stated that "***[w]e have a disciplined approach to***

***underwriting and risk management***."  In making that assertion, Defendants further

stated that "we will underwrite and accept only those risks we know and

understand."    Further, Defendants assured investors that they had intimate

knowledge of the loss experience of AmTrust, noting that the Company established

loss reserves for that business by "using prudent actuarial methods after receiving

all information known to us at the date they are recorded."

96.    Defendants' statement regarding having a "disciplined approach" to

underwriting and risk management was materially misleading when made because

it gave investors the misleading impression that the AmTrust book of business was

more profitable than it actually was.  Specifically, Defendants were estimating loss

ratios in the 50% range for the AmTrust business for the most recent vintage of

earned premiums while Defendants had access to, or were aware of, historical claim

and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2013, Defendants had utilized initial loss ratios of 48.6% to 52.1% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

97.    On May 8, 2014, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter of 2014 ("1Q 2014") results.  Raschbaum and Marshaleck participated in the call.  During his opening remarks, Raschbaum stated:

> With regard to AmTrust, we continue to see strong growth, chiefly from their small account[s] [workers] compensation portfolio. Net written premium assumed from AmTrust totaled $419 million, compared to $344.8 million in the first quarter of 2013.  That's a growth rate of 21.5%.  We're very comfortable with the quality of the workers' comp underwriting, as AmTrust remains focused on low severity segments and maintains pricing discipline.

> *             *             *

> ***From an underwriting perspective, our overall combined ratio was 97.7%, which is slightly higher than the 97.5% registered in the first quarter of 2013***.

> *             *             *

- 48 -

*In the AmTrust segment our combined ratio improved slightly from 95.9% in the first quarter of 2013 to 95.3% in the first quarter of 2014.* The reduction is largely driven by an improvement in the business mix as the small account worker's compensation segment earned premium continues to significantly outpace the growth of the other AmTrust segments.

98.    Defendants' May 8, 2014 conference call statements concerning the Company and AmTrust's profitability ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2013, Defendants had utilized initial loss ratios of 48.6% to 52.1% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had been had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

99.    On May 31, 2014, *Barron's* issued an article entitled "Balance-Sheet Risks Makes AmTrust Shares Vulnerable."  *Barron's* noted that market participants

were questioning the accounting for AmTrust's insurance reserves, warning that "poorly controlled reserving can prove to be a snakebite to an insurer if growth slows – triggering a double whammy as underwriting losses demand new capital while rendering earnings less attractive to investors."  In the article, AmTrust denied it had overstated the value of its assets ceded to Maiden, and Maiden's Vice President of Investor Relations, Noah Fields, denied the Company was under-reserved for AmTrust quota share liabilities.

100.   On August 7, 2014, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's second quarter of 2014 ("2Q 2014") results.   Raschbaum and Schmitt participated in the call.   During his opening remarks, Raschbaum stated:

> For the second quarter of 2014, we achieved annualized operating return on common equity of 13%, while book value per common share increased 8.6% during the quarter as earnings were strong and mark-to-market values of fixed income securities were up at the end of the quarter. . . . ***Our combined ratio for the quarter was 98%, which is 4/10 of a percentage point higher than in the second quarter of 2013***.  The 2014 second-quarter combined ratio reflects non-operating losses related to the Company's excess and surplus lines property business, which sold in the second quarter of 2013.  Absent these losses, Maiden's combined ratio would have been 97.5%.
>
> *     *     *
>
> In the AmTrust segment, we continue to see strong growth primarily driven by the expansion of their small account workers' compensation segment.  The pricing environment remains strong in this segment and AmTrust continues to benefit from their strong market

position.  Importantly, they remain disciplined and true to their small account, lower volatility hazard classes.

\*       \*       \*

*AmTrust continued to perform at or better than target with a combined ratio for the first six months of 2014 coming in at 95.3%, an improvement over the 95.7% combined ratio that was posted in the first six months of 2013*.

101.   During the August 7, 2014 earnings call, Schmitt stated:

The AmTrust segment also saw a strong growth rate of 28% with net premiums written of $372 million driven by favorable trends in lines of business such as workers' comp. . . .  The AmTrust segment earned premiums grew 24% to $325 million.

\*       \*       \*

*The AmTrust segment reported a combined ratio of 95.3% in the second quarter of 2014 compared to 95.5% in the second quarter of 2013*.

102.   Defendants' August 7, 2014 statements concerning the Company and AmTrust's profitability ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2013, Defendants had utilized initial loss ratios of 48.6% to 52.1% as part of the process to estimate

- 51 -

reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

103.   On September 4, 2014, Raschbaum and Schmitt participated in the Keefe, Bruyette & Woods, Inc. ("KBW") Insurance Conference for analysts and investors.   During the KBW Insurance Conference, Raschbaum and Schmitt addressed the May 2014 *Barron's* article that questioned the propriety of AmTrust and Maiden's accounting for the AmTrust business.  During the call Raschbaum and Schmitt engaged in the following discussion with KBW analyst Robert Farnam:

> [FARNAM:]  One of the other questions that – these reports had come up – was the difference in the balance sheet between you and AmTrust. Can you just go over kind of why they don't tie?  I think the bottom line was that they don't time for some reason.
>
> [SCHMITT:]  Do you want me to take that one?
>
> [RASCHBAUM:]  If you would like to, sure.
>
> *     *     *
>
> [SCHMITT:]  *So the Barron's article was saying that either AmTrust is over-ceding to prop themselves up, or that we are underreporting to make ourselves look better.  But there are at least two things that could be going on, and we think that this is more likely to explain it*.

So when a ceding company is projecting their reserves, they are really focused on net reserves. Gross is a calculation, and they do look at it, but they are really focusing on net. That is what is driving their earnings. So the cession to reinsurers, to all the reinsurers is not as – it is not as refined as the net calculations are.

And then, once you have the growth calculation, and you come up with the ceded reserve – the difference between the gross and the net – you still have to allocate it out to all of those reinsurers. And that clearly is not – I mean, we are quite certain that AmTrust is not calculating ceded reserves by reinsurer. It would be pretty extraordinary, unless you only have one reinsurer, that you would do that. So there are any number of areas where they are going to look a little bit different from us.

And then, in addition, when you are just looking at reported numbers on the balance sheet, you also have some timing differences in when they are reporting to us, and categories of when things are in certain places on the balance sheet versus others. So there was a little bit of that. But, a bigger part of it, I think, is just in the way that companies look at allocating things out by reinsurer, or even the calculation of the ceded itself.

And the other – how we get comfortable, when we look their reserves and ours, as Art said, we do not participate in everything that they do, but we participate in a lot. So we look at the net loss ratio – their net loss ratio, and the loss ratios that we calculate on their business. And those should be pretty close, and they are. Maybe not every single time period, but on an inception-to-date basis, they are going to be pretty close. And last, when the Barron's article came out, and we looked at it, we were within about a point. Actually, we were a little bit higher.

That is not to say that they are wrong, and we are right. Because there are some other things in their book of business that we are not participating in, including some prior-year favorable development that they could be seeing that we are not.

\*     \*     \*

- 53 -

[RASCHBAUM:] So we focus – and we do this with every client – when we establish loss reserves, we look at our business on a client-by-client basis every quarter. We have multi-functional teams, and we do in the AmTrust relationship as well, that look at what is happening from a claim perspective with the company; look at what is happening from a pricing and risk selection environment; and then look at actual raw development. And then we establish our own independent picks. Those get evaluated annually by our outside actuary, our outside auditor [*i.e.*, BDO, who was the same independent auditor for AmTrust, and both auditing teams were led by the same BDO engagement partner, Richard Bertuglia].

104. Defendants' September 4, 2014 statements denying Maiden was inappropriately under-reserving for the AmTrust book of business were false because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was. Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%. ¶¶65-71. For example, between 2011 and 2013, Defendants had utilized initial loss ratios of 48.6% to 52.1% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums. In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net

earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

105.   On September 30, 2014, Maiden participated in the JMP Securities Financial Services and Real Estate Conference.  Raschbaum and Schmitt addressed analysts and investors and Raschbaum confirmed that Defendants had complete transparency into historical claims, payment and actuarial data associated with the AmTrust book of business:

> In addition to our small and midsize-focused regional business, we also have the benefit of a successful and stable multiyear strategic relationship with AmTrust Financial Services.  Since the Company was formed – and it's no surprise AmTrust – or Maiden was formed by the founding shareholders of AmTrust – when the Company was formed, the formative transaction was a 40% quota share of the AmTrust business.

> Since that point in time – what it did immediately for Maiden was it gave it scale to support the half-billion dollar capital base it had at the time.  In addition to that, for AmTrust, it gave them a very stable capital source for their own purposes to support their business development.

> And since that time, the business has evolved.  We've made modifications to the contract, focused on maximizing performance of the contract and delivering value to our customers as well.  It is a large segment of our business, so we do have a dedicated team that performs active diligence on that business.

> In 2013 alone, we completed 17 audits, claims underwriting financial audits, and in all of our client relationships, we maintain a very active audit involvement with our customers to validate the pricing process, risk selection, claims activities, and the efficacy of the statements that we get.  And happy to say that in AmTrust's case, they have been very cooperative and very – a good partner in the process.

We've seen a significant amount of growth over the last two years in this segment. Prior to that, the bigger growth engine was our diversified non-AmTrust business. But AmTrust has benefited significantly from the strength in the primary market. It is the one place for Maiden that we have most directly enjoyed the strength of the primary market, particularly on the small account workers compensation space.

And we feel very comfortable about that business – the pricing, the risk selection, and the capabilities of the AmTrust team in managing it.

106.    On November 6, 2014, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter of 2014 ("3Q 2014") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated:

In the AmTrust segment, we continue to see strong growth with net written premiums in the quarter totaling $386 million which is an increase of 49% from the prior year. This growth is primarily driven by the expansion of their small account workers compensation segment in the US and, of course, the Tower renewal rights transaction. Worker's Compensation pricing has remained strong, particularly in the markets of focus for AmTrust such as California, where they have developed a market-leading position in small account, lower hazard business classes.

We continue to be very satisfied with the quality of business ceded to Maiden from AmTrust. Similar to many of our clients, we work closely with our largest client during regular audit site visits and management meetings to ensure that we have a clear understanding of the underlying business and how it is performing.

***For the nine months ended September 30, Maiden reported a combined ratio of 97.8%.*** That's up slightly from the 97.6% during the first nine months of last year.

\*      \*      \*

*Of course, AmTrust continues to be a very profitable contributor to Maiden's results with a combined ratio of 95.6% in the first three quarters of 2014, which is largely unchanged from the same period last year, and remaining better than target*.

\*　　　\*　　　\*

Finally, from our largest client, AmTrust, we expect to see continued growth in their core small account business, reflecting both pricing power in select markets and the impact of the renewal rights transfer of the Tower business. *We found that AmTrust remains focused on ensuring that profitability holds and we've seen no examples of weakening underwriting standards*.

107.   Defendants' November 6, 2014 statements concerning the Company and AmTrust's profitability ratios and underwriting standards were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2013, Defendants had utilized initial loss ratios of 48.6% to 52.1% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on

- 57 -

net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

108.   After the market close on February 18, 2015, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2014 ("4Q 2014") and FY 2014.   As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release.   The press release reported ***reserve for loss and loss adjustment expenses of $2.195 billion as of December 31, 2014, and net income of $77.1 million for fiscal year 2014***.

109.   On February 19, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2014 and FY 2014 results. Raschbaum and Schmitt participated in the call.   During his opening remarks, Raschbaum stated:

> I'm very pleased to report Maiden's continued strong performance in the fourth quarter and year ended December 31, 2014.  In the quarter and throughout 2014, we made significant progress to profitably expand Maiden's highly differentiated lower volatility-oriented business model.
>
> *        *        *
>
> Premium growth during 2014 was strong.   In the case of AmTrust, the exceptional growth resulted primarily from continued organic growth, the renewal rights transaction with the Tower Group, and rate increases in US workers compensation business. During 2014, AmTrust's net premiums written increased 38%.
>
> *        *        *

- 58 -

*Turning now to underwriting profitability, for the year, we reported a combined ratio of 98% compared to 97.5% in 2013. Our AmTrust business was better than target, resulting in a combined ratio of 95.4%, with net earned premiums increasing 39% year on year to $1.4 billion*.

110.   During the February 19, 2015 earnings call, Schmitt stated:

In the AmTrust Reinsurance segment, net premiums written increased by 58% [in 4Q] to $434 million due to continued rate increases in workers comp as well as new business from the Tower Group renewal rights transaction.  For the full year, AmTrust premiums increased 38%.  Net premiums earned of $600 million increased 24%.

. . . The AmTrust Reinsurance segment net premiums earned were up 48% to $389 million.

The net loss and loss adjustment expenses of $396 million in the fourth quarter of 2014 were up 20%.  *The loss ratio of 64.8% was lower than the 66.8% reported in the fourth quarter of 2013*.

Business mix changes between AmTrust and diversified segments distort loss ratio comparisons.  With AmTrust being entirely quota share, we see higher expense and lower loss ratios compared to diversified, which is a mix of quota share in excess of loss business.

As a result, our focus is on the overall combined ratio.  *The combined ratio for the fourth quarter of 2014 totaled 98.6% compared with 97.3%*.

*         *         *

*The AmTrust Reinsurance segment reported a combined ratio of 94.8% in the fourth quarter of 2014 compared to 96.2%, and 95.4% for the full year versus 95.8% in the prior year*.

111.   Defendants' February 19, 2015 conference call statements concerning the Company and AmTrust's loss and combined ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust

- 59 -

book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2014, Defendants had utilized initial loss ratios of 48.6% to 55.3% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

112.  On March 13, 2015, the Company issued its 2014 annual financial results on SEC Form 10-K.  Raschbaum and Schmitt signed the 2014 Form 10-K pursuant to the requirements of the Exchange Act.  The 2014 Form 10-K repeated the loss and combined ratios for Maiden and AmTrust, which Raschbaum and Schmitt disseminated to analysts and investors during the 4Q 2014 earnings conference call.  These statements regarding the Company's profitability ratios were materially misleading for the same reasons stated in ¶111.

113.   The 2014 Form 10-K also reported a **reserve for loss and loss adjustment expenses of $2.195 billion as of December 31, 2014, and net income of $77.1 million for FY 2014**.

114.   The Company's reported 2014 consolidated loss reserve and net income, as reported in the February 18, 2015 press release and in the 2014 Form 10-K (filed March 13, 2015), were materially false and misleading when made because Maiden had not sufficiently reserved for AmTrust liabilities in 2014.   Had Defendants applied the Company's past history of the AmTrust business generating a loss ratio of approximately 75% (versus 64.8% as reported) its loss reserves for the $1.4 billion AmTrust net earned premiums as of December 31, 2014 would have been approximately $140 million higher and its operating income (functional equivalent of EBITDA) would have been $140 million lower.  But for Defendants' unlawful conduct of deliberately or recklessly under-reserving for AmTrust liabilities during the Class Period, Maiden would have reported higher loss reserves and materially lower net income.

115.   Raschbaum and Schmitt also signed certifications pursuant to SOX, which stated that the 2014 Form 10-K "**does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**."  These certifications

- 61 -

were materially false and misleading when made because the Company was not accurate in reporting its loss and combined ratios, consolidated loss reserves and net income.

116.   On May 6, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter of 2015 ("1Q 2015") results.   Raschbaum and Schmitt participated in the call.   During his opening remarks, Raschbaum stated:

> Welcome and thank you for joining us today.  During the first quarter of 2015, we were pleased with the core performance of Maiden's lower volatility non-catastrophe business.  Notwithstanding a challenging operating environment with low interest rates, a strengthening dollar and an increasingly competitive marketplace, Maiden continued to profitably expand its business while growing its investable asset base.
>
> *        *        *
>
> The largest attribution to first-quarter 2015 premiums came from AmTrust where strong US Workers Compensation pricing and the continued growth from Tower Group business resulted in net premiums written increasing 20% to $503 million.  While the impact of the Tower acquisition will begin to normalize in the future, AmTrust continues to enjoy significant business opportunities in their core segments. Importantly, we continue to observe a rational and disciplined approach by AmTrust in the market.
>
> ***Maiden's combined ratio for the first quarter was 98.2%, an increase over the 97.7% reported in the first quarter of 2014***. . . .  In the first quarter of 2015, we recognized the impact of several large European auto liability losses along with the effect of a strong dollar which negatively impacted the IIS segment and diversified segment results.
>
> *        *        *

*AmTrust combined ratio has continued to perform better than target with the first quarter coming in at 94.6% benefitting from improving Workers Comp rates and a business mix trending toward higher-margin business*.   We remain committed to strengthening operating performance and continue to emphasize underwriting discipline.

117.   Defendants' May 6, 2015 statements concerning the Company and AmTrust's loss and combined ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2014, Defendants had utilized initial loss ratios of 48.6% to 55.3% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

118.   On August 5, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's second quarter of 2015 ("2Q 2015")

- 63 -

results.   Raschbaum and Schmitt participated in the call.   During his opening remarks, Raschbaum stated:

> *Maiden's combined ratio increased in the second quarter to 99.2%, up from 98%.  The AmTrust segment performed well, with a combined ratio of 95.2% for the quarter, an improvement versus 95.7%, largely reflecting changes in business mix*.  We continue to benefit significantly from their profitable growth.

During the August 5, 2015 call, Schmitt repeated Raschbaum's reporting of Maiden and AmTrust's combined ratios for 2Q 2015.

119.   Defendants' August 5, 2015 statements concerning the Company and AmTrust's loss and combined ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2014, Defendants had utilized initial loss ratios of 48.6% to 55.3% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under

the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

120.   On November 5, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter of 2015 ("3Q 2015") results.  Raschbaum and Schmitt participated in the call.  During his opening remarks, Raschbaum stated:

> For the first nine months of the year gross premiums written were up 12% to $2.1 billion, with AmTrust increasing 28%, while the Diversified Reinsurance segment fell 13%.  In the US, premiums from the Diversified segment were down, as we continued to feel the impact of the loss of one [life] client earlier in the year, as well as the impact of underwriting actions resulting in non-renewal of several underperforming accounts.  As we have consistently communicated, we remain focused on maintaining underwriting discipline.

> Despite these challenges, we continue to believe that we're well-positioned to expand our US business.  We've added a number of new accounts this year, grown existing client portfolios, and are actively working with a number of prospects which should enable us over time to offset the impact of underwriting actions and the loss of our large client relationship.  Our focus continues to be on expanding our highest-margin segments and on developing long-term capital solutions for regional insurers.

> \*       \*       \*

> In our AmTrust segment, while growth has moderated as compared to the third quarter of 2014, we continue to enjoy strong organic growth.  You may recall that in the third quarter of 2014 we began to see the full impact of the Tower acquisition.

> ***The year-to-date combined ratio [on a consolidated basis] is [99.6%], compared to 97.8% for 2014***.

121.   During the November 5, 2015 call, Schmitt stated:

*The AmTrust reinsurance segment reported a combined ratio of 95.5% in the third quarter of 2015, compared to 95.6% in the third quarter of 2014*.  In addition, the group combined ratio in the third quarter of 2015 was impacted by 0.6 points of non-operating losses, mainly stemming from the adverse run-off of the NGHC quota share.

*The loss ratio [on a consolidated basis] for the quarter was 67.2%, the same as last year*.  The commission and other acquisition expense ratio was 29.9%, 2 points higher than the 27.9% in the prior year.  The higher commission ratio is due to the larger proportion of quota share business in Q3 of 2015 versus the same quarter last year.  Also the commission ratio for AmTrust is 1 point higher, due to the smaller proportion coming from the hospital liability contract, which has lower acquisition expenses.  The G&A ratio for the quarter was 2.5% compared to 2.7%.

122.   Defendants' November 5, 2015 statements concerning the Company and AmTrust's loss and combined ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2014, Defendants had utilized initial loss ratios of 48.6% to 55.3% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because

Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

123.   After the market close on February 22, 2016, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2015 ("4Q 2015") and FY 2015.   As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release.   The press release reported *reserve for loss and loss adjustment expenses of $2.271 billion as of December 31, 2015, and net income of $100.1 million for FY 2015*.

124.   On February 23, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2015 and FY 2015 results. Raschbaum and Schmitt participated in the call.   During his opening remarks, Raschbaum stated:

> For the full year, Maiden continued to enjoy solid growth, profitable underwriting results, enhanced-expense efficiencies and double-digit operating returns on equity.   Importantly we continued to benefit from our strategic AmTrust relationship while expanding active clients in the United States, implementing our Solvency II triggered Capital Solutions business in Europe and positioning our unique European international insurance services business for expansion. We're confident that we've effectively laid the groundwork for growth in 2016 and beyond.

*     *     *

- 67 -

For the AmTrust-reinsurance segment gross-written premiums increased by 17% to $1.9 billion, reflecting the continued impact of the Tower Group acquisition in the first three quarters of the year while experiencing organic growth throughout the year as well. Absent the fourth-quarter commutation, full-year 2015 gross premiums written for the AmTrust-reinsurance segment increased 21% to approximately $2 billion. Absent major acquisitions, we believe that AmTrust growth will return to more historical pre-Tower acquisition levels.

*Turning now to the combined ratio, for the year ended December 31, 2015, the total combined ratio was 99.3% compared with 98% in 2014*. The diversified-reinsurance segment produced a combined ratio of 103.3% in 2015 compared to 98.3% in the prior year. As I have mentioned, the biggest challenge faced in the diversified segment was from the US commercial auto line of business, which experienced prior-year adverse development throughout the year, but to a much lesser extent in the fourth quarter of 2015.

\*      \*      \*

The AmTrust-reinsurance segment produced a combined ratio of 95.3% [sic] in the year ended December 31, 2015, compared to 95.4% in 2014.

125.   During the February 23, 2016 call, Schmitt stated:   "*The AmTrust-reinsurance segment reported combined ratio of 95.8% in the fourth quarter, compared to 94.9% [in fourth quarter 2014], due to business mix as well as a higher booking rate for select portions of the segment*." Schmitt added: "*The [consolidated] loss ratio for the quarter was 67.8%, higher than the 64.8% reported in the fourth quarter last year*."

126.   Defendants' February 23, 2016 statements concerning the Company and AmTrust's profitability ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business

- 68 -

was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2015, Defendants had utilized initial loss ratios of 48.6% to 55.9% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

127.   On March 1, 2016, the Company issued its 2015 annual financial results on SEC Form 10-K.  Raschbaum and Schmitt signed the 2015 Form 10-K pursuant to the requirements of the Exchange Act.  The 2015 Form 10-K repeated the loss and combined ratios for Maiden and AmTrust, which Raschbaum and Schmitt disseminated to analysts and investors during the 4Q 2015 earnings conference call.  These statements regarding the Company's profitability ratios were materially misleading for the same reasons stated in ¶126.

128.   The 2015 Form 10-K also reported a *reserve for loss and loss adjustment expenses of $2.271 billion as of December 31, 2015, and net income of $100.1 million for FY 2015*.

129.   The Company's reported 2015 consolidated loss reserve and net income, as reported in the February 22, 2016 press release and in the 2015 Form 10-K (filed March 1, 2016), were materially false and misleading when made because Maiden had not sufficiently reserved for AmTrust liabilities in 2015.   Had Defendants applied the Company's past history of the AmTrust business generating a loss ratio of approximately 75% (versus the reported 64.8%) its loss reserves for the $1.6 billion AmTrust net earned premiums as of December 31, 2015 would have been approximately $160 million higher and its operating income (functional equivalent of EBITDA) would have been $160 million lower.  But for Defendants' unlawful conduct of deliberately or recklessly under-reserving for AmTrust liabilities during the Class Period, Maiden would have reported higher loss reserves and materially lower net income.

130.   Raschbaum and Schmitt also signed certifications pursuant to SOX, which stated that the 2015 Form 10-K "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*."  These certifications

were materially false and misleading when made because the Company was not accurate in reporting its loss and combined ratios, consolidated loss reserves and net income.

131.   The 2015 Form 10-K also contained several statements concerning Defendants' purported underwriting discipline, which further misled investors to believe that the AmTrust business was more profitable and stable than it actually was.  For instance, Defendants stated that the "***majority of the exposure in the [AmTrust] book of business has significant seasoning, and allows for a significant amount of credibility in using parameters derived from historical experience to calculate reserve estimates***."  In making that assertion, Defendants further stated that their "actuarial analysis of the [AmTrust] book of business is more refined in that [Maiden] utilizes a combination of quarterly and annual data instead of contract period data in totality."  Further, Defendants assured investors of the accuracy and reliability of their loss reserve estimates by stating "[b]ecause of the refinement of the data, [it] allows [us] greater use of the loss development method earlier on in the maturity of the book than would ordinarily occur."

132.   Defendants' statement regarding having a "credible" approach to underwriting and risk management with regard to the AmTrust book of business was materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually

- 71 -

was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2015, Defendants had utilized initial loss ratios of 48.6% to 55.9% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had been had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.   In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

133.   On May 5, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter 2016 ("1Q 2016") results.   Raschbaum and Schmitt participated in the call.  During his opening remarks, Raschbaum stated:

> While the global reinsurance marketplace remains competitive, our highly differentiated business model continues to serve us well.  For Maiden, our focus on serving the long-term capital needs of our regional and specialty insurer clients remains unchanged.  Importantly, whether it be continued profitable growth from our significant strategic quota share with AmTrust, organic growth from our existing client relationships in our Diversified segment, or expansion emanating from

our European and US new business initiatives; we believe that we're focused on intelligent and disciplined business development.

\*     \*     \*

Turning now to the AmTrust Reinsurance segment, we had gross written premium growth of nearly 4% compared to the first quarter of last year.  Our AmTrust segment growth was dampened somewhat due to the commutation that was implemented in the fourth quarter of 2015, as well as the completion of the onboarding of the new Tower Group premiums last year, which boosted comparative period premium volumes.  That said, we believe that AmTrust remains well-positioned to continue its profitable growth.

**Overall, Maiden's combined ratio was within expectation, at 98.9%, above the 98.2% reported in the first quarter of 2015, but an improvement compared to the fourth quarter and full-year 2015 results**.

In the AmTrust segment, we continue to see strong underwriting results.  **Our combined ratio for the quarter in this segment was 95.3% versus 94.6% in the first quarter of 2015.  While loss ratios and combined ratios for the quarter are modestly higher, this reflects a combination of business mix changes and a higher initial booking ratio**.

134.  During the May 5, 2016 call, Schmitt stated:

Net premiums earned of $616 million, increased 7%. . . .  The AmTrust Reinsurance segment net earned premiums were up 15% to $444 million.  Net, written, and earned premium comparisons are distorted by the significantly larger impact of our corporate retrocessional program in 2016 versus 2015.

Net loss and loss adjustment expenses of $404 million were up 7%.  **The [consolidated] loss ratio of 65% was slightly higher than the 64.8% reported in the first quarter of 2015**.

\*     \*     \*

**The AmTrust Reinsurance segment reported a combined ratio of 95.3% in the first quarter, compared to 94.6% in the first quarter**

- 73 -

*of 2015. The increase was due to a higher booking rate, slightly offset by changes due to business mix. Additionally, the overall combined ratio in the first quarter of 2016 includes $2.8 million of non-operating development in the other category due to adverse development in a few remaining superstorm Sandy claims, which if excluded would have resulted in a 98.5% combined ratio.*

135.  Defendants' May 5, 2016 statements concerning the Company and AmTrust's profitability ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2015, Defendants had utilized initial loss ratios of 48.6% to 55.9% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

- 74 -

136.   On August 5, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 2Q 2016 results.  Raschbaum and Schmitt participated in the call.  During his opening remarks, Raschbaum stated:

Good morning, and thank you for joining us.  Against the backdrop of increasingly intensifying competition, growing loss-cost volatility and declining interest rates, Maiden produced double-digit returns, along with profitable underwriting results, reflecting the wisdom of our unique business model.  With our continued strong focus on risk management, a lower risk underwriting profile than the typical reinsurer, and a conservative investment portfolio focused on high-quality investment-grade debt, we've been able to deliver stronger and more stable operating returns than more traditional volatility-oriented reinsurers.

Importantly, we do this by delivering high-quality reinsurance capital solutions to small to midsize companies, and to our long-standing strategic quota-share reinsurance relationship with AmTrust.  For the quarter, Maiden generated net income per share of $0.39 and operating earnings per share $0.37, along with an annualized return on common equity of 12.3% and an operating return on common equity of 11.3%.  This is the 12th consecutive quarter of double-digit operating returns for Maiden.

\*     \*     \*

In the AmTrust segment, growth was moderated in the second quarter versus the same period in 2015, which reflected the impact of various acquisitions, including Tower.  We also saw the impact of previously commuted lines, along with a disciplined reaction to growing competition in the quarter.  While we expect to see continued growth in this segment for the balance of the year absent any significant unidentified acquisition activity, we do anticipate a more moderate growth rate than in 2015, as prior-year acquisition premium flows normalized.

It's important to note that much of AmTrust reported growth in the quarter has emanated from recent acquisitions in business lines that we've chosen not to participate in.  Despite a softening market,

AmTrust continues to emphasize geographies and lines of business where they can maintain responsible risk-based pricing.

*      *      *

***In terms of underwriting profitability, we saw some improvement in the [consolidated] combined ratio during the quarter of 98.6%, versus 99.2% in 2015.*** AmTrust continues to run at or better than expectations, largely reflecting business mix changes within segments of their portfolio reinsured by Maiden.

137. During the August 5, 2016 call, Schmitt stated:

Gross premium written increased 2% in the quarter to $688 million from $674 million. In the AmTrust Reinsurance segment, gross premiums written were $524 million, compared to $523 million. The AmTrust Reinsurance segment saw limited premium growth this quarter, with increases in the master quota share offset by decreases in the Italian hospital liability contract for the quarter. This segment was also impacted by the commutation announced in the fourth quarter of 2015, and slower growth following the completion of AmTrust's integration of the Tower Group.

Gross premiums written in the Diversified segment were $165 million, an increase of 9%, which Art covered earlier. Net premiums written were $650 million in the quarter, an increase of 3%. Net premiums earned of $638 million increased 5%. In the AmTrust Reinsurance segment, net premiums earned were up 5% to $447 million.

*      *      *

General and administrative expenses for the second quarter totaled $17 million, a 6% increase compared with $16 million. The G&A expense ratio was 2.7% in the second quarter, which is the same as last year. ***The combined ratio for the second quarter totaled 98.6%, compared with 99.2%. The AmTrust Reinsurance segment reported a combined ratio of 94.9%, compared to 95.2%***.

138. Defendants' August 5, 2016 statements concerning the Company and

AmTrust's profitability ratios were materially misleading when made because they

- 76 -

gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was. Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%. ¶¶65-71. For example, between 2011 and 2015, Defendants had utilized initial loss ratios of 48.6% to 55.9% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums. In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

139. On November 3, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter 2016 ("3Q 2016") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated:

> In the quarter Maiden's highly differentiated business model continues to serve us well, notwithstanding a challenging operating environment characterized by continued strong competition and a growing level of loss cost volatility. As we have throughout the year, in the quarter we remain focused on maintaining underwriting

discipline, while leveraging our highly efficient operating platform and balance sheet and our unique low volatility non-underwriting focus.

*      *      *

AmTrust gross written premium for the quarter totaled $520 million, which is up 15% from the prior-year.  Quarterly results include the first sessions of several US commercialized acquisitions.   The session reflects the gross stream of written and ceded year to date.  As a result, we do not view 15% as necessarily a run rate.  We believe the annual incremental run rate is lower absent significant acquisitions and as we've commented in the past, net of acquisitions we expect organic growth to be in the single digits reflecting AmTrust disciplined response in a competitive market.

**Maiden's combined ratio has improved to 98.5% in the third quarter**, we continued to see pressure on the diversified segment from adverse development in the commercial auto line of business with a third-quarter combined ratio of 102.2%[.]  However we do believe we have been early to recognize challenges in this line of business with aggressive on-site audits and active use of additional case reserves and we're confident that our efforts to address nonprofitable contracts will benefit us in the future.

*      *      *

Maiden's disciplined underwriting philosophy continues to drive underwriting efforts and we remain committed to focusing on profitability.  **The combined ratio in the quarter for the AmTrust segment was 95.9% as compared to 95.4% in the prior-year, across the underwriting portfolio we remain focused on enhancing underwriting results absent the impact of adverse commercial audit development across the portfolio, our core underwriting performance is in line with our expectations**.

140.   During the November 3, 2016 call, Schmitt stated:

In the AmTrust Reinsurance segment net premiums written were $512 million, an increase of 18%.  The AmTrust segment net written premiums are somewhat inflated in the quarter due to a one-time catch-up of premiums from acquisitions that were ceded for the first time

- 78 -

during the quarter.  On a year-to-date basis AmTrust net premiums written are up 6%.

. . . The AmTrust Reinsurance segment net premiums earned were $523 million, up 12%.  Net loss and loss adjustment expenses of $467 million were up 5%.  ***The loss ratio of 66.6% dropped slightly from 67.2%***.

\*       \*       \*

***The AmTrust Reinsurance segment combined ratio was 95.9% in the third quarter, compared to 95.4%***.

141.   Defendants' November 3, 2016 statements concerning the Company and AmTrust's profitability ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2015, Defendants had utilized initial loss ratios of 48.6% to 55.9% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under

the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

142.   Prior to market open on February 28, 2017, Maiden issued a press release reporting the Company's financial results for 4Q 2016 and FY 2016.  As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release.  The press release reported *reserve for loss and loss adjustment expenses of $2.896 billion as of December 31, 2016, and net income of $15.2 million for FY 2016*.

143.   On February 28, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2016 and FY 2016 results.  Raschbaum and Schmitt participated in the call.  During his opening remarks, Raschbaum stated:

> Thank you, Noah.  Good morning.  As we indicated in our pre-release communication several weeks ago, in the fourth quarter we have recorded a $120 million reserve charge, reflecting continued adverse development, primarily in the commercial auto line.
>
> As you know, for quite some time, we and others throughout the industry have continued to experience unexpected adverse loss development.  In the fourth quarter, we experienced a continued unexpected level of loss development, primarily emanating from the 2011 to 2014 historical underwriting years across Maiden's portfolio.  In the Diversified segment, much of this activity was focused on our historical excess of loss portfolio, and to a lesser extent, our pro rata business.

In the AmTrust segment, we experienced adverse development, primarily in their US program segment. As you may know, AmTrust also reported an elevated level of loss development from their program segment (technical difficulty) in the quarter.

Across our portfolio, the fourth-quarter charge reflects both the response to incurred loss development during the quarter, and an overall increase in our reserves in view of the ongoing loss cost volatility. Karen will provide more details on this following my opening remarks. ***As a result of the reserve charge, Maiden's full-year combined ratio was 103.2%***, and our return on equity and operating return on equity were 1.6% and 1.9%, respectively.

144.   During the February 28, 2017 call, Schmitt stated:

Gross premiums written in the fourth quarter of 2016 increased 8.8% to $572 million. The Diversified Reinsurance segment's gross premium written grew 8%, and totaled $157 million. The gross resulted from existing client accounts and revenue from new customers added throughout the year. In the AmTrust Reinsurance segment, gross premiums written were $415 million.

Net premiums written totaled $521 million in the fourth quarter, an increase of 7%. Net premiums earned were $616 million, an increase of 6%. Net premiums earned in the Diversified Reinsurance segment increased 7% to $186 million. The AmTrust Reinsurance segment net premiums earned were $430 million, up 5%.

\*       \*       \*

***The combined ratio for the fourth quarter of 2017 (sic) totaled 117.4%, compared with 99.9%***. In order to provide some visibility to the underlying performance of the current underwriting, if we exclude the fourth-quarter reserve charge related to prior-year development, Maiden's combined ratio for the fourth quarter of 2016 would have been 97.9%. The Diversified Reinsurance segment was 128.3% in the fourth quarter, compared to 103.6%. The Diversified segment combined ratio was negatively impacted by reserve additions of $57 million from commercial auto business. Excluding the fourth-quarter reserve charge, the Diversified Reinsurance combined ratio would have been 98.1%.

- 81 -

> *The AmTrust segment combined ratio was 108.1% in the fourth quarter, compared to 95.8%, as net adverse development of auto and general liability reserves, primarily related to AmTrust specialty program business unit, reduced profitability of the segment by $52 million.  If we exclude the reserve charge in the fourth quarter of 2016, the AmTrust combined ratio would have been 96%.*

145.   While, as discussed in ¶¶168-184, the February 28, 2017 disclosures partially revealed the truth about Defendants' prior misrepresentations, Defendants' statements in the press release and conference call continued to be materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2016, Defendants had utilized initial loss ratios of 48.6% to 56.4% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

146.    On March 6, 2017, the Company issued its 2016 annual financial results on SEC Form 10-K.  Raschbaum and Schmitt signed the 2016 Form 10-K pursuant to the requirements of the Exchange Act.  The 2016 Form 10-K repeated the loss and combined ratios for Maiden and AmTrust, which Raschbaum and Schmitt disseminated to analysts and investors during the 4Q 2016 earnings conference call. These statements regarding the Company's profitability ratios were materially misleading for the same reasons stated in ¶145.

147.    The 2016 Form 10-K also reported a **_consolidated loss reserve of $2.896 billion as of December 31, 2016, and net income of $15.2 million for FY 2016_**.

148.    The Company's reported 2016 consolidated loss reserve and net income, as reported in the February 28, 2017 press release and in the 2016 Form 10-K (filed March 6, 2017), were materially false and misleading when made because Maiden had not sufficiently reserved for AmTrust liabilities in 2016.   Had Defendants applied the Company's past history of the AmTrust business generating a loss ratio of approximately 75% (versus the reported 64.8%) its loss reserves for the $1.8 billion AmTrust net earned premiums as of December 31, 2016 would have been approximately $180 million higher and its operating income (functional equivalent of EBITDA) would have been $180 million lower.  But for Defendants' unlawful conduct of deliberately or recklessly under-reserving for AmTrust

- 83 -

liabilities during the Class Period, Maiden would have reported higher loss reserves and materially lower net income.

149.   Raschbaum and Schmitt also signed certifications pursuant to SOX, which stated that the 2016 Form 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***."   These certifications were materially false and misleading when made because the Company was not accurate in reporting its loss and combined ratios, consolidated loss reserves and net income.

150.   On May 9, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter of 2017 ("1Q 2017") results.   Raschbaum and Schmitt participated in the call.   During his opening remarks, Raschbaum stated:

> Good morning, and welcome.  Following our challenging fourth quarter, results during the first quarter of 2017 have improved significantly, but is still a bit short of our expectations.  Nevertheless, we are optimistic that we remain on track to achieve double-digit non-GAAP operating returns for the full year, profitable underwriting results and disciplined year-on-year growth.
>
> In the quarter, in addition to recording more conservative initial loss picks for the most recent underwriting year, we did experience a modestly higher-than-anticipated level of loss activity from prior periods, which we will discuss further.  ***In combination, these factors resulted in a combined ratio of 100.9%***.  While the market environment

- 84 -

remains challenging, gross premiums written grew 7% during the quarter with growth in both of our operating segments.

\*       \*       \*

The AmTrust reinsurance segment grew 8% during the first quarter, which is below historical growth levels for AmTrust but more in line with our expectations, and it reflects continued discipline and the continued impact of 2016 acquisition activity.  As you may know, AmTrust continues to build its business.  But in some cases, we do not participate in certain new lines of business.  As a result, our growth rates do not always match theirs.  ***In terms of worker's compensation, AmTrust's largest line of business, we continue to monitor the qualitative aspects of that business and we've not seen any significant changes in risk profile within the lower severity smaller commercial accounts that AmTrust targets***.

151.   During the May 9, 2017 call, Schmitt stated:

In the AmTrust Reinsurance segment, gross premiums written were $591 million, an increase of 8%.

\*       \*       \*

***The AmTrust Reinsurance segment combined ratio was 99.8% in the first quarter of 2017, compared to 95.3% [in first quarter of 2016], partially due to higher initial loss ratio on the master quota share as well as adverse development of approximately $10 million***.  There was no adverse development booked for AmTrust commercial auto in the quarter.  The adverse development related to general liability and Worker's Compensation lines of business in response to higher loss emergence in recent quarters.  ***While there's a possibility that some of the development is a reflection of recent claim process changes and a review is underway, we chose to recognize that movement as adverse development in the quarter***.

152.   Defendants' May 9, 2017 statements concerning the Company and AmTrust's profitability ratios were materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was

- 85 -

more profitable than it actually was. Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%. ¶¶65-71. For example, between 2011 and 2016, Defendants had utilized initial loss ratios of 48.6% to 56.4% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums. In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

153.   On August 9, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 2Q 2017 results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated:

> Good morning, and thank you for joining us. Results for the quarter were challenged with adverse loss development observed in both of our operating segments. While I'll get into our overall business activities for the quarter shortly, I believe it's important to address this development first. We do not believe that the development observed in the quarter is analogous to the trend observed across our portfolio over many quarters, which specifically emanated from elevated excess commercial auto liability frequency and severity in our treaty portfolio for the 2011 to 2014 underwriting years. That's a phenomenon that has plagued many in the industry for some time.

In contrast, this quarter we responded to specific development, largely related to specific accounts. . . .

As a result of the adverse development, Maiden produced a non-GAAP operating loss for the quarter of $12 million and generated non-GAAP operating income for the first 6 months of $10 million. Beginning with the AmTrust Reinsurance segment, we experienced $29 million of adverse development in the quarter. We mentioned in our first quarter results that we've been observing changes in loss activity in the small account commercial casualty lines in the last 2 quarters, which were impacting a number of underwriting years. We committed to complete a review of claim activity in advance of the quarter. In our experience, the pattern suggested that they were either fundamental changes in the way losses are developing or there were changes in claim practices that influence the development or a combination of both.

\*       \*       \*

Looking at the AmTrust segment. Gross written premiums in the quarter were $564 million, up 7.8% from the prior year second quarter; that's the same as the year-to-date change. Much of the growth continues to reflect the impact of 2016 acquisition activity versus the prior year. The majority of AmTrust growth is emanating from the workers' comp and small account commercial underwriting portfolios in the U.S. Absent the impact of acquisitions that were first ceded to Maiden in 2016, overall organic growth is relatively modest as they continue to maintain discipline. The warranty and special risk businesses are up year-on-year, while the revenue from Hospital Liability has continued to decline, again, reflecting continued discipline. We expect continued moderation in AmTrust growth as prior year acquisitions are fully absorbed, and disciplined underwriting actions in its program business continue to be implemented.

154.   During the August 9, 2017 call, Schmitt stated:

In the second quarter of 2017, gross premiums written increased 2.5% to $705 million from $6 million. Gross premiums in the diversified segment totaled $141 million, a decrease of 15% versus the second quarter of 2016, which, as Art mentioned, was primarily affected by the termination and commutation of one account.

- 87 -

Our AmTrust Master Quota Share business saw an increase in premiums during the second quarter, while European Hospital Liability business continues to decline and is down more than 20% on a year-to-date basis.

Net premiums written totaled $684 million, an increase of 5%. Net premium written changes were higher than gross written premium changes due to reduced usage of the retrocessional quota share in 2017 versus 2016.

Net premiums earned were $711 million, an increase of 12%. In the Diversified Reinsurance segment, premiums – net premiums earned increased 7% to $204 million. The AmTrust Reinsurance segment net premiums earned were $507 million, up 13%. The lower utilization of retrocessional support also impacted net premiums earned in both of our operating segments.

Net loss and loss adjustment expenses of $529 million were up 24%. The loss ratio of 74.1% was higher than the 66.8% reported in the second quarter of 2016, largely due to the adverse development recognized in both operating segments.

\*     \*     \*

***The combined ratio for the second quarter totaled 105.8%, compared with 98.6% in the second quarter of 2016. For the first 6 months of 2017, the combined ratio was 103.4%, compared to 98.7% in the corresponding period last year.***

***The AmTrust Reinsurance segment combined ratio was 101.5%, compared to 94.9%.*** In the AmTrust segment, we experienced adverse loss development in the U.S. small account casualty lines. In the quarter, AmTrust announced the purchase of an adverse development cover that would respond to adverse net development over its entire portfolio with outstanding reserves. Maiden does not participate in this contract, and the economic impact does not [in origin] Maiden nor is the cost allocated to Maiden.

As we've commented in the past, Maiden reinsures a specific portion of the AmTrust underwriting portfolio, not the entire book. As an example, Maiden does not assume in-force liabilities of any acquired

- 88 -

business with the exception of the single 2008 deal that Art mentioned, and does not reinsure Lloyd's syndicates.

155.   Later during the August 9, 2017 call, Raschbaum engaged in the following discussion with KBW equity analyst Christopher Campbell:

[CAMPBELL:]   And then just over on the reserving.  Obviously, reinsurance reserving is complicated, right?  You're at a level back from the ultimate – the risk.  But Maiden have taken 2 big reserve charges in the past 3 quarters, so there could be some investor concerns about the process.  So what steps are you taking to improve this?  And do you think Maiden may need to buy its own reserve cover on AmTrust segment, given the relative exposure it has in your book?

[RASCHBAUM:]   Well, let me take those in pieces here.  First of all, we're equally concerned.  And we want to ensure investors that we don't take lightly what occurred at the end of the year and what occurred in this quarter.  I'd still kind of reinforce the fact that what occurred at the end of the year was significantly a function of an adverse industry-wide trend related to commercial auto.  I wish, in retrospect, that we hadn't generated as much in those particular underwriting years that created the adverse.  It's important to point out that – and this was in our excess business – if you exclude the effect of commercial auto and you look at the rest of our excess business, it's been very solidly and quite consistently profitable, even in those same years.  So – and we keep looking to see whether there's any other line that's manifesting the same behavior.  And to date, we've not found it.  But it's intensified our effort to get in, look at files and get comfortable with preserving and post additional case reserves when appropriate and necessary.  So I think that, that issue is an issue that we've been talking about for quite some time.  Our action at the end of the year was to try to be more permanently responsive to that issue.  And as I say, the first quarters of this year, excess commercial auto development has not been an issue.  It's been relatively benign, which gives us some comfort that, that issue is addressed.

*The things that occurred in the quarter itself, as I said earlier, were kind of more account-specific issues*.  And we believe that our reaction to the things that we saw in the quarter are responsive.  And we believe that – our view is that prospectively, we think there's a

- 89 -

significant opportunity; obviously, restore our profitability and continue.  We can't ever make a guarantee that we'll never see adverse development.

*    *    *

**The issues in this quarter are pretty unique to the quarter.  I don't believe at this point they're systemic, and we'll keep watching it.  But as we look at going forward, I think that the excess commercial auto activity has been addressed.  You can never be 1,000% sure, but we believe that we have, and I think the issues in this quarter have been addressed**.

156.   While, as discussed below in ¶¶174-184, the August 9, 2017 disclosures partially revealed the truth about Defendants' prior misrepresentations, Defendants' statements, including those statements regarding adverse developments being limited to the current quarter and specific accounts, continued to be materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2016, Defendants had utilized initial loss ratios of 48.6% to 56.4% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition,

- 90 -

because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

157.   On November 9, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter of 2017 ("3Q 2017") results.  Raschbaum and Schmitt participated in the call.  During his opening remarks, Raschbaum stated:

> Despite the relatively modest losses from catastrophe events, Maiden's results were most significantly impacted by prior period development, primarily emanating from the AmTrust Reinsurance segment.  Within this segment, we've commented previously that we've seen a significant level of claims process changes that have created distortions and loss development when compared to historical patterns.  Although we believe these reflect substantial improvements throughout their claim operation and we're validating these changes through increased and enhanced audit activity, they are influencing the patterns observed in the last several quarters and as a result, we believe it's prudent to recognize much of the loss emergence observed in the quarter as prior period development.

> We do believe that these process changes should normalize over time given the implementation of many initiatives, which began last year.  While Karen will provide a bit more detail on the prior period development shortly, the total amount of prior development recognized from the AmTrust segment was $61 million.  Relative to the significant historical premiums that we've assumed from our largest client, the development realized in the quarter and on a historical basis is relatively modest.  Despite the challenges of recent results, our reinsurance contracts with AmTrust remain profitable on an inception-to-date basis.

> *            *            *

> ***Overall, the impact of the prior period development and the cat losses do mask a number of favorable trends observed in the quarter,***

- 91 -

including a continued strengthening of our investment earnings, strong growth in our Diversified segment emanating from both our U.S. platform and our international insurance services brand and insurance solutions business, primarily in Europe, growth in unrealized gains, solid growth in invested assets and reduced share count reflecting active share repurchases in the quarter. *These continuing trends will ultimately strengthen returns as we return to more stable underwriting results*.

*For the quarter, Maiden's combined ratio was 114%*, reflect both – reflecting both the cat losses and the prior period development. That resulted in a net loss for the quarter, which Karen will provide more detail on shortly.

\*      \*      \*

*Clearly, today our share price reflects shareholder reaction to our reported prior period development, but it's our view that at the current share price, the level of discount is unrealistic, and it presupposes a dramatically higher future level of prior period development*. We obviously don't agree, but as I stated in the past, we believe that as management, we have an absolute obligation to respond and validate prior period development. We remain committed to strengthen and stabilize our underwriting performance.

\*      \*      \*

Within the AmTrust segment, gross premium written was down 19%. We anticipated a drop emanating from the program segment with the prior quarter's news that several significant programs had been terminated as of September 1, along with a slower rate of organic growth, both of which are occurring. In addition, the decline in premium written reflects changes in 2017 to the mix of programs in the specialty risk and extended warranty business and in 2016, the cession of premium for the first time from a series of acquisitions made by AmTrust in its small commercial and specialty program businesses.

158.   During the November 9, 2017 call, Schmitt stated:

Last night, Maiden reported a third quarter 2017 net loss attributable to common shareholders of $64 million or $0.74 per

common share compared to net income attributable to common shareholders of $32 million or $0.40 per share. The non-GAAP operating loss was $56 million or $0.66 per common share compared with non-GAAP operating earnings of $30 million or $0.39 per share. Maiden's gross premiums written decrease 11% to $631 million from $707 million. In the Diversified Reinsurance segment, gross premiums written totaled $211 million, an increase of 13% as a result of growth from existing client relationships and development of new business.

In the AmTrust Reinsurance segment, gross premiums written were $420 million, a decrease of 19%. The drop in the AmTrust segment gross premiums written was significantly influenced by changes in 2017 to the mix of programs in the specialty risk and extended warranty business and in 2016, the cession of premiums for the first time from a series of acquisitions made by AmTrust in its small commercial and specialty program businesses. While we do expect a moderation in growth from AmTrust relative to previous quarters due to disciplined underwriting and lower program volume business, we believe this quarter is not indicative of expected run rate. We do, however, expect that Diversified Reinsurance segment growth should outpace AmTrust segment growth for the foreseeable future.

Net premiums written totaled $617 million in the third quarter or 11% lower. Net premiums earned were $654 million, a decrease of 6%. In the AmTrust Reinsurance segment, net premiums earned increased 24% to $218 million. The AmTrust Reinsurance segment net premiums earned were $436 million or 17% lower. Net loss and loss adjustment expenses of $536 million were up 15%. *The loss ratio of 81.6% was higher than the 66.6% reported in the third quarter of 2016 due to prior year development and the impact of catastrophes during the quarter*. Commission and other acquisition expenses decreased 6% to $193 million in the third quarter. The expense ratio increased to 32.5% in the third quarter of 2017 compared with 31.9%.

\*    \*    \*

*AmTrust Reinsurance segment combined ratio was 113.3% in the third quarter of 2017 compared to 95.9%*. The AmTrust Reinsurance segment combined ratio was impacted by $61 million of net prior year development, predominantly from the specialty program and small business commercial businesses, mainly from general

- 93 -

liability.  In addition, the non-operating other reported category had $9 million of prior year development.

159.   While, as discussed below in ¶¶175-184, the November 9, 2017 disclosures partially revealed the truth about Defendants' prior misrepresentations, Defendants' statements, including those statements suggesting the AmTrust book of business would not see a "dramatically higher" amount of future adverse development, continued to be materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2016, Defendants had utilized initial loss ratios of 48.6% to 56.4% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80% over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share Agreement, the business was significantly less profitable (and often times operated at a loss).

160.   After the market close on February 27, 2018, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2017 ("4Q 2017") and FY 2017.   As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release.   The press release reported *reserve for loss and loss adjustment expenses of $3.547 billion as of December 31, 2017, and a net loss of $171.5 million for FY 2017*.

161.   On February 28, 2018, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2017 and FY 2017 results. Raschbaum and Schmitt participated in the call.   During his opening remarks, Raschbaum confirmed that the adverse developments Maiden experienced in the AmTrust Reinsurance segment were associated with the 2014-2016 underwriting years, when the rate of AmTrust earned premiums was at its highest:

> The total amount of recognized development in the fourth quarter was $171 million, with $139 million of that emanating from the AmTrust segment.
>
> The most significant amount of the development recognized in 2017, and in particular, the fourth quarter, focused on the AmTrust segment.   As we've commented in previous quarters, we've observed elevated levels of loss emergence, primarily across the U.S. casualty lines, including workers' compensation, general liability and auto and predominantly, in the 2014 through 2016 underwriting years.
>
> *             *             *
>
> One final note regarding Maiden's adverse development.   We have evaluated a number of potential adverse development cover

- 95 -

structures over the last several months, but we recently concluded that the cost as well as the transaction accounting provides little real benefit to Maiden and its shareholders.  Karen will provide more detail on the quarter and annual results.  But needless to say, that a full year net loss of $199 million is unacceptable.

162.   During the February 28, 2018 call, Schmitt stated:

Last night, Maiden reported a fourth quarter 2017 net loss attributable to common shareholders of $134 million or $1.59 per diluted common share compared to net loss attributable to common shareholders of $75 million or $0.87 per share.

\*       \*       \*

Net premiums written increased by 4% in 2017 to $2.76 billion from $2.65 billion.  Net premiums earned in 2017 were $2.73 billion, an increase of 6.4%.  For the year, gross written premiums were $823 million in Diversified and just under $2 billion in the AmTrust Reinsurance segment, both essentially unchanged from the prior year.

**The combined ratio for 2017 totaled 111.3% compared to 103.2%.**  For the full year, the Diversified reinsurance segment's combined ratio was 107.1% compared to 109.4% in 2016.  **And in 2017, the combined ratio in the AmTrust segment was 110.8% compared to 98.4% in 2016**.

Adverse development was the main driver of the higher combined ratio for the year, with the loss ratio increasing from 70.6% to 78.8%.  The expense ratio was 32.5% versus 32.6%, and the general and administrative expense ratio was 2.6%, the same as last year.

\*       \*       \*

**The combined ratio for the fourth quarter totaled 125.5% compared with 117.4% last year**.

\*       \*       \*

**The combined ratio in the AmTrust Reinsurance segment was 131.1% in the fourth quarter compared to 108.1% in the fourth quarter of 2016**.

The AmTrust Reinsurance segment combined ratio was impacted by $139 million of net adverse development, primarily in workers' comp and general liability and to a lesser extent, in commercial auto liability. ***Excluding the adverse development, the AmTrust segment combined ratio would have been 100.8% in the fourth quarter, reflecting the higher booking rates in this segment for the current year***.

163.   While, as discussed below in ¶¶177-184, the disclosures on February 27 and 28, 2018 partially revealed the truth about Defendants' prior misrepresentations, Defendants' statements concerning the Company and AmTrust's profitability ratios continued to be materially misleading when made because they gave investors the misleading impression that the AmTrust book of business was more profitable than it actually was.  Specifically, Defendants were estimating loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater than 60%.  ¶¶65-71.  For example, between 2011 and 2017, Defendants had utilized initial loss ratios of 48.6% to 62.1% as part of the process to estimate reserves, despite the historical data Defendants had access to, or were aware of, indicating that the loss ratios had normalized to between 70% and 80%  over time for the same book of AmTrust net premiums.  In addition, because Maiden was required to pay AmTrust an additional 30% in commissions on net

earned premiums under the AmTrust Quota share of business, the business was significantly less profitable (and often times operated at a loss).

164.   On March 1, 2018, the Company issued its 2017 annual financial results on SEC Form 10-K.  Raschbaum and Schmitt signed the 2017 Form 10-K pursuant to the requirements of the Exchange Act.  The 2017 Form 10-K repeated the loss and combined ratios for Maiden and AmTrust, which Raschbaum and Schmitt disseminated to analysts and investors during the 4Q 2017 earnings conference call. These statements regarding the Company's profitability ratios were materially misleading for the same reasons stated in ¶163.

165.   The 2017 Form 10-K also reported a ***consolidated loss reserve of $3.547 billion as of December 31, 2017, and a net loss of $171.5 million for FY 2017***.

166.   The Company's reported 2017 consolidated loss reserve and net income, as reported in the February 27, 2018 press release and in the 2017 Form 10-K (filed March 1, 2018), were materially false and misleading when made because Maiden had not sufficiently reserved for AmTrust liabilities in 2017.   Had Defendants applied the Company's past history of the AmTrust business generating a loss ratio of approximately 75% (versus the reported 66.5%) its loss reserves for the $1.8 billion AmTrust net earned premiums as of December 31, 2016 would have been approximately $92 million higher and its operating income (functional

equivalent of EBITDA) would have been $92 million lower.  But for Defendants' unlawful conduct of deliberately or recklessly under-reserving for AmTrust liabilities during the Class Period, Maiden would have reported higher loss reserves and materially lower net income.

167.   Raschbaum and Schmitt also signed certifications pursuant to SOX, which stated that the 2017 Form 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***."  These certifications were materially false and misleading when made because the Company was not accurate in reporting its loss and combined ratios, consolidated loss reserves and net income.

## THE TRUTH EMERGES

168.   As specified below, beginning in February 2017 and running through November 2018, Maiden was forced to make a series of negative disclosures regarding adverse developments in the Company's AmTrust Reinsurance segment. Over this period, and largely as a result of these disclosures, Maiden's share price dropped from $16.50 per share to under $2.50 per share.  Maiden's share price has never recovered, and currently trades for less than $1.00 per share.

169.   Following the close of the market on February 14, 2017, Maiden issued a press release disclosing that the Company would have to take a reserve charge of approximately $120 million and that the charge primarily emanated from losses related to adverse developments from the 2011-2014 underwriting years.  The press release stated that Maiden's management would provide additional details regarding the reserve charge on a conference call schedule for February 28, 2017.

170.   As a result of the disclosure of the reserve charge, Maiden's stock price fell nearly 10%, from $16.65 to $15.02 per share, on February 15, 2017, on abnormally high trading volume of 1,075,400 shares.

171.   Following the close of the market on February 27, 2017, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Fourth Quarter and Year-End 2016 Financial Results."  The press release disclosed that $52 million of the previously announced $120 million reserve charge stemmed from Maiden's AmTrust Reinsurance segment, and an additional $11.5 million of the charge reflected reserves for Maiden's reinsurance of National General Holdings Corporation, another related insurance company controlled by the Karfunkels.  The release also disclosed that, due to the reserve charge, Maiden suffered a net loss of $74.7 million for 4Q 2016 alone, and that net income for FY 2016 was reduced by 89%, from $135.7 million to $15.2 million.  The release further disclosed that the loss ratio for 4Q 2016 for the AmTrust Reinsurance segment was 76.1%, more than

10% higher than what was reported the prior year.  Prior to the market opening on February 28, 2017, Maiden hosted a conference call with analysts to discuss the 4Q 2016 and FY 2016 results.  During the call, Raschbaum and Schmitt acknowledged the impact of the large reserve charge on Maiden's earnings and warned that, as a result of audit procedures concerning the charge, Maiden might be forced to delay filing the Company's Form 10-K on a timely basis.

172.   As a result of the disclosures in the February 27, 2017 press release and February 28, 2017 conference call regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell an additional 6.4%, from $14.58 to $13.65 per share, on February 28, 2017, on abnormally high trading volume of 1,131,900 shares.

173.   After the close of the market on August 8, 2017, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Second Quarter 2017 Financial Results."   The press release disclosed that Maiden suffered net adverse developments in 2Q 2017 of $29.4 million from the AmTrust Reinsurance segment. The release also disclosed that, primarily due to the adverse developments in the AmTrust segment, Maiden suffered a net loss of $22.4 million in 2Q 2017, $53.3 million less than the Company's reported net income in 2Q 2016.  Prior to the market opening on August 9, 2017, Maiden hosted a conference call with analysts to discuss the 2Q 2017 results.  During the call, Raschbaum acknowledged that the adverse

developments in the AmTrust segment largely reflected ongoing diligence and active management of Maiden's relationship with AmTrust.

174.   As a result of the disclosures in the August 8, 2017 press release and August 9, 2017 conference call regarding adverse developments in the AmTrust Reinsurance segment and Maiden's financial results, Maiden's stock price plummeted 31.3%, from $9.55 to $6.56 per share, by the close of the market on August 10, 2017.  This stock price decline was on abnormally high trading volume of 2,132,600 shares on August 9 and 1,821,900 shares on August 10.

175.   Following the close of the market on November 8, 2017, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Third Quarter 2017 Financial Results."   The press release disclosed that "[n]et adverse loss reserve development in the third quarter of 2017 was $77.7 million.  Primarily emanating from the AmTrust reinsurance segment."  The release further provided that the net adverse development emanating from the AmTrust business was $61.1 million and that the loss ratio for the AmTrust segment was 81.4%, up significantly from the 63.9% loss ratio reported for 3Q 2016.  As a result of the adverse developments reported for the AmTrust segment, Maiden suffered a net loss of $63.6 million in 3Q 2017, a decline of more than $95 million from the reported income in 3Q 2016.  Prior to the market opening on November 9, 2017, Maiden hosted a conference call with analysts to discuss the 3Q 2017 results.  During the call, Raschbaum conceded that

"Maiden's results were most significantly impacted by prior period development[s], primarily emanating from the AmTrust Reinsurance segment."

176.   As a result of the disclosures in the November 8, 2017 press release and November 9, 2017 conference call regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell once again, from $7.75 to $6.07 per share, a one day decline of 21.7% on abnormally high trading volume of 2,497,000 shares.

177.   On February 27, 2018, after the close of the market, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Fourth Quarter and Full Year 2017 Financial Results."  The press release disclosed that net adverse loss reserve developments in just 4Q 2017 totaled $171 million, largely from the AmTrust Reinsurance segment.  The release further provided that the loss ratio for the AmTrust segment had increased to 98.4%.  As a result of the disclosed adverse developments, Maiden suffered a net loss of $133.6 million in 4Q 2017 alone.  Prior to the market opening on February 28, 2018, Maiden hosted a conference call with analysts to discuss the 4Q 2017 results.  During the call, Raschbaum disclosed that $139 million of the adverse loss reserve development in 4Q 2017 emanated from the AmTrust Reinsurance segment.  The $171 million adverse development charge taken in 4Q 2017 was more than the entire reserve charge in 2016, and brought the total adverse development reserves for FY 2017 to $311.3 million, 77% of which emanated from the AmTrust segment.

178.   As a result of the disclosures in the February 27, 2018 press release and February 28, 2018 conference call regarding losses in the AmTrust reinsurance segment and Maiden's financial results, Maiden's stock price suffered a one day decline of 16.6%, from $6.79 to $5.66 per share, on abnormally high trading volume of 2,498,200 shares.

179.   Prior to the opening of the market on August 9, 2018, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Second Quarter 2018 Financial Results – Company provides update on strategic review."   The press release disclosed that Maiden had to record an additional $36.4 million in adverse loss development, of which $28.4 million, 78%, emanated from the AmTrust segment.   As a result of the adverse loss development, Maiden also had to report that the Company suffered a net loss of $5.9 million for the second quarter of 2018 ("2Q 2018").   Following the string of disclosures uncovering their previous misstatements and causing the precipitous decline in Maiden's stock price, it was also announced on August 9, 2018, that defendants Raschbaum and Schmitt were leaving the Company.   As a result of the true facts emerging about the AmTrust Reinsurance segment, Maiden was also forced to disclose that the Company's dividend payment would be cut by two-thirds.   Defendants declined to hold a conference call after the August 9, 2018 press release.

180.  As a result of the disclosures in the August 9, 2018 press release regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell sharply from $7.37 to $4.32 per share, a one day decline of 41.4%, on abnormally high trading volume of 2,516,900 shares.

181.  Shortly after August 9, 2018, Maiden disclosed in a series of announcements that it had entered into a number of agreements to sell a large portion of its business to competitors, effectively divesting the Company's U.S. reinsurance treaty operations.  After these divestitures, Maiden was left with significantly reduced business.  The Company, however, maintained its AmTrust business, which continued to form a significant majority of the Company's source of revenue.

182.  Finally, after the close of the market on Friday, November 9, 2018, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Third Quarter 2018 Financial Results – Company enters loss portfolio transfer for AmTrust loss reserves."  The press release disclosed that Maiden had to record a massive adverse loss development of $210.4 million for the AmTrust Reinsurance segment.  The release also disclosed that the loss ratio for Maiden's AmTrust Reinsurance segment had increased to 117.9%.  As a result of these belated disclosures regarding the AmTrust Reinsurance segment, Maiden suffered a net loss of $308.8 million in 3Q 2018.

183.   As a result of the disclosures in the November 9, 2018 press release regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell sharply the following trading day, November 12, 2018.  On that day, Maiden's share price dropped 31.8%, from $3.52 to $2.40 per share, on abnormally high trading volume of 2,874,400 shares.

184.   On January 3, 2019, Maiden announced that it had amended its AmTrust Quota Share Agreement with AmTrust, which would result in Maiden returning approximately $700 million in gross unearned premium to AmTrust. Rather than a return to profitability, the shoddy underwriting practices of Maiden, in particular with respect to related-party AmTrust, had eviscerated the value of the Company and left the Company's shareholders holding the bag.  In addition, Maiden disclosed that, as part of its renegotiated deal, the Company had agreed to pay an additional five points of ceding commission to AmTrust for a dramatically slimmed down book of business.   Typically, cedants that inflict heavy losses on their reinsurers are obliged to offer significant reductions in ceding commissions. Maiden's acceptance of an even worse deal with an entity that had just caused it to suffer hundreds of millions of dollars in losses, rather than simply terminating the agreement, is indicative of the improper extent to which Maiden was improperly beholden to AmTrust, its largest and most important client.

185.   From the trading price immediately before the first corrective disclosures of Defendants' fraud, Maiden's stock price had dropped 86% by November 12, 2018, from $16.65 to $2.40 per share.  In the aftermath of these disclosures, Maiden's stock price has continued to sink and currently trades for less than $1.00 per share.

## ADDITIONAL ALLEGATIONS OF SCIENTER

186.   Defendants acted with scienter throughout the Class Period in that, as discussed above, each knew or recklessly disregarded that Maiden's publicly reported financial results and other statements issued during the Class Period regarding the AmTrust Reinsurance segment were materially false and misleading. Defendants were also motivated, and had the opportunity, to mislead investors and artificially inflate Maiden's stock price.

**Insider Trading**

187.   Defendants Raschbaum and Schmitt collectively sold more than $1.275 million of their Maiden stock while in possession of material, nonpublic information about Maiden's failure to appropriately account for AmTrust Reinsurance segment loss reserves and the resulting inflation of Maiden's financial results.  As reflected in the chart below, Raschbaum sold 70,000 shares of his Maiden stock for proceeds of $956,200 and Schmitt sold 20,000 of her shares for proceeds of $319,700.  Based

on the Forms 4 filed with the SEC following these sales, Raschbaum sold 16% of his Maiden stock and Schmitt sold 12% of the Maiden stock she held.

| Date | Number of Shares | Share Price | Total Proceeds |
|------|------------------|-------------|----------------|
| **Raschbaum** | | | |
| 11/7/2016 | 70,000 | $13.66 | $956,200 |
| **Total** | **70,000** | | **$956,200** |
| **Schmitt** | | | |
| 11/11/2016 | 10,000 | $15.57 | $155,700 |
| 11/14/2016 | 10,000 | $16.40 | $164,000 |
| **Total** | **20,000** | | **$319,700** |

188.   Raschbaum and Schmitt's insider sales occurred only weeks before Maiden's stock price hit a Class Period and all-time high of $16.65 per share and only three months before the first corrective disclosure, on February 14, 2017, when the truth about the AmTrust segment began to emerge.  Raschbaum and Schmitt did not engage in any insider trading in the 12 months before the Class Period began, and they did not sell any stock during the remainder of the Class Period once the truth began to emerge about their misstatements and omissions.

**Executive Compensation**

189.   The Individual Defendants were also incentivized to conceal the problems with the AmTrust Reinsurance segment and overstate Maiden's financial results because a significant portion of their compensation was performance-based and varied materially depending on the Company's financial performance. According to Maiden's SEC filings, the Individual Defendants' compensation packages were based on "the creation of shareholder value, and bonuses and share-

based awards that are dependent on, and strictly tied to, the Company's performance and paid upon the achievement of business goals and key business metrics."

190.    Schmitt and Marshaleck were eligible to earn annual incentive compensation that was primarily based on hitting targeted operating return on equity (40% of incentive compensation basis) and achievement of combined ratio objectives (30% of basis).    As a result of misrepresentations regarding Maiden's financial results, these defendants were able to secure significant incentive bonuses. For FY 2013, defendant Marshaleck received an incentive bonus of $540,000, equivalent to 90% of his annual salary.    For FY 2013, FY 2014, and FY 2015, defendant Schmitt was awarded incentive compensation equivalent to 70%, 119% and 85%, respectively, of her annual salary ($420,626 for FY 2013; $711,000 for FY 2014; and $510,000 for FY 2015).    In comparison, as the truth emerged about the AmTrust segment and Maiden's financial results, Schmitt's incentive compensation dropped to just 29% of her salary for FY 2016 and 31% of her salary for FY 2017, and she was not awarded incentive compensation for FY 2018.

191.    Defendant Raschbaum was similarly incentivized to misrepresent Maiden's results.    According to Maiden's SEC filings, during the Class Period Raschbaum received incentive compensation totaling $5,160,000 for, among other things: (a) record annual reported earnings (before February 2017); (b) a capital raise resulting in capital growth of $165 million; (c) continued enhancement of an

effective risk-management framework; and (d) refinancing $110 million Senior Notes which reduced the cost of capital. For FY 2014, FY 2015 and FY 2016, Raschbaum was awarded incentive compensation equivalent to 180%, 140% and 146%, respectively, of his annual salary ($1.8 million for FY 2014; $1.4 million for FY 2015; and $1.46 million for FY 2016). In comparison, as the truth emerged about the AmTrust segment and Maiden's financial results, Raschbaum's incentive compensation dropped to 25% of his salary for FY 2017 and 25% of his salary for FY 2018.

**Securities Offerings**

192.   Maiden's SEC filings throughout the Class Period show that it funded its capital requirements through securities and debt offerings to investors. The prospectus for each of these offerings incorporated false and misleading statements Defendants had made during the Class Period about the AmTrust Reinsurance segment and Maiden's financial results. The success of each of the offerings identified below was dependent on maintaining Maiden's inflated common stock price and positive earnings and obfuscating the true facts regarding the AmTrust segment. Collectively, through these securities and debt offerings, Defendants were able to raise over $410 million in capital.

193.   On November 25, 2015, Maiden sold 6.6 million Series C shares at a price of $25 per share. The offering prospectus incorporated by reference Maiden's

misleading 2014 Form 10-K.  As a result of this securities offering, Maiden collected $159.6 million in net proceeds.  According to the offering prospectus, these funds were needed to support the development of Maiden's reinsurance business and other general corporate purposes.

194.   On June 14, 2016, Maiden made a public debt offering of $110 million for net proceeds of $106.3 million.  The offering prospectus incorporated by reference Maiden's misleading 2015 Form 10-K.  According to the offering prospectus, the offering was needed to fully redeem the Company's previously-issued 2011 Senior Notes, thus lowering its cost of capital.

195.   On June 15, 2017, Maiden sold six million Series D shares at a price of $25 per share.  The offering prospectus incorporated by reference Maiden's misleading 2016 Form 10-K. As a result of this securities offering, Maiden collected $144.9 million in net proceeds.  A portion of the proceeds from this offering were needed to redeem its previously-issued 2012 Senior Notes.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

196.   Maiden's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability and do not shield from liability statements regarding purported historical results.

197.   To the extent any of Defendants' false or misleading statements are deemed to be forward-looking, Defendants are liable for those statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Maiden who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

198.   At all relevant times, Maiden's common stock traded in an efficient market for the following reasons, among others:

(a)   Maiden met the requirements for listing, and was listed and actively trade on the NASDAQ Global Select Market, a highly efficient and automated market;

(b)   As a regulated issuer, Maiden filed periodic public reports with the SEC and NASDAQ;

(c)   Maiden regularly and publicly communicated with investors via established market communication mechanisms, including through regular

- 112 -

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Maiden was followed by multiple securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.   These reports were publicly available and entered the public market.

199.   As a result of the foregoing, the market for Maiden stock promptly digested statements and information regarding Maiden from publicly available sources and reflected such statements and information in the price of the stock. Under these circumstances, all purchasers of Maiden common stock during the Class Period suffered similar injury through their purchases of the stock at artificially inflated prices and the fraud-on-the-market presumption of reliance applies.

200.   A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there is a duty to disclose.

## CLASS ACTION ALLEGATIONS

201.   Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants and their families, the officers and directors of Maiden, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

202.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Maiden common stock was actively traded on the NASDAQ Global Select Market, one of the largest stock exchanges in the world.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  During the Class Period, there were more than 82 million shares of Maiden common stock outstanding and the average daily trading volume was 505,163 shares.  Record owners and other members of the Class may be identified from records maintained by Maiden or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

4812-7962-7451.v1

203.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts;

(c)     whether the price of Maiden stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

204.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

205.   Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel who are experienced in securities and class action litigation. Plaintiffs have no interests which conflict with those of the Class.

206.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

207.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Maiden stock and operated as a fraud or deceit on Class Period purchasers of Maiden stock by misrepresenting and omitting material information about the AmTrust book of business and Maiden's financial results.  As Defendants' prior misrepresentations and omissions were disclosed to the market, Maiden's stock price fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Maiden stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

208.   Defendants' misleading statements and omissions of material fact, identified herein at ¶¶87-89, 91-92, 94-95, 97, 100-101, 103, 106, 108-110, 112-113, 115-116, 118, 120-121, 123-125, 127-128, 130-131, 133-134, 136-137, 139-140, 142-144, 146-147, 149-151, 154-155, 157-158, 160, 162, 164-165, 167, had the

intended effect and caused Maiden stock to trade at artificially inflated prices during the Class Period.

209. As a direct result of the disclosures from February 14, 2017 to November 9, 2018, as detailed in ¶¶168-183, Maiden's stock price suffered a significant decline. As reflected in the charts below, the price of Maiden stock, fell sharply following, and in direct response to, each of the corrective disclosures:

| Disclosure Date | Maiden's Stock Price Prior to Disclosure | Maiden's Stock Price at the Close of the Day Following Disclosure | Maiden's Stock Price Decline ($/share) | Maiden's Stock Price Decline (%) |
|---|---|---|---|---|
| February 14, 2017 | $16.65 | $15.02 | -$1.63 | - 9.8% |
| February 27, 2017 | $14.58 | $13.65 | -$0.93 | - 6.4% |
| August 9, 2017 | $9.55 | $6.56 | -$2.99 | - 31.3% |
| November 8, 2017 | $7.75 | $6.07 | -$1.68 | - 21.7% |
| February 27, 2018 | $6.79 | $5.66 | -$1.13 | -16.6% |
| August 9, 2018 | $7.37 | $4.32 | -$3.05 | - 41.4% |
| November 9, 2018 | $3.52 | $2.40 | -$1.12 | - 31.8% |



210.   The declines in Maiden's stock price on February 15, 2017, February 28, 2017, August 9-10, 2017, November 9, 2017, February 28, 2018, August 9, 2018 and November 12, 2018, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market.  The average daily trading volume for Maiden on the days following these corrective disclosures was 2,103,814 shares, compared to an average daily trading volume during the Class Period of 505,163 shares.

211.   As reflected in the charts below, the timing and magnitude of Maiden's stock price decline negates any inference that the losses suffered by Plaintiffs and

- 118 -

other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct:

| Date of Decline Due to Corrective Disclosure | Maiden's Stock Price Decline (%) | NASDAQ Daily Return (%) | NASDAQ Insurance Index Daily Return (%) |
|---|---|---|---|
| February 15, 2017 | - 9.8% | 0.0% | 0.0% |
| February 28, 2017 | - 6.4% | 0.0% | 0.0% |
| August 9-10, 2017 | - 31.3% | - 2.4% | 0.0% |
| November 9, 2017 | - 21.7% | 0.0% | 0.0% |
| February 28, 2018 | -16.6% | 0.0% | - 1.5% |
| August 9, 2018 | - 41.4% | 0.0% | - 1.0% |
| November 12, 2018 | - 31.8% | - 2.8% | - 1.1% |



Maiden:  Stock Price vs NASDAQ and NASDAQ Insurance Index

- 119 -

212.   The economic losses suffered by Plaintiffs and other members of the Class were a direct result of Defendants' fraudulent scheme to inflate Maiden's stock price and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

## COUNT I

### For Violations of §10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

213.   Plaintiffs incorporate ¶¶1-212 by reference.

214.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

215.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

4812-7962-7451.v1

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Maiden securities during the Class Period.

216.   In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, the Defendants had a duty to promptly disseminate truthful information with respect to the AmTrust book of business and Maiden's financial results that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's earnings trends, so that the market prices of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

217.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases of Maiden common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Maiden stock and experienced losses when the artificial inflation was released from Maiden stock as a result of the revelations and price declines detailed herein.  Plaintiffs and the Class would not have purchased Maiden securities at the prices they paid, or at all, if they

had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

218.   By virtue of the foregoing, each of the Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the Exchange Act Against All Defendants

219.   Plaintiffs incorporate ¶¶1-218 by reference.

220.   During their tenures as officers and/or directors of Maiden, Defendants were controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  By reason of their positions of control and authority as officers of Maiden, these Defendants had the power and authority to cause Maiden to engage in the conduct complained of herein.  The Individual Defendants were able to, and did, control, directly and indirectly, the decision-making of Maiden, including the content and dissemination of Maiden's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.  Maiden exercised control over and directed the actions of its senior officers, managers, directors and agents, including the Individual Defendants.  Maiden controlled the Individual Defendants and all of its employees and subsidiaries.

221.   In their capacities as senior corporate officers of Maiden, and as more fully described herein, the Individual Defendants participated in the misstatements and omissions set forth above.  Indeed, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Maiden's deceptive business practices. Defendants had the ability to influence and direct and did so influence and direct the activities of Defendants in their violation of §10(b) of the Exchange Act and Rule 10b-5.

222.   As a result, Defendants were control persons within the meaning of §20(a) of the Exchange Act.

223.   As set forth above, Maiden violated §10(b) of the Exchange Act.  By virtue of its position, and as a result of its aforementioned conduct and culpable participation, Maiden is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Individual Defendants are liable to Plaintiffs and the other members of the Class.  Maiden exercised control over the Individual Defendants and all of its employees and subsidiaries and, as a result of its aforementioned conduct and culpable participation, is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Individual Defendants are liable to Plaintiffs and the other members of the Class.

224.   This claim is brought within the applicable statute of limitations.

225.    By reason of the foregoing, Defendants violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on their own behalf and on behalf of the Class, respectfully pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as Class Representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other costs and disbursements; and

D.    Such equitable, injunctive or other and further relief as the Court may deem just and proper, including, but not limited to, rescission.

4812-7962-7451.v1

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  May 1, 2020                    THE ROSEN LAW FIRM, P.A.
                                       LAURENCE M. ROSEN


                                       s/ LAURENCE M. ROSEN
                                       LAURENCE M. ROSEN

                                       One Gateway Center, Suite 2600
                                       Newark, NJ  07102
                                       Telephone:  973/313-1887
                                       973/833-0399 (fax)
                                       lrosen@rosenlegal.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       TOR GRONBORG
                                       TRIG R. SMITH
                                       ALEXANDER M. MENDOZA
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)
                                       torg@rgrdlaw.com
                                       trigs@rgrdlaw.com
                                       amendoza@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com

                                       Co-Lead Counsel

4812-7962-7451.v1

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated: May 1, 2020

*/s/ Laurence M. Rosen*
Laurence M. Rosen