THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: 973/313-1887
973/833-0399 (fax)
lrosen@rosenlegal.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
ALEXANDER M. MENDOZA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com
amendoza@rgrdlaw.com

Co-Lead Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re MAIDEN HOLDINGS, LTD. SECURITIES LITIGATION | ) Master File No. 1:19-cv-05296-RMB-JS |
| | ) |
| | ) CLASS ACTION |
| This Document Relates To: | ) |
| | ) PLAINTIFFS' MEMORANDUM OF |
| ALL ACTIONS. | ) LAW IN OPPOSITION TO |
| | ) DEFENDANTS' MOTION TO |
| | ) DISMISS |
| | ) |

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   FACTS ...............................................................................................4

      A.    Background ..............................................................................4

      B.    Maiden Was An Affiliate of AmTrust ....................................4

      C.    Maiden's Key Metrics for Loss Estimates and Reserves ...............6

      D.    Misleading Statements and Omissions ...................................8

      E.    Raschbaum And Schmitt Unload Their Shares Just Before
            Maiden Discloses Adverse Developments ...........................10

III.  ARGUMENT ...................................................................................11

      A.    Applicable Standards ............................................................11

      B.    Defendants' Class Period Statements are Actionably Misleading 12

            1.    The Complaint Adequately Alleges Misleading Omissions of
                  Material Fact ...............................................................13

            2.    The Complaint Adequately Alleges Defendants Made
                  Materially Misleading Statements ...........................24

      C.    The Complaint Adequately Pleads Defendants' Scienter ...........26

            1.    The Complaint Sufficiently Pleads Defendants'
                  Recklessness ...............................................................28

                  a)    Defendants Had Knowledge of and Access to the Omitted
                        Historical Loss Experience Information .....................28

                  b)    Core Operations Contribute to Inference of Scienter ....30

                  c)    Defendants' SOX Certifications Add to the Inference of
                        Scienter .......................................................................32

            2.    The Complaint's Motive Allegations Bolster the Inference
                  of Scienter ...................................................................33

            3.    Inferences of Scienter Are At Least As Cogent and
                  Compelling as Non-Fraudulent Inferences .........................36

      D.    The Complaint Adequately Pleads a Section 20(a) Claim ...........39

IV.   CONCLUSION ...............................................................................40

i

# TABLE OF AUTHORTIES

**Other Authorities**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................23

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)...................................................................................38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................11

*Atain Specialty Ins. Co. v. Ne. Mountain Guiding, LLC*,
No. 316CV05129BRMLHG, 2020 WL 487110 (D.N.J. Jan. 30, 2020) .............25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................11

*Bing Li v. Aeterna Zentaris, Inc.*,
No. 314CV7081PGSTJB, 2016 WL 827256 (D.N.J. Mar. 2, 2016) ...................14

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010)..................................................................35

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009)......................................................................26

*Dudley v. Haub*,
No. 2:11-CV-05196 WJM, 2013 WL 1845519 (D.N.J. Apr. 30, 2013).............25

*Fryman v. Atlas Fin. Holdings, Inc.*,
No. 18-CV-01640, 2020 WL 2735366 (N.D. Ill. May 26, 2020).......................21

*Haberle v. Borough of Nazareth*,
936 F.3d 138 (3d Cir. 2019)..................................................................................25

*Hall v. Johnson & Johnson*,
No. CV 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ...........13, 37

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)..............................................................................21, 22

*In re Advance Auto Parts, Inc., Sec. Litig.*,
  No. CV 18-212-RGA, 2020 WL 599543 (D. Del. Feb. 7, 2020) ........................15

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  No. CV169449KSHCLW, 2019 WL 3562134 (D.N.J. Aug. 6, 2019) ................31

*In re Apple Inc. Sec. Litig.*,
  No. 19-CV-02033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020) ........18, 19

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) .................................................................34

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ..............................................................................28

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  No. 17 CIV. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...........33

*In re Cornerstone Propane Partners, L.P.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) ..............................................................35

*In re DVI, Inc. Sec. Litig.*,
  No. 2:03-CV-05336, 2010 WL 3522086 (E.D. Pa. Sept. 3, 2010) ......................28

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ..................................................................32

In re Hertz Glob. Holdings Inc,
  905 F.3d 106 (3d Cir. 2018) ................................................................................33

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ............................28

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) ................................................................................23

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901 (D.N.J. 1998) .......................................................................14

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) ...................................................................31

*In re Portal Software, Inc. Sec. Litig.*,
  No. C-03-5138 VRW, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)................36

*In re Rent-Way Sec. Litig.*,
  209 F. Supp. 2d 493 (W.D. Pa. 2002).....................................................31

*In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*,
  311 F.3d 198 (3d Cir. 2002).........................................................12, 13

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...........21

*In re Toronto-Dominion Bank Sec. Litig.*,
  No. CV 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) ........30, 32

*In re Valeant Pharm. Int'l, Inc., Sec. Litig.*,
  No. CV157658MASLHG, 2019 WL 2724075 (D.N.J. June 30, 2019)...............34

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996).................................................................39

*In the Matter of Richard J. Bertuglia, Cpa, John W. Green, Cpa, & Lev Nagdimov, Cpa, Respondents.*,
  Release No. 3992 (Oct. 12, 2018)........................................................38

*Institutional Inv'rs Grp. v. Avaya, Inc.,*,
  564 F.3d 242 (3rd Cir. 2009) .........................................................27, 39

*Kline v. First W. Gov't Sec., Inc.*,
  24 F.3d 480 (3d Cir. 1994)..................................................................14

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, No. CIV.A,
  . 09-799, 2011 WL 2444675 (D. Del. June 14, 2011) ..........................40

*Martinek v. AmTrust Fin. Servs., Inc.*,
  No. 19 CIV. 8030 (KPF), 2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020) ...........38

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...................................................................passim

*Mulderrig v. Amyris, Inc.*,
  No. 19-CV-1765 YGR, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020)................32

iv

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)..................................................................35

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)...................................................................22

*Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013)..................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).........................................................................14, 15, 20, 21

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)................................................................................23

*Palladin Partners v. Gaon*,
   No. 05 CV 3305 WJM, 2006 WL 2460650 (D.N.J. Aug. 22, 2006) ..................40

*Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
   No. 1:12-CV-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015)...................24

*Phillips v. Cty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008)................................................................................12

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*,
   No. CIV.A. 00-5965 (JCL), 2005 WL 1366025 (D.N.J. June 8, 2005)..............31

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .............................................................................27

*Russo v. Bruce*,
   777 F. Supp. 2d 505 (S.D.N.Y. 2011)................................................................36

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018) ......................................................16, 23, 37

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992)................................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................11, 13, 28

v

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ................................................................15

*Underland v. Alter*,
  No. CIV.A. 10-3621, 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) ...............24, 25

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) .......................................................................14

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
  No. CV21815530KMJAD, 2020 WL 3169506 (D.N.J. June 12, 2020) ..15, 26, 32

**Statutes**

15 U.S.C. § 78u-4(b) .........................................................................12

15 U.S.C. § 78u-4(b)(1) ......................................................................13

**Rules**

Fed. R. Civ. P. 9(b) ...........................................................................12

Fed. R. Civ. P. 12(d) .........................................................................20

**Regulations**

17 C.F.R. § 240.10b-5 ........................................................................12

17 C.F.R. § 240.10b-5(b) ....................................................................13

## I.     INTRODUCTION

Throughout the Class Period, Defendants[1] misled investors by disclosing loss reserves and loss ratios for Maiden that did not align with undisclosed, adverse historical loss data. Quarter after quarter, Defendants systematically underreported Maiden's loss reserves for its AmTrust Segment by estimating losses for unseasoned accident years at levels far below the historical losses for more-seasoned accident years. And, quarter after quarter, Defendants failed to disclose the adverse historical loss data to investors. By omitting this adverse data that undermined Maiden's stated loss reserves and loss ratios, Defendants prevented investors from accurately assessing Maiden's profitability.

The late astronomer Carl Sagan once said that "you have to know the past to understand the present."[2] And the Supreme Court has made it clear that under the federal securities laws when corporate executives chose to speak, they are under a duty to disclose the facts necessary to make the statements made, not misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). Defendants here violated the federal securities laws, misleading investors about Maiden's past results and rendering them unable to assess the Company's present state.

---

[1] "Defendants" are Maiden Holdings, Ltd. ("Maiden" or the "Company"), Arturo M. Raschbaum, Karen L. Schmitt, and John M. Marshaleck.

[2] Carl Sagan, *Cosmos: One Voice in the Cosmic Fugue* (Turner Home Entertainment 1989).

1

Defendants continually set Maiden's loss reserves by estimating a 50% loss ratio for unseasoned accident years despite the fact that the AmTrust Segment actually experienced loss ratios between 70% and 80% in seasoned accident years. Using unreasonably low initial loss ratios allowed Defendants to report overall loss ratios of 65% for the AmTrust segment—significantly below the actual loss ratios for seasoned accident years.

Investors had every reason to expect that Maiden's reported loss reserves aligned with the historical data: Maiden stated that its loss reserve methodology was largely based on historical data, Defendants repeatedly told investors that they had access to and relied on AmTrust's historical loss data, and both GAAP and professional standards required reinsurers to focus on historical data. Once Defendants chose to speak about Maiden's loss reserves and loss ratios, they had a duty to disclose the adverse historical data that undermined their statements.

Scienter in this action is strong and straightforward. The Complaint adequately alleges that Defendants omitted material, adverse historical loss data that they knew and possessed, which misled investors about Maiden's loss reserves. These allegations, alone, amount to a cogent and compelling inference of scienter. The already-strong inference of scienter is bolstered by the fact that two Defendants sold over $1.2 million of Maiden stock mere weeks before the first corrective disclosure—their only stock sales during the Class Period. Further, Maiden also used

2

its inflated stock price to secure hundreds of millions of dollars of financing, and the Individual Defendants were all motivated by executive compensation packages that were primarily based on meeting explicit earnings and loss ratio targets.

Defendants' Motion[3] does not—and cannot—dispute the Complaint's key allegations: that Maiden's stated reserves did not align with Maiden's historical data, that Defendants knew or had access to the historical data, and that Defendants failed to disclose this historical data to investors. Instead, Defendants suggest that the adverse historical information was immaterial and that Defendants were not motivated to commit fraud. These arguments both fail. First, given that the omitted historical information undermines Defendants' key public disclosures, it is not so obviously unimportant that reasonable minds could not differ on its materiality. Indeed, when the truth about Maiden's loss reserves finally came out, the Company's stock price dropped significantly—unambiguous evidence of materiality. Second, while the Complaint adequately alleges motive and opportunity, the Motion ignores the seminal evidence of scienter: Defendants' undisputed knowledge of and access to the undisclosed historical loss data that rendered their statements to investors false and misleading.

The Court should deny the Motion.

---

[3] Plaintiffs cite to Defendants' Memorandum in Support of their Motion To Dismiss, Dkt. No. 61-1, as "Motion at __" and to the Amended Class Action Complaint ("Complaint"), Dkt. No. 43, as "¶__."

3

## II.    FACTS

### A.    Background

Maiden is a holding company whose wholly-owned subsidiaries primarily provide reinsurance for insurance policies written by primary insurers. ¶¶3, 23, 36. Reinsurance is essentially insurance for insurance companies; primary insurance companies use reinsurance to mitigate their risks and reduce the amount of capital they are required to carry by ceding a portion of their premiums and liabilities to the reinsurer. Maiden divides its business into two reportable operating segments: (i) Diversified Reinsurance, which consists predominantly of property and casualty reinsurance business, and (ii) AmTrust Reinsurance, which includes all business ceded by AmTrust to Maiden. ¶38.

Defendants Arturo Raschbaum, Karen Schmitt, and John Marshaleck (collectively, the "Individual Defendants") each have decades of experience in the insurance industry and were intimately familiar with reserve loss methodologies and reporting requirements for insurance companies. ¶¶24-33. Prior to joining Maiden together in 2008, the trio served as executives for GMAC RE. *Id.*

### B.    Maiden Was An Affiliate of AmTrust

George Karfunkel, Michael Karfunkel, and Michael's son-in-law, Barry Zyskind, founded Maiden in 2007. ¶3, 40. The Karfunkel brothers and Zyskind were

4

executive officers and directors of AmTrust[4] at the time of Maiden's founding, and they collectively owned or controlled about half of AmTrust's outstanding common stock throughout the Class Period. ¶¶5, 22, 40. The trio also beneficially owned a significant portion of Maiden's stock throughout the Class Period, and Zyskind served as Chairman of Maiden's board of directors. ¶3. Maiden's own financial filings concede that it "may be deemed an affiliate of AmTrust." ¶39.

From its founding through the end of the Class Period, AmTrust was Maiden's largest and most important customer. Pursuant to a 2007 agreement between AmTrust and Maiden, (i) AmTrust ceded 40% of its premiums; (ii) Maiden assumed 40% of the associated risk; and (iii) Maiden paid AmTrust approximately 30% in commission on net earned premiums. ¶¶4, 41, 45. The agreement also granted Maiden access to AmTrust's books and records, which were essential to Maiden accurately assessing its loss reserves, loss ratio, and combined ratio. ¶46. Maiden's net premiums from AmTrust more than tripled from $558 million in 2011 to over $1.68 billion in 2015. ¶60. By 2017, the $1.9 billion in AmTrust net earned premiums accounted for 70% of Maiden's consolidated net earned premiums. ¶¶5, 41, 60.

---

[4] "AmTrust is AmTrust Financial Services, Inc. and its subsidiaries.

5

## C.    Maiden's Key Metrics for Loss Estimates and Reserves

Investors relied on Maiden's disclosures of certain key metrics to evaluate Maiden's business:

- Maiden's <u>loss reserves</u> represent the expected future losses that Maiden will be required to pay out for claims on the insurance policies it had reinsured. ¶¶47-49. Investors focused on loss reserves because any corrective increase in Maiden's loss reserves—an "adverse development"—results in a commensurate reduction in Maiden's net income.

- Maiden's <u>loss ratio</u> represents incurred losses divided by earned premiums. ¶50(a). An increasing loss ratio means that Maiden is paying out an increasing portion of its premiums in claims.

- Maiden's <u>combined ratio</u> represents the sum of Maiden's incurred losses and other expenses divided by its earned premiums. ¶50(b). The combined ratio indicates to investors whether or not Maiden is earning a profit on its insurance underwriting, outside of any investment income.

Maiden included each of these key metrics for the AmTrust Segment in its quarterly and annual financial reports during the Class Period. ¶50.

Crucially, investors relied on Maiden to accurately estimate the Company's expected future losses in order to set its loss reserves. Insurers, including Maiden (*see* Motion at 8-9), use a variety of methodologies to calculate expected future losses depending on the maturity of the lines of business. In accordance with industry standards and accounting requirements, Maiden used the Expected Loss Ratio

6

method to estimate future losses for unseasoned accident years. The Expected Loss Ratio method ("ELR") is an actuarial method that multiplies premiums by an expected loss ratio to produce ultimate loss estimates for each accident year. *See* Maiden 2016 Form 10-K at 62.[5] The expected loss ratio is derived from the historical experience of the business being insured. *Id.* Only once an accident years become more seasoned does Maiden use its other actuarial methods to estimate ultimate losses. *Id.* Maiden also informed investors that among the most significant assumptions the Company made in estimating losses was that historic loss development is indicative of future loss development. ¶51; Ex. A to Marino Decl. (Maiden 2016 Form 10-K at 63). Accordingly, investors understood from Maiden's disclosures that Defendants based Maiden's reported initial loss ratios primarily on historical experience—information that Defendants failed to disclose to investors.

In March 2018, Maiden further confirmed that the Company relies on ELR for unseasoned accident years before transitioning to other methodologies once accident years have seasoned. Maiden 2017 Form 10-K at F-45 ("Our initial underwriting year loss projections are generally based on the ELR method, derived from historical performance after the consideration of loss and premium trends. This proportional exposure is relatively short tailed, and the transition to the BF and the

---

[5] The relevant excerpts of Maiden's 2016 Form 10-K are included in Exhibit A to the Declaration of Kevin H. Marino ("Marino Decl.") (Dkt. No. 61-2).

LD methods happens relatively quickly, within the first several years."); *id.* at F-46 (same); *id.* at F-47 (same).[6]

### D.    Misleading Statements and Omissions

Throughout the Class Period, Defendants successfully misled investors by making public statements about Maiden's loss reserves and loss ratios that did not align with undisclosed adverse, objective historical loss data. ¶¶87-93, 97-104, 106-114, 116-129, 133-148, 150-166. Unbeknownst to investors, Defendants systematically under-reported Maiden's loss reserves for the AmTrust business by estimating losses for unseasoned accident years at levels far below the historical losses for more-seasoned accident years.  ¶¶42-43.

Despite assuring investors that Maiden used historical loss data and "prudent" and "disciplined" reserve methodology to set loss reserves, Defendants continually set loss reserves based on a 50% loss ratio for unseasoned accident years in the AmTrust segment. ¶¶8, 41, 66-71. But Defendants knew that the AmTrust segment actually experienced historical loss ratios between 70% and 80% in more seasoned accident years. *Id.*

---

[6] The relevant excerpts of Maiden's 2017 Form 10-K are included in Exhibit A to the Declaration of Laurence M. Rosen, filed concurrently with this brief.

| AmTrust QS: WC, CA, GL & Other SC/SP | Incurred Loss + LAE/Earned Premiums, as of December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| Accident Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2008 | 68.5% | 71.7% | 72.9% | 73.2% | 73.9% | 75.4% | 76.0% |
| 2009 | 62.0% | 70.4% | 68.9% | 73.2% | 73.0% | 73.4% | 75.1% |
| 2010 | 59.5% | 69.8% | 78.3% | 76.6% | 80.1% | 79.8% | 81.9% |
| 2011 | 50.9% | 65.4% | 74.8% | 78.5% | 78.2% | 79.6% | 82.2% |
| 2012 | | 48.6% | 63.3% | 69.2% | 71.8% | 72.8% | 76.1% |
| 2013 | | | 52.1% | 55.4% | 60.5% | 62.1% | 67.2% |
| 2014 | | | | 55.3% | 55.2% | 60.4% | 67.6% |
| 2015 | | | | | 55.9% | 56.3% | 63.2% |
| 2016 | | | | | | 56.4% | 59.6% |
| 2017 | | | | | | | 62.1% |

¶69. Reading accident years left to right, the unmistakable pattern in Maiden's own historical loss data shows that the loss ratio for each accident year balloons as it becomes more seasoned—an adverse pattern Defendants ignored in setting loss reserves and withheld from investors. ¶¶70-71.

Using unreasonably low expected loss ratios to estimate losses for unseasoned accident years allowed Defendants to keep the AmTrust Segment's overall loss ratio lower than the historical loss ratios for the more seasoned accident years. From 2014 through 2016, Maiden reported loss ratios for its AmTrust Segment in a narrow range between 63.8% and 66.5%. ¶53. These loss ratios ballooned to 78.4% in 2017 and 94.4% in 2018 as Maiden reported "loss development" to previously unseasoned accident years. *Id*.

Moreover, because Maiden was required to pay AmTrust an additional 30% in commissions on net earned premiums under the AmTrust Quota Share

9

Agreement, the business was significantly less profitable and often times operated at a loss. ¶¶96, 98, 102, 117, 156.

Defendants' systematic use of inadequate reserve methodology also violated Generally Acceptable Accounting Principles ("GAAP") and professional standards by failing to use historical data to set its loss reserves. ¶¶72-86. GAAP requires that insurers use "past experience adjusted for current trends" in setting loss reserves. ¶84; ASC 944-40-30-1. The American Institute of Certified Public Accountants' Audit and Accounting Guide states that "the historical adequacy or inadequacy of total reserves" is one of the most important factors in establishing an appropriate financial statement reserve. ¶85.

Further, in violation of ASC 944-40-50-4H, ¶67, Defendants improperly failed to disclose in Maiden's 2016 10-K disaggregated loss development data. The SEC informed Defendants of this violation through a series of correspondence in 2017, which culminated in Defendants finally disclosing the corrective historical, disaggregated loss data in Maiden's 2017 Form 10-K. ¶¶67-68.

### E.    Raschbaum And Schmitt Unload Their Shares Just Before Maiden Discloses Adverse Developments

In November 2016, Raschbaum and Schmitt collectively sold 90,000 shares of Maiden stock for over $1.27 million. ¶¶187-88. Just three months after these insider sales, Maiden began recognizing hundreds of millions of dollars in adverse developments in its AmTrust segment. Maiden disclosed a $52 million adverse

development to its AmTrust segment in February 2017, $29.4 million in August 2017, $61.1 million in November 2017, and $139 million in February 2018. ¶¶13-16. After each disclosure, Maiden reassured investors that these charges were due to isolated circumstances and that further problems were unlikely to arise. ¶9. Finally, in November 2018, Maiden disclosed a $238.8 million adverse development in its AmTrust segment. ¶16.

Due to these corrective disclosures regarding its loss reserves, Maiden's stock price crashed from $16.50 per share in February 2017 to under $2.50 per share in November 2018. ¶17, 168.

## III.    ARGUMENT

### A.    Applicable Standards

When evaluating Defendants' Motion, this Court will take as true all factual allegations, construing each in the light most favorable to Plaintiffs. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). To suffice, the Complaint need only contain factual matter that states a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Even after *Twombly* and *Iqbal,* stating a claim "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of

11

the necessary element." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

Of the six SEC Rule 10b-5 elements, Defendants challenge only the sufficiency of the Complaint's pleading of falsity and scienter.

The pleadings standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b) apply to Rule 10b-5 claims, requiring that the Complaint allege fraud with particularity. 15 U.S.C. § 78u-4(b). Even so, as the Third Circuit has stated, "in applying Rule 9(b), courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.' *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). "Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control," the Court wrote, "the rigid requirements of Rule 9(b) may be relaxed." *Id..*  Under Rule 10b-5, it is unlawful for a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

For the following reasons, this Court should deny Defendants' Motion.

**B.      Defendants' Class Period Statements are Actionably Misleading**

Throughout the Class Period, Defendants misled investors by disclosing rosy loss ratios and loss reserves while omitting the fact that these metrics were based on

expected loss ratios that bore no resemblance to Maiden's historical results. Defendants' omissions of material adverse facts misled investors into believing that Maiden's profitability was sustainable rather than built on a foundation that had already begun to crumble. The Complaint adequately identifies each misleading statement (¶¶87-89, 91-92, 94-95, 97, 100-101, 103, 105-106, 108-110, 112-113, 115-116, 118, 120-121, 123-125, 127-128, 130-131, 133-134, 136-137, 139-140, 142-144, 146-147, 149-151, 153-155, 157-158, 160-162, 164-165, 167), who made the statement (*id.*), and explains in detail how each was materially false (¶¶90, 93, 96, 98, 102, 104, 107, 111, 114, 119, 122, 126, 129, 132, 135, 138, 141, 148, 152, 159, 163, 166, 168). *Tellabs,* 551 U.S. at 321; 15 U.S.C. § 78u-4(b)(1); *see Hall v. Johnson & Johnson*, No. CV 18-1833 (FLW), 2019 WL 7207491, at *9 (D.N.J. Dec. 27, 2019) (a complaint must allege "essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue") (citations omitted).

### 1. The Complaint Adequately Alleges Misleading Omissions of Material Fact

An omission is actionable when disclosure is "necessary . . . to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Section 10(b) does not require registrants to disclose every material fact to investors. In this Circuit, however, registrants that make affirmative disclosures must "communicate any additional or qualifying

13

information, then known, the absence of which would render misleading that which was communicated." *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994); *see also Bing Li v. Aeterna Zentaris, Inc.*, No. 314CV7081PGSTJB, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016) ("When a company 'puts an issue into play,' it acquires a duty to disclose information relating to that topic") (citation omitted). Defendants do "not have license to accurately report certain facts while omitting facts which would make the stated facts not misleading." *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 939–40 (D.N.J. 1998) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 (1991)). As set forth in the Complaint, Defendants' affirmative disclosures of Maiden's loss ratios and loss reserves obligated Defendants to disclose adverse historical data that undermined those positive statements.

A company's general obligation to speak truthfully applies to both statements of fact and statements of opinion. Among the three circumstances rendering an opinion actionable is where it "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). When companies issue statements of opinion, investors expect "not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the

14

information in the issuer's possession at the time." *Id.* at 188–89; *see also Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) ("opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor").

Here, Defendants disclosed loss reserves and loss ratios, omitting material facts that rendered their opinions misleading.[7] Contrary to Defendants' assertion, *see* Motion at 25-26, the Complaint details precisely the statements of opinion Defendants' material omissions rendered misleading, who made those statements, when the misleading statements were made, the material facts Defendants omitted, and how Defendants' omissions rendered each opinion misleading. ¶¶87-93, 97-104, 106-14, 116-29, 133-48, 150-66; *see Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. CV21815530KMJAD, 2020 WL 3169506, at *6 (D.N.J. June 12, 2020) (denying dismissal, court finds the complaint pleads the "who, what, when, where

---

[7] Defendants argue that the Complaint fails to plead the first of *Omnicare*'s three enunciated circumstances giving rise to an actionable opinion—that Defendants did not subjectively believe their statements about Maiden's loss estimates. Motion at 18-25. "Honest belief," however, applies only to *Omnicare* circumstance one, but not to the Complaint's allegations that Defendants omitted material facts that conflicted with their opinion. *See In re Advance Auto Parts, Inc., Sec. Litig.*, No. CV 18-212-RGA, 2020 WL 599543, at *5 (D. Del. Feb. 7, 2020) (allegation of "honest belief" is necessary only for prong one of *Omnicare* but unnecessary for prong three).

and how" for each statement and notes that plaintiffs are only "required to plead with particularity the omission, not all of the underlying misconduct.")

Throughout the Class Period, Defendants disclosed Maiden's loss reserves, loss ratios, and loss development for its reinsurance segments. Each of these "opinions" omitted that Defendants based their estimates on loss ratios in the 50% range for the AmTrust business for the most recent vintage of earned premiums. And, as alleged, Defendants knew or had access to *historical* claim and actuarial data, indicating the loss ratio for all vintages of earned premiums ranged from 60% to 80%. ¶¶65-71, 111. The fact that the process for calculating reserves is complex (Motion at 3-4, 7-10) does not alleviate Defendants' obligation to inform investors that Maidens publicly stated loss reserves did not align with objective, adverse historical data. *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018) ("An opinion about data cannot be considered reasonably held if it is not supported by the evidence or ignores contradictory results in the same data.")

Defendants' failure to disclose the discrepancy between the 50% loss ratios for recent accident years used to estimate Maiden's loss reserves and the 60% to 80% historical loss ratios for the Company's more seasoned accident years misled investors and kept them from accurately assessing Maiden's reported loss ratios and loss reserves. For example, between 2011 and 2014, Defendants had utilized initial loss ratios of 48.6% to 55.3% in creating reserves estimates. *See, e.g.,* ¶90. But the

16

historical data Defendants knew and had access to identified the actual loss ratios had normalized between 70% and 80% over time for the same book of AmTrust net premiums. ¶¶8, 41, 66-71. Once Defendants disclosed Maiden's purported estimates of loss ratios and loss reserves to investors, Defendants acquired a duty to disclose the material, adverse historical information about the actual loss ratios of the more seasoned accident years. The omission of these facts misled investors about the true state of Maiden's profitability. ¶¶9, 12, 66-71.

Prior to Defendants' eventual disclosure of detailed loss development tables by accident year and business line in its 2017 Form 10-K, reasonable investors understood that Maiden's initial loss ratios for each accident year aligned with loss ratios for more seasoned accident years. This understanding was based on Maiden's own disclosures about its loss reserve methodology, Defendants' repeated assurances that it had access to AmTrust's historical loss data, GAAP requirements, and professional standards for reinsurance accounting.

As discussed *supra* Part II.D-E, the methodology investors were told that Maiden used to estimate losses for unseasoned accident years was premised almost entirely on historical loss performance as an input. ¶¶82, 131. Further, Maiden informed investors that among the most significant assumptions the Company made in estimating losses was that historic loss development is indicative of future loss

17

development. ¶51; Maiden 2016 Form 10-K at 63. But Defendants failed to disclose to investors the truth about Maiden's historic loss performance.

Further, GAAP and professional standards reinforced that Defendants should have based Maiden's initial loss estimates primarily on historical experience. Specifically ASC 944-40-30-1 states that estimates for the ultimate cost of settling claims shall be based on "past experience adjusted for current trends, and any other factors that would modify past experience." ¶84. Additionally, the American Institute of Certified Public Accountants proscribes that the most important factor in setting loss reserves is the "historical adequacy or inadequacy of total reserves." ¶85. Here, Defendants violated these principles quarter after quarter by ignoring the obvious: past performance is the best indicator of future performance.

In fact, Maiden's initial estimated loss ratios for each accident year drastically differed from historical loss ratios from more seasoned years. Despite recording loss ratios for seasoned years of between 70% and 80%, ¶69, Defendants disclosed that they used initial expected loss ratios of only 48% to 56% for each new accident year to calculate reserves. ¶69. Thus, Defendants' public statements about Maiden's loss ratios and loss reserves did not align with the adverse information Defendants possessed at the time about the loss ratios for seasoned accident years. That rendered their statements to investors false and misleading. Earlier this year, the court in *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at

*16 (N.D. Cal. June 2, 2020) denied dismissal and found that the complaint adequately pleaded that a statement of opinion by Apple's CEO was misleading because it did not align with the information he possessed at the time. Apple's CEO had stated that he would not put China in a category of emerging market issues for Apple and that Apple's sales in China had been very strong last quarter. *Id.* Acknowledging that Apple's sales in China had been strong during the last quarter, the court nonetheless found the statement materially misleading because the CEO knew at the time that Apple's sales in China were particularly bad during the quarter in which the statement was made. *Id.* Similarly, Defendants' statements were misleading because they did not align with the undisclosed historical information they possessed at the time.

Defendants do not dispute that (i) the historical loss information set forth in the Complaint accurately reflects Maiden's historical loss data; (ii) Defendants failed to disclose this adverse historical loss experience information; (iii) Defendants knew, or at a minimum recklessly disregarded, the actual loss data during the Class Period; and (iv) Maiden's initial loss estimates for new accident years materially differed from the historical loss experience of more seasoned years. Defendants do not and cannot identify any public fact to challenge the underlying data or substantively dispute any of the inferences the Complaint draws therefrom. Motion at 20 ("Even Plaintiffs' historical loss ratio chart, *see* AC ¶69—on which

19

Plaintiffs rest essentially their entire claim—fails to show that Maiden's loss reserves were so unreasonable as to constitute 'false' opinions."); *id.* at 20 & n.12 ("Plaintiffs plead another chart supposedly showing that Maiden underestimated their AmTrust reserves. *See* AC ¶58.").[8] Indeed, Defendants conceded during the Pre-Motion Conference[9] that "[y]es, we looked at historical data" when setting loss reserves. PMC Tr. at 12:16-19; *see also id.*, at 8:12-14 (conceding Defendants relied on "historical data" in setting loss reserves) *id.*, at 13:5-9 (same). In quarter after quarter after quarter during the Class Period, Defendants chose not to disclose adverse historical loss information that undermined Maiden's stated loss ratios and loss reserves.

Unable to dispute the facts alleged, Defendants suggest that the historical loss information was "at most, a 'fact cutting the other way,' the non-disclosure of which does not render a statement of opinion actionable." Motion at 26 (citing *Omnicare,*

---

[8] Defendants impermissibly assert that "workers' compensation and commercial auto business lines" of business greatly exceeded historical loss figures "in and after 2016 throughout the insurance industry." Motion at 21-22. Defendants provide no support for this assertion, and factual arguments like this one are not permitted on a motion to dismiss. To the extent the Court considers this purported factual argument, Fed. R. Civ. P. 12(d) mandates both conversion to summary judgment and permitting discovery. Moreover, Defendants' assertion fails to explain how two lines of business exceeding historical loss figures beginning in 2016 would cause Maiden to have consistently underestimated loss ratios for each new accident year dating back to 2011. ¶69.

[9] References to the transcript of the Premotion Conference, conducted via Zoom on July 28, 2020, are cited as "PMC Tr. at __."

*Inc.*, 575 U.S. at 189). This conclusory assertion—essentially contesting the materiality of the omissions without citing any applicable cases or contesting any allegations—fails on both the facts and the law. [10]

The law is well-settled that courts should not dismiss an action based on materiality unless the alleged omission is "so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274–75 (3d Cir. 2004) (reversing dismissal on materiality grounds). An omitted fact, like a false statement, is material if "there is a substantial likelihood that a reasonable [investor] would consider it important." *Omnicare*, 575 U.S., at 196 (citation omitted). The Complaint adequately particularizes  the importance of the omitted facts here and how their omission caused Defendants' statements to mislead investors. ¶¶58-71, 87-93, 97-104, 106-114, 116-129, 133-148, 150-166. At a minimum, these allegations raise a plausible inference that Defendants' omissions are actionable, and this Court must avoid finding that the adverse omitted historical loss ratios are immaterial as a matter of law. *See, e.g., In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 CIV. 6728 (CM), 2018

---

[10] *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-CV-01640, 2020 WL 2735366, at *9 (N.D. Ill. May 26, 2020), Motion at 20-21, provides Defendants no support. In *Fryman*, dismissing an omissions claim, the court found that the complaint's allegations were insufficiently particular to establish defendants were reckless about the severity of a negative trend. *Id.* Here, the Complaint details information about the historical data Defendants possessed—and omitted from disclosure—throughout the Class Period. *See* ¶¶58-61, 69-71.]

WL 6167889, at \*13–14 (S.D.N.Y. Nov. 26, 2018) (denying dismissal, finding material historical numbers providing objective measure for future, uncollectible accounts). Given that the omitted information undermines Defendants' key public disclosures, it is not "so *obviously unimportant . . .* that reasonable minds cannot differ." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d, at 274–75.

Similarly, under an analogous fact pattern, the court in *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019), denied dismissal on materiality grounds. The plaintiffs alleged that the defendants' statements attributing revenue growth to end-user demand were misleading because the defendants failed to disclose that the revenue growth was due, in significant part, to ballooning channel inventory. The court rejected the idea that the omission was "some ancillary fact 'cutting the other way'" because "a reasonable investor would likely have found it significant that printer supplies revenues were driven by inflated channel inventory and not increased end-user demand because those forces fundamentally differ in sustainability." *Id.*

Further, contrary to Defendants' contention, Maiden's adverse, material historical loss ratios were not "ancillary" noise. They belied Defendants' estimates, and their omission prevented reasonable investors from assessing Defendants' loss estimates in context. At the pleading stage, this Court should not rule that an investor's ability to assess Defendants' estimates by reference to adverse historical

22

information is insignificant. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) (reversing district court's dismissal and finding complaint plausibly pled *Omnicare* omission because the "omitted contrary facts substantially undermine[] the conclusion a reasonable investor would reach" from the statement of opinion)

Finally, as now Justice Alito wrote in *Oran v. Stafford*, at the pleading stage, a stock price decline upon correction of an undisclosed fact indicates that the misrepresentation or omission was material. 226 F.3d 275, 282 (3d Cir. 2000) ("when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock"). The fact that Maiden's stock price substantially dropped when Defendants finally disclosed the historical, seasoned loss ratios (¶¶ 209-11) establishes the materiality of that information. *See, e.g., SEB Inv. Mgmt. AB*, 351 F. Supp. 3d at 903 (denying dismissal, finding decline in stock price after correction shows significance of omitted information to investors and, therefore, materiality) (citing *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005)).[11]

---

[11] Notably, Defendants do not dispute that the Complaint adequately pleads loss causation and damages.

23

The Complaint plausibly alleges that Defendants omitted material facts from their statements about Maiden's loss development, loss ratios, and loss reserves that rendered those statements misleading to a reasonable investor.[12]

### 2. The Complaint Adequately Alleges Defendants Made Materially Misleading Statements

Defendants assert that no question exists that loss estimates are opinions. Motion at 2-3, 17-18. Because they are incorrect, the Complaint adequately alleges affirmative misleading statements in addition to omissions. ¶¶67-68, 86, 94, 115, 130, 149, 167. Third Circuit precedent does not confine loss reserves to opinions. *See Underland*, 2011 WL 4017908, at *9 (denying dismissal, finding statements of loan loss reserves materially misleading and actionable). Rather, no "broad proposition" establishes "that *all* statements pertaining to loan loss reserves are opinions." *Id.* (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992))

---

[12] Defendants argue that the Complaint fails to plead *Omnicare* omissions based on Maiden's failure to adhere to its stated reserve methodology. Motion at 25-26. The cases upon which they rely, however, were not based on *Omnicare* omissions. Instead, they were based on statements of fact, and not, as here, statements of opinion or that the complaints alleged misstatements rather than omissions. *See Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 488 (S.D.N.Y. 2013) (based on misrepresentations of adequacy of loan reserves, not omissions); *Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2015 WL 3833849, at *23 (M.D. Pa. June 22, 2015) (dismissing claim based on statement that loan loss reserves were "adequate" due to failure to adhere to stated reserve methodology, while acknowledging that such statement could be evaluated as a statement of fact) (citing *Underland v. Alter*, No. CIV.A. 10-3621, 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011)).

(emphasis in original).

It is axiomatic that "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." *Dudley v. Haub*, No. 2:11-CV-05196 WJM, 2013 WL 1845519, at *2 (D.N.J. Apr. 30, 2013) (quoting SEC Rule 4–01(a) of SEC Regulation S–X). The Complaint alleges that Defendants did not prepare Maiden's financial statements in compliance with GAAP. In violation of ASC 944-40-30-1, ¶¶72-85, Defendants reported loss reserves that materially failed to account for historical loss data. In violation of ASC 944-40-50-4H, Defendants improperly failed to disclose in Maiden's 2016 Form 10-K disaggregated loss development data. ¶66. *See Underland*, 2011 WL 4017908, at *9 ("[i]f, as Plaintiffs allege, [defendant] omitted factors from its calculation, the sum of that calculation is necessarily misstated"). Defendants do not contest these allegations, and the Court should not permit them to do so for the first time in their reply brief. *See, e.g., Atain Specialty Ins. Co. v. Ne. Mountain Guiding, LLC*, No. 316CV05129BRMLHG, 2020 WL 487110, at *5 (D.N.J. Jan. 30, 2020) (refusing to consider two arguments raised for the first time in a reply brief because "an argument raised for the first time in a reply brief is waived") (citing *Haberle v. Borough of Nazareth*, 936 F.3d 138, 141 n.3 (3d Cir. 2019)).

Second, the Complaint adequately alleges that the Individual Defendants each

25

signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that Maiden's annual reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the reports "fairly present in all material respects the financial condition" of the Company. ¶¶94, 115, 130, 149, 167. The SEC "interprets 'fair presentation' of financials to include 'any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition.'" *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 419 (D. Del. 2009)

Each of these SOX certifications was false and misleading because the Complaint adequately alleges that each of the associated Form 10-Ks omitted or misrepresented material facts. *See China Zenix*, 2020 WL 3169506, at *8 (denying dismissal and finding SOX certification adequately alleged to be misleading and actionable because the complaint adequately the associate annual report contained misleading information). Again, Defendants do not contest these allegations and should not be permitted to do so for the first time in their reply.

### C.   The Complaint Adequately Pleads Defendants' Scienter

Unable to credibly dispute the Complaint's allegations of material falsity, Defendants attack the allegations of scienter. Motion at 26-36. As an initial matter,

26

securities fraud cases such as this, the same facts often suffice to allege falsity and scienter. *See Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) ("falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts"). That is particularly true in a case, like this one, where there is no real dispute that Defendants knew the facts that rendered their statements false and misleading. Because the Complaint adequately alleges that Defendants omitted material, adverse historical loss ratios, affirmatively misleading investors about the loss reserves they disclosed, this Court would have to suspend disbelief to find the inference of scienter is not at least as equally cogent and compelling as any counter-inference.[13]

To plead scienter in the Third Circuit, a complaint must allege facts giving rise to a strong inference of "either reckless or conscious behavior," with recklessness defined as "an extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 & n.42, 276 (3d Cir. 2009). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts *or access to information* contradicting their public statements. Under such

---

[13] The Individual Defendants' scienter can be imputed to Maiden because a "corporation is liable for statements by employees who have apparent authority to make them." *Avaya*, 564 F.3d at 251-52.

27

circumstances, defendants knew or, *more importantly, should have known* that they were misrepresenting material facts related to the corporation." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *12 (E.D. Pa. Mar. 25, 2020)*, 2020 WL 1479128, at *12 (citations omitted) (emphases in original). A complaint need only plead that Defendants had access to the omitted information, not that they actually examined or considered it. *Id.*[14]

No "smoking gun" is required to plead scienter. *Tellabs*, 551 U.S. at 310. Rather, the Court will decide whether all of the allegations—collectively, rather than in isolation—give rise to a strong inference of scienter that is "*at least as likely as any plausible opposing inference.*" *Id.* at 324, 328 (emphasis in original). Scienter can be inferred from "circumstantial evidence," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997), and the "absence of a motive allegation, though relevant, is not dispositive." *Matrixx,* 563 U.S. at 48.

### 1.    The Complaint Sufficiently Pleads Defendants' Recklessness

#### a)    *Defendants Had Knowledge of and Access to the Omitted Historical Loss Experience Information*

The Complaint alleges with particularity that Raschbaum, Schmitt, and Marshaleck each knew and had access to the omitted material facts about Maiden's historical loss ratios. ¶¶5-11, 34-35, 46, 66, 88, 95, 105, 106; s*ee In re DVI, Inc. Sec.*

---

[14] Defendants' assertion that the Complaint must allege actual knowledge to plead scienter is wrong. Motion at 15.

*Litig.*, No. 2:03-CV-05336, 2010 WL 3522086, at *10 (E.D. Pa. Sept. 3, 2010) (denying dismissal and finding strong inference of scienter based on importance of loss reserves, magnitude of the alleged fraud, and executive's access to information). Tellingly, Defendants do not even attempt to challenge the adequacy of these allegations.

For example, Plaintiffs allege that:

- the AmTrust Quota Share Agreement entitled Maiden to access "all papers, books, accounts, documents, claims files and other records" of AmTrust (¶46);

- the historical AmTrust data to which Defendants claimed Maiden had access revealed that the loss ratio for the AmTrust business, as it matured, actually fell in the range of between 70% and 80% (¶66);

- Defendants assured investors that they had intimate knowledge of the loss experience of AmTrust, noting that the Company established loss reserves for that business by "using prudent actuarial methods after receiving all information known to us at the date they are recorded" (¶95);

- Raschbaum assured investors that "[o]ur active client diligence process, which includes underwriting, accounting and claims auditing, actuarial reviews, and other activities, give us confidence in the high quality of the business we are receiving from our largest client [*i.e.*, AmTrust]" (¶88);

- Raschbaum assured investors that Maiden "maintain[ed] a very active audit involvement with our customers to validate the pricing process,

29

> risk selection, claims activities, and the efficacy of the statements that we get" and "that in AmTrust's case, they have been very cooperative and very – a good partner in the process" (¶105); and
>
> - Raschbaum assured investors that Maiden worked closely with AmTrust "during regular audit site visits and management meetings to ensure that we have a clear understanding of the underlying business and how it is performing (¶106).

Defendants concede, by their silence, all of these allegations evidencing their knowledge of and access to the actual historical loss data. In addition to alleging that each Individual Defendant had knowledge of and access to the material omitted facts, the Complaint also alleges that each was familiar with loss reserve methodology and applicable GAAP through their decades of work in the industry. ¶¶25, 28, 31.

### b) Core Operations Contribute to Inference of Scienter

"[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS), 2018 WL 6381882, at *17 (D.N.J. Dec. 6, 2018) (citation omitted). Reinforcing the allegations of Defendants' knowledge is the fact that AmTrust accounted for the majority of Maiden's revenues throughout the class period (¶7), including over 70% of Maiden's revenue in 2016 (¶5), and was

30

undeniably central to Maiden's business. *See In re Allergan Generic Drug Pricing Sec. Litig.*, No. CV169449KSHCLW, 2019 WL 3562134, at \*12 (D.N.J. Aug. 6, 2019) (finding scienter, imputing to senior executives knowledge of company's core business). There is simply no plausible scenario under which Defendants did not know and have access to the historical loss ratios that rendered their statements to investors false and misleading.

The magnitude and duration of the fraud also support a strong inference of scienter. *See Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*, No. CIV.A. 00-5965 (JCL), 2005 WL 1366025, at \*8 (D.N.J. June 8, 2005) ("[t]he magnitude of any given misstatement or overstatement may help support an inference of scienter"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) (denying dismissal and finding "the magnitude and duration of the misstatements and the existence of GAAP violations" support the inference of scienter). The material omissions in this action spanned over four years and led to Maiden belatedly recognizing over $500 million in adverse developments in the AmTrust Segment. ¶¶13-17. These facts further contribute to an inference that Defendants were aware—or should have been aware—of the fraud. *See In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (denying dismissal and finding the magnitude and duration of the fraud were probative of scienter where the

31

complaint alleged a $15 million misstatement and misstatements spanning two fiscal years).

The Individual Defendants also assured investors of their detailed knowledge of Maiden's loss estimation and reserve methods during Maiden's investor calls and through their statements to investors about the loss reserves. ¶¶89, 97, 100, 103, 105, 106, 109, 116; *see In re Toronto-Dominion Bank Securities Litigation*, 2018 WL 6381882, at *17 ("Individual Defendants made statements concerning the Canadian retail segment and internal controls and the Canadian retail segment was of central importance to TD Bank's success. That is enough at the pleading stage to support the core operations doctrine.")

      c)      *Defendants' SOX Certifications Add to the Inference of Scienter*

Taken together with Defendants' own concession that they knew and had access to the true adverse loss data, as well as the central importance of the AmTrust Segment to Maiden's business, Defendants' SOX certifications contribute to an inference of scienter. *See, e.g., China Zenix*, 2020 WL 3169506, at *10 (finding scienter, in part, on signing of false SOX certification); *Mulderrig v. Amyris, Inc.*, No. 19-CV-1765 YGR, 2020 WL 5903844, at *20 (N.D. Cal. Oct. 5, 2020) (same); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) (same). The Individual Defendants subjected themselves to criminal liability by certifying the truthfulness of Maiden's annual reports, and the Court should infer at the pleading

stage that they took that responsibility seriously enough that material adverse historical data was omitted with requisite fraudulent intent rather than haphazardly.[15]

### 2. The Complaint's Motive Allegations Bolster the Inference of Scienter

Allegations of circumstantial evidence of recklessness need not be as strong if a complaint adequately pleads a motive. See *Matrixx*, 563 U.S. at 48 ("absence of a motive allegation, though relevant, is not dispositive"). Here, the Complaint also pleads motive and opportunity to defraud investors.

Allegations of "[i]nsider trading will strengthen an inference of scienter when the "sales of company stock by insiders ... are 'unusual in scope or timing[.]' In re Hertz Glob. Holdings Inc, 905 F.3d 106, 119–20 (3d Cir. 2018). Plaintiffs allege that Raschbaum and Schmitt collectively sold more than $1.275 million of their Maiden stock while in possession of material, nonpublic information in November 2016. ¶187. These sales were suspicious in both scope and timing: neither Raschbaum nor Schmitt sold any other stock during the Class Period (or in the twelve months before the start of the Class Period), and the sales came mere weeks before Maiden's stock hit a Class Period high and just three months before the first corrective disclosure. ¶188.

---

[15] Defendants' GAAP violations also contribute to a strong inference of scienter. *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 CIV. 1580 (LGS), 2018 WL 2382600, at *9 (S.D.N.Y. May 24, 2018) ("Defendants' failure to comply with GAAP in their SEC filings bolsters the inference of scienter").

Defendants incorrectly argue that these insider sales do not contribute to an inference of scienter, and, in fact, negate such an inference. Motion at 28, 30. First, Defendants argue that Raschbaum selling 16% of his holdings and Schmitt selling 12% of her holdings suggests neither had any intent to profit from artificial inflation of Maiden's stock. Motion at 30. In fact, courts have found scienter where defendants sold similar portions of their holdings. *See In re Valeant Pharm. Int'l, Inc., Sec. Litig.*, No. CV157658MASLHG, 2019 WL 2724075, at *9 (D.N.J. June 30, 2019) (finding scienter despite defendants retaining 80% of their holdings).

Next, Defendants assert that their receiving grants of stock from Maiden is "inconsistent with fraudulent intent." Motion at 30-31. But they cite no case to support this argument. Corporate executives rewarding themselves with cost- and risk-free stock grants cannot be likened to actually buying stock at open market prices. Defendants also argue that the purpose of the sales undermines fraudulent intent. Motion at 29-30. To do so, Defendants impermissibly rely on Form 4s submitted by Raschbaum and Schmitt for the truth of their contents that the sales were for "tax planning purposes." Id. at 29 & n. 15. *See* Opposition to Defendants' Request for Judicial Notice, filed concurrently, at 8. If the Court allows such an inference, the Motion should be converted to a motion for summary judgment, and Plaintiffs should be permitted to conduct discovery. Further, the case Defendants cite for this point undermines their argument. In *In re Bristol-Myers Squibb Sec.*

*Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004), the court found that the inference of scienter was not strong only where there was "a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock options or to pay taxes." No such pattern exists here; neither Raschbaum nor Schmitt sold any other stock during the Class Period or before the Class Period. And even if Defendants' factual argument could be considered on a motion to dismiss, the evidence does not support a claim that the stock sales were made just to pay taxes.[16]

Further, specific allegations that a company was motivated to inflate its stock price to secure financing can contribute to an inference of scienter. *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (allegations "that Defendants needed to conceal iStar's deteriorating performance so that the Company would be able to secure financing and maintain an investment-grade credit rating" helped create strong inference of scienter). Here, the Complaint

---

[16] The Complaint's allegations regarding Defendants' incentive compensation, including specifically how the fraudulent scheme inflated their compensation and allowed Defendants to collect over $7.2 million during the Class Period, contribute to the inference of scienter. ¶¶189-99; *see Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (finding strong inference of scienter, in part, based on allegations of the defendants' specific motive to lie about or manipulate numbers since doing so would allow them to reap a concrete benefit in the form of bonuses tied directly to those numbers); *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005) (finding allegations of incentive "programs which specifically and directly tied executive bonuses to the very instrument used to commit the alleged fraud" "squarely contribute to a strong inference of scienter).

35

alleges that Maiden raised over $400 million in much needed capital during the Class Period that would not have been available without the artificial inflation of Maiden's stock price. ¶¶192-195. *See In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) ("plaintiffs' contention that defendants were motivated to inflate artificially [the company's] stock price in the short term in order to conduct a successful secondary public offering and obtain much-needed operating capital does allege facts of a palpable motive for fraud"). Even the cases upon which Defendants rely acknowledge that, in certain circumstances, "the desire to enhance a stock price in advance of an offering can give rise to an inference of fraudulent intent." *Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011) (cited in Motion at 33). Those circumstances are met, here, where Maiden needed hundreds of millions of dollars in capital to redeem its previously issued senior notes. ¶¶194-195.

### 3. Inferences of Scienter Are At Least As Cogent and Compelling as Non-Fraudulent Inferences

A strong inference of scienter means that, under holistic review, a complaint's inference of fraudulent intent is "cogent and at least as compelling as any opposing inference" proposed by defendants. *Matrixx*, 563 U.S. at 48. Here, despite exhausting pages attempting to undermine the Complaint's motive allegations (Motion at 26-35), Defendants propose no competing inference. Indeed, Defendants do not contest the fact that each of the Individual Defendants had actual knowledge

36

of and access to the material omitted facts about Maiden's historical loss ratios. Defendants' failure to disclose material adverse facts is a classic fact pattern raising a strong inference of scienter. *See Hall*, 2019 WL 7207491, at *22 (denying dismissal and finding strong inference of scienter based on defendant's "failure to disclose the contrary information of which he was allegedly aware"); *SEB Inv. Mgmt. AB*, 351 F. Supp. 3d at 906 (denying dismissal and finding strong inference of scienter where complaint pled "a cogent inference that the defendants recklessly disregarded the facts they knew contradicted their public statements").

In place of a competing non-fraudulent inference, Defendants suggest that risk warnings and the absence of a formal restatement negate scienter. These arguments are misplaced. Defendants place undue weight on Maiden's consistently revising its reserves and loss estimates rather than formally restating them. Motion at 3, 22, 24, 36, 37. As an initial matter, Defendants' assertion that Maiden received "clean" audit opinions is a factual argument that is impermissible on a motion to dismiss. Further, if the Court were to entertain Defendants' factual argument, any inference that could be drawn from Maiden's audit opinions must consider the tangled and problematic relationship caused by Maiden and AmTrust sharing the same auditor and engagement partner. ¶103. This BDO engagement partner, who also purportedly gave a "clean" audit opinion to AmTrust, was later sanctioned by the SEC for his

37

misconduct in auditing AmTrust's financial statements.[17] Maiden began disclosing corrective information, including the previously omitted historical loss ratios, immediately after belatedly replacing BDO with Deloitte for its 2017 Form 10-K.[18] Finally, the absence of a restatement is irrelevant where, as here, a complaint adequately pleads the elements of securities fraud. As the First Circuit recognized in *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002), allowing a defendant to escape liability due to a lack of a restatement "would shift to accountants the

---

[17] *In the Matter of Richard J. Bertuglia, Cpa, John W. Green, Cpa, & Lev Nagdimov, Cpa, Respondents.*, Release No. 3992 (Oct. 12, 2018) (sanctioning Richard Bertuglia for "predating" blank audit documents during his team's review of AmTrust's financial statements and finding Bertuglia "failed to properly supervise the audit and the work of audit team members, who (i) violated numerous PCAOB standards, including audit documentation standards, and (ii) failed to complete necessary audit procedures, and obtain sufficient audit evidence, to support BDO's audit report"). After replacing BDO as its auditor, and as a result of regulatory investigations into its accounting practices, AmTrust restated its financial statements covering the bulk of the Class Period. *See Martinek v. AmTrust Fin. Servs., Inc.*, No. 19 CIV. 8030 (KPF), 2020 WL 4735189, at \*2 (S.D.N.Y. Aug. 14, 2020) ("AmTrust engaged in accounting practices that, when finally investigated by the SEC, the New York Department of Financial Services, and the Federal Bureau of Investigation, resulted in AmTrust having to restate approximately three years of financial statements from 2013 to 2017").

[18] Moreover, Defendants' insistence that a purported "clean" audit opinion negates scienter is undermined by the fact that the historical loss data that Maiden finally disclosed in the 2017 Form 10-K was unaudited. See Ex. A to Rosen Decl. (Maiden 2017 Form 10-K at F-34) ("The following is a summary of the Company's incurred losses and paid losses development by accident year, net of reinsurance, from the last six calendar years including the total reserve for losses IBNR plus development on reported loss and LAE for both our reportable segments, Diversified Reinsurance and AmTrust Reinsurance, as of December 31, 2016. *Information prior to 2016 is included as unaudited supplementary information*.") (emphasis added).

responsibility that belongs to the courts" and "allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements."

The fact that Maiden made broad, generic risk disclosures about loss reserves that are equally applicable to any reinsurer also fails to negate or weigh against scienter. *See, e.g.,* Motion at 10 ("every Company 10-K, including those predating the class period, warned investors that the Company's reserves might not be sufficient to cover future losses"). Addressing the type of risk disclosure arguments Defendants make here, the Third Circuit in *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709–10 (3d Cir. 1996), reversed dismissal and found the defendants' risk warnings failed to overcome specific allegations of their reckless misrepresentation of reserves.

Defendants' characterizing individual scienter allegations as insufficient to establish a strong inference fails to advance a *more* cogent and compelling competing inference.

### D.    The Complaint Adequately Pleads a Section 20(a) Claim

Defendants do not address Plaintiffs' Section 20(a) claim. In such cases, courts will simply uphold Section 20(a) claims without further analysis upon finding Section 10(b) claims adequately alleged. *Avaya*, 564 F.3d at 280. Accordingly, because the Complaint adequately pleads Plaintiffs' Section 10(b) claim, it also

39

adequately alleges a claim for control person liability. *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, No. CIV.A. 09-799, 2011 WL 2444675, at *14 (D. Del. June 14, 2011); *Palladin Partners v. Gaon*, No. 05 CV 3305 WJM, 2006 WL 2460650, at *16 (D.N.J. Aug. 22, 2006).

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

Dated: October 26, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen

One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: 973/313-1887
973/833-0399 (fax)
lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
DANIEL TYRE-KARP
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
dtyrekarp@rosenlegal.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
TOR GRONBORG
TRIG R. SMITH
ALEXANDER M. MENDOZA
655 West Broadway, Suite 1900
San Diego, CA 92101

Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com
amendoza@rgrdlaw.com

**ROBBINS GELLER RUDMAN
& DOWD LLP**
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

*Co-Lead Counsel for
Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of October, 2020 a true and correct copy

of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO

DEFENDANTS' MOTION TO DISMISS was served by CM/ECF to the parties

registered to the Court's CM/ECF system.

/s/ Laurence M. Rosen
Laurence M. Rosen