**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

**MICHAEL WIGGLESWORTH, Individually and on Behalf of All Others Similarly Situated,**

    **Plaintiff,**

 **v.**

**MAIDEN HOLDINGS, LTD., et al,**

    **Defendants.**
_____

**CIVIL ACTION NUMBER:**

**19-cv-05296-RMB-JS**

**Premotion Conference CONDUCTED VIA ZOOM VIDEOCONFERENCING**

Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey  08101
July 28, 2020

**B E F O R E:**         **THE HONORABLE RENÉE MARIE BUMB, UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

THE ROSEN LAW FIRM
BY:  JACOB GOLDBERG, ESQUIRE
and
ROBBINS GELLER RUDMAN & DOWD LLP
BY: TRIG R. SMITH, ESQUIRE
For the Plaintiffs

MARINO, TORTORELLA & BOYLE, P. C.
BY:  KEVIN H. MARINO, ESQUIRE
      JOHN D. TOTORELLA, ESQUIRE
and
QUINN EMANUEL URQUHART & SULLIVAN LLP
BY: JACOB J. WALDMAN, ESQUIRE
For the Defendants

    Theodore M. Formaroli, Official Court Reporter
        tedformaroli@yahoo.com
          (609) 575-3864

 Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

(PROCEEDING CONDUCTED VIA ZOOM VIDEOCONFERENCING.)

THE COURT:  Good morning.  Everybody on?  Is everybody on this.

MR. MARINO:  Good morning, your Honor.

THE COURT:  Good morning.  Is everybody on?

MR. MARINO:  Everyone's on for defendants, your Honor.

MR. GOLDBERG:  Good morning, your Honor.  I can see that it's Trig Smith from Robbins Geller is on, but we are here as well.

THE COURT:  Well, let's go through and we'll see who is on.  I see some of you and some of you I don't see, which is fine if you just want to listen in.  So we're appearing by Zoom in the case of In re:  Maiden Holdings Securities Litigation, 19-5269.  I'm going to ask you to enter your appearances, and I'll start with the plaintiff.  And then, as my court reporter asked, if you are going to speak if you could just announce your name first.  Okay.  Good to see you all under all the circumstances.  Let's start with who is appearing for the plaintiff first.

MR. GOLDBERG:  On behalf of the Boilermakers and Blacksmith National Pension Trust and Talshin International Bank, Jacob Goldberg from The Rosen Law Firm.

THE COURT:  Okay.  Good morning.

Okay.  Anyone else for the plaintiff?

*United States District Court*
*Camden, New Jersey*

MR. TYRE-KARP: Daniel Tyre-Karp from the Rosen Law Firm.

THE COURT:  You are appearing just by audio?  Oh, no, there you are, Mr. Karp.  Now I see you.  Okay.

Anyone else?  No?  Okay.

And for the defendants?

MR. MARINO:  Good morning, your Honor, Kevin Marino, Marino, Tortorella & Boyle, for the defendants.  Can you see me, your Honor?

THE COURT:  I cannot.

MR. MARINO:  I don't know why that is.

THE DEPUTY CLERK:  You just want to start your video at the bottom of the screen?

THE COURT:  I just see your name, Mr. Marino, but I don't see you.

MR. MARINO:  I'm sorry, I'm trying to start my video because I don't -- I'm not sure -- I apologize, I'm not sure how to do that.

THE COURT:  So do you see a camera?  You should see like a video camera, old-fashioned video camera.

THE DEPUTY CLERK:  At the bottom left of your screen right near audio.

THE COURT:  It's usually at the bottom left.  It could be at the top.

MR. MARINO:  Oh, no, here it is.  Here it is.

THE COURT:  Aha.  There you are.

MR. MARINO:  That better, Judge?

THE COURT:  Mr. Marino, it's a very sad day if this Court is teaching you technology.

MR. MARINO:  You have no idea how limited I am in this regard, Judge.  But in all events, good morning to you, and to you, Mr. Formaroli.

THE COURT REPORTER:  Good to see you, Mr. Marino.

THE COURT:  Who else is for the defendants on the conference?

MR. TORTORELLA:  Your Honor, John Tortorella also from Marino Tortorella & Boyle.  And with us is Jacob Waldman from Quinn Emanuel.

MR. WALDMAN:  Good morning, your Honor.

THE COURT:  Are you appearing only by audio?  No, I see you, Mr. Tortorella.  Okay.  And what about Mr. Waldman?

MR. TORTORELLA:  He's on.

MR. MARINO:  He's on video also, your Honor.

MR. WALDMAN:  I'm on video as well, your Honor.

THE COURT:  There you are.  Okay.

And anyone else want to enter an appearance?  No?  Okay.

MR. MARINO:  I don't believe so, your Honor.

THE COURT:  Okay.  I think I have everyone.  So, okay.  Thank you all.  I hope you are all well in these

*United States District Court*
*Camden, New Jersey*

challenging times.  So I thank you all for following my rules and procedures.  For those of you who have appeared in front of me before you know I have this procedure because I always find it's helpful to move the case forward in the sense that -- whether or not we can move it forward by having these pre-motion conferences.

So, Mr. Marino, are you going to speak on behalf of the defendants?

MR. MARINO:  I am, your Honor.

THE COURT:  Okay.  So let me hear you.

MR. GOLDBERG:  Your Honor?

THE COURT:  Yes.

MR. GOLDBERG:  With apologies.  This is Jacob Goldberg from the Rosen Law Firm.  Trig Smith was supposed to speak for us today, he is from the Robbins Geller firm.  I haven't heard his appearance yet.  Trig, if you are on the line, if you could let us know.  And if not, let's go forward and we'll do our best.

MR. MARINO:  He's on, your Honor.  I think you were muted there.

MR. SMITH:  Yeah, there you go.  Good morning, your Honor.  This is Trig Smith from Robbins Geller on behalf of Boilermakers and Blacksmith National Pension Trust and Taishin International Bank.

THE COURT:  So he's here's.  All right.

*United States District Court*
*Camden, New Jersey*

So, Mr. Marino, go ahead.  And I may have some questions for you, but let me hear what you have to say.

MR. MARINO:  Thank you very much, your Honor.  And thank you for -- actually for adopting this procedure because I do think it's helpful.  I've not had it in a lot of courts in this district but I have had it a number of times elsewhere and I do think it's a very helpful thing.

I won't regurgitate everything we've said.  We tried to make our letter at the same time concise and yet sufficiently expansive to give your Honor some insight into what we're hoping to accomplish in our motion.

So, as your Honor knows, Maiden provides reinsurance to insurance company clients, including AmTrust Financial.  The way that works is just in exchange for a portion of the premiums it collects, Maiden pays a portion of its clients' losses, and that requires it to estimate in advance the losses its clients might incur and to preserve for them.  Maiden disclosed in its SEC filings estimating losses and setting appropriate reserves involves complicated actuarial, market and economic analysis and predictions about future conditions.  They are very upfront about that, there isn't any dispute about that, and plaintiffs don't allege anything to the contrary.

Maiden has reported significant reserve charges relating to AmTrust beginning in February of 2017 because

actual losses exceeded Maiden's estimates.  The plaintiffs claim that this is securities fraud, and basically that we must have known that the reserves that we set for the AmTrust business segment was inadequate, those were inadequate reserves based on historical experience.

In the motion that we will file if your Honor permits it, your Honor, we will take the position that the complaint does not state a claim under the PSLRA because it contains no particularized facts showing that Maiden did not believe its reserves or its reserve methodology were unreasonable at the time they were made.  And I think it's fairly clear that without more, failure to estimate your loss reserves correctly does not constitute securities fraud.  We will explain in our motion, and I think it's clear, your Honor, from the face of the complaint that the plaintiffs don't allege a plausible misstatement.  Obviously, a statement about a loss reserve is by definition a forecast.  Right?  It's a subjective statement.  And we believe in the normal course typically it's a subjective statement of opinion.  So, in order to properly allege securities fraud, the plaintiffs must allege facts that plausibly show that the subjective statements were false either because we didn't believe they were true when they were made, in other words subjectively false, or the facts implied by the statement of opinion were knowingly false, meaning we knew that our lose reserves were wrong when we made them.  And

the Supreme Court said that as recently as 2015 in the Omnicare case.

Now, there are no allegations, and you can go through, and I'm sure you will, plaintiffs' complaint in detail, there are no allegations that we did not believe our loss reserve figures were accurate based on the company's loss reserve methodology.  And this is another undisputed fact, that the 10-K that's filed in 2016 states, quote, we're required by applicable insurance laws and regulations to establish loss reserves to cover our estimated liability for the payment of all loss and loss adjustment expenses incurred.  The company disclosed how we arrived at these.  Okay?  That we used specific actuarial models, industry trends in addition to historical data, trends in claim frequency and severity, emerging economic and social trends, inflation, applicable regs and the litigation environment.

After determination by internal staff and management, external actuaries reviewed the reserve loss and certified that they made a reasonable provision for the unpaid loss and loss adjustment expense and obligations (distortion) we disclosed, and there is no -- nothing alleged in the complaint to the contrary, we disclosed to investors that although we employed sophisticated analyses and multiple levels of review establishing the proper and adequate reserves is a significant risk to the company because the prediction of future

performance could prove to be materially wrong.

Now, in responding to our allegations -- I'm sorry. In responding to the position that was set forth in the letter to your Honor asking for permission to file the motion, the plaintiffs rely on several cases.  And I, as your Honor may have some questions at this point, I'd like to talk about a couple of those cases, but I want to be responsive to whatever is -- may be troubling your Honor the most.

THE COURT:  Well, the question I had is what is your answer to the -- it seems so obvious when the 10-K was filed that is when sort of it all came to light.  Right?  Why did your client not -- so the SEC, as I understand it, if I'm understanding wrong you'll tell me I am, and I'll put this to the plaintiff as well, the SEC comes in in 2016 and says you are doing this all wrong, you are not giving us -- you have not filed the appropriate disclosures, you are not giving us the amount of information that we need, then that is when your client drilled down and in all of this drilling down in the subsequent 10-K made these disclosures that then, you know, showed that they had been underreporting the losses loss reserves, so what is the response as to why they weren't complying with SEC prior thereto?

MR. MARINO:  Your Honor, we believe that we were fully compliant with the SEC rules and regulations prior to that.  And you are correct, obviously the SEC came in and

invited us to drill down further and we drilled down further. I believe that's actually reflective of not engaging in fraudulently conduct.

THE COURT:  It cuts both ways, the argument cuts both ways.  That's right.

MR. MARINO:  I think that's right.  And so, you know --

THE COURT:  As long as -- as long as -- (cross-talk) I'll hear what your adversary says, but if there is an agreement that was defendants prior thereto was in compliance with SEC regs, then, yeah, I think the point is well-taken. It cuts both ways.

MR. MARINO:  And I don't believe they will plausibly allege anything to the contrary.  I mean, you can always improve the manner in which you are doing any one of these things.  Right?  And we have been very up front about how difficult a process this is and how complicated a process it is.  And I know they want to focus on the -- and have your Honor look at this through the prism of the historical data, but historical data is not the only data point and we've been very clear about that.  So I think what is lacking here, and I think we can establish this to your satisfaction, and I think very effectively distinguish the cases that the plaintiffs rely upon in asking you not to even let us make this motion, but from my perspective, and I think this is fair, if you are

going to bring a securities fraud case against someone, you better have particularized facts about what it is that they did that was intentionally misleading, what it is that they did that was false.  Right?  What it is -- I mean, this is the essence of fraud.  Right?  That we tried to pull the wool over on folks, we intentionally -- by the way, it's pretty clear, and I don't think they have an answer for this, it's pretty clear that it would not have been in our interests to do that, it would have been obviously adverse to our interests to do it.  But, you know, for years we are trying to get these loss reserves just right because that's how our business works.  Right?  It works effectively in a most efficiently and most productively and profitably for us if this is done correctly.  If it is not done correctly, the whole thing goes sideways.  Right?  They come in after the fact and say well, this forecast that you made turned out to be wrong, let's bring a fraud case and say that there is a basis to sustain our complaint, and the basis is you must have known these were wrong.  There isn't any red flag here.

As you look at the cases that they talk about, they're very different, they are very, very different from this case.  I believe notwithstanding the SEC coming in and saying, hey, you should look at this a little bit differently and our saying, you know what?  We will do that and then drilling down.  There is absolutely nothing about that

suggests that the prior conduct, which was completely consistant with SEC rules and regulations, was somehow an indicia of fraud. It just isn't so.

For example, I think it's very important to focus on discipline. The word "discipline" become an important word in this context because it certainly can be the case that if you have no disciplined approach and you tout a disciplined approach and say we have this extraordinarily disciplined approach, well that could be false and misleading, that could be a basis for a fraud claim. But there isn't any doubt that what we said was true, that we do indeed have a disciplined approach and it's not -- there is no basis to dispute, there is no basis to dispute the various things that we rely on, I mentioned them earlier, but the -- when you look at our approach, the manner in which we tried to be as accurate as possible. In talking about our loss reserves, we looked to specific actuarial models, we looked at industry trends. Yes, we looked at historical data, but their interpretation of historical data is not the only way to read that thing. Right? So the fact that at any time you get a loss reserve that turns out to be wrong, right, then you begin to judge from the other end of telescope. So it's a lot of reasoning backward to the result that you want to reach.

They say well, how do we know that you defrauded us in the manner in which you outlined your lose reserves and

calculated them and expressed them and explained to us?  Well, we know because they were wrong.  Well, if it works that way, any mistake would be -- would rise to the level of fraud.  No, it doesn't work that way.

We've got actuarial models and industry trends, the historical data, the trends in (distortion) frequency and severity, we have to look at emerging economic and social trends, inflation, look at the regulations, look at the litigation environment.  These are all things that have to be done when you are trying your best to come up with an appropriate forecast.

And so, you know, it's -- sure, after the fact you can always -- you can always judge the race very effectively the day after it's run.  Right?  The problem is they don't have a basis in their complaint, and it is long and it is detailed, but it does not talk of particularized allegations of wrongdoing by us, it does not offer any plausible allegation that we in our own subjective mind were attempting to do the best that we could possibly do to come up with these loss reserves, we just were trying to pull a fast one.  Certainly --

THE COURT:  Mr. Marino, so I may not -- you may not go as far as this, as to say, you know, could we have done it better -- perhaps -- but we have not engaged in any type of fraudulent conduct.  I'm not even so sure you are willing to

say you could have done better because -- because you may not be. So, what do you say to their argument that you've not been complying with, you know, with accounting standards and --

MR. MARINO: It's just not true. I mean, to take your first point, your Honor, I'm not sure I would be willing go that far. I think -- but going that far, as far as your Honor has done, is certainly sufficient to give us a -- you know, make it appropriate to let us file the motion. Right? But I'm not so sure -- I mean, I think we did a really, really good job here. I think that we got the wrong answer. Right? Because we -- obviously the loss reserves were (distortion) understated. But I considered actually the exact question that you asked. Right? Because I certainly want to be in a position to defend the manner in which we did this. Right? And say look, this really is the very best of what we've got. Of course, the test right now is not whether this really was the best that we could have done, the test right now isn't whether the standards that we applied were carefully calibrated and sufficiently appropriate and correct to result in --

THE COURT: At the time -- at the time they were being made, I mean.

MR. MARINO: At the time they were made. Exactly right.

THE COURT:  Right.

MR. MARINO:  So that, you know -- and, you know, plaintiff cites Shapiro v. NJB, that's a 1992 Third Circuit case, to say that we subject ourselves to liability for securities fraud when we characterize our loss reserves as adequate or solid, but they later turn out to be wrong. That's not what Shapiro says.

THE COURT:  Well, I think -- I think that's only half the loaf.

MR. MARINO:  That's right.  Shapiro says -- the defendant characterizes loan loss reserves as adequate or solid even though it knows they're inadequate or unstable --

(cross talk)

THE COURT:  That is the key language that goes to the heart of this, so....

MR. MARINO:  That's the rest of -- in your Honor's terminology, that's the rest of the loaf.  Right?

So, there are no properly pleaded facts in this complaint that plausibly allege that we represented the reserves were adequate at a time when we knew that not to be the case or that we disclosed our reserves methodology at a time when we knew it was unreliable or had not even been used. That's the Shapiro analysis.  Right?  And if you really drill down to what I believe, your Honor, is the heart of it, they allege that our historical loss ratios (Screen freezes)

THE COURT:  You froze for a moment.  So say it again, please.

MR. MARINO:  I'm sorry.  Sure.  So, no -- their allegation that the historical loss ratios they've identified weighed against our opinion about appropriate reserves, that's not now to plead securities fraud.  They say our loss reserves were substantially lower than the historical ratio of premiums to losses.  There is no allegation that Maiden was ever required to restate any aspect of its historical financial statements for any year, that the company disclosed misconduct in the investigation, any supposed malfeasance that the company disagreed with or declined to adopt the recommendations of outside auditors or outside actuaries.  Those are entities whose function was to review our reserve decisions.  There is no suggestion that we said yeah, yeah, thanks anyway and went on our own way.  So, all those things go I think very strongly and very directly against what the plaintiffs are arguing.

Now, I will tell you also, your Honor, I think the complaint fails to plead that either Maiden or our individual defendant clients acted at any time with *scienter*.  So, if you look at Tellabs, there are some major issues and rights, the Supreme Court case from 2007.  They have to make particularized allegations to support an inference of *scienter* that is -- I'm here quoting the test, cogent and at least as

compelling as any plausible opposing inference.  They have to allege facts supporting an inference of an intent to deceive or highly unreasonable, quote-unquote, conduct, conduct, quote, involving not merely simple or even excusable negligence, but an extreme departure from the standard of care presenting a danger of misleading buyers or sellers that is either known to us or so obvious that we must have known.  That's from a Third Circuit decision in 2004, In re Alpharma, Inc. Securities Litigation.  They allege *scienter* because the former CEO, Mr. Raschbaum, and the former CFO Schmitt, sold small amounts of stock, their compensation included incentives, and we raised capital.  We did a capital raise during the class period.  Those allegations do not remotely get them there to the point where they state --

THE COURT:  I don't think they -- I don't think they use the word "small," though.  You do.  You say it was small in comparison.

MR. MARINO:  Yes, that's fair, your Honor.  That's right.  And I believe that's -- they make -- I think they're largely focused on the fact that the sales occurred, but you are right, they don't allege that they're small, but I don't think there is any -- there would be any dispute if you look at -- relatively if you look at them --

THE COURT:  And I think that's a question I want to pose to I guess Mr. Smith.  If they sold stock every year and

the amount of stock that they sold every year didn't change, that's much different from saying well, right before everything, you know, fell through they sold much more stock than typical, then I think that has more indicia of fraud than otherwise.  And I don't see that in the pleadings.  Sounds like selling shares in and of itself is not problematic.  And that will be the question I ask Mr. Smith.  But when I read through your letter, your proffer to me is, is that what they sold was very minimal.

MR. MARINO:  Right, your Honor, and --

THE COURT:  As a matter of fact, they held onto all of this stock to their detriment, which is contraindicative of fraud, it seems to me.

MR. MARINO:  I think that's right.  You know, Raschbaum and Schmitt sold only a small portion of their shares by just looking at their holdings, right, and held the vast majority throughout the decline in 2017 to 2018, which your Honor referred to a moment ago.

I want to draw your attention to Party City, which is a 2001 case in this district.  Quote, low aggregate sales and large retained aggregate holdings rebut an inference of motive even where some defendants have sold significant percentages. In re Intelligroup Group Securities Litigation in this district from 2007.  The Court rejected, quote, executive incentives based on earnings as grounds for *scienter*.

Goodness gracious, almost all of these folks in almost every corporation in the world you can find an executive incentive based on earnings.  That's not complicated.

Now, an allegation that the defendants, quote, inflate the price of company stock so the company can sell the money -- sell the stock to raise cash comfortably fits within the set of universal corporate motivations that are inadequate to sustain a security fraud complaint.  That's Russo v. Bruce in the Southern District of New York in 2011.

See, the problem here, the problem with their -- and obviously I much appreciate these conferences, your Honor, and we -- I'm sorry to belabor it, but I prepare for them a little like I would prepare for the actual argument, knowing, however, that your Honor doesn't have the benefit of full briefing either from us or from our counterparty on the other side of aisle, so I don't want to go too far with it, but I did want to make just a few points about some cases that are cited in their letter, just three of them, and then if your Honor has other questions I'm happy to be responsive and perhaps have an opportunities to speak again after my colleague across the aisle does.

In the Lord Abbett Affiliated Fund case they rely on, the Court there said:  In Shapiro the Court held that general labels describing loan loss provisions as adequate or solid might be actionable material misstatements.  Here, quoting the

Court, here plaintiffs' complaint does not rest on statements about loan loss provisions using general labels, rather the complaint alleges that the dollar amount disclosed for the loan loss provisions were false or misleading because defendants systemic use of forbearance meant the loan loss provisions were artificially understated.  Well, that's the way to play a game, right?  I think you can forebear and use that forbearance and actually miscast the true financial picture.  There is no allegation that happened here, and it sure didn't.

In the Freudenber v. E*Trade case, the Southern District case from 2010, the Court says, I think helpfully to us, defendants' statements about discipline that are alleged that fundamentally misstated the most significant aspect of E*Trade's most important business sector.  They said, quote, "We grew the balance sheet while adhering to our strict discipline with respect to credit quality.  We have stayed completely disciplined about focusing on what we call prime (distortion)

THE COURT:  I'm sorry.  What are you quoting from?

MR. MARINO:  I'm sorry, Judge.  The Freudenberg v. E*Trade Financial, which is 712 F. Supp. 2d 171 and I'm at page 186, it's S.D.N.Y 2010.

And this picks up on something that I thought the plaintiffs made much of in their response to our request for

permission to file a motion, which is this business about discipline and our saying that, you know, we had a disciplined approach.  In the <u>Freudenberg</u> case the Southern District made clear what's really going on when you're talking about discipline, having discipline and having that be a problem. They said in that case, quote, we grew the balance sheet while adhering to our strict discipline with respect to credit quality.  We've stayed completely disciplined about focusing on what we call prime and really super prime borrowers and we also maintained strict discipline with respect to risk mitigation all the way down to the level of the borrower.

What the plaintiffs' complaint alleged in that case is that while we -- the defendants in the <u>E\*Trade Financial Corporation</u> increased purchases of risky loans, quote, only one percent of the loans were reviewed, appraisals were overstated, experienced loan review personnel were terminated, remaining loan reviewers were too overworked and inexperienced to review more than a *de minimus* percentage of the purchased loans, CLPDs were not tracked and defendants refused to review or return loan pulls when problematic loans were found from small samples.

Well, when you say they are not being truthful when they say they are disciplined that doesn't get you there, but when you say things like this, I mean those are allegations of fraudulent conduct.  Right?  That doesn't exist in this case.

Nothing remotely like it.  So you can look at this, as they do, you can look at these statements about discipline, you can look at what Shapiro says about discipline and then try to sort of cram that square peg into the round hole on this case, but it doesn't work.

The last case I'll refer to, and thanks, Judge, for indulging me, is In re Aetna Securities Litigation.  That is a 2009 case from the Eastern District.  And rejecting the kind of arguments that are being made in this case, quote:  While plaintiff counters that in another case a company's statement that it engaged in discipline underwriting was held to be immaterial.  In that case, the company was underpricing its insurance policies at rates between 70 and 90 percent of market rates and was effectively not underwriting at all. Here, the parties were arguing about whether Aetna's pricing can properly be termed disciplined, the Court said that was far more analogous to In re Advanta and In re Capital Corp.

And I think you take my point, the idea here is you don't just get to get a buzz word like "discipline" and say well, you said you were disciplined and you really looked with care at this and say well, you said you were disciplined but in reality it turned out these loss review -- these loss reserve numbers were wrong, so how disciplined could you have been?  Well, that, respectfully, doesn't get you there, that's the problem.

THE COURT: I think the question is, and I'll turn to Mr. Smith in a moment, but I think the question is are you really pleading fraud or are you really pleading negligence?

MR. MARINO: I think that's right, your Honor. And I think it's very, very difficult, you can -- you know, you can couch anything in terms of false and misleading, you can use buzz words and ultimately the ultimate buzz word "fraud" and ask the Court and ask a jury to -- if the case were to proceed, to infer an intent to deceive. You can search their complaint with liberality, and I have searched their complaint with liberality, and we're very accustomed to the idea that obviously they get the benefit of reasonable inferences, but we've known now for some years the cases have to be plausible. It's not the Connelly standard, these cases just have to be a plausible set of factors. And when you strip away all the excess verbiage, what you are left with is: Please agree with us that because they got the loss reserve numbers wrong they deceived us. That doesn't work and that's why, and obviously I appreciate the opportunity to speak at such length, but obviously when we put our papers together, if your Honor will permit us the opportunity to do that, we will go through chapter and verse and put forward the actual -- each and everyone of these paragraphs and explain why they fall short of the mark. But I certainly would ask your Honor to give us the opportunity to do that.

Thank you very much.

THE COURT:  Thank you, Mr. Marino.

Mr. Smith, are you going to argue?

MR. SMITH:  Yes, your Honor.  And good morning to you.  And welcome to everybody.  I hope everybody is safe and healthy.

And, of course, I disagree with pretty much everything that opposing counsel had said.  What I want to do is just kind of step back, I'm going to be short here, I want to step back and give a little bit more context about the case.

Let's be clear precisely what AmTrust was.  AmTrust was this company's largest customer.  During the class period AmTrust made up between 60 and 70 percent of this company's insurance premiums from period to period to period.  They had to pay AmTrust a 30 percent commission on all premiums ceded to make -- so, if the company's combined ratio starts approaching that 70 percent number, they're basically doing insurance underwriting for free.  And that's precisely what happened during the class period.

Now, what I'd like to do is just step back and talk a little bit about the plausibility (distortion) issues.  Counsel's letter and the complaint clearly alleges that the defendants had access to during the class period critical information regarding the history in determining the reserves.

There are two key tables in the complaint, your Honor, at Paragraphs 58 and 69.  Now, this is actual data that was accessible to the defendants during the class periods when they set their reserves.  Defendants don't dispute that.  Defendants say that they knew about this data.  And what in data clearly shows is that they were under-reserving and they were doing it deliberately.  They had the history that showed where these -- where these combined ratios went.

And as you can see if you look at the table at Paragraph 69.  Just go down to 2017.  I mean, you've got lost ratios that are in the 80 percent ratio.  You've got loss ratios --

THE COURT:  And here's my question.  So it is easy with the benefit of hindsight to conclude what you have concluded.  Right?  So my question is, if there is no dispute, and that's the question I had, if there is no dispute that the disclosures that they were making weren't in compliance with GAAP, which you don't -- you dispute the -- Mr. Marino says that they had complied, but let's say just for argument's sake they complied with the general accounting standards, that they complied with the SEC regs and didn't drill down like you have now drilled down and they didn't drill down until the SEC said drill down in 2017, isn't it a case of negligence and not fraud?

MR. SMITH:  No, your Honor.  And let me just point to

a couple of other paragraphs in the complaint.  If you go to Paragraph 103.  This was not -- this was not a case where the company was not drilling down on these numbers.  Paragraph 103, you've got a long narrative from one of the defendants saying precisely what they do when they calculate their reserves.  Every single period they do this.  This is the CEO.  This is a small organization.  And you've got the CFO on Paragraph 105 basically saying the same thing.  This is not a case where they were suddenly caught by surprise that the loss ratios that they had access to, they knew of -- of course they knew it, they were -- they were disclosing what they thought their loss ratios were during the class period, there is no dispute that they had this information in those two tables.  And here you have two defendants saying, specifically with data-ladened statements during the class period saying what they did to determine the reserves.

Now, as to your question about SEC compliance or compliance with SEC regulations, I think all we want to do is be clear about this.  The allegation in the complaint is that they did not comply with the GAAP guidance that said one of the most important factors, if not the most important factor, is your past history.  In setting reserves, what is your loss ratio history?  That is a critical factor.  You look at the loss ratio numbers that the defendant --

THE COURT:  Try not to tap on your desk.

MR. SMITH:  Sure.  So to look at the loss ratio numbers and just the -- just the (distortion) percentages in absolutely dollar terms, I mean, we're talking accumulations of over a billion dollars in under-reserved -- of under-reserving during the class period.  I don't see how they can sit there and claim that they weren't aware of those numbers when they are setting the reserves as they are describing to investors during the class period.  It just doesn't make sense.

The argument that defense counsel is asking you to credit is much less plausible than our argument.  We've got the allegations.  He's got an argument.  He's got a client that's telling him well, say this and this is what we'll say. And what he'll do is he'll -- he'll kick up the dirt with all these different factors that the company may have or may not have considered during the class period.  The one thing that we have is we have the actual numbers.

THE COURT:  Well, to be fair, you have the numbers and , but you have to do much more than conclusions and labels.  I mean, you have to have particularized evidence, you have to make a good faith alleged showing of fraud.  And I think that when I read through the complaint I think it's very easy to say that something's rotten here.  Right?  Something, you know, went amiss.  I think knowing -- I don't think merely -- you know, it happened, right?  So then what happens

is that they think it's easy then to go back and say aha, this is what was really going on, they were deceiving their investors and they were doing something fraudulent, etcetera, etcetera, and then, you know, it's easy to grab little pieces in hindsight and say aha and then they sold stock. But you've got to put meat on the bones. Right? If they've been selling their stock all along every single year, is that really a proper showing, number one? Number two, if they really are following GAAP standards, that really is a -- now, I know there is a dispute and Mr. Marino says they were and you say they knew -- you allege that they weren't, but let's assume just that's all you have. They say we're following accounting standards, that's not -- do you agree with that? That that in and of itself would not be enough. Right?

MR. SMITH: Well, just if they weren't following accounting standards, that in and of itself is not a fraud, but the rest of it is. I mean --

(Cross-talk)

THE COURT: Mr. Smith, tell me what the rest of it is because that's the trouble I'm having when I read through your complaint, which is -- and it's long, I don't know that it needs to be as long as it is, but it's long, but where were the particularized showing and where's the evidence of *scienter?* That's really where I think --

(Cross-talk)

MR. SMITH:  Well, we can go over this again. Paragraph 58.

THE COURT:  That's the table.

MR. SMITH:  And 69.

THE COURT:  Right.

MR. SMITH:  Those are highly detailed facts that were admitted to by defendants after the class period.  Right?  So when we say fraud by hindsight, that's one thing.  This is information that the defendants had access to and knew of at the time they set reserves during the class period.

THE COURT:  And when you say "and knew of" you mean?

MR. SMITH:  Well, they're saying -- they tell investors during public calls what we do when we set our reserves.  They're describing this.  This is information they have.  This is not information that was just made up after the fact.  This is information that they disclosed to the SEC after the class period when the wheels started to fall off.

Let me just kind of step back and explain to you what happened.  You had asked defense counsel a question regarding some communications with the SEC.  I believe those communications first happened in 2016.  What happened was is the SEC changed the accounting guidance for setting reserves and that rule had fallen in place in 2016.  The company filed its -- what was applicable to the 2015 or 2016 or 2017 10-K. The company failed to comply with the rule.  The SEC came back

and said listen, sent a letter to the company, this is all public, you're not complying with the rules, we need to see the details to reflect the new rules.

The company sent a letter to the SEC and basically said well, here are the numbers but we're really not sure if these are the numbers.  And the numbers actually were false. They were not accurate, they didn't tell the SEC they were accurate, and then a year later when they finally did their next 10-K they finally revealed to the public what the actual loss adjustments were during the class period.  There was no transparency into that during the class period.  But when they originally responded to the SEC in September of 2016 I believe it was, or 2017, one of the two, those numbers were just completely wrong.

So going back to the original question regarding *scienter*, what do we have?  Defendants will not dispute that they had this data when they're setting reserves.  Okay?  We have insider trading.  You asked the question about insider trading.  The allegations in the complaint are clear that the 12 months leading up to the sale, when the company was starting to experience increasing losses due to improper reserving, they started selling.  Now, I think that we can make a strong argument in opposition to a motion to dismiss that under those facts, that's another fact that can be added to the larger (Indiscernible) of facts the Court would be

looking at to make a determination of whether the complaint wholistically raises a strong inference of *scienter*. We believe it does.

THE COURT: Well, the point that I was making to Mr. Marino is that there is nothing wrong with selling stock, it happens everyday, but -- and the statement they've been selling their stocks for years and years and years, and you can't allege with specificity that there is this -- all of a sudden there is a change in their pattern of behavior, I think that becomes problematic and you would be asking this Court to draw an inference that was not reasonable. That was the point he was trying to make, which is --

MR. SMITH: Your Honor, I understand that. I --

THE COURT: I don't know if that's enough to --

(Cross-talk)

MR. SMITH: I can -- I can point the Court to the allegation where the details are in the complaint. I think defense counsel may have skipped those.

THE COURT: What paragraph is it?

MR. SMITH: Okay, your Honor, if you go to page 107.

THE COURT: Okay.

MR. SMITH: Paragraph 188.

THE COURT: Yes.

MR. SMITH: So, insider sales occurred only weeks before Maiden's stock price hit a class period and all-time

high of $16.65 per share and only three months before the first corrective disclosure. Right? Raschbaum and Schmitt did not engage in any insider trading in the 12 months before the class period began. So, in other words, these folks hadn't sold any stock in almost seven years before this. So I think that that's a pretty strong argument that something is afoot.

THE COURT: Okay.

MR. SMITH: Okay. And for every single case that defense counsel can point the Court to regarding selling stock or raising capital with the market during the class period when you know you've got a reserve problem, we can point to several cases that (Indiscernible). So we're looking forward to making that argument to defendants' motion to dismiss.

THE COURT: Okay.

Mr. Marino, I'll give you the last words.

MR. MARINO: Just very, very briefly, your Honor.

Listening to everything that counsel has said, there is not, and again zeroing in on what appears to be the heart of their complaint, which is historical data, they don't allege that we did not look at historical data. Mr. Goldberg points -- or, I'm sorry, Mr. Smith points to the these tables in the complaint. They don't allege that we did not look at that data, they allege -- their allegation amounts to we didn't see it their way, we didn't get it right.

And back to your Honor's first question at the top of the hour, why isn't that negligence?  The idea that these sales are somehow indicative of putting -- you know, you take the sales and you take the historical data, you've ignored everything else we've said and done about how we fixed these loss reserves, you've ignored everything else we've said and done that makes it very clear that it was in our interest to get it right and apparently in this instance we didn't and somehow you should put that all in a little beaker and stir it up and it becomes fraud.  It doesn't.  That's not how it works.

I was happy to hear counsel say that he looks forward to responding to our motion because we certainly look forward to making it, if your Honor will permit us to do so.

Thank you very much, Judge.

THE COURT:  Okay.  Thank you.

MR. SMITH:  Your Honor, may I just add one thing real quick?  I want to draw the Court's attention to Paragraph 58. Now, defense counsel -- it's notable how defense counsel just admitted that his client looked at this data during the class period.  Now, what I find odd is if this was truly just a mistake in judgment, you would think that these numbers would be a little bit more evenly distributed between hits and misses.  Right?  And ironically I see a lot of red here and I see a lot of money, I see a lot of pattern here of

deliberately under-reserving during the class period to maximize the company's earnings.  So I'm glad to see that there will be no dispute that his clients looked precisely at this information, that there will be no dispute at this stage. I'm glad that he cleared it up.

THE COURT:  I don't think that Mr. Marino was quite saying exactly that.  What he was saying was that they looked at these numbers and they did not -- you know, they didn't see it the way that you now see it and the way you want it to be viewed, which is like so obvious, you say it's so obvious that they were underestimating loss reserves and that it should have hit them over the head and he said since it didn't hit them over the head that means they were engaging in fraud.  I don't think that's what he said.  I think that's an argument that you --

MR. SMITH:  And I understand that argument, but I can just kind of circle back on that.  The prior chart or the other chart we were looking at that had the percentages, I would hope that they were looking at that because it indicates that at the time they're not making money on their underwriting.  Now, if this company's in business to lose money, that doesn't sound right.  It seems to me like they were trying to cover up the fact they weren't reserving properly, and that is fraud.

MR. MARINO:  I have nothing, your Honor.

THE COURT: Yes. Mr. Marino, you can go ahead and file your motion. We will talk about the timing.

A concern in these types of cases is I think it's always easy in these kind of cases to do Monday morning quarterbacking and take whatever it is that can be glommed on to and try and fit it into a place. And so, you know, the motion will help me sift through the essence of these allegations and what inferences, if any, can be drawn from them. We can talk about this another day if the motion to dismiss isn't granted about maybe paring down the complaint. However, when it's so long like I'm like wait, can't we just get to the gestalt of the matter? But we can talk about that on another day if I don't grant the motion.

So, I mean, it's all been helpful. I think there -- I see both sides to this. You know, I do. So let's see what the briefing says.

How much time do you need, Mr. Marino?

MR. MARINO: I'm going to, if your Honor would permit me, I'm going to ask my colleague Mr. Waldman. I don't want to make a promises that we can't keep. So can you weigh in?

Your Honor, this is Jacob Waldman of Quinn Emanuel, our co-counsel.

THE COURT: Mr. Waldmann, how much time would you like?

MR. WALDMAN: Good morning, your Honor. Thank you

very much.  We appreciate the Court's indulgence for three weeks to file the brief.

THE COURT:  Okay.

And how much time to respond, Mr. Smith?

MR. SMITH:  I think 45 days would be good.

THE COURT:  Well, I'll give them 30.  How about 30 and 30?  I don't want to give you more than them.  You already know what their arguments are.  Unless I give them 45 and give you 45.

MR. WALDMAN:  That's fine, your Honor.  We will take the 45 if you want to do that.  I have no objection to Mr. Smith having 45.

THE COURT:  Okay.

MR. SMITH:  Just for clarification, you know, defense counsel has had plenty of time to get a motion to dismiss ready, they made a representation in court that they were ready to file it in June, so 45/45 is good for us.

THE COURT:  I mean, the case is getting kind of -- it's getting kind of old already, but the way things are going in this district it's going to get much older before it gets --

MR. SMITH:  We understand.

THE COURT:  We are inundated with cases in this district now.  So does anybody have a calendar that you can give me a date and I'll issue a text order?

MR. SMITH:  Your Honor, I believe if you can just bear with me, I think 45 days from today would be September 11th for the motion.

THE COURT:  Okay.

MR. SMITH:  And then I believe 45 days for the opposition would be October -- do I have this right? November 4th.

THE COURT:  Okay.  Then two weeks for a reply, Mr. Marino.

MR. MARINO:  Yes, your Honor.  That would be great.

THE COURT:  And that will be the date.  So I'll issue a text order.

Where are you with Judge Schneider?  The case has sort of been on hold, right?

MR. WALDMAN:  We've not interacted with Judge Schneider in the case yet except for submitting some proposed orders.

THE COURT:  Okay.  There is no date that would conflict with what I'm doing.  Okay.

MR. GOLDBERG:  Your Honor, this is Jacob Goldberg. My dear friend and colleague Mr. Smith has not calculated exactly correctly.  I'm happy to take November 4th, but on the Atkinson-Baker Timing Website it says that 45 days from September 11th is October the 26th, not November 4th.  I just want the Court to be aware of that.

THE COURT:  Okay.  Then two weeks from October 26th is what?  You know, Mr. Marino is going hold this against you folks, you know, you are faulting his client for not getting it right.

MR. MARINO:  I would be lying if I told you that I didn't think and then said maybe I shouldn't.

THE COURT:  I was just going to do it for you, Mr. Marino.

Okay.  Mr. Goldberg, two weeks from October 26th is what?

MR. GOLDBERG:  Give me one second, your Honor.

MR. MARINO:  I think it's the 9th.

MR. GOLDBERG:  Yes.

THE COURT:  Okay.  I'll issue an order 9-11, 10-26 and 11-9.  I'll try to get a decision to you as expeditiously as I can.  Good to see all of you.  Everyone stay safe and healthy during this time.  Thank you.

(Court adjourned at 11:16 a.m.).

- - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/S/ Theodore M. Formaroli, CCR, CRR, RMR, FAPR*
*Court Reporter*

*United States District Court*
*Camden, New Jersey*

*MONTH/DAY/YEAR*
*July 28, 2020*

**$**

$16.65 [1] - 31:25

**/**

/S [1] - 38:23

**0**

08101 [1] - 1:11

**1**

10-26 [1] - 38:13
10-K [5] - 8:8, 9:10, 9:19, 29:23, 30:8
103 [2] - 26:1, 26:3
105 [1] - 26:7
107 [1] - 31:19
11-9 [1] - 38:14
11:16 [1] - 38:17
11th [2] - 37:2, 37:23
12 [2] - 30:19, 32:2
171 [1] - 20:21
186 [1] - 20:22
188 [1] - 31:21
19-5269 [1] - 2:15
19-cv-05296-RMB-JS [1] - 1:4
1992 [1] - 15:2

**2**

2001 [1] - 18:19
2004 [1] - 17:7
2007 [2] - 16:22, 18:23
2009 [1] - 22:7
2010 [2] - 20:11, 20:22
2011 [1] - 19:8
2015 [2] - 8:1, 29:23
2016 [6] - 8:8, 9:14, 29:20, 29:22, 29:23, 30:11
2017 [6] - 6:25, 18:16, 25:9, 25:22, 29:23, 30:12
2018 [1] - 18:16
2020 [2] - 1:12, 38:25
26th [3] - 37:23, 37:25, 38:8
28 [2] - 1:12, 38:25
2d [1] - 20:21

**3**

30 [4] - 24:15, 36:5, 36:6

**4**

45 [8] - 36:4, 36:7, 36:8, 36:10, 36:11, 37:1, 37:4, 37:22
45/45 [1] - 36:16
4th [4] - 1:11, 37:6, 37:21, 37:23

**5**

575-3864 [1] - 1:24
58 [3] - 25:1, 29:1, 33:17

**6**

60 [1] - 24:13
609 [1] - 1:24
69 [3] - 25:1, 25:9, 29:3

**7**

70 [3] - 22:12, 24:13, 24:17
712 [1] - 20:21

**8**

80 [1] - 25:10

**9**

9-11 [1] - 38:13
90 [1] - 22:12
9th [1] - 38:11

**A**

a.m.) [1] - 38:17
Abbett [1] - 19:21
above-entitled [1] - 38:21
absolutely [2] - 11:25, 27:2
access [3] - 24:23, 26:9, 29:8
accessible [1] - 25:2
accomplish [1] - 6:11
accounting [4] - 25:19, 28:12, 28:15, 29:21
accumulations [1] - 27:2
accurate [4] - 8:6, 12:15, 30:6, 30:7
accustomed [1] - 23:10
acted [1] - 16:20
ACTION [1] - 1:3
actionable [1] - 19:24
actual [6] - 7:1, 19:12, 23:21, 25:1, 27:16, 30:8
actuarial [4] - 6:19, 8:13, 12:17, 13:5
actuaries [2] - 8:18, 16:12
add [1] - 33:16
added [1] - 30:23
addition [1] - 8:13
adequate [5] - 8:24, 15:5, 15:10, 15:19, 19:23
adhering [2] - 20:15, 21:6
adjourned [1] - 38:17
adjustment [2] - 8:11, 8:20
adjustments [1] - 30:9
admitted [2] - 29:6, 33:19
adopt [1] - 16:11
adopting [1] - 6:4
advance [1] - 6:16
Advanta [1] - 22:16
adversary [1] - 10:9
adverse [1] - 11:9
Aetna [1] - 22:6
Aetna's [1] - 22:14
Affiliated [1] - 19:21
afoot [1] - 32:6
aggregate [2] - 18:19, 18:20
ago [1] - 18:17
agree [2] - 23:15, 28:12
agreement [1] - 10:9
aha [3] - 4:1, 27:25, 28:4
ahead [2] - 6:1, 34:25
aided [1] - 1:25
aisle [2] - 19:15, 19:20
al [1] - 1:8
all-time [1] - 31:24
allegation [8] - 13:18, 16:3, 16:7, 19:3, 20:8, 26:18, 31:16, 32:23
allegations [10] - 8:3, 8:5, 9:2, 13:16, 16:23, 17:12, 21:23, 27:11, 30:18, 35:7
allege [15] - 6:22, 7:15, 7:20, 10:14, 15:18, 15:24, 17:1, 17:8, 17:20, 28:10, 31:7, 32:20, 32:22, 32:23
alleged [4] - 8:21, 20:12, 21:11, 27:20
alleges [2] - 20:2, 24:22
almost [3] - 18:25, 32:4
Alpharma [1] - 17:7
amiss [1] - 27:23
amount [3] - 9:17, 17:25, 20:2
amounts [2] - 17:10, 32:23
AmTrust [7] - 6:13, 6:25, 7:3, 24:11, 24:13, 24:15
analogous [1] - 22:16
analyses [1] - 8:23
analysis [2] - 6:20, 15:22
announce [1] - 2:18
answer [3] - 9:10, 11:7, 14:10
anyway [1] - 16:15
apologies [1] - 5:13
apologize [1] - 3:17
appearance [2] - 4:21, 5:16
appearances [1] - 2:16
appeared [1] - 5:2
appearing [4] - 2:13, 2:20, 3:3, 4:15
applicable [3] - 8:9, 8:15, 29:23
applied [1] - 14:18
appraisals [1] - 21:14
appreciate [3] - 19:10, 23:18, 35:25
approach [6] - 12:7, 12:8, 12:9, 12:12, 12:15, 21:2
approaching [1] - 24:17
appropriate [5] - 6:19, 13:11, 14:8, 14:19, 16:4
argue [1] - 24:2
arguing [2] - 16:17, 22:14
argument [11] - 10:4, 14:2, 19:12, 27:9, 27:10, 27:11, 30:22, 32:5, 32:13, 34:14, 34:15
argument's [1] - 25:18
arguments [2] - 22:8, 36:7
arrived [1] - 8:12
artificially [1] - 20:5
aspect [2] - 16:8, 20:13
assume [1] - 28:11
Atkinson [1] - 37:22
Atkinson-Baker [1] - 37:22
attempting [1] - 13:18
attention [2] - 18:18, 33:17
audio [3] - 3:3, 3:22, 4:15
auditors [1] - 16:12
aware [2] - 27:5, 37:24

**B**

backward [1] - 12:23
Baker [1] - 37:22
balance [2] - 20:15, 21:5
Bank [2] - 2:23, 5:24
based [4] - 7:5, 8:6, 18:24, 19:2
basis [6] - 11:17, 11:18, 12:10, 12:12, 12:13, 13:15
beaker [1] - 33:8
bear [1] - 37:1
become [1] - 12:5
becomes [2] - 31:9, 33:9
began [1] - 32:3
begin [1] - 12:21
beginning [1] - 6:25
Behalf [1] - 1:4
behalf [3] - 2:21, 5:7, 5:22
behavior [1] - 31:8
belabor [1] - 19:11
benefit [3] - 19:13, 23:11, 25:13
best [5] - 5:18, 13:10, 13:19, 14:15, 14:17
better [4] - 4:2, 11:2, 13:24, 14:1
between [3] - 22:12, 24:13, 33:22
billion [1] - 27:3
bit [4] - 11:23, 24:9, 24:21, 33:22

**Blacksmith** [2] - 2:22, 5:23
**Boilermakers** [2] - 2:21, 5:23
**bones** [1] - 28:5
**borrower** [1] - 21:10
**borrowers** [1] - 21:8
**bottom** [3] - 3:13, 3:21, 3:23
**BOYLE** [1] - 1:19
**Boyle** [2] - 3:8, 4:12
**brief** [1] - 36:1
**briefing** [2] - 19:14, 35:15
**briefly** [1] - 32:16
**bring** [2] - 11:1, 11:16
**Bruce** [1] - 19:7
**Building** [1] - 1:10
**BUMB** [1] - 1:13
**business** [5] - 7:4, 11:11, 20:14, 20:25, 34:20
**buyers** [1] - 17:5
**buzz** [3] - 22:18, 23:6
**BY** [4] - 1:16, 1:17, 1:19, 1:21

## C

**calculate** [1] - 26:4
**calculated** [2] - 13:1, 37:20
**calendar** [1] - 36:23
**calibrated** [1] - 14:19
**Camden** [1] - 1:11
**camera** [3] - 3:19, 3:20
**cannot** [1] - 3:10
**capital** [3] - 17:11, 32:10
**Capital** [1] - 22:16
**care** [2] - 17:4, 22:20
**carefully** [1] - 14:18
**case** [33] - 2:14, 5:4, 8:2, 11:1, 11:17, 11:22, 12:6, 15:3, 15:20, 16:22, 18:19, 19:21, 20:10, 20:11, 21:2, 21:5, 21:11, 21:24, 22:3, 22:5, 22:7, 22:8, 22:9, 22:11, 23:7, 24:10, 25:22, 26:1, 26:8, 32:8, 36:17, 37:12, 37:15
**cases** [11] - 9:5, 9:7, 10:23, 11:20, 19:16, 23:12, 23:13, 32:12, 35:2, 35:3, 36:22
**cash** [1] - 19:5

**caught** [1] - 26:8
**CCR** [1] - 38:23
**ceded** [1] - 24:15
**CEO** [2] - 17:9, 26:5
**certainly** [6] - 12:6, 13:21, 14:7, 14:13, 23:23, 33:12
**certified** [1] - 8:18
**certify** [1] - 38:20
**CFO** [2] - 17:9, 26:6
**challenging** [1] - 5:1
**change** [2] - 17:25, 31:8
**changed** [1] - 29:21
**chapter** [1] - 23:21
**characterize** [1] - 15:4
**characterizes** [1] - 15:10
**charges** [1] - 6:24
**chart** [2] - 34:16, 34:17
**circle** [1] - 34:16
**Circuit** [2] - 15:2, 17:7
**circumstances** [1] - 2:19
**cited** [1] - 19:17
**cites** [1] - 15:2
**City** [1] - 18:18
**CIVIL** [1] - 1:3
**claim** [5] - 7:2, 7:8, 8:14, 12:10, 27:5
**clarification** [1] - 36:13
**class** [20] - 17:12, 24:12, 24:19, 24:23, 25:2, 26:11, 26:14, 27:4, 27:7, 27:15, 29:6, 29:9, 29:16, 30:9, 30:10, 31:24, 32:3, 32:10, 33:19, 33:25
**clear** [10] - 7:11, 7:14, 10:21, 11:6, 11:8, 21:3, 24:11, 26:18, 30:18, 33:6
**cleared** [1] - 34:4
**clearly** [2] - 24:22, 25:5
**CLERK** [2] - 3:12, 3:21
**client** [5] - 9:12, 9:18, 27:11, 33:19, 38:2
**clients** [4] - 6:13, 6:17, 16:20, 34:2
**clients'** [1] - 6:15
**CLPDs** [1] - 21:18
**co** [1] - 35:21
**co-counsel** [1] - 35:21
**cogent** [1] - 16:24
**Cohen** [1] - 1:10
**colleague** [3] - 19:20,

35:18, 37:20
**collects** [1] - 6:15
**combined** [2] - 24:16, 25:7
**comfortably** [1] - 19:5
**coming** [1] - 11:22
**commission** [1] - 24:15
**communications** [2] - 29:19, 29:20
**company** [15] - 6:13, 8:12, 8:25, 16:9, 16:11, 19:4, 22:11, 26:2, 27:14, 29:22, 29:24, 29:25, 30:3, 30:19
**company's** [7] - 8:6, 22:9, 24:12, 24:13, 24:16, 34:1, 34:20
**comparison** [1] - 17:16
**compelling** [1] - 16:25
**compensation** [1] - 17:10
**complaint** [26] - 7:7, 7:15, 8:4, 8:21, 11:18, 13:15, 15:18, 16:19, 19:7, 19:25, 20:2, 21:11, 23:9, 24:22, 24:25, 25:25, 26:18, 27:21, 28:20, 30:18, 30:25, 31:16, 32:19, 32:22, 35:9
**completely** [4] - 12:1, 20:17, 21:7, 30:13
**compliance** [4] - 10:10, 25:16, 26:16, 26:17
**compliant** [1] - 9:24
**complicated** [3] - 6:19, 10:17, 19:2
**complied** [3] - 25:18, 25:19, 25:20
**comply** [2] - 26:19, 29:24
**complying** [3] - 9:22, 14:3, 30:1
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concern** [1] - 35:2
**concise** [1] - 6:9
**conclude** [1] - 25:13
**concluded** [1] - 25:14
**conclusions** [1] - 27:18
**conditions** [1] - 6:20
**conduct** [6] - 10:3, 12:1, 13:25, 17:2, 21:24

**CONDUCTED** [2] - 1:6, 2:1
**conference** [1] - 4:10
**Conference** [1] - 1:5
**conferences** [2] - 5:6, 19:10
**conflict** [1] - 37:18
**Connelly** [1] - 23:13
**considered** [2] - 14:12, 27:15
**consistant** [1] - 12:2
**constitute** [1] - 7:13
**contains** [1] - 7:8
**context** [2] - 12:6, 24:9
**contraindicative** [1] - 18:11
**contrary** [3] - 6:23, 8:22, 10:14
**Cooper** [1] - 1:11
**Corp** [1] - 22:16
**corporate** [1] - 19:6
**Corporation** [1] - 21:13
**corporation** [1] - 19:1
**correct** [3] - 9:25, 14:19, 38:20
**corrective** [1] - 32:1
**correctly** [4] - 7:12, 11:13, 11:14, 37:21
**couch** [1] - 23:5
**counsel** [11] - 24:7, 27:9, 29:18, 31:17, 32:9, 32:17, 33:11, 33:18, 35:21, 36:14
**counsel's** [1] - 24:22
**counterparty** [1] - 19:14
**counters** [1] - 22:9
**couple** [2] - 9:7, 25:25
**course** [4] - 7:18, 14:16, 24:6, 26:9
**Court** [18] - 1:23, 4:4, 8:1, 16:22, 18:23, 19:22, 19:25, 20:11, 22:15, 23:7, 30:24, 31:9, 31:15, 32:9, 37:24, 38:17, 38:23
**COURT** [65] - 1:1, 2:2, 2:5, 2:11, 2:24, 3:3, 3:10, 3:14, 3:19, 3:23, 4:1, 4:3, 4:8, 4:9, 4:15, 4:20, 4:24, 5:10, 5:12, 5:25, 9:9, 10:4, 10:8, 13:22, 14:21, 14:25, 15:7, 15:13, 15:25, 17:14, 17:23, 18:10, 20:19, 22:25, 24:1, 25:12, 26:24, 27:17, 28:18,

29:2, 29:4, 29:10, 31:3, 31:13, 31:18, 31:20, 31:22, 32:7, 32:14, 33:15, 34:5, 34:25, 35:22, 36:2, 36:5, 36:12, 36:17, 36:22, 37:3, 37:7, 37:10, 37:17, 37:25, 38:6, 38:13
**court** [2] - 2:17, 36:15
**Court's** [2] - 33:17, 35:25
**Courthouse** [1] - 1:10
**courts** [1] - 6:5
**cover** [2] - 8:10, 34:22
**cram** [1] - 22:3
**credit** [3] - 20:16, 21:6, 27:10
**critical** [2] - 24:23, 26:22
**Cross** [2] - 28:17, 28:24
**cross** [3] - 10:8, 15:12, 31:14
**Cross-talk** [2] - 28:17, 28:24
**cross-talk** [2] - 10:8, 31:14
**CRR** [1] - 38:23
**customer** [1] - 24:12
**cuts** [3] - 10:4, 10:11

## D

**danger** [1] - 17:5
**Daniel** [1] - 3:1
**data** [17] - 8:14, 10:19, 10:20, 12:18, 12:19, 13:6, 25:1, 25:4, 25:5, 26:14, 30:16, 32:19, 32:20, 32:23, 33:3, 33:19
**data-ladened** [1] - 26:14
**date** [3] - 36:24, 37:10, 37:17
**days** [4] - 36:4, 37:1, 37:4, 37:22
**de** [1] - 21:17
**dear** [1] - 37:20
**deceive** [2] - 17:1, 23:8
**deceived** [1] - 23:17
**deceiving** [1] - 28:1
**decision** [2] - 17:7, 38:14
**decisions** [1] - 16:14
**decline** [1] - 18:16
**declined** [1] - 16:11
**defend** [1] - 14:14

**defendant** [3] - 15:10, 16:20, 26:23
**Defendants** [2] - 1:9, 1:22
**defendants** [19] - 2:6, 3:6, 3:8, 4:9, 5:8, 18:21, 19:3, 20:4, 21:12, 21:18, 24:23, 25:2, 25:3, 25:4, 26:3, 26:13, 29:6, 29:8, 30:15
**defendants'** [2] - 20:12, 32:13
**defense** [7] - 27:9, 29:18, 31:17, 32:9, 33:18, 36:13
**definition** [1] - 7:17
**defrauded** [1] - 12:24
**deliberately** [2] - 25:6, 33:25
**departure** [1] - 17:4
**DEPUTY** [2] - 3:12, 3:21
**describing** [3] - 19:23, 27:7, 29:13
**desk** [1] - 26:24
**detail** [1] - 8:5
**detailed** [2] - 13:16, 29:5
**details** [2] - 30:2, 31:16
**determination** [2] - 8:17, 30:25
**determine** [1] - 26:15
**determining** [1] - 24:24
**detriment** [1] - 18:11
**different** [4] - 11:21, 18:1, 27:14
**differently** [1] - 11:23
**difficult** [2] - 10:17, 23:4
**directly** [1] - 16:16
**dirt** [1] - 27:13
**disagree** [1] - 24:6
**disagreed** [1] - 16:11
**discipline** [13] - 12:5, 20:12, 20:16, 21:1, 21:4, 21:6, 21:9, 22:1, 22:2, 22:10, 22:18
**disciplined** [12] - 12:7, 12:8, 12:11, 20:17, 21:1, 21:7, 21:22, 22:15, 22:19, 22:20, 22:22
**disclosed** [8] - 6:18, 8:12, 8:21, 8:22, 15:20, 16:9, 20:2, 29:15

**disclosing** [1] - 26:10
**disclosure** [1] - 32:1
**disclosures** [2] - 9:19, 25:16
**dismiss** [4] - 30:22, 32:13, 35:9, 36:14
**dispute** [13] - 6:21, 12:12, 12:13, 17:21, 25:3, 25:14, 25:15, 25:17, 26:12, 28:9, 30:15, 34:2, 34:3
**distinguish** [1] - 10:23
**distortion** [13] - 8:20, 9:10, 9:13, 9:16, 9:21, 10:10, 13:6, 14:3, 14:11, 20:18, 24:21, 27:1, 28:7
**distributed** [1] - 33:22
**District** [4] - 19:8, 20:11, 21:2, 22:7
**DISTRICT** [3] - 1:1, 1:1, 1:13
**district** [5] - 6:6, 18:19, 18:23, 36:19, 36:23
**dollar** [2] - 20:2, 27:2
**dollars** [1] - 27:3
**done** [9] - 11:13, 11:14, 13:10, 13:23, 14:1, 14:7, 14:17, 33:4, 33:6
**doubt** [1] - 12:10
**DOWD** [1] - 1:17
**down** [14] - 9:18, 10:1, 11:25, 15:23, 21:10, 25:9, 25:20, 25:21, 25:22, 26:2, 35:9
**draw** [3] - 18:18, 31:10, 33:17
**drawn** [1] - 35:7
**drill** [5] - 10:1, 15:22, 25:20, 25:21, 25:22
**drilled** [3] - 9:18, 10:1, 25:21
**drilling** [3] - 9:18, 11:25, 26:2
**due** [1] - 30:20
**during** [18] - 17:12, 24:12, 24:19, 24:23, 25:2, 26:11, 26:14, 27:4, 27:7, 27:15, 29:9, 29:12, 30:9, 30:10, 32:10, 33:19, 33:25, 38:16

---

**E**

---

**E*Trade** [3] - 20:10, 20:21, 21:12
**E*Trade's** [1] - 20:14

**earnings** [3] - 18:24, 19:2, 34:1
**Eastern** [1] - 22:7
**easy** [5] - 25:12, 27:22, 27:25, 28:3, 35:3
**economic** [3] - 6:20, 8:15, 13:7
**effectively** [4] - 10:23, 11:12, 13:13, 22:13
**efficiently** [1] - 11:12
**either** [4] - 7:22, 16:19, 17:6, 19:14
**elsewhere** [1] - 6:6
**Emanuel** [2] - 4:13, 35:20
**EMANUEL** [1] - 1:21
**emerging** [2] - 8:15, 13:7
**employed** [1] - 8:23
**end** [1] - 12:22
**engage** [1] - 32:2
**engaged** [2] - 13:24, 22:10
**engaging** [2] - 10:2, 34:12
**enter** [2] - 2:15, 4:21
**entities** [1] - 16:13
**entitled** [1] - 38:21
**environment** [2] - 8:16, 13:9
**ESQUIRE** [5] - 1:16, 1:17, 1:19, 1:20, 1:21
**essence** [2] - 11:5, 35:6
**establish** [2] - 8:10, 10:22
**establishing** [1] - 8:24
**estimate** [2] - 6:16, 7:12
**estimated** [1] - 8:10
**estimates** [1] - 7:1
**estimating** [1] - 6:18
**et** [1] - 1:8
**etcetera** [2] - 28:2, 28:3
**evenly** [1] - 33:22
**events** [1] - 4:6
**everyday** [1] - 31:5
**evidence** [2] - 27:19, 28:22
**exact** [1] - 14:12
**exactly** [3] - 14:23, 34:6, 37:21
**example** [1] - 12:4
**exceeded** [1] - 7:1
**except** [1] - 37:15
**excess** [1] - 23:15
**exchange** [1] - 6:14

**excusable** [1] - 17:3
**executive** [2] - 18:23, 19:1
**exist** [1] - 21:24
**expansive** [1] - 6:10
**expeditiously** [1] - 38:14
**expense** [1] - 8:20
**expenses** [1] - 8:11
**experience** [2] - 7:5, 30:20
**experienced** [1] - 21:15
**explain** [3] - 7:13, 23:22, 29:17
**explained** [1] - 13:1
**expressed** [1] - 13:1
**external** [1] - 8:18
**extraordinarily** [1] - 12:8
**extreme** [1] - 17:4

---

**F**

---

**face** [1] - 7:14
**fact** [9] - 8:7, 11:15, 12:20, 13:12, 17:19, 18:10, 29:15, 30:23, 34:22
**factor** [2] - 26:20, 26:22
**factors** [3] - 23:14, 26:20, 27:14
**facts** [9] - 7:9, 7:20, 7:23, 11:2, 15:17, 17:1, 29:5, 30:23, 30:24
**failed** [1] - 29:24
**fails** [1] - 16:19
**failure** [1] - 7:12
**fair** [3] - 10:25, 17:17, 27:17
**fairly** [1] - 7:11
**faith** [1] - 27:20
**fall** [2] - 23:22, 29:16
**fallen** [1] - 29:22
**false** [8] - 7:21, 7:23, 7:24, 11:4, 12:9, 20:3, 23:5, 30:5
**FAPR** [1] - 38:23
**far** [6] - 13:23, 14:6, 19:15, 22:16
**fashioned** [1] - 3:20
**fast** [1] - 13:20
**faulting** [1] - 38:2
**February** [1] - 6:25
**fell** [1] - 18:2
**few** [1] - 19:16
**figures** [1] - 8:6

**file** [7] - 7:6, 9:4, 14:8, 20:25, 35:1, 36:1, 36:16
**filed** [4] - 8:8, 9:11, 9:16, 29:22
**filings** [1] - 6:18
**finally** [2] - 30:7, 30:8
**Financial** [3] - 6:13, 20:21, 21:12
**financial** [2] - 16:8, 20:7
**fine** [2] - 2:13, 36:9
**Firm** [3] - 2:23, 3:2, 5:14
**FIRM** [1] - 1:15
**firm** [1] - 5:15
**first** [6] - 2:18, 2:20, 14:5, 29:20, 32:1, 32:25
**fit** [1] - 35:5
**fits** [1] - 19:5
**fixed** [1] - 33:4
**flag** [1] - 11:19
**focus** [2] - 10:18, 12:4
**focused** [1] - 17:19
**focusing** [2] - 20:17, 21:7
**folks** [4] - 11:6, 18:25, 32:3, 38:2
**following** [4] - 5:1, 28:8, 28:11, 28:14
**FOR** [1] - 1:1
**forbearance** [2] - 20:4, 20:7
**forebear** [1] - 20:6
**forecast** [3] - 7:17, 11:16, 13:11
**foregoing** [1] - 38:20
**Formaroli** [3] - 1:23, 4:7, 38:23
**former** [2] - 17:9
**forth** [1] - 9:3
**forward** [7] - 5:4, 5:5, 5:17, 23:21, 32:12, 33:11, 33:12
**fraud** [23] - 7:2, 7:13, 7:20, 11:1, 11:5, 11:17, 12:3, 12:10, 13:3, 15:4, 16:5, 18:3, 18:12, 19:7, 23:2, 23:6, 25:23, 27:20, 28:15, 29:7, 33:9, 34:13, 34:23
**fraudulent** [3] - 13:25, 21:24, 28:2
**fraudulently** [1] - 10:3
**free** [1] - 24:18
**freezes** [1] - 15:24
**frequency** [2] - 8:14, 13:6

**Freudenber** [1] - 20:10
**Freudenberg** [2] - 20:20, 21:2
**friend** [1] - 37:20
**front** [2] - 5:2, 10:16
**froze** [1] - 15:25
**full** [1] - 19:13
**fully** [1] - 9:24
**function** [1] - 16:13
**Fund** [1] - 19:21
**fundamentally** [1] - 20:13
**future** [2] - 6:20, 8:25

**G**

**GAAP** [3] - 25:17, 26:19, 28:8
**game** [1] - 20:6
**GELLER** [1] - 1:17
**Geller** [3] - 2:9, 5:15, 5:22
**general** [3] - 19:22, 20:1, 25:19
**gestalt** [1] - 35:11
**glad** [2] - 34:1, 34:4
**glommed** [1] - 35:4
**GOLDBERG** [8] - 1:16, 2:8, 2:21, 5:11, 5:13, 37:19, 38:10, 38:12
**Goldberg** [5] - 2:23, 5:14, 32:20, 37:19, 38:8
**goodness** [1] - 18:25
**grab** [1] - 28:3
**gracious** [1] - 18:25
**grant** [1] - 35:12
**granted** [1] - 35:9
**great** [1] - 37:9
**grew** [2] - 20:15, 21:5
**grounds** [1] - 18:24
**Group** [1] - 18:22
**guess** [1] - 17:24
**guidance** [2] - 26:19, 29:21

**H**

**half** [1] - 15:7
**happy** [3] - 19:18, 33:11, 37:21
**head** [2] - 34:11, 34:12
**healthy** [2] - 24:5, 38:16
**hear** [4] - 5:10, 6:2, 10:9, 33:11
**heard** [1] - 5:16

**heart** [3] - 15:14, 15:23, 32:18
**held** [4] - 18:10, 18:15, 19:22, 22:10
**help** [1] - 35:6
**helpful** [4] - 5:4, 6:5, 6:7, 35:13
**helpfully** [1] - 20:11
**high** [1] - 31:25
**highly** [2] - 17:2, 29:5
**hindsight** [3] - 25:13, 28:4, 29:7
**historical** [14] - 7:5, 8:14, 10:19, 10:20, 12:18, 12:19, 13:6, 15:24, 16:3, 16:6, 16:8, 32:19, 32:20, 33:3
**history** [4] - 24:24, 25:6, 26:21, 26:22
**hit** [3] - 31:24, 34:11, 34:12
**hits** [1] - 33:22
**hold** [2] - 37:13, 38:1
**Holdings** [1] - 2:14
**HOLDINGS** [1] - 1:8
**holdings** [2] - 18:15, 18:20
**hole** [1] - 22:3
**Honor** [55] - 2:4, 2:7, 2:8, 3:7, 3:9, 4:11, 4:14, 4:18, 4:19, 4:23, 5:9, 5:11, 5:19, 5:22, 6:3, 6:10, 6:12, 7:6, 7:7, 7:14, 9:4, 9:5, 9:8, 9:23, 10:19, 14:5, 14:7, 15:23, 16:18, 17:17, 18:9, 18:17, 19:10, 19:13, 19:18, 23:3, 23:19, 23:23, 24:3, 24:25, 25:24, 31:12, 31:19, 32:16, 33:13, 33:16, 34:24, 35:17, 35:20, 35:24, 36:9, 36:25, 37:9, 37:19, 38:10
**Honor's** [2] - 15:15, 32:25
**HONORABLE** [1] - 1:13
**hope** [3] - 4:25, 24:4, 34:18
**hoping** [1] - 6:11
**hour** [1] - 33:1

**I**

**idea** [4] - 4:5, 22:17, 23:10, 33:1
**identified** [1] - 16:3

**ignored** [2] - 33:3, 33:5
**immaterial** [1] - 22:11
**implied** [1] - 7:23
**important** [5] - 12:4, 12:5, 20:14, 26:20
**improper** [1] - 30:20
**improve** [1] - 10:15
**inadequate** [4] - 7:4, 15:11, 19:6
**Inc** [1] - 17:8
**incentive** [1] - 19:1
**incentives** [2] - 17:11, 18:24
**included** [1] - 17:10
**including** [1] - 6:13
**increased** [1] - 21:13
**increasing** [1] - 30:20
**incur** [1] - 6:17
**incurred** [1] - 8:11
**indeed** [1] - 12:11
**indicates** [1] - 34:18
**indicative** [1] - 33:2
**indicia** [2] - 12:3, 18:3
**Indiscernible** [1] - 30:24
**indiscernible** [1] - 34:9
**Indiscernible)** [1] - 32:12
**individual** [1] - 16:19
**Individually** [1] - 1:4
**indulgence** [1] - 35:25
**indulging** [1] - 22:6
**industry** [3] - 8:13, 12:17, 13:5
**inexperienced** [1] - 21:16
**infer** [1] - 23:8
**inference** [6] - 16:23, 16:25, 17:1, 18:20, 31:1, 31:10
**inferences** [2] - 23:11, 35:7
**inflate** [1] - 19:4
**inflation** [2] - 8:15, 13:8
**information** [8] - 9:17, 24:24, 26:12, 29:8, 29:13, 29:14, 29:15, 34:3
**insider** [4] - 30:17, 31:23, 32:2
**insight** [1] - 6:10
**instance** [1] - 33:7
**insurance** [5] - 6:13, 8:9, 22:12, 24:14, 24:18
**Intelligroup** [1] - 18:22

**intent** [2] - 17:1, 23:8
**intentionally** [2] - 11:3, 11:6
**interacted** [1] - 37:14
**interest** [1] - 33:6
**interests** [2] - 11:8, 11:9
**internal** [1] - 8:17
**International** [2] - 2:22, 5:24
**interpretation** [1] - 12:18
**inundated** [1] - 36:22
**investigation** [1] - 16:10
**investors** [4] - 8:22, 27:7, 28:2, 29:12
**invited** [1] - 10:1
**involves** [1] - 6:19
**involving** [1] - 17:3
**ironically** [1] - 33:23
**issue** [3] - 36:24, 37:10, 38:13
**issues** [2] - 16:21, 24:21
**itself** [3] - 18:5, 28:13, 28:15

**J**

**JACOB** [2] - 1:16, 1:21
**Jacob** [5] - 2:23, 4:12, 5:13, 35:20, 37:19
**JERSEY** [1] - 1:1
**Jersey** [1] - 1:11
**job** [1] - 14:10
**JOHN** [1] - 1:20
**John** [1] - 4:11
**JUDGE** [1] - 1:13
**Judge** [7] - 4:2, 4:6, 20:20, 22:5, 33:14, 37:12, 37:14
**judge** [2] - 12:21, 13:13
**judgment** [1] - 33:21
**July** [2] - 1:12, 38:25
**June** [1] - 36:16
**jury** [1] - 23:7

**K**

**KARP** [1] - 3:1
**Karp** [2] - 3:1, 3:4
**keep** [1] - 35:19
**Kevin** [1] - 3:7
**KEVIN** [1] - 1:19
**key** [2] - 15:13, 24:25
**kick** [1] - 27:13

**kind** [7] - 22:7, 24:8, 29:17, 34:16, 35:3, 36:17, 36:18
**knowing** [2] - 19:12, 27:23
**knowingly** [1] - 7:24
**known** [5] - 7:3, 11:18, 17:6, 23:12
**knows** [2] - 6:12, 15:11

**L**

**labels** [3] - 19:23, 20:1, 27:19
**lacking** [1] - 10:21
**ladened** [1] - 26:14
**language** [1] - 15:13
**large** [1] - 18:20
**largely** [1] - 17:19
**larger** [1] - 30:24
**largest** [1] - 24:12
**last** [2] - 22:5, 32:15
**Law** [3] - 2:23, 3:1, 5:14
**LAW** [1] - 1:15
**laws** [1] - 8:9
**leading** [1] - 30:19
**least** [1] - 16:24
**left** [3] - 3:21, 3:23, 23:15
**length** [1] - 23:18
**less** [1] - 27:10
**letter** [7] - 6:9, 9:3, 18:7, 19:17, 24:22, 29:25, 30:3
**level** [2] - 13:3, 21:10
**levels** [1] - 8:23
**liability** [2] - 8:10, 15:3
**liberality** [2] - 23:9, 23:10
**light** [1] - 9:11
**limited** [1] - 4:5
**line** [1] - 5:17
**listen** [2] - 2:13, 29:25
**listening** [1] - 32:17
**litigation** [2] - 8:16, 13:9
**Litigation** [4] - 2:15, 17:8, 18:22, 22:6
**LLP** [2] - 1:17, 1:21
**loaf** [2] - 15:8, 15:16
**loan** [8] - 15:10, 19:23, 20:1, 20:3, 20:4, 21:15, 21:16, 21:19
**loans** [4] - 21:13, 21:14, 21:18, 21:19
**look** [20] - 10:19, 11:20, 11:23, 12:14,

13:7, 13:8, 14:15, 16:21, 17:21, 17:22, 21:25, 22:1, 22:2, 25:8, 26:22, 26:25, 32:20, 32:22, 33:12
**looked** [7] - 12:16, 12:17, 12:18, 22:19, 33:19, 34:2, 34:6
**looking** [5] - 18:15, 30:25, 32:12, 34:17, 34:18
**looks** [1] - 33:11
**Lord** [1] - 19:21
**lose** [3] - 7:25, 12:25, 34:20
**loss** [36] - 7:12, 7:16, 8:6, 8:10, 8:11, 8:18, 8:19, 8:20, 11:10, 12:16, 12:20, 13:20, 14:11, 15:4, 15:10, 15:24, 16:3, 16:5, 19:23, 20:1, 20:3, 20:4, 22:21, 23:16, 25:10, 26:8, 26:11, 26:21, 26:23, 26:25, 30:9, 33:5, 34:10
**losses** [7] - 6:16, 6:18, 7:1, 9:20, 16:7, 30:20
**lost** [1] - 25:9
**low** [1] - 18:19
**lower** [1] - 16:6
**LTD** [1] - 1:8
**lying** [1] - 38:4

## M

**Maiden** [8] - 2:14, 6:12, 6:15, 6:17, 6:24, 7:9, 16:7, 16:19
**MAIDEN** [1] - 1:8
**Maiden's** [2] - 7:1, 31:24
**maintained** [1] - 21:9
**major** [1] - 16:21
**majority** [1] - 18:16
**malfeasance** [1] - 16:10
**management** [1] - 8:17
**manner** [4] - 10:15, 12:15, 12:25, 14:14
**MARIE** [1] - 1:13
**Marino** [20] - 3:7, 3:8, 3:14, 4:3, 4:8, 4:12, 5:7, 6:1, 13:22, 24:1, 25:17, 28:9, 31:4, 32:15, 34:5, 34:25, 35:16, 37:8, 38:1,

38:7
**MARINO** [35] - 1:19, 1:19, 2:4, 2:6, 3:7, 3:11, 3:16, 3:25, 4:2, 4:5, 4:18, 4:23, 5:9, 5:19, 6:3, 9:23, 10:6, 10:13, 14:4, 14:23, 15:1, 15:9, 15:15, 16:2, 17:17, 18:9, 18:13, 20:20, 23:3, 32:16, 34:24, 35:17, 37:9, 38:4, 38:11
**mark** [1] - 23:23
**market** [3] - 6:19, 22:13, 32:10
**material** [1] - 19:24
**materially** [1] - 9:1
**matter** [3] - 18:10, 35:11, 38:21
**maximize** [1] - 34:1
**mean** [13] - 10:14, 11:4, 14:4, 14:9, 14:22, 21:23, 25:9, 27:2, 27:19, 28:16, 29:10, 35:13, 36:17
**meaning** [1] - 7:24
**means** [1] - 34:12
**meant** [1] - 20:4
**meat** [1] - 28:5
**mechanical** [1] - 1:25
**mentioned** [1] - 12:14
**merely** [2] - 17:3, 27:24
**methodology** [3] - 7:10, 8:7, 15:20
**MICHAEL** [1] - 1:3
**might** [2] - 6:17, 19:24
**mind** [1] - 13:18
**minimal** [1] - 18:8
**minimus** [1] - 21:17
**miscast** [1] - 20:7
**misconduct** [1] - 16:9
**misleading** [5] - 11:3, 12:9, 17:5, 20:3, 23:5
**misses** [1] - 33:23
**misstated** [1] - 20:13
**misstatement** [1] - 7:16
**misstatements** [1] - 19:24
**mistake** [2] - 13:3, 33:21
**Mitchell** [1] - 1:10
**mitigation** [1] - 21:10
**models** [3] - 8:13, 12:17, 13:5
**moment** [3] - 15:25, 18:17, 23:1
**Monday** [1] - 35:3

**money** [4] - 19:5, 33:24, 34:19, 34:21
**MONTH/DAY/YEAR** [1] - 38:25
**months** [3] - 30:19, 31:25, 32:2
**morning** [12] - 2:2, 2:4, 2:5, 2:8, 2:24, 3:7, 4:6, 4:14, 5:21, 24:3, 35:3, 35:24
**most** [7] - 9:8, 11:12, 20:13, 20:14, 26:20
**motion** [17] - 5:6, 6:11, 7:6, 7:14, 9:4, 10:24, 14:8, 20:25, 30:22, 32:13, 33:12, 35:1, 35:6, 35:8, 35:12, 36:14, 37:2
**motivations** [1] - 19:6
**motive** [1] - 18:20
**move** [2] - 5:4, 5:5
**MR** [70] - 2:4, 2:6, 2:8, 2:21, 3:1, 3:7, 3:11, 3:16, 3:25, 4:2, 4:5, 4:11, 4:14, 4:17, 4:18, 4:19, 4:23, 5:9, 5:11, 5:13, 5:19, 5:21, 6:3, 9:23, 10:6, 10:13, 14:4, 14:23, 15:1, 15:9, 15:15, 16:2, 17:17, 18:9, 18:13, 20:20, 23:3, 24:3, 25:24, 26:25, 28:14, 28:25, 29:3, 29:5, 29:11, 31:12, 31:15, 31:19, 31:21, 31:23, 32:8, 32:16, 33:16, 34:15, 34:24, 35:17, 35:24, 36:4, 36:9, 36:13, 36:21, 36:25, 37:4, 37:9, 37:14, 37:19, 38:4, 38:10, 38:11, 38:12
**multiple** [1] - 8:23
**must** [4] - 7:3, 7:20, 11:18, 17:6
**muted** [1] - 5:20

## N

**name** [2] - 2:18, 3:14
**narrative** [1] - 26:3
**National** [2] - 2:22, 5:23
**near** [1] - 3:22
**need** [3] - 9:17, 30:1, 35:16
**needs** [1] - 28:21
**negligence** [4] - 17:4, 23:2, 25:22, 33:1

**new** [1] - 30:2
**NEW** [1] - 1:1
**New** [2] - 1:11, 19:8
**next** [1] - 30:8
**NJB** [1] - 15:2
**normal** [1] - 7:18
**notable** [1] - 33:18
**nothing** [5] - 8:21, 11:25, 21:25, 31:4, 34:24
**notwithstanding** [1] - 11:22
**November** [3] - 37:6, 37:21, 37:23
**number** [4] - 6:6, 24:17, 28:7
**NUMBER** [1] - 1:3
**numbers** [14] - 22:22, 23:16, 26:2, 26:23, 27:1, 27:6, 27:16, 27:17, 30:4, 30:5, 30:12, 33:21, 34:7

## O

**objection** [1] - 36:10
**obligations** [1] - 8:20
**obvious** [3] - 17:6, 34:9, 34:10
**obviously** [8] - 7:16, 9:25, 11:9, 14:11, 19:10, 23:11, 23:17, 23:19
**occurred** [2] - 17:19, 31:23
**October** [4] - 37:5, 37:23, 37:25, 38:8
**odd** [1] - 33:20
**OF** [1] - 1:1
**offer** [1] - 13:17
**Official** [1] - 1:23
**old** [2] - 3:20, 36:18
**old-fashioned** [1] - 3:20
**older** [1] - 36:19
**Omnicare** [1] - 8:2
**one** [11] - 10:15, 13:20, 21:14, 26:3, 26:19, 27:15, 28:7, 29:7, 30:12, 33:16, 38:10
**opinion** [3] - 7:19, 7:24, 16:4
**opportunities** [1] - 19:19
**opportunity** [3] - 23:18, 23:20, 23:24
**opposing** [2] - 16:25, 24:7
**opposition** [2] - 30:22,

37:5
**order** [4] - 7:19, 36:24, 37:11, 38:13
**orders** [1] - 37:16
**organization** [1] - 26:6
**original** [1] - 30:14
**originally** [1] - 30:11
**otherwise** [1] - 18:4
**ourselves** [1] - 15:3
**outlined** [1] - 12:25
**outside** [2] - 16:12
**overstated** [1] - 21:15
**overworked** [1] - 21:16
**own** [2] - 13:18, 16:15

## P

**page** [2] - 20:22, 31:19
**papers** [1] - 23:19
**Paragraph** [4] - 25:9, 26:1, 26:7, 33:17
**paragraph** [4] - 26:2, 29:1, 31:18, 31:21
**paragraphs** [2] - 23:22, 25:25
**Paragraphs** [1] - 25:1
**paring** [1] - 35:9
**particularized** [6] - 7:9, 11:2, 13:16, 16:23, 27:19, 28:22
**parties** [1] - 22:14
**Party** [1] - 18:18
**past** [1] - 26:21
**pattern** [2] - 31:8, 33:24
**pay** [1] - 24:15
**payment** [1] - 8:11
**pays** [1] - 6:15
**peg** [1] - 22:3
**Pension** [2] - 2:22, 5:23
**per** [1] - 31:25
**percent** [6] - 21:14, 22:12, 24:13, 24:15, 24:17, 25:10
**percentage** [1] - 21:17
**percentages** [3] - 18:21, 27:1, 34:17
**performance** [1] - 9:1
**perhaps** [2] - 13:24, 19:19
**period** [23] - 17:12, 24:12, 24:14, 24:19, 24:23, 26:5, 26:11, 26:14, 27:4, 27:7, 27:15, 29:6, 29:9, 29:16, 30:9, 30:10, 31:24, 32:3, 32:10,

33:20, 33:25
**periods** [1] - 25:2
**permission** [2] - 9:4, 20:25
**permit** [3] - 23:20, 33:13, 35:17
**permits** [1] - 7:6
**personnel** [1] - 21:15
**perspective** [1] - 10:25
**picks** [1] - 20:23
**picture** [1] - 20:8
**pieces** [1] - 28:3
**place** [2] - 29:22, 35:5
**Plaintiff** [1] - 1:6
**plaintiff** [6] - 2:16, 2:20, 2:25, 9:14, 15:2, 22:9
**plaintiffs** [8] - 6:22, 7:1, 7:15, 7:20, 9:5, 10:23, 16:17, 20:24
**Plaintiffs** [1] - 1:18
**plaintiffs'** [3] - 8:4, 19:25, 21:11
**plausibility** [1] - 24:21
**plausible** [6] - 7:15, 13:17, 16:25, 23:12, 23:14, 27:10
**plausibly** [3] - 7:21, 10:13, 15:18
**play** [1] - 20:6
**plead** [2] - 16:5, 16:19
**pleaded** [1] - 15:17
**pleading** [2] - 23:2
**pleadings** [1] - 18:4
**plenty** [1] - 36:14
**point** [12] - 9:6, 10:11, 10:20, 14:5, 17:13, 22:17, 25:24, 31:3, 31:10, 31:15, 32:9, 32:11
**points** [3] - 19:16, 32:21
**policies** [1] - 22:12
**portion** [3] - 6:14, 6:15, 18:14
**pose** [1] - 17:24
**position** [3] - 7:7, 9:3, 14:14
**possible** [1] - 12:16
**possibly** [1] - 13:19
**pre** [1] - 5:6
**pre-motion** [1] - 5:6
**precisely** [4] - 24:11, 24:18, 26:4, 34:2
**prediction** [1] - 8:25
**predictions** [1] - 6:20
**premiums** [4] - 6:15, 16:6, 24:14, 24:15
**Premotion** [1] - 1:5

**prepare** [2] - 19:11, 19:12
**presenting** [1] - 17:5
**preserve** [1] - 6:17
**pretty** [4] - 11:6, 11:7, 24:6, 32:5
**price** [2] - 19:4, 31:24
**pricing** [1] - 22:14
**prime** [3] - 20:17, 21:8
**prism** [1] - 10:19
**problem** [6] - 13:14, 19:9, 21:4, 22:24, 32:11
**problematic** [3] - 18:5, 21:19, 31:9
**procedure** [2] - 5:3, 6:4
**procedures** [1] - 5:2
**proceed** [1] - 23:8
**PROCEEDING** [1] - 2:1
**proceedings** [1] - 38:21
**Proceedings** [1] - 1:25
**process** [2] - 10:17
**produced** [1] - 1:25
**productively** [1] - 11:13
**proffer** [1] - 18:7
**profitably** [1] - 11:13
**promises** [1] - 35:19
**proper** [1] - 8:24
**properly** [4] - 7:19, 15:17, 22:15, 34:23
**proposed** [1] - 37:15
**prove** [1] - 9:1
**provides** [1] - 6:12
**provision** [1] - 8:19
**provisions** [4] - 19:23, 20:1, 20:3, 20:5
**PSLRA** [1] - 7:8
**public** [3] - 29:12, 30:1, 30:8
**pull** [2] - 11:5, 13:20
**pulls** [1] - 21:19
**purchased** [1] - 21:17
**purchases** [1] - 21:13
**put** [5] - 9:13, 23:19, 23:21, 28:5, 33:8
**putting** [1] - 33:2

### Q

**quality** [2] - 20:16, 21:7
**quarterbacking** [1] - 35:4
**questions** [3] - 6:2,

9:6, 19:18
**quick** [1] - 33:17
**QUINN** [1] - 1:21
**Quinn** [2] - 4:13, 35:20
**quite** [1] - 34:5
**quote** [10] - 8:8, 17:2, 17:3, 18:19, 18:23, 19:3, 20:14, 21:5, 21:13, 22:8
**quote-unquote** [1] - 17:2
**quoting** [3] - 16:24, 19:24, 20:19

### R

**race** [1] - 13:13
**raise** [2] - 17:11, 19:5
**raised** [1] - 17:11
**raises** [1] - 31:1
**raising** [1] - 32:10
**Raschbaum** [3] - 17:9, 18:14, 32:1
**rates** [2] - 22:12, 22:13
**rather** [1] - 20:1
**ratio** [6] - 16:6, 24:16, 25:10, 26:22, 26:23, 26:25
**ratios** [7] - 15:24, 16:3, 25:7, 25:10, 25:11, 26:9, 26:11
**re** [6] - 2:14, 17:7, 18:22, 22:6, 22:16
**reach** [1] - 12:23
**read** [4] - 12:19, 18:6, 27:21, 28:19
**ready** [2] - 36:15, 36:16
**real** [1] - 33:16
**reality** [1] - 22:21
**really** [16] - 14:9, 14:15, 14:16, 15:22, 21:3, 21:8, 22:19, 23:2, 28:1, 28:6, 28:8, 28:23, 30:4
**reasonable** [3] - 8:19, 23:11, 31:10
**reasoning** [1] - 12:22
**rebut** [1] - 18:20
**recently** [1] - 8:1
**recommendations** [1] - 16:12
**record** [1] - 38:21
**recorded** [1] - 1:25
**red** [2] - 11:19, 33:23
**refer** [1] - 22:5
**referred** [1] - 18:17
**reflect** [1] - 30:2
**reflective** [1] - 10:2

**refused** [1] - 21:18
**regard** [1] - 4:6
**regarding** [4] - 24:24, 29:18, 30:14, 32:9
**regs** [3] - 8:16, 10:11, 25:20
**regulations** [5] - 8:9, 9:24, 12:2, 13:8, 26:17
**regurgitate** [1] - 6:8
**reinsurance** [1] - 6:12
**rejected** [1] - 18:23
**rejecting** [1] - 22:7
**relating** [1] - 6:25
**relatively** [1] - 17:22
**rely** [4] - 9:5, 10:24, 12:13, 19:21
**remaining** [1] - 21:16
**remotely** [2] - 17:12, 21:25
**RENÉE** [1] - 1:13
**reply** [1] - 37:7
**reported** [1] - 6:24
**Reporter** [2] - 1:23, 38:23
**REPORTER** [1] - 4:8
**reporter** [1] - 2:17
**representation** [1] - 36:15
**represented** [1] - 15:18
**request** [1] - 20:24
**required** [2] - 8:9, 16:8
**requires** [1] - 6:16
**reserve** [11] - 6:24, 7:10, 7:16, 8:6, 8:7, 8:18, 12:20, 16:13, 22:22, 23:16, 32:11
**reserved** [1] - 27:3
**reserves** [31] - 6:19, 7:3, 7:5, 7:10, 7:12, 7:25, 8:10, 8:24, 11:11, 12:16, 12:25, 13:20, 14:11, 15:4, 15:10, 15:19, 15:20, 16:4, 16:5, 24:24, 25:3, 26:5, 26:15, 26:21, 27:6, 29:9, 29:13, 29:21, 30:16, 33:5, 34:10
**reserving** [5] - 25:5, 27:4, 30:21, 33:25, 34:22
**respect** [3] - 20:16, 21:6, 21:9
**respectfully** [1] - 22:23
**respond** [1] - 36:3
**responded** [1] - 30:11
**responding** [3] - 9:2,

9:3, 33:12
**response** [2] - 9:21, 20:24
**responsive** [2] - 9:7, 19:18
**rest** [5] - 15:15, 15:16, 19:25, 28:16, 28:18
**restate** [1] - 16:8
**result** [2] - 12:23, 14:19
**retained** [1] - 18:20
**return** [1] - 21:19
**revealed** [1] - 30:8
**review** [6] - 8:23, 16:13, 21:15, 21:17, 21:18, 22:21
**reviewed** [2] - 8:18, 21:14
**reviewers** [1] - 21:16
**rights** [1] - 16:21
**rise** [1] - 13:3
**risk** [2] - 8:25, 21:9
**risky** [1] - 21:13
**RMR** [1] - 38:23
**Robbins** [3] - 2:9, 5:15, 5:22
**ROBBINS** [1] - 1:17
**Rosen** [3] - 2:23, 3:1, 5:14
**ROSEN** [1] - 1:15
**rotten** [1] - 27:22
**round** [1] - 22:3
**RUDMAN** [1] - 1:17
**rule** [2] - 29:22, 29:24
**rules** [5] - 5:1, 9:24, 12:2, 30:1, 30:2
**run** [1] - 13:14
**Russo** [1] - 19:7

### S

**S.D.N.Y** [1] - 20:22
**sad** [1] - 4:3
**safe** [2] - 24:4, 38:15
**sake** [1] - 25:18
**sale** [1] - 30:19
**sales** [5] - 17:19, 18:19, 31:23, 33:2, 33:3
**samples** [1] - 21:20
**satisfaction** [1] - 10:22
**Schmitt** [3] - 17:9, 18:14, 32:1
**Schneider** [2] - 37:12, 37:15
**scienter** [7] - 16:20, 16:23, 17:8, 18:24, 28:23, 30:15, 31:1

Screen [1] - 15:24
screen [2] - 3:13, 3:21
search [1] - 23:8
searched [1] - 23:9
SEC [20] - 6:18, 9:12, 9:14, 9:22, 9:24, 9:25, 10:10, 11:22, 12:2, 25:20, 25:21, 26:16, 26:17, 29:15, 29:19, 29:21, 29:24, 30:3, 30:6, 30:11
second [1] - 38:10
sector [1] - 20:14
Securities [4] - 2:14, 17:8, 18:22, 22:6
securities [6] - 7:2, 7:13, 7:20, 11:1, 15:4, 16:5
security [1] - 19:7
see [28] - 2:8, 2:11, 2:12, 2:18, 3:4, 3:8, 3:14, 3:15, 3:19, 4:8, 4:16, 18:4, 19:9, 25:8, 27:4, 30:1, 32:24, 33:23, 33:24, 34:1, 34:7, 34:8, 35:14, 38:15
segment [1] - 7:4
sell [2] - 19:4, 19:5
sellers [1] - 17:5
selling [6] - 18:5, 28:5, 30:21, 31:4, 31:6, 32:9
sense [2] - 5:4, 27:8
sent [2] - 29:25, 30:3
September [3] - 30:11, 37:2, 37:23
set [7] - 7:3, 9:3, 19:6, 23:14, 25:3, 29:9, 29:12
setting [5] - 6:18, 26:21, 27:6, 29:21, 30:16
seven [1] - 32:4
several [2] - 9:5, 32:12
severity [2] - 8:14, 13:7
Shapiro [6] - 15:2, 15:6, 15:9, 15:22, 19:22, 22:2
share [1] - 31:25
shares [2] - 18:5, 18:15
sheet [2] - 20:15, 21:5
short [2] - 23:22, 24:8
show [1] - 7:21
showed [2] - 9:20, 25:6
showing [4] - 7:9, 27:20, 28:7, 28:22

shows [1] - 25:5
side [1] - 19:15
sides [1] - 35:14
sideways [1] - 11:14
sift [1] - 35:6
significant [4] - 6:24, 8:24, 18:21, 20:13
Similarly [1] - 1:4
simple [1] - 17:3
single [3] - 26:5, 28:6, 32:8
sit [1] - 27:5
Situated [1] - 1:5
skipped [1] - 31:17
small [7] - 17:10, 17:15, 17:20, 18:14, 21:20, 26:6
SMITH [23] - 1:17, 5:21, 24:3, 25:24, 26:25, 28:14, 28:25, 29:3, 29:5, 29:11, 31:12, 31:15, 31:19, 31:21, 31:23, 32:8, 33:16, 34:15, 36:4, 36:13, 36:21, 36:25, 37:4
Smith [12] - 2:9, 5:14, 5:22, 17:24, 18:6, 23:1, 24:2, 28:18, 32:21, 36:3, 36:11, 37:20
so... [1] - 15:14
social [2] - 8:15, 13:7
sold [9] - 17:9, 17:24, 17:25, 18:2, 18:8, 18:14, 18:21, 28:4, 32:4
solid [3] - 15:5, 15:11, 19:23
someone [1] - 11:1
something's [1] - 27:22
sophisticated [1] - 8:23
sorry [7] - 3:16, 9:2, 16:2, 19:11, 20:19, 20:20, 32:21
sort [3] - 9:11, 22:3, 37:13
sound [1] - 34:21
sounds [1] - 18:4
Southern [3] - 19:8, 20:10, 21:2
specific [2] - 8:13, 12:17
specifically [1] - 26:13
specificity [1] - 31:7
square [1] - 22:3
staff [1] - 8:17
stage [1] - 34:3

standard [2] - 17:4, 23:13
standards [5] - 14:18, 25:19, 28:8, 28:12, 28:15
start [4] - 2:16, 2:19, 3:12, 3:16
started [2] - 29:16, 30:21
starting [1] - 30:20
starts [1] - 24:16
state [2] - 7:8, 17:13
statement [6] - 7:16, 7:18, 7:19, 7:24, 22:9, 31:5
statements [6] - 7:21, 16:9, 19:25, 20:12, 22:1, 26:14
STATES [2] - 1:1, 1:13
states [1] - 8:8
stay [1] - 38:15
stayed [2] - 20:16, 21:7
stenography [1] - 1:25
step [4] - 24:8, 24:9, 24:20, 29:17
stir [1] - 33:8
stock [13] - 17:10, 17:24, 17:25, 18:2, 18:11, 19:4, 19:5, 28:4, 28:6, 31:4, 31:24, 32:4, 32:9
stocks [1] - 31:6
Streets [1] - 1:11
strict [3] - 20:15, 21:6, 21:9
strip [1] - 23:14
strong [3] - 30:22, 31:1, 32:5
strongly [1] - 16:16
subject [1] - 15:3
subjective [4] - 7:17, 7:19, 7:21, 13:18
subjectively [1] - 7:23
submitting [1] - 37:15
subsequent [1] - 9:19
substantially [1] - 16:6
sudden [1] - 31:8
suddenly [1] - 26:8
sufficient [1] - 14:7
sufficiently [2] - 6:10, 14:19
suggestion [1] - 16:14
suggests [1] - 12:1
SULLIVAN [1] - 1:21
super [1] - 21:8
Supp [1] - 20:21
support [1] - 16:23

supporting [1] - 17:1
supposed [2] - 5:14, 16:10
Supreme [2] - 8:1, 16:22
surprise [1] - 26:8
sustain [2] - 11:17, 19:7
systemic [1] - 20:4

**T**

table [2] - 25:8, 29:2
tables [3] - 24:25, 26:12, 32:21
Taishin [1] - 5:23
Talshin [1] - 2:22
tap [1] - 26:24
teaching [1] - 4:4
technology [1] - 4:4
tedformaroli@yahoo.com [1] - 1:23
telescope [1] - 12:22
Tellabs [1] - 16:21
termed [1] - 22:15
terminated [1] - 21:15
terminology [1] - 15:16
terms [2] - 23:5, 27:2
test [3] - 14:16, 14:17, 16:24
text [2] - 36:24, 37:11
THE [69] - 1:1, 1:13, 1:15, 2:2, 2:5, 2:11, 2:24, 3:3, 3:10, 3:12, 3:14, 3:19, 3:21, 3:23, 4:1, 4:3, 4:8, 4:9, 4:15, 4:20, 4:24, 5:10, 5:12, 5:25, 9:9, 10:4, 10:8, 13:22, 14:21, 14:25, 15:7, 15:13, 15:25, 17:14, 17:23, 18:10, 20:19, 22:25, 24:1, 25:12, 26:24, 27:17, 28:18, 29:2, 29:4, 29:10, 31:3, 31:13, 31:18, 31:20, 31:22, 32:7, 32:14, 33:15, 34:5, 34:25, 35:22, 36:2, 36:5, 36:12, 36:17, 36:22, 37:3, 37:7, 37:10, 37:17, 37:25, 38:6, 38:13
Theodore [2] - 1:23, 38:23
thereto [2] - 9:22, 10:10
they've [3] - 16:3, 28:5, 31:5

Third [2] - 15:2, 17:7
three [3] - 19:17, 31:25, 35:25
throughout [1] - 18:16
Timing [1] - 37:22
timing [1] - 35:1
today [2] - 5:15, 37:1
together [1] - 23:19
top [2] - 3:24, 32:25
TORTORELLA [3] - 1:19, 4:11, 4:17
Tortorella [4] - 3:8, 4:11, 4:12, 4:16
TOTORELLA [1] - 1:20
tout [1] - 12:7
tracked [1] - 21:18
trading [3] - 30:17, 30:18, 32:2
transcript [2] - 1:25, 38:20
transcription [1] - 1:25
transparency [1] - 30:10
trends [7] - 8:13, 8:14, 8:15, 12:17, 13:5, 13:6, 13:8
tried [3] - 6:8, 11:5, 12:15
TRIG [1] - 1:17
Trig [4] - 2:9, 5:14, 5:16, 5:22
trouble [1] - 28:19
troubling [1] - 9:8
true [4] - 7:22, 12:11, 14:4, 20:7
truly [1] - 33:20
Trust [2] - 2:22, 5:23
truthful [1] - 21:21
try [4] - 22:2, 26:24, 35:5, 38:14
trying [6] - 3:16, 11:10, 13:10, 13:20, 31:11, 34:22
turn [2] - 15:5, 22:25
turned [2] - 11:16, 22:21
turns [1] - 12:21
two [8] - 24:25, 26:12, 26:13, 28:7, 30:12, 37:7, 37:25, 38:8
type [1] - 13:24
types [1] - 35:2
typical [1] - 18:3
typically [1] - 7:18
TYRE [1] - 3:1
Tyre [1] - 3:1
TYRE-KARP [1] - 3:1
Tyre-Karp [1] - 3:1

**U**

**U.S** [1] - 1:10
**ultimate** [1] - 23:6
**ultimately** [1] - 23:6
**under** [7] - 2:19, 7:8, 25:5, 27:3, 27:4, 30:23, 33:25
**under-reserved** [1] - 27:3
**under-reserving** [3] - 25:5, 27:4, 33:25
**underestimating** [1] - 34:10
**underpricing** [1] - 22:11
**underreporting** [1] - 9:20
**understated** [2] - 14:12, 20:5
**underwriting** [4] - 22:10, 22:13, 24:18, 34:20
**undisputed** [1] - 8:7
**UNITED** [2] - 1:1, 1:13
**universal** [1] - 19:6
**unless** [1] - 36:7
**unpaid** [1] - 8:19
**unquote** [1] - 17:2
**unreasonable** [2] - 7:10, 17:2
**unreliable** [1] - 15:21
**unstable** [1] - 15:11
**up** [11] - 10:16, 13:10, 13:19, 20:23, 24:13, 27:13, 29:14, 30:19, 33:9, 34:4, 34:22
**upfront** [1] - 6:21
**URQUHART** [1] - 1:21

**V**

**various** [1] - 12:13
**vast** [1] - 18:16
**verbiage** [1] - 23:15
**verse** [1] - 23:21
**VIA** [2] - 1:6, 2:1
**video** [6] - 3:12, 3:16, 3:20, 4:18, 4:19
**VIDEOCONFERENCI NG** [2] - 1:6, 2:1

**W**

**wait** [1] - 35:10
**WALDMAN** [6] - 1:21, 4:14, 4:19, 35:24, 36:9, 37:14

**Waldman** [4] - 4:12, 4:16, 35:18, 35:20
**Waldmann** [1] - 35:22
**ways** [3] - 10:4, 10:5, 10:12
**Website** [1] - 37:22
**weeks** [5] - 31:23, 36:1, 37:7, 37:25, 38:8
**weigh** [1] - 35:19
**weighed** [1] - 16:4
**welcome** [1] - 24:4
**well-taken** [1] - 10:11
**wheels** [1] - 29:16
**whole** [1] - 11:14
**wholistically** [1] - 31:1
**WIGGLESWORTH** [1] - 1:3
**willing** [2] - 13:25, 14:5
**wool** [1] - 11:5
**word** [5] - 12:5, 17:15, 22:18, 23:6
**words** [4] - 7:23, 23:6, 32:3, 32:15
**works** [5] - 6:14, 11:11, 11:12, 13:2, 33:10
**world** [1] - 19:1
**wrongdoing** [1] - 13:17

**Y**

**year** [5] - 16:9, 17:24, 17:25, 28:6, 30:7
**years** [6] - 11:10, 23:12, 31:6, 32:4
**York** [1] - 19:8

**Z**

**zeroing** [1] - 32:18
**ZOOM** [2] - 1:6, 2:1
**Zoom** [1] - 2:14