UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____          CIVIL ACTION NUMBER:

In Re:  Maiden Holdings,
Ltd. Securities Litigation          1:19-cv-05296-RMB
_____          ORAL ARGUMENT

Pages 1 - 49

Thursday, May 13, 2021
Commencing at 11:00 a.m.

B E F O R E:                    THE HONORABLE RENÉE MARIE BUMB,
                               UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

    CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
    BY:  DONALD A. ECKLUND, ESQUIRE
    5 Becker Farm Road
    Roseland, NJ 07068
    For the Plaintiffs

    ROBBINS GELLER RUDMAN & DOWD LLP
    BY:  TOR GRONBORG, ESQUIRE
         TRIG R. SMITH, ESQUIRE
    655 West Broadway, Suite 1900
    San Diego, CA 92101
    For the Plaintiffs

    ROSEN LAW FIRM
    BY:  DANIEL TYRE-KARP, ESQUIRE
         JACOB GOLDBERG, ESQUIRE
    One Gateway Center
    Suite 2600
    Newark, NJ 07102
    For the Plaintiffs

        Karen Friedlander, Official Court Reporter
            friedlanderreporter@gmail.com
                 (856) 756-0160

    Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.

**A P P E A R A N C E S: - CONTINUED**

MARINO, TORTORELLA & BOYLE, P.C.
BY:  KEVIN H. MARINO, ESQUIRE
     JOHN D. TORTORELLA, ESQUIRE
437 Southern Boulevard
Chatham, New Jersey 07928-1488
For the Defendants

QUINN EMANUEL URQUHART & SULLIVAN, LLP
BY:  MICHAEL B. CARLINSKY, ESQUIRE
     JACOB J. WALDMAN, ESQUIRE
51 Madison Avenue, 22nd Floor
New York, NY 10010
For the Defendants

ALSO PRESENT:

    Lawrence Metz, CEO of Maiden Holdings Limited

*United States District Court*
*Camden, New Jersey*

(ALL PARTIES BY ZOOM VIDEOCONFERENCE; MAY 13, 2021; 11:00 A.M.)

THE COURT:  Good morning, everyone.  Good to see you all.  Sorry for the delay.  I got tied up in another hearing.  So here we are.  We are on the record in re Maiden Holdings.  The number is 19-5296.

So let's start with the appearances on behalf of the plaintiffs, please -- or plaintiff.

MR. ECKLUND:  Good morning, Your Honor, Don Ecklund from the law firm Carella Byrne on behalf of lead plaintiffs, and I'm joined today with my co-counsel from Robbins Geller Rudman & Dowd, Tor Gronborg and Trig Smith, and it's my understanding that Mr. Smith will be handling the oral argument for plaintiffs.

THE COURT:  Mr. Smith, where are you?  There you are.

MR. SMITH:  Good morning, Your Honor.

THE COURT:  Nice to see you all.  Okay.  For the defendant?

MR. MARINO:  Good morning, Your Honor.  Kevin Marino; Marino Tortorella & Boyle for defendants.  With me is my partner, John Tortorella, and also my colleagues from Quinn Emanuel, Michael Carlinsky and Jacob Waldman, and Lawrence Metz, Your Honor, the CEO of Maiden Holdings Limited is also on the call.

THE COURT:  Okay.  By audio only, yes?

MR. MARINO:  That is correct, Your Honor.

THE COURT:  Okay.  All right.  Okay.  So I set this down for oral argument.  Mr. Marino --

MR. TYRE-KARP:  I'm sorry, Your Honor, you also have Daniel Tyre-Karp and Jacob Goldberg from the Rosen Law Firm on behalf of plaintiffs.

THE COURT:  Okay.  So tell me again.

MR. TYRE-KARP:  Daniel Tyre-Karp and Jacob Goldberg.

THE COURT:  Okay.  Thank you.  So on behalf of the plaintiffs, Mr. Smith is arguing, and on behalf of the defendant, who -- Mr. Marino, is it you?

MR. MARINO:  Yes, I will, Your Honor.

THE COURT:  All right.  So I've read through all of the submissions.  So, Mr. Marino, is there anything you want to add or maybe summarize what your arguments are and we'll get into some of the questions that I have.

MR. MARINO:  Certainly, Your Honor.  Just to highlight, if you read the Complaint with care, as I know you have, and you read the parties submissions on this motion, as I know you also have, you will see that the claims in this case all reduce to a single allegation, that is, that historical loss ratios are the only basis for setting loss reserves.  And because we got it wrong, right, that is to say, because our loss reserves were not sufficient to cover our losses, that means somehow we violated the federal securities

laws.  It's simply not the case, okay?

The allegations are very integrally related to the statements made in our 10-K right?  I think it's a good place to just start to look at that 10-K which says, quite plainly, estimating loss reserves is a difficult and complex process involving many variables and subjective judgments.  As part of our reserving process, we review historical data, as well as actuarial and statistical projections and consider the impact of various factors, such as trends and clean frequency and severity, changes in operations, emerging economic and social trends, inflation, and changes in the regulatory and litigation environments.

In other words, we plainly disclose that we have a formula for arriving at our loss reserves that is by no means limited to historical data.  Are historical data considered?  Yes, they are, okay?  But there's no allegation in this case, first of all, no allegation whatsoever that we knew that the loss reserves we were setting were going to be inadequate, or that we did not follow our stated model and method for arriving at those loss reserves.

Without that, to be very direct, they're going nowhere.  There's no allegation here that we didn't believe our loss reserves were correct.  There's no allegation that we said we were going to arrive at them in one way, the way I've just described --

THE COURT:  Mr. Marino, I'm sorry I have to take a quick pause.  I'll be right back.

MR. MARINO:  Sure.

(Pause)

THE COURT:  Okay.  My apologies, Mr. Marino.  Go ahead.  Did I lose Mr. Marino?  There he is.

MR. MARINO:  Sorry, Judge.

MR. ECKLUND:  Your Honor, if I could, Mr. Smith actually just stepped out to use the restroom.

THE COURT:  Do you want me to wait?

MR. ECKLUND:  Sure.

THE COURT:  Okay.

(Pause)

MR. MARINO:  Thank you very much, Your Honor.

So the point, Your Honor, very simply, is that there just isn't any basis for this notion that there's some sort of ipso facto relationship between historical loss ratios and the loss reserves that the company was required to set.  In fact, that's directly contrary to the facts.

And nothing in the Complaint alleges to the contrary. In other words, there's no allegation that we didn't believe our loss reserves were adequate, there's no allegation that we didn't employ the methodology that we said we'd employ, or that that methodology was somehow inherently flawed.  Those allegations just don't exist.

And you start with the notion that this is all about an opinion.  You know, by definition, the business that investors in Maiden Holdings invested in is a business that by definition entails prediction.  By definition, it entails a forecast of future events.

I'm looking at the Second Circuit's decision in *Fait versus Regions Financial Corporation*, quote:

Determining the adequacy of loan loss reserves is not a matter of objective fact.  Instead, loan loss reserves reflect management's opinion or judgement about what, if any, portion of amounts due on loans ultimately might not be collectible.

Third Circuit said the same thing in *Shapiro.* There's no single method of evaluating and setting loan loss reserves perhaps because no method has proven foolproof, close quote.

So in the absence of allegations that we did not believe our loss reserves were adequate, right?  That's subjective falsity.  Or that the facts implied by those loss reserves were knowingly false, that we knew that the actuarial process that yielded these loan loss reserves or loss reserves were flawed, or were not actually used.

There is simply no basis for these allegations.

Now, you know, it's interesting.  I'm looking at our 10-K, which they want you to look at the 10-K.  It's integral

to the Complaint, right?  There's lots of quotes and references to the 10-K.  They don't want you to look at certain other aspects of what's in the 10-K.

But if you look at them, they're very clear at Page 62.

"There can be no assurances that losses will not deviate from our reserves possibly by material amounts.  These estimates are based on actuarial projections and our assessment of currently available data, as well as estimates of future trends in claims severity, frequency, judicial theories of liability and other factors."

And it's very plain that we're disclosing how we do business, how we set these loss reserves.

Now, unlike the cases on which the plaintiffs rely in trying to save this Complaint from dismissal, there's not a situation here where they can point to a fact and say, there's a fact that you stated or failed to state that rendered this a misrepresentation, rendered what you did state untrue.

There's no witness here, for example, that's going to say, these folks didn't -- they knew this process wasn't going to work, they knew these reserves were not adequate, but they went ahead with them any way, right?

So in the absence of that -- I mean, to me, that's the end of the story.  I don't think it gets more complicated than that.

Now, they try to make up for their inability to make these allegations by making certain arguments in there, in their brief, as to what's in the Complaint that don't really accurately state what's in the Complaint.

For example, the Complaint doesn't really allege that we did not abide by GAAP, right?  If you look at the paragraphs that they refer to, and specifically the language of ASC 944-40-30-1, it says here that:

"The liability for unpaid insurance claims shall be based on the estimated ultimate cost of settling the claims, including the effects of inflation and other societal and economic factors, using past experience adjusted for current trends and any other factors that would modify past experience."

And it's very plain that we didn't file a GAAP.  It's not -- it just isn't the case, and they don't allege that we violated GAAP.

They put forth these statements as to what you need to do to comply with GAAP, but there's no allegation that we didn't, in fact, do it.  And indeed, that's because there's absolutely no basis for making such an allegation.

And we fully disclosed that our loss reserves took into account specific actuarial models, industry trends, historical data, trends in claim frequency and severity, emerging economic and social trends, inflation, so forth and

so on.

So, you know, they point to -- and it's interesting. They point to this *Underland* case.  And I know Your Honor will have questions for me, and I don't want to restate things that are in our brief, but I thought the *Underland versus Alter* case was very illuminating, right?  The plaintiffs in that case alleged that the defendants departed from their claimed methodology to calculate loss reserves.

Okay.  That, unlike -- and here's what the Court says:

"Unlike a subjective evaluation that alone loss reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact."

In other words, making an allegation in this case, by analogy, it would be, you didn't really go look at not only historical loss but all the other factors that you say you looked at.  You didn't really do that.  You didn't really do that at all.

I mean, at Page 26 of our 2016 10-K we say, quote:

Given the inherent uncertainty of modeling techniques and the applications of such techniques, these models and databases may not accurately address the emergence of a variety of matters which might be deemed to impact certain of our coverages.

Accordingly, these models may understate the exposures we are assuming, and our financial results may be adversely impacted, perhaps significantly.

So let's think about that for a second.

THE COURT:  Tell me the page again.

MR. MARINO:  That's Page 26 of our 2016 10-K.  It's Exhibit A to my declaration.

And it's very interesting.  You start at Page 16 -- Page 14, I beg your pardon, and you'll see that after a determination by internal staff and management, external actuaries reviewed the reserve levels and certified that they made a reasonable provision for our unpaid loss and loss adjustment expense obligations.

But at Page 26 was where I was reading from.

And looking at this, the inherent uncertainty of modeling techniques is one thing, right?  So that's sort of a broad disclaimer.  Look, we are modeling, we are forecasting the future, it's inherently uncertain.

But I think it's also very important that we say -- that we refer not only to the uncertainty of the techniques themselves but the inherent uncertainty of the application of such techniques.  That's --

If you think about that, that directly undermines the heart of their case because the heart of their case is -- and you could count them.  The reference to historical loss

reserves comes up literally scores of times in their Complaint and in their briefing as though we ever said to the public, here's how we determine our loss reserves.  We look at the historical loss numbers and ipso facto, that drives our loss reserves, right?

It doesn't.  Not only do we never say that, that's not how it's done, and it wouldn't make any sense to do it that way.

So when you start to look at the cases they refer to, I mean, it's very plain.  It's not -- this is not a situation where, for example, in the *Apple* case, you have Mr. Cook saying, you know, our last quarter, China was really strong in our last quarter, right?  All the while knowing that they are in the middle of a quarter in which they're getting crushed in China, okay?  The allegation that you made that statement about last quarter despite knowing that that would be interpreted to mean the most recent information, when the most recent information you had was contrary to that, well, that's actionable, right?  If you proved that, you prove the case.

There's nothing like that here, you know.  So what do they do?  Okay.  In the absence of the ability to make such allegations, they turn to the following.  Well, there were stock sales.  And it's very clever the way this is done.  The argument is, one of the defendants made this amount of money on stock sales, another defendant made that amount of money.

Here's what they don't say, that we, these two individuals, one of them retained 84 percent of his holdings in the company, another retained 88 percent while the stock went from 16.50 all the way down to 2.50.

So you're actually putting forth as proof of scienter, right?  As proof of an ill motive.

THE COURT:  Isn't it more -- isn't it, though, that what they don't say is that that was somehow different from any other timing?

MR. MARINO:  That's true, too.  They don't say that. There's nothing -- like, you know -- I have to say, you're exactly right, right?  It just hit me -- maybe it just hit me in the face because I'm reading this, like, I'm reading the suggestion that they avoided losses, like they sold -- they dumped, they cut and ran, and I'm looking at, my goodness, they hold on to the overwhelming share of their stocks and rode the thing right to the basement, which cuts directly in favor of the belief that they had these things, right?  Okay.

But you're right, of course.  There's nothing different about those stock sales, right?  But that's a big part of what they say.

Also, they don't want you to look at our Form 4s. Judge Wolfson recently said of course you look at the Form 4 in these cases on a motion to dismiss.  And if you look at our Form 4s, which are attached to my declaration as well, as

Exhibit G, okay, these -- these common shares were sold for tax planning purposes. That's what our SEC Form 4 says.

And with respect to Mr. Rauschbaum's sales and Exhibit H of the same document, Ms. Schmidt: "These common shares were sold for tax planning purposes."

And also, the scores of cases that are cited -- the case that are cited in our brief that speak to timing, show that there's nothing unusual about this timing.

So the stock sale doesn't get -- doesn't fill the gap left by their inability to not only allege that we didn't believe our loss reserves were accurate, not only allege that we didn't actually follow the model we said we were going to follow, okay, but -- and those are -- you know, not only are they unable to allege that, well, hold it, let's look at the stock sales. This is evidence of wrongdoing.

No, it's not. Okay.

So when you get past the stock sales, then what do they say? Well, they raised capital. They did this to raise capital. They did this -- there was incentive compensation paid. Well, raising capital and paying incentive compensation to executives is, and has been found to be, the type of conduct that corporations properly engage in every single day.

So the stock sales are not remarkable either in timing or in amount, much less in the purpose, which is asserted in the Form 4 to be for tax purposes, but the

incentive compensation and the capital raised, they do not, under any circumstances, give rise to a suggestion that there was a motive -- some sort of improper motive and that was why we intentionally set these loss reserves the wrong way, and then these, particularly these two individuals, held on to 84 and 88 percent of their stock respectively as it rode from the penthouse to the basement.

So that's where that is.

Now, I'm looking at the *Oklahoma Firefighters* case in the Southern District in 2013 in which the action was dismissed alleging understated reserves where there were, quote:  No firsthand accounts from confidential witnesses from which one could reasonably conclude that defendants manipulated or did not actually perform the multifactor migration analysis they said they did.

So too here no witness is going to say that we manipulated or didn't perform.  There's not an allegation in the Complaint that if you let us go forward and take discovery, what you'll find is this witness well knew that these individuals were misrepresenting their loss reserve. Intentionally concealing the historical loss reserves that, in their imagination, being the plaintiff's imagination, were somehow outcome-determinative of what our loss reserves had to be.

Nothing could be farther from the truth.

Again, another case in the SDNY from 2019, *Sjunde-AP Fonden versus General Electric*. Even if plaintiffs could allege defendants, quote, Knew that the models used to set the reserves were fraught with serious issues, such as lack of validation and so forth, plaintiffs would not come close to believing -- to pleading defendant's affirmatively disbelieved or recklessly credited a statement of opinion.

So too here.

We thought we got it right. I'm not even prepared to say, to be honest with Your Honor, that we were negligent. I'm not even prepared to say that. But the worst-case scenario, we somehow negligently got it wrong, right?

Their gripe is with the benefit of Monday morning quarterbacking, they're looking at the actual losses and the fact that we didn't cover them with our reserves and saying, you know what, that means that somehow at the beginning there was not just a mistake made, there was intentional fraud in the setting of those reserves.

On its face, that just doesn't make any sense.

You know, I was trying to think of an analogy, and there are a few. The Supreme Court so carefully in the *Omnicare* case, in its analysis of whether this is a statement of opinion and so forth, and they talk about the high resolution television example, right? That -- saying, we've got the highest res- -- I believe we have the highest

resolution television on the market.  Well, that's okay if you really believe that.

If, however, you knew, and I can allege that you knew at the time that you said that, that someone else actually had a higher resolution television on the market.  Well, that's actionable.  Okay.

Nothing like that here whatsoever.

And I think of another analogy.  It's as though -- you know, you'll permit me a baseball analogy, right?  That this particular pitcher historically has always won when he's pitched in the daytime and has had much more difficulty at nighttime, okay?

If our way of predicting the future was, you know, it's this simple, this guy wins during the day and loses at night, okay, that's a driver, right?  That's an objective fact.  That's what they're trying to transmogrify this incredibly difficult modeling process into.

It doesn't fly.  I mean, at the end of the day -- you know, sometimes you go in for an eye examination, right, and you -- and the eye doctor will say, you know, cover one eye, right?  Just look at it with your one eye and look at it with your other eye.

If you just covered the eye that sees what happened after the fact and assessed our conduct looking only at what we knew at the time we set these reserves, would you really

conclude that we did something wrong?  Is there really an allegation that when you say there's a complicated model, it's not science, it's art.  Okay?

And when someone invests in a reinsurance company -- remember, that's what this is, right?  Someone invests in that kind of company, and what the registration statement says, it's covering Section 11, and what the prospectus says, covering Section 12, is this is, in essence, if you were to -- if you were to -- if I were to say to you, after you read these statements --

THE COURT:  Okay.  Well, that's certain -- I mean, I think that everyone will knowledge there's certainly an amount of risk and conjecture and, you know, best estimates that go into investing in a company like this, unless all investors believe that all companies are clairvoyants, which they don't.

Mr. Marino, can you talk to me about and help me understand the regulation that changed --

MR. MARINO:  Sure.

THE COURT:  -- and the company's response to it?

MR. MARINO:  Sure.

And I'll tell you, I appreciate the question because I think that actually is a very strong evidence in support -- or a very strong argument in support of our position.

So an accounting rule that revised the way in which an insurer was to disclose the development of claims became

effective in 2016.  I believe that's what Your Honor is referring to.

THE COURT:  Yes.

MR. MARINO:  In our 2016 10-K, we made a loss development disclosure for the AmTrust business that reflected all AmTrust's business lines in a single, aggregated chart, okay?

The SEC sought additional disclosures based on the SEC's interpretation of the new rule that they required additional disclosures --

THE COURT:  But that -- but first tell me, educate me on the new rule.

MR. MARINO:  So the new rule says you have to aggregate the disclosures, right?  So you're not reporting them in a dis- -- you have to -- I'm sorry, you have to break them out.  So you're not just lumping them together, you're actually giving the -- anybody who would review your 10-K to know where you based it on this, where you based it on that. It's that simple, right?

So we then make a loss development disclosure that reflects all the business in a single, aggregated chart.  They say, come back, consistent with the new rule, and better reflect loss development within the individual lines, right?

So initially, we had done it in the way that we thought the existing rule permitted, which was to give a

disaggregated, general, here it is, right?

THE COURT:  And am I correct in understanding that this was not something that the SEC directed solely to your client but across the board?

MR. MARINO:  That is correct.  They interpreted the new rule to require additional disclosures that would better reflect loss development within our individual lines of business, okay?  We gave them the supplemental disclosures in September of 2017, and the SEC closed its inquiry into us.

So when I look at that, I think, is that -- take a step back.  Is that --

THE COURT:  So the plaintiff somehow seemed to sort of cast aspersion that did you something wrong in the eyes of the SEC.  But is that a fair criticism?

MR. MARINO:  Absolutely not.  Absolutely not.  In fact, it's exactly the opposite, right?

Whether we read the rule or would today read the rule in the same way the SEC read it in that timeframe is really of no moment.  The fact is, that's their job, right?  These new rules are passed and they are trying, as you correctly point out, across the board, right, to make certain that compliance with that rule will, as they interpret the rules, will provide more of a -- sort of a blue sky for folks, right, so they'll be able to see more clearly what's going on.

So they come to us and say, you know, this business

of, here's the sort of disaggregated group that you're showing us, let's see how your individuals lines did.  Well, okay.

We came back and did it and we said, here it is.  We laid it out, and they closed the inquiry.  If they hadn't closed the inquiry at that point, said, wait a second, that, we think, makes the way you were previously reporting it somehow unlawful, right, that you are concealing something, that there was some material omission or a material comission.  None of that happened.  They closed it as to us.

So I guess I thank them for pointing that out because I think it's yet further evidence, along with two very large stockholders riding the stock all the way to the bottom, I think these are things that suggest, we really tried to get it right.

And I'll tell you something else that's really troubled me about this whole set of allegations.  It wasn't in our interest, in my view, to somehow get it wrong on loss reserves, right?  Because if you look at it this way, on its face, well, that presented a rosier picture, right?  The allegation is by not revealing -- or by not reserving at a larger number, a larger amount, you somehow painted a rosier picture for the investors.  Okay.  I hear that, but let's take a step back and look at what we were really doing.  Look at how the business came into being.

AmTrust decides to form Maiden and lay off a portion

of risk pure reinsurance, right?  So 40 percent of the risk, 40 percent of the premiums go, and, as would be expected, commissions are paid because that's something of value, right? I'm giving you a piece of business on which you can earn money.

And that's fair, right?  We wanted to succeed and we tried to succeed.

I won't ask Your Honor to enter the conjectural thicket about this chart the plaintiffs put together that they somehow think carries the ball over the goal line for them because I don't want to dignify that whole line of argument. I don't think it's a fair way to look at this.

I really, as a matter of, you know, defending a securities fraud case, a Section 11 and a Section 12 case, I think we need to stay focused on the ball, right?  That they're able to say, with more of this Monday morning quarterback and 20/20 hindsight, the fraud by hindsight, that they're able to say, well, the numbers were wrong and you said historical loss ratios were something you considered; ipso facto, you lied.

It's not only that it's offensive, it's just so patently untrue.  It's just not consistent, and this is not the question of fact.  This is not something you get to the jury on.

And my largest point on this, I have to say, Your

Honor, is -- because I can hear, well, dismiss it without prejudice and give us an opportunity to replead.  And I would strongly urge you not to do that.

And the reason I would strongly urge you not to do that is very simple.  We don't have to get into the vagaries of whether their statement of opinion is, under the *Omnicare* case, is applicable as well to 10b-5s, you know, I know there's been some back and forth on that.

It's not a matter of any significance to me, right, any more than these charts are a matter of significance because so I'm not going to ask Your Honor to enter the conjectural thicket and start doing a Monday morning assessment of whether we put the right quarterback in the game in the fourth quarter or we should have left the starter in there or whatever.  It's all nonsense.

At the end of the day, tell me that you -- you allege, you're the plaintiff, allege that historic -- that I ever, in any way, shape, or form, gave any potential investor, either through my registration statement or through my prospectus or through my 10-K or through any filing that was available, that I ever gave anyone to believe that historical loss data drove 100 percent my conclusions as to what my loss reserves would be.

It doesn't exist, it isn't going to exist.  That's reality.

So, you know, from my perspective, you have to not just say, hey, you said you'd consider loss, a historical loss data.  Your loss reserves were not consistent with historical loss data in a one-on-one, ipso facto, this-therefore-that relationship, and, therefore, you're out.

They have to allege particularized facts.  This isn't a case where they do a really good job of alleging fraud, but I have a problem with the level of particularity, and I'm going to ask Your Honor to go out to the outer limits of 9b. It's not that.

This is, fundamentally, you have it wrong, okay? Fundamentally wrong.

So I know Your Honor has some questions, perhaps, for me, and if there's anything I haven't covered that's of importance to Your Honor, please --

THE COURT:  Okay.  Thank you.  Let me just hear from your adversary first.

Mr. Smith.

MR. MARINO:  Thank you, Your Honor.

MR. SMITH:  Yes.  Thank you, Counsel, and good morning, Your Honor.

I think counsel may have misspoke there a little bit. Maybe he has the impression that this is a Section 11 or Section 12 case.  This case is brought under Section 10(b) and 20(a) of the 1934 Act.

What I'd like to just do here is beg the Court's indulgence to spend a little bit of time, a couple of minutes, setting the table.

And back in 2007, Maiden and AmTrust entered into this AmTrust, quote, share agreement.  And pursuant to that agreement, basically for each dollar of insurance premium that was ceded to Maiden by AmTrust, the company paid a 30-percent commission, right?

So bottom line is, is the company had a 70-cent cushion for each dollar that was ceded to them in order to generate a profit from.

Now, the Complaint is direct in its allegation that the AmTrust business was a 70 to 80 percent loss ratio.

Now, notably, defense counsel, again, concedes that its clients had direct knowledge of those facts.  He doesn't dispute it.  He consents that --

THE COURT:  Well, I think that -- I think you're looking at it far too myopically, and that's what the defendant's argument is.  Is it's easy to say, in a vacuum, it's 70, 80 percent, but you want the Court and everyone else to ignore all the other facts.  So --

MR. SMITH:  No -- go ahead.

THE COURT:  -- if that's what you're saying, that when you look at the historical lost ratios over the years, that they're really 70, 80 percent, et cetera, and not 50,

isn't that what you're doing?  Where am I wrong?

MR. SMITH:  Well, no, you're absolutely correct, and no, we're not asking the Court to disregard all the other facts.

THE COURT:  But tell me why you're not.  Because when I read through the Complaint, what it says to me, in capital letters, is hindsight, hindsight, hindsight.  Easy to say.  And you want -- and you're alleging, it seems to me, the plaintiffs are alleging, without -- I think it's pretty broad the plaintiffs seem to be alleging they didn't consider and look at the loss reserve ratios over the years.  And that's -- where do you -- where do you get that?

MR. SMITH:  Well, with all due respect, Your Honor, I think that that's an unfair characterization of the --

THE COURT:  Tell me why.  Tell me why.

MR. SMITH:  Okay.  Well, let's -- sure.  And let me just step back.

So we agree with defense counsel that these statements are statements of a payment.

THE COURT:  Yes.

MR. SMITH:  The Supreme Court is clear that when you issue an opinion like this, you also have the well-known duty to disclose material information that you know of when you make that statement.  And that is the rub of the matter here.

Defense counsel concedes that they knew that

inclination. And when they discussed these loss ratios, you know, they're coming in 60s, upper 50s, 60s, upper 60s, and then they degraded over time, got a little bit higher, it is our simple position that when you state that opinion that you trigger an obligation under the securities fraud laws to say simply, hey, we are aware that this ceded business, there's indications that it's really a 70 to 80 percent -- 75 percent loss ratio business, but, you know, listen, we've got these other factors that we look at. But to --

THE COURT: But that wasn't the law until they changed the rule in 2016, right? In 2016 --

MR. SMITH: The --

THE COURT: In 2016, the SEC says --

MR. SMITH: The law -- the laws never change, Your Honor.

THE COURT: No, in terms of --

MR. SMITH: That law's been on the books forever.

THE COURT: In terms of what you spell out.

MR. SMITH: Excuse me?

THE COURT: In terms of what you spell out.

MR. SMITH: In terms of what you spell out.

THE COURT: Yes.

MR. SMITH: I'm sorry. I'm unclear what you're speaking about in terms of "spelling out."

THE COURT: I thought I understand what you're

saying, and maybe I'm not understanding it correctly, is that there is an affirmative obligation on the part of the defendant to say to its investors in the 10-K, oh, and by the way, you should all know that it's really 70 percent.

Isn't that what you're saying to me?

MR. SMITH:  No, no.  What I'm saying, it's nuanced, is, we were aware of data that indicates that the business is a 70- to 80-percent loss ratio business.

THE COURT:  Yes.

MR. SMITH:  We've looked at that, we've considered other items.

THE COURT:  Yes.

MR. SMITH:  And we believe that the loss ratio -- that is the opinion, we believe that the loss ratio is lower.

THE COURT:  But, Mr. Smith, how do you know -- so that I'm really going to press you on this, because --

MR. SMITH:  Sure, Your Honor.

THE COURT:  -- your allegation is, is that they -- they failed -- that they deceived the investors.  So there is a difference between -- let me back up.

How do you know that they didn't -- that their analysts, their auditors, their internal folks didn't consider the historical loss ratios and despite it all, gave the opinion that they gave?  How do you know that?

That's the first question.

And the second question is, is where in the law does it say that they have to set forth their thinking process?

Because that's sounds like what you're saying to me is that they -- they should have informed investors that as part of their analyses, they did, in fact, consider the historical loss ratios; that that seems to be a very finite allegation that you're alleging. And if that's what you're alleging, where is it in the law that says that they have to, if you will, tell the investors their thought processes?

MR. SMITH: I'm not saying that they have to disclose their thought processes. They disclosed in general terms in the risk disclosures, and they disclosed in general terms they arrived at reserves.

THE COURT: Okay.

MR. SMITH: Our point is simply -- is nuanced.

When you speak of a matter publicly, the law is clear that to the extent that you're withholding material information that may render that -- let's just assume that the statement is absolutely true, okay? The statement on its face is true. But to the extent that you're withholding material information, information that investors would be interested in, and I don't know how we can rationally dispute whether an investor would be interested in knowing the historical loss ratio for the AmTrust book of business that may --

THE COURT: But it --

MR. SMITH:  Sure.

THE COURT:  You know, sort of a red flag goes up when you say this is very nuanced to make it into a securities fraud case.  The two really don't go together.  If it's so nuanced, how can it be a securities fraud case?

MR. SMITH:  Your Honor --

THE COURT:  I mean, no --

MR. SMITH:  Judge, I apologize for the use of the word "nuanced," but I can cite case after case after case in the Third Circuit that stands for this basic proposition; that when you speak on a matter, if you withhold material information from investors that sheds some light, puts that statement into context, it's a classic case of securities fraud.

THE COURT:  How do you -- how can you allege in good faith that they withheld it?  If the evidence shows that they considered it and in all of their bucket of items to consider, that if they all sat around, the analysts sat around, the auditors sat around and they looked at it all, but there were all other factors that they considered, they considered the trends, they considered the regulatory changing environment, they considered all of that and they still came up with that opinion, a good faith opinion, that these were what -- this is what we say, then your case really just boils down to a should have; they should have given us the historical loss ratio

charts because some may have thought it was important and some may not have thought it was important.

But I don't see how that makes a securities fraud case.

MR. SMITH:  Well, again, Your Honor --

THE COURT:  If it would not have changed the opinions of the defendants.  If they nonetheless --

I guess I'm just having -- it would be one thing to make an allegation that they ignored all of this and lied or falsified it, but -- and part of the pleading here is that you allege that -- it seems like you're alleging that they ignored the historical loss ratio.  And my question is, where is the good faith belief for that.

But the defendants say they considered all of this in their analysis, and they still came up with what their opinions were.

So it seems to me that the case boils down to just really one sentence, which is, they should have told us -- they should have showed us the chart, period.

MR. SMITH:  I'm not saying they should have shown the chart.  I'm saying that they should have disclosed that the historical data indicated that this book of business was a 70- to 80-percent loss ratio business, right?

Investors deserve to know that information when they utter their opinions stating that the loss ratio are opinion

on what the loss -- the loss status of -- the loss characterization of this business is in the 60s.

I find it difficult to believe that investors would not find that information entirely reasonable, entirely pertinent to the opinion.

The fact that they knew the information, there's no dispute that they knew the information.  That's why I'm confused about it here.  I mean, they conceded that they knew it.

And we keep talking about "it."  They said they considered "it."  But they never said what "it" was, other than historical loss data.  That historical loss data was in sharp contrast to the opinion that they were uttering.

THE COURT:  Well, that's -- but that's --

MR. SMITH:  And let me -- Your Honor, let me just finish the thought.

There's nothing in the securities laws that precludes defendants from disclosing material information when they so choose to speak about loss ratios.  They've not addressed that in their reply brief.  They're dancing around it.

THE COURT:  What are they dancing around?

MR. SMITH:  The duty to disclose information that would provide investors some bases to evaluate their investment.

THE COURT:  Mr. Smith, now let me ask you this

question.

Where do you stop?  Where does a plaintiff stop when they file a lawsuit such as this?  Where is the beginning and where is the end as to what should have been disclosed?

Because in every single case I think an investor could say, you should have disclosed X, regardless of what it is.  So where does it begin and where does it end?  And what is the test?

MR. SMITH:  Well, it begins and ends with materiality, Your Honor.  It's that simple.

THE COURT:  Yes.  And so if the evidence here is that all of the analysts, whoever it is that the defendants employed, considered all of this, considered it only one factor in their opinion, and it would not have changed their opinions, okay; then what?

MR. SMITH:  Well, again, I understand Your Honor. The rule that you're suggesting to me is that there could never be liability for these types of statements, regardless of --

THE COURT:  Well, actually, that's not a fair response to my statement.  I mean, that's not true because, obviously, if there's falsity, if they've lied upon what they've relied upon, if they've given false facts in their analysis, that's -- so to be fair, I mean, there can always be a securities fraud case if the opinions are based on falsity.

I'm assuming -- I'm assuming that this has all been done, you know, above board.

So if the plaintiff's case really solely boils down to, and it sounds to me like that's what it does, if it boils down to that the defendant should have disclosed the historical loss ratios because it might have been material to it an investor without all of the other facts, the trends, the regulatory environment, whatever it is that the defendants relied upon, that's a lot of ifs and speculation --

MR. SMITH:  Well, I would disagree.

THE COURT:  -- it sounds to me -- sounds to me --

MR. SMITH:  With all due respect, Your Honor, I would respectfully disagree.

The securities fraud laws are clear that when you choose to speak to on a topic, you are under a duty to disclose all material information related to that topic.

Now, I'm just somewhat troubled by defense counsel's argument, the suggestion somehow that because they looked at a couple different factors, which, you know, we'll credit them with that -- but just because they looked at two other factors means that material information regarding the historical loss ratio of this business, they're somehow excused from sharing that with investors.  And I think prong three of *Omnicare* spells this out.  It falls cleanly within the Supreme Court's opinion in that case.

THE COURT:  Okay.  I guess where I'm struggling with is how you can say that there's a duty to disclose material information until you show materiality of it, that if it wouldn't have changed anyone's opinion, I don't know how -- I mean, it's sort of the cart and the horse, I suppose.

MR. SMITH:  Sure.  And, Your Honor, again, materiality is measured what's important to investors, not what's important to defendants.

So, you know, to the extent that they're suggesting that they didn't believe that that historical loss data was material, well, ultimately, that's a question of fact.  I don't think anybody sitting here today saying that the actual historical data that was never brought to investor's attention is somehow immaterial.  And if we're having a dispute regarding materiality on that factor --

THE COURT:  I think it's relevant.  I mean --

MR. SMITH:  -- at a motion to dismiss stage -- at a motion to dismiss, Your Honor, materiality is not amenable.

THE COURT:  No, I know.  But the problem that I'm having with the case, and it's the problem I had with the pre-motion conference as well, is that I think that the Complaint is far to -- that the Complaint makes broad-brush allegations, and it really just boils down to, if you want to call it a nuance, perhaps, but it really just boils down to one simple fact, which is, should they have disclosed the

historical thoughts data.

And so even if I were to allow the case to go forward, I would reign it in considerably on that very finite issue because I think that all of the other allegations in the Complaint, they're really just not relevant because it really just boils down to, they should have disclosed the historical data. That's it. That's how I see the case.

I haven't -- except I haven't talked about the sale of the stock. We can talk about that in a moment.

So the question is even if I let the case go forward, how can I keep a reign on it, and how do I resolve that issue? Because at the end of the day, someone's going to have to persuade me that there was a duty to disclose. It would have been -- I mean, I can't disagree with the plaintiffs. It would have been nice to see it, perhaps, the investors would want to see it. But where's the duty to disclose it if at the end of the day they did consider it, and they didn't consider it relevant to their opinions?

MR. SMITH: And there lies the rub, Your Honor. Again, materiality is not measured by what defendants think is important, it's measured by what investors thought was important.

THE COURT: And so how do you -- let's say the case goes to discovery. How do you prove it? You just depose all different types of shareholders and say it would have made a

difference?

MR. SMITH:  Well, I mean, we could start there, we could depose analysts, we could depose analysts on the buy side, which are analysts that are looking at these issues from the context of an institution, we can depose analysts from the sell side, which are generally friendly to defendants.

THE COURT:  Right.  And if there's a difference of opinion, then how is it a securities fraud case?

MR. SMITH:  Well, it's a mixed question of law and fact, Your Honor.  That goes to the jury.  The jury determines whether that omission was material.  If the jury so concludes, the obligation to speak is that.

THE COURT:  Well, I have to figure out a way to reign the case in if it goes forward.  Because I'm not going to let -- you know, these cases sort of take a life of their own if I let them, and I'm not going to do that.

MR. SMITH:  Sure.

MR. MARINO:  Your Honor, may I be heard on that --

MR. SMITH:  Excuse me.  Excuse me, Counsel.

THE COURT:  Mr. Marino, let him speak.

MR. SMITH:  What I'd like to do is just turn to scienter here briefly.

THE COURT:  Well, you know, I'll just shortcut you for a second because all I really think you have in terms of scienter is perhaps the issue of the sale of stocks, which I

think is sort of a finite issue because there's no allegation about the timing, there's no allegation that it was something out of the ordinary for the sales of these stocks.  I think that's kind of a glaring omission in your Complaint.

MR. SMITH:  Well, Your Honor --

THE COURT:  What else do you have?

MR. SMITH:  Sure.  Let's go to the Complaint, shall we?

Okay.  Well, just a couple things.  If you look at Paragraph 188, there is the allegation that the sales occurred a couple months, few months before the first crack of disclosure, which was on February 14th, 2017.

THE COURT:  Yeah.

MR. SMITH:  The other thing I'd like to point out, and, again, I think there's a little bit of misunderstanding about the allegations regarding the interaction between Maiden and the SEC in 2017 after the SEC pointed out that, hey, the rules changed, we need to see these loss charts on a disaggregated basis.

Mind you, the first response to the SEC's request was basically Maiden saying, we're not going to do it.

Then it required a separate letter from the SEC saying, no, we would like you to do that.  Right?  And oddly enough, these sales of stock also occurred when defendants knew that this rule change was going to come in, right?  So

this additional information was forced out by the SEC, right? They knew that was coming.  They slowed it down.  And those sales happened before that rule of fact.

THE COURT:  No, I understand all of that, but you know -- that's a snapshot in time, so let's see what happened in the years before.  That's why I say it may be an issue.  It may be an issue.  I mean, maybe you have enough on that particular aspect of it, but I'm just trying to figure out a way of -- I just am not going to let this case get out of hand in terms of --

MR. SMITH:  I understand, Your Honor.

THE COURT:  -- if it goes forward, I'm just simply not satisfied.  I think it's a lot of Monday morning quarterbacking.  I think it's easy to say they should have disclosed it.

But I, you know, it -- I said it before, I'll say it again.  It just sounds like, you know -- it doesn't sound like a securities fraud case to me, it sounds like a negligence case.  It just doesn't.

MR. SMITH:  Well, Your Honor, again, let me just go back to the scienter issue.  There's no dispute that they knew this data.  There was a deliberate decision not to share it with investors.  This is not --

THE COURT:  How can you -- how can you make that -- that's the problem I have with the Complaint, is how can you

make that allegation:  They knew about it, but there was a deliberate decision not to disclose it.  How can you make that allegation?  What good faith basis do you have?

MR. SMITH:  What good faith basis do I have?

THE COURT:  Yeah.

MR. SMITH:  The defendants conceded that they knew of the information, and the defendants conceded they never disclosed it.

THE COURT:  Because they didn't -- because why?  Because they wanted to hide it from investors or because they only considered it part of an analysis?  That's the thing.

MR. SMITH:  Well, again, Your Honor, the securities laws don't make an exception to withholding material information.  It's -- you know, we're pointing to that information.  We're saying the historical loss data for this AmTrust book of business, which made up the vast majority of this company's revenues, I mean, the vast majority of this company's revenues, okay, it's material.  You know, we have a very strong argument that that information is material.

I understand defendant's argument, that they think it -- in the overall scheme of things that the information may not be material, but at the end of the day, there lies the rub.  We're having the argument here regarding materiality.  It's just not an issue that should be decided at a motion to dismiss.  That should be left to a jury.  It should be left

for summary judgment.

THE COURT: Well, I'm inclined to convert them -- I'll tell the parties what I'm contemplating doing is, I'm inclined to convert the motion to dismiss to one for summary judgment and allowing discovery to go forward on a very, underlined, limited bases. Because I think if I don't do that, I think it gets out of -- because I think the case boils down to just that one simple question: Was there a duty to disclose the historical loss ratio.

MR. MARINO: So, Your Honor, first of all, we did disclose a historical loss ratio, okay? But let's just move away from the fact that there is no case that says that when you speak you have some undefined or limitless obligation to disclose facts. The fact here is we did. And that's why -- I didn't mean to interrupt earlier, but I felt that we were getting far afield. This case should not go forward in any form and here is why.

THE COURT: When you say you disclosed the historical data, what are you talking about?

MR. MARINO: I am saying it was disclosed in the way we thought it was appropriate to disclose it in a disaggregated form. And it appears -- I beg your pardon, in an aggregated form. I'm misspeaking on that. In other words, we gave the lump-sum disclosure, right? And that's at F-35 of the 10-K for 2016 that is attached to my declaration as

Exhibit A, okay?  F-35 gives the historical numbers:  Reserve for loss and loss adjusted expenses, okay?

The suggestion that -- it's astonishing to me that counsel would, at this point, try to suggest to Your Honor that the law didn't change.  I'm looking at Paragraph 67.

THE COURT:  Wait, can you tell me -- I'm sorry.  Tell me -- go -- F-35, where am I looking?

MR. MARINO:  I'm sorry, Judge.  It is Exhibit A to my declaration, in support of our motion to dismiss the Amended Complaint, and it's at Page F-35.

THE COURT:  Let me just try and find it.

MR. MARINO:  "The following table represents information" --

THE COURT:  Hang on, hang on.

MR. MARINO:  -- "the company's incurred losses as LAE" --

THE COURT:  Mr. Marino, let me try and find it, please.

MR. MARINO:  Oh, I'm sorry, Judge.

THE COURT:  Okay, I found it.  Now where -- okay.  Go ahead.

MR. MARINO:  "The following table represents information on the company's incurred losses and LAE and cumulative paid losses and LAE, both net of reinsurance since 2011 for our AmTrust reinsurance segment.  Prior period

information is unaudited and is presented as required supplementary information."

So that's disclosed, right?

Now, this is where this confusion around the change in the law arises. I can't believe they're now saying there was no change in the law when Your Honor --

THE COURT: Wait, can you hold your thought for a second?

So talk to me about F-35, Mr. Smith.

MR. SMITH: Your Honor -- well, the question I was answering is just on the general concept of when defendants know of material information, they speak on a topic and they note material information that they decide to withhold, the laws never change there. That's what --

THE COURT: But they disclosed it, so speak on that.

MR. SMITH: No, they didn't. I mean, again, this is aggregated information. There are other businesses in that triangle that had nothing to do with the problems that this company ultimately experienced to the tune of a half a billion dollars of loan loss write-offs. This was not a transparent disclosure.

MR. MARINO: Okay. Now it's not a transparent disclosure.

MR. SMITH: Counsel, counsel, the question is directed to me. Excuse me.

THE COURT:  I know, but to that point -- Mr. Smith --

MR. SMITH:  Your Honor, the triangle does not disclose loss ratios.

MR. MARINO:  Hold on a second.

MR. SMITH:  It just discloses -- it just discloses absolute losses.

MR. MARINO:  Judge -- I'm sorry, Judge.

MR. SMITH:  He's speaking about a different issue.

MR. MARINO:  No, I'm not.

MR. SMITH:  You're talking there was a duty to disclose the loss ratios.

THE COURT:  Wait.  Mr. Smith, I mean no disrespect, but it sounds like there's shifting sands going on here --

MR. MARINO:  I'll say --

THE COURT:  -- with the plaintiff's case.  Now you're saying that it wasn't transparent.  I don't know what your allegation really is.

MR. MARINO:  Let me illuminate -- let me illuminate --

THE COURT:  No, let Mr. Smith.

Mr. Smith, go ahead.  Tell me about F-35 and why you find that to be a fraudulent disclosure.

MR. SMITH:  We're not alleging that that's a fraudulent disclosure, Your Honor.

THE COURT:  What are you alleging?

MR. SMITH: I'm not alleging anything about that. I don't understand. It seems to be a red herring. We're not alleging that that statement is false.

THE COURT: But you're alleging that it wasn't sufficient, right?

MR. SMITH: No, we're not. We're alleging that when they announced their loss ratios -- that table has nothing to do with loss ratios. Counsel can't point to a single loss ratio. Our case is clear. The false statements regard loss ratios, whether it's just the loss ratio or the complete loss ratio.

This table doesn't have anything to do with the loss ratio. It doesn't disclose what the loss ratios were historically for AmTrust. It discloses what their losses were, but it's not the loss ratio.

MR. MARINO: I know it's not the loss ratio.

May I respond to that, Your Honor?

THE COURT: Okay.

MR. MARINO: All right.

Introduction to their brief: "Throughout the class period, defendants misled investors by disclosing loss reserves and loss ratios for Maiden that did not align with undisclosed, adverse historical loss data."

That's what they allege.

You're absolutely correct as to the nature of the

allegation.

Now, what astonishes me, when you talk about shifting sands, it's pretty mind-boggling -- I'm looking at Paragraph 67 of their Complaint, the one that they drafted and filed, quote:  After the company filed its 2016 Form 10-K with the SEC, the Commission sent Maiden a letter informing it that the SEC believed that Maiden had not complied with new loss development disclosure rules in its 2016 Form 10-K; specifically, the SEC informed Maiden that the company was required to further disaggregate its disclosures for reserves and lost adjustment expenses by the individual lines of business within the AmTrust reinsurance segment as the new disclosure rules required.

So we have gone from, they didn't disclose, they didn't disclose, they didn't disclose, to it's really nuanced, they didn't disclose it the right way, to they didn't disaggregate it, to the rule changed, to the rule didn't change.

You know what, it's totally improper for this case to go forward because it does not state a claim on which relief can be granted.  That's reality, okay?

So we have the allegation they made and they must live with.  The heart of their case is that we somehow failed to disclose adverse historical loss data, which is -- there's probably a less and a more delicate word for that than

baloney, but I'll stick with baloney.

Here's the reality.  The allegation suffers.  The allegation falters, and ultimately the allegation fails because --

THE COURT:  Here's what I'm doing.  Here's what I'm going to do.

The plaintiffs have 10 days to tell me their -- what Mr. Marino just did is he summed up the consternation on behalf of the Court.  I find that the allegations have shifted, they've become left precise, they've become -- I don't know.  I don't understand the allegations.

I want -- and so what Mr. Marino just said a few moments ago I think sums up how I have seen the shifting sands of the plaintiff's case.

It's not fair to the defendant if the allegations continue to shift.  The defendant has to know what it's defending against.

And then, from there, I have to know, as the Court, what it is that the Complaint is and whether or not it states a claim.

So the plaintiff has 10 days to tell me in three sentences its claim.  Three sentences its claim.

MR. MARINO:  And, Your Honor, are you reserving decision on the motion pending that?

THE COURT:  Yeah.

MR. MARINO:  Yeah, all right.

THE COURT:  And then you can give me a five-page brief as to why it states a claim.  I want -- what is the allegation of this case?  It is a -- it is a very, very, very lengthy Complaint that I think boils down to one sentence really, and I don't quite know what that sentence is.

And I don't mean to be critical, but I do find that the plaintiff's theory keeps changing.

So -- and then the defendant can respond with the same amount of pages, and I'll probably have you folks back for oral argument again.

MR. MARINO:  Maybe Your Honor -- sorry, Judge.

THE COURT:  I guess it's probably no secret.  I don't see the case from ceding, but I may be missing something.  I may be missing something.

I do -- I see the case as one of hindsight, and I think that's easy to allege.  And that's what I have to be cautious about and that's certainly what the cases talk about.

But I don't want to conjecture as to really what the claim is because I do think it's kind of -- even if I think if an objective observer read through the transcript, I think one would see how things kind of have shifted.

So I'm doing the best I can, Counsel, to try to, you know, come at a fair decision here, but I also feel like I just don't have a handle on what the allegation is.  And

perhaps that's my bad and maybe I should, but to be perfectly blunt, I think the oral argument has confused me even more.

So I think the best way to do it is that I'm going to reserve on the decision, carry the motion, let me see what the plaintiff files, what the response is, and then you folks will hear from me.  Okay?

MR. MARINO:  Thank you very much, Your Honor.

THE COURT:  All right.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  Okay.  Everybody stay safe and healthy. Thank you.

(12:17 p.m.)

- - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/S/ Karen Friedlander, CRR, RMR*
*Court Reporter/Transcriber*


*May 14, 2021*
*Date*

| **0** | **3** |
| --- | --- |
| **07068** [1] - 1:13 | **30-percent** [1] - 25:7 |
| **07102** [1] - 1:21 | |
| **07928-1488** [1] - 2:4 | **4** |

**0**

**07068** [1] - 1:13
**07102** [1] - 1:21
**07928-1488** [1] - 2:4

**1**

**1** [1] - 1:7
**10** [2] - 47:7, 47:21
**10(b** [1] - 24:24
**10-K** [15] - 5:3, 5:4, 7:25, 8:2, 8:3, 10:20, 11:6, 19:4, 19:17, 23:20, 28:3, 41:25, 46:5, 46:8
**100** [1] - 23:22
**10010** [1] - 2:7
**10b-5s** [1] - 23:7
**11** [3] - 18:7, 22:14, 24:23
**11:00** [2] - 1:8, 3:2
**12** [3] - 18:8, 22:14, 24:24
**12:17** [1] - 49:12
**13** [2] - 1:8, 3:1
**14** [1] - 11:9
**14th** [1] - 38:12
**16** [1] - 11:8
**16.50** [1] - 13:4
**188** [1] - 38:10
**19-5296** [1] - 3:6
**1900** [1] - 1:16
**1934** [1] - 24:25
**1:19-cv-05296-RMB** [1] - 1:5

**2**

**2.50** [1] - 13:4
**20(a** [1] - 24:25
**20/20** [1] - 22:17
**2007** [1] - 25:4
**2011** [1] - 42:25
**2013** [1] - 15:10
**2016** [10] - 10:20, 11:6, 19:1, 19:4, 27:11, 27:13, 41:25, 46:5, 46:8
**2017** [3] - 20:9, 38:12, 38:17
**2019** [1] - 16:1
**2021** [2] - 1:8, 3:1
**22nd** [1] - 2:7
**26** [3] - 10:20, 11:6, 11:14
**2600** [1] - 1:20

**3**

**30-percent** [1] - 25:7

**4**

**4** [3] - 13:23, 14:2, 14:25
**40** [2] - 22:1, 22:2
**437** [1] - 2:3
**49** [1] - 1:7
**4s** [2] - 13:22, 13:25

**5**

**5** [1] - 1:13
**50** [1] - 25:25
**50s** [1] - 27:2
**51** [1] - 2:7

**6**

**60s** [4] - 27:2, 32:2
**62** [1] - 8:5
**655** [1] - 1:16
**67** [2] - 42:5, 46:4

**7**

**70** [7] - 25:13, 25:20, 25:25, 27:7, 28:4, 28:8, 31:22
**70-cent** [1] - 25:9
**75** [1] - 27:7
**756-0160** [1] - 1:24

**8**

**80** [4] - 25:13, 25:20, 25:25, 27:7
**80-percent** [2] - 28:8, 31:23
**84** [2] - 13:2, 15:5
**856** [1] - 1:24
**88** [2] - 13:3, 15:6

**9**

**92101** [1] - 1:17
**944-40-30-1** [1] - 9:8
**9b** [1] - 24:9

**A**

**a.m** [1] - 1:8
**A.M** [1] - 3:2
**abide** [1] - 9:6
**ability** [1] - 12:21
**able** [3] - 20:24, 22:16, 22:18
**absence** [3] - 7:17, 8:23, 12:21
**absolute** [1] - 44:6
**absolutely** [6] - 9:21, 20:15, 26:2, 29:19, 45:25
**accordingly** [1] - 11:1
**account** [1] - 9:23
**accounting** [1] - 18:24
**accounts** [1] - 15:12
**accurate** [1] - 14:11
**accurately** [2] - 9:4, 10:23
**Act** [1] - 24:25
**action** [1] - 15:10
**ACTION** [1] - 1:4
**actionable** [2] - 12:19, 17:6
**actual** [2] - 16:14, 35:12
**actuarial** [4] - 5:8, 7:20, 8:8, 9:23
**actuaries** [1] - 11:11
**add** [1] - 4:15
**additional** [4] - 19:8, 19:10, 20:6, 39:1
**address** [1] - 10:23
**addressed** [1] - 32:19
**adequacy** [1] - 7:8
**adequate** [4] - 6:22, 7:18, 8:21, 10:12
**adjusted** [2] - 9:12, 42:2
**adjustment** [2] - 11:13, 46:11
**adversary** [1] - 24:17
**adverse** [2] - 45:23, 46:24
**adversely** [1] - 11:3
**affirmatively** [1] - 16:6
**afield** [1] - 41:16
**aggregate** [1] - 19:14
**aggregated** [4] - 19:6, 19:21, 41:23, 43:17
**AGNELLO** [1] - 1:12
**ago** [1] - 47:13
**agree** [1] - 26:18
**agreement** [2] - 25:5, 25:6
**ahead** [5] - 6:6, 8:22, 25:22, 42:21, 44:21
**aided** [1] - 1:25
**align** [1] - 45:22
**ALL** [1] - 3:1
**allegation** [31] - 4:21, 5:16, 5:17, 5:22, 5:23, 6:21, 6:22, 9:19, 9:21, 10:15, 12:15, 15:17, 18:2, 21:20, 25:12, 28:18, 29:7, 31:9, 38:1, 38:2, 38:10, 40:1, 40:3, 44:17, 46:1, 46:22, 47:2, 47:3, 48:4, 48:25
**allegations** [13] - 5:2, 6:25, 7:17, 7:23, 9:2, 12:22, 21:16, 35:23, 36:4, 38:16, 47:9, 47:11, 47:15
**allege** [14] - 9:5, 9:16, 14:10, 14:11, 14:14, 16:3, 17:3, 23:17, 24:6, 30:15, 31:11, 45:24, 48:17
**alleged** [1] - 10:7
**alleges** [1] - 6:20
**alleging** [14] - 15:11, 24:7, 26:8, 26:9, 26:10, 29:7, 29:8, 31:11, 44:23, 44:25, 45:1, 45:3, 45:4, 45:6
**allow** [1] - 36:2
**allowing** [1] - 41:5
**alone** [1] - 10:11
**ALSO** [1] - 2:10
**Alter** [1] - 10:5
**amenable** [1] - 35:18
**Amended** [1] - 42:9
**amount** [7] - 10:13, 12:24, 12:25, 14:24, 18:12, 21:21, 48:10
**amounts** [2] - 7:11, 8:7
**AmTrust** [11] - 19:5, 21:25, 25:4, 25:5, 25:7, 25:13, 29:24, 40:16, 42:25, 45:14, 46:12
**AmTrust's** [1] - 19:6
**analogy** [4] - 10:16, 16:20, 17:8, 17:9
**analyses** [1] - 29:5
**analysis** [5] - 15:15, 16:22, 31:15, 33:24, 40:11
**analysts** [7] - 28:22, 30:18, 33:12, 37:3, 37:4, 37:5
**announced** [1] - 45:7
**answering** [1] - 43:11
**AP** [1] - 16:1
**apologies** [1] - 6:5
**apologize** [1] - 30:8
**appearances** [1] - 3:7
**Apple** [1] - 12:11
**applicable** [1] - 23:7
**application** [1] - 11:21
**applications** [1] - 10:22
**appreciate** [1] - 18:21
**appropriate** [1] - 41:21
**arguing** [1] - 4:10
**argument** [12] - 3:14, 4:3, 12:24, 18:23, 22:11, 25:19, 34:18, 40:19, 40:20, 40:23, 48:11, 49:2
**ARGUMENT** [1] - 1:6
**arguments** [2] - 4:15, 9:2
**arises** [1] - 43:5
**arrive** [2] - 5:24, 10:13
**arrived** [1] - 29:13
**arriving** [2] - 5:14, 5:20
**art** [1] - 18:3
**ASC** [1] - 9:8
**aspect** [1] - 39:8
**aspects** [1] - 8:3
**aspersion** [1] - 20:13
**asserted** [1] - 14:25
**assessed** [1] - 17:24
**assessment** [2] - 8:9, 23:13
**assume** [1] - 29:18
**assuming** [3] - 11:2, 34:1
**assurances** [1] - 8:6
**astonishes** [1] - 46:2
**astonishing** [1] - 42:3
**attached** [2] - 13:25, 41:25
**attention** [1] - 35:13
**audio** [1] - 3:25
**auditors** [2] - 28:22, 30:19
**available** [2] - 8:9, 23:21
**Avenue** [1] - 2:7
**avoided** [1] - 13:14
**aware** [2] - 27:6, 28:7

**B**

**bad** [1] - 49:1
**ball** [2] - 22:10, 22:15
**baloney** [2] - 47:1
**baseball** [1] - 17:9
**based** [6] - 8:8, 9:10, 19:8, 19:18, 33:25
**basement** [2] - 13:17, 15:7
**bases** [2] - 32:23, 41:6
**basic** [1] - 30:10
**basis** [7] - 4:22, 6:16, 7:23, 9:21, 38:19, 40:3, 40:4
**became** [1] - 18:25

*United States District Court*
*Camden, New Jersey*

Becker [1] - 1:13
become [2] - 47:10
beg [3] - 11:9, 25:1, 41:22
begin [1] - 33:7
beginning [2] - 16:16, 33:3
begins [1] - 33:9
behalf [6] - 3:7, 3:10, 4:6, 4:9, 4:10, 47:9
belief [2] - 13:18, 31:13
benefit [1] - 16:13
best [3] - 18:13, 48:23, 49:3
better [2] - 19:22, 20:6
between [3] - 6:17, 28:20, 38:16
big [1] - 13:20
billion [1] - 43:19
bit [4] - 24:22, 25:2, 27:3, 38:15
blue [1] - 20:23
blunt [1] - 49:2
board [3] - 20:4, 20:21, 34:2
boggling [1] - 46:3
boils [9] - 30:24, 31:17, 34:3, 34:4, 35:23, 35:24, 36:6, 41:7, 48:5
book [3] - 29:24, 31:22, 40:16
books [1] - 27:17
bottom [2] - 21:12, 25:9
Boulevard [1] - 2:3
Boyle [1] - 3:20
BOYLE [1] - 2:2
break [1] - 19:15
brief [6] - 9:3, 10:5, 14:7, 32:20, 45:20, 48:3
briefing [1] - 12:2
briefly [1] - 37:22
broad [3] - 11:17, 26:9, 35:22
broad-brush [1] - 35:22
Broadway [1] - 1:16
BRODY [1] - 1:12
brought [2] - 24:24, 35:13
brush [1] - 35:22
bucket [1] - 30:17
BUMB [1] - 1:9
business [22] - 7:2, 7:3, 8:13, 19:5, 19:6, 19:21, 20:8, 20:25, 21:24, 22:4, 25:13,
27:6, 27:8, 28:7, 28:8, 29:24, 31:22, 31:23, 32:2, 34:22, 40:16, 46:12
businesses [1] - 43:17
buy [1] - 37:3
BY [6] - 1:12, 1:15, 1:19, 2:2, 2:6, 3:1
Byrne [1] - 3:10
BYRNE [1] - 1:12

**C**

CA [1] - 1:17
calculate [1] - 10:8
capital [5] - 14:18, 14:19, 14:20, 15:1, 26:6
care [1] - 4:18
carefully [1] - 16:21
CARELLA [1] - 1:12
Carella [1] - 3:10
CARLINSKY [1] - 2:6
Carlinsky [1] - 3:22
carries [1] - 22:10
carry [1] - 49:4
cart [1] - 35:5
case [57] - 4:21, 5:1, 5:16, 9:16, 10:3, 10:6, 10:7, 10:15, 11:24, 12:11, 12:19, 14:7, 15:9, 16:1, 16:11, 16:22, 22:14, 23:7, 24:7, 24:24, 30:4, 30:5, 30:9, 30:13, 30:24, 31:4, 31:17, 33:5, 33:25, 34:3, 34:25, 35:20, 36:2, 36:7, 36:10, 36:23, 37:8, 37:14, 39:9, 39:18, 39:19, 41:7, 41:12, 41:16, 44:15, 45:9, 46:19, 46:23, 47:14, 48:4, 48:14, 48:16
cases [6] - 8:14, 12:9, 13:24, 14:6, 37:15, 48:18
cast [1] - 20:13
cautious [1] - 48:18
CECCHI [1] - 1:12
ceded [3] - 25:7, 25:10, 27:6
ceding [1] - 48:14
Center [1] - 1:20
CEO [2] - 2:11, 3:23
certain [5] - 8:3, 9:2, 10:24, 18:11, 20:21
certainly [3] - 4:17,
18:12, 48:18
certified [1] - 11:11
cetera [1] - 25:25
change [7] - 27:14, 38:25, 42:5, 43:4, 43:6, 43:14, 46:18
changed [7] - 18:17, 27:11, 31:6, 33:14, 35:4, 38:18, 46:17
changes [2] - 5:10, 5:11
changing [2] - 30:21, 48:8
characterization [2] - 26:14, 32:2
chart [5] - 19:6, 19:21, 22:9, 31:19, 31:21
charts [3] - 23:10, 31:1, 38:18
Chatham [1] - 2:4
China [2] - 12:12, 12:15
choose [2] - 32:19, 34:15
Circuit [2] - 7:13, 30:10
Circuit's [1] - 7:6
circumstances [1] - 15:2
cite [1] - 30:9
cited [2] - 14:6, 14:7
CIVIL [1] - 1:4
claim [7] - 9:24, 46:20, 47:20, 47:22, 48:3, 48:20
claimed [1] - 10:7
claims [5] - 4:20, 8:10, 9:9, 9:10, 18:25
clairvoyants [1] - 18:15
class [1] - 45:20
classic [1] - 30:13
clean [1] - 5:9
cleanly [1] - 34:24
clear [5] - 8:4, 26:21, 29:16, 34:14, 45:9
clearly [1] - 20:24
clever [1] - 12:23
client [1] - 20:4
clients [1] - 25:15
close [2] - 7:15, 16:5
closed [4] - 20:9, 21:4, 21:5, 21:9
co [1] - 3:11
co-counsel [1] - 3:11
colleagues [1] - 3:21
collectible [1] - 7:12
coming [2] - 27:2, 39:2
comission [1] - 21:8
Commencing [1] - 1:8
Commission [1] - 46:6
commission [1] - 25:8
commissions [1] - 22:3
common [2] - 14:1, 14:4
companies [1] - 18:15
company [10] - 6:18, 13:3, 18:4, 18:6, 18:14, 25:7, 25:9, 43:19, 46:5, 46:9
company's [5] - 18:19, 40:17, 40:18, 42:15, 42:23
compensation [3] - 14:19, 14:20, 15:1
Complaint [21] - 4:18, 6:20, 8:1, 8:15, 9:3, 9:4, 9:5, 12:1, 15:18, 25:12, 26:6, 35:22, 36:5, 38:4, 38:7, 39:25, 42:10, 46:4, 47:19, 48:5
complete [1] - 45:10
complex [1] - 5:5
compliance [1] - 20:21
complicated [2] - 8:24, 18:2
complied [1] - 46:7
comply [1] - 9:19
computer [1] - 1:25
computer-aided [1] - 1:25
concealing [2] - 15:21, 21:7
conceded [3] - 32:8, 40:6, 40:7
concedes [2] - 25:14, 26:25
concept [1] - 43:11
conclude [2] - 15:13, 18:1
concludes [1] - 37:11
conclusions [1] - 23:22
conduct [2] - 14:22, 17:24
conference [1] - 35:21
confidential [1] - 15:12
confused [2] - 32:8, 49:2
confusion [1] - 43:4
conjectural [2] - 22:8, 23:12
conjecture [2] - 18:13, 48:19
consents [1] - 25:16
consider [8] - 5:8, 24:2, 26:10, 28:22, 29:5, 30:17, 36:17
considerably [1] - 36:3
considered [13] - 5:15, 22:19, 28:10, 30:17, 30:20, 30:21, 30:22, 31:14, 32:11, 33:13, 40:11
consistent [3] - 19:22, 22:22, 24:3
consternation [1] - 47:8
contemplating [1] - 41:3
context [2] - 30:13, 37:5
continue [1] - 47:16
CONTINUED [1] - 2:1
contrary [3] - 6:19, 6:20, 12:18
contrast [1] - 32:13
convert [2] - 41:2, 41:4
cook [1] - 12:11
Corporation [1] - 7:7
corporations [1] - 14:22
correct [6] - 4:1, 5:23, 20:2, 20:5, 26:2, 45:25
correctly [2] - 20:20, 28:1
cost [1] - 9:10
Counsel [3] - 24:20, 37:19, 48:23
counsel [9] - 3:11, 24:22, 25:14, 26:18, 26:25, 42:4, 43:24, 45:8
counsel's [1] - 34:17
count [1] - 11:25
couple [4] - 25:2, 34:19, 38:9, 38:11
course [2] - 13:19, 13:23
Court [3] - 1:23, 16:21, 26:21
COURT [1] - 1:2
Court's [2] - 25:1, 34:24
cover [3] - 4:24, 16:15, 17:20
coverages [1] - 10:25
covered [2] - 17:23, 24:14
covering [2] - 18:7, 18:8

**crack** *[1]* - 38:11
**credit** *[1]* - 34:19
**credited** *[1]* - 16:7
**critical** *[1]* - 48:7
**criticism** *[1]* - 20:14
**crushed** *[1]* - 12:14
**cumulative** *[1]* - 42:24
**current** *[1]* - 9:12
**cushion** *[1]* - 25:10
**cut** *[1]* - 13:15
**cuts** *[1]* - 13:17

### D

**dancing** *[2]* - 32:20, 32:21
**Daniel** *[2]* - 4:5, 4:8
**DANIEL** *[1]* - 1:19
**data** *[21]* - 5:7, 5:15, 8:9, 9:24, 23:22, 24:3, 24:4, 28:7, 31:22, 32:12, 35:10, 35:13, 36:1, 36:7, 39:22, 40:15, 41:19, 45:23, 46:24
**databases** *[1]* - 10:23
**days** *[2]* - 47:7, 47:21
**daytime** *[1]* - 17:11
**deceived** *[1]* - 28:19
**decide** *[1]* - 43:13
**decided** *[1]* - 40:24
**decides** *[1]* - 21:25
**decision** *[6]* - 7:6, 39:22, 40:2, 47:24, 48:24, 49:4
**declaration** *[4]* - 11:7, 13:25, 41:25, 42:9
**deemed** *[1]* - 10:24
**defendant** *[8]* - 3:18, 4:11, 12:25, 28:3, 34:5, 47:15, 47:16, 48:9
**defendant's** *[3]* - 16:6, 25:19, 40:20
**defendants** *[18]* - 3:20, 10:7, 12:24, 15:13, 16:3, 31:7, 31:14, 32:18, 33:12, 34:8, 35:8, 36:20, 37:6, 38:24, 40:6, 40:7, 43:11, 45:21
**Defendants** *[2]* - 2:4, 2:8
**defending** *[2]* - 22:13, 47:17
**defense** *[4]* - 25:14, 26:18, 26:25, 34:17
**definition** *[3]* - 7:2, 7:4
**degraded** *[1]* - 27:3
**delay** *[1]* - 3:4

**deliberate** *[2]* - 39:22, 40:2
**delicate** *[1]* - 46:25
**departed** *[1]* - 10:7
**depose** *[4]* - 36:24, 37:3, 37:5
**described** *[1]* - 5:25
**deserve** *[1]* - 31:24
**despite** *[2]* - 12:16, 28:23
**determination** *[1]* - 11:10
**determinative** *[1]* - 15:23
**determine** *[1]* - 12:3
**determines** *[1]* - 37:10
**determining** *[1]* - 7:8
**development** *[6]* - 18:25, 19:5, 19:20, 19:23, 20:7, 46:8
**deviate** *[1]* - 8:7
**Diego** *[1]* - 1:17
**difference** *[3]* - 28:20, 37:1, 37:7
**different** *[5]* - 13:8, 13:20, 34:19, 36:25, 44:8
**difficult** *[3]* - 5:5, 17:17, 32:3
**difficulty** *[1]* - 17:11
**dignify** *[1]* - 22:11
**direct** *[3]* - 5:21, 25:12, 25:15
**directed** *[2]* - 20:3, 43:25
**directly** *[3]* - 6:19, 11:23, 13:17
**dis** *[1]* - 19:15
**disaggregate** *[2]* - 46:10, 46:17
**disaggregated** *[4]* - 20:1, 21:1, 38:19, 41:22
**disagree** *[3]* - 34:10, 34:13, 36:14
**disbelieved** *[1]* - 16:6
**disclaimer** *[1]* - 11:17
**disclose** *[22]* - 5:13, 18:25, 26:23, 29:10, 32:22, 34:16, 35:2, 36:13, 36:16, 40:2, 41:9, 41:11, 41:14, 41:21, 44:3, 44:11, 45:13, 46:14, 46:15, 46:16, 46:24
**disclosed** *[15]* - 9:22, 29:11, 29:12, 31:21, 33:4, 33:6, 34:5, 35:25, 36:6, 39:15, 40:8, 41:18, 41:20,

43:3, 43:15
**discloses** *[3]* - 44:5, 45:14
**disclosing** *[3]* - 8:12, 32:18, 45:21
**disclosure** *[10]* - 19:5, 19:20, 38:12, 41:24, 43:21, 43:23, 44:22, 44:24, 46:8, 46:13
**disclosures** *[7]* - 19:8, 19:10, 19:14, 20:6, 20:8, 29:12, 46:10
**discovery** *[3]* - 15:19, 36:24, 41:5
**discussed** *[1]* - 27:1
**dismiss** *[7]* - 13:24, 23:1, 35:17, 35:18, 40:25, 41:4, 42:9
**dismissal** *[1]* - 8:15
**dismissed** *[1]* - 15:11
**dispute** *[5]* - 25:16, 29:22, 32:7, 35:14, 39:21
**disregard** *[1]* - 26:3
**disrespect** *[1]* - 44:12
**DISTRICT** *[3]* - 1:2, 1:2, 1:10
**District** *[1]* - 15:10
**doctor** *[1]* - 17:20
**document** *[1]* - 14:4
**dollar** *[2]* - 25:6, 25:10
**dollars** *[1]* - 43:20
**Don** *[1]* - 3:9
**DONALD** *[1]* - 1:12
**done** *[4]* - 12:7, 12:23, 19:24, 34:1
**DOWD** *[1]* - 1:15
**Dowd** *[1]* - 3:12
**down** *[12]* - 4:3, 13:4, 30:24, 31:17, 34:3, 34:5, 35:23, 35:24, 36:6, 39:2, 41:8, 48:5
**drafted** *[1]* - 46:4
**driver** *[1]* - 17:15
**drives** *[1]* - 12:4
**drove** *[1]* - 23:22
**due** *[3]* - 7:11, 26:13, 34:12
**dumped** *[1]* - 13:15
**during** *[1]* - 17:14
**duty** *[8]* - 26:22, 32:22, 34:15, 35:2, 36:13, 36:16, 41:8, 44:10

### E

**earn** *[1]* - 22:4
**easy** *[4]* - 25:19, 26:7,

39:14, 48:17
**Ecklund** *[1]* - 3:9
**ECKLUND** *[4]* - 1:12, 3:9, 6:8, 6:11
**economic** *[3]* - 5:10, 9:12, 9:25
**educate** *[1]* - 19:11
**effective** *[1]* - 19:1
**effects** *[1]* - 9:11
**either** *[2]* - 14:23, 23:19
**Electric** *[1]* - 16:2
**Emanuel** *[1]* - 3:22
**EMANUEL** *[1]* - 2:5
**emergence** *[1]* - 10:23
**emerging** *[2]* - 5:10, 9:25
**employ** *[2]* - 6:23
**employed** *[1]* - 33:13
**end** *[8]* - 8:24, 17:18, 23:16, 33:4, 33:7, 36:12, 36:17, 40:22
**ends** *[1]* - 33:9
**engage** *[1]* - 14:22
**entails** *[2]* - 7:4
**enter** *[2]* - 22:8, 23:11
**entered** *[1]* - 25:4
**entirely** *[2]* - 32:4
**environment** *[2]* - 30:21, 34:8
**environments** *[1]* - 5:12
**ESQUIRE** *[9]* - 1:12, 1:15, 1:16, 1:19, 1:19, 2:2, 2:3, 2:6, 2:6
**essence** *[1]* - 18:8
**estimated** *[1]* - 9:10
**estimates** *[3]* - 8:8, 8:9, 18:13
**estimating** *[1]* - 5:5
**et** *[1]* - 25:25
**evaluate** *[1]* - 32:23
**evaluating** *[1]* - 7:14
**evaluation** *[1]* - 10:11
**events** *[1]* - 7:5
**evidence** *[5]* - 14:15, 18:22, 21:11, 30:16, 33:11
**exactly** *[2]* - 13:12, 20:16
**examination** *[1]* - 17:19
**example** *[4]* - 8:19, 9:5, 12:11, 16:24
**except** *[1]* - 36:8
**exception** *[1]* - 40:13
**excuse** *[4]* - 27:19, 37:19, 43:25
**excused** *[1]* - 34:22

**executives** *[1]* - 14:21
**Exhibit** *[5]* - 11:7, 14:1, 14:4, 42:1, 42:8
**exist** *[3]* - 6:25, 23:24
**existing** *[1]* - 19:25
**expected** *[1]* - 22:2
**expense** *[1]* - 11:13
**expenses** *[2]* - 42:2, 46:11
**experience** *[2]* - 9:12, 9:14
**experienced** *[1]* - 43:19
**exposures** *[1]* - 11:2
**extent** *[3]* - 29:17, 29:20, 35:9
**external** *[1]* - 11:10
**eye** *[6]* - 17:19, 17:20, 17:21, 17:22, 17:23
**eyes** *[1]* - 20:13

### F

**F-35** *[6]* - 41:24, 42:1, 42:7, 42:10, 43:9, 44:21
**face** *[4]* - 13:13, 16:19, 21:19, 29:19
**fact** *[20]* - 6:18, 7:9, 8:16, 8:17, 9:20, 10:14, 16:15, 17:16, 17:24, 20:16, 20:19, 22:23, 29:5, 32:6, 35:11, 35:25, 37:10, 39:3, 41:12, 41:14
**facto** *[4]* - 6:17, 12:4, 22:20, 24:4
**factor** *[2]* - 33:14, 35:15
**factors** *[9]* - 5:9, 8:11, 9:12, 9:13, 10:17, 27:9, 30:20, 34:19, 34:20
**facts** *[9]* - 6:19, 7:19, 24:6, 25:15, 25:21, 26:4, 33:23, 34:7, 41:14
**failed** *[3]* - 8:17, 28:19, 46:23
**fails** *[1]* - 47:3
**fair** *[7]* - 20:14, 22:6, 22:12, 33:20, 33:24, 47:15, 48:24
**Fait** *[1]* - 7:6
**faith** *[5]* - 30:16, 30:23, 31:13, 40:3, 40:4
**falls** *[1]* - 34:24
**false** *[4]* - 7:20, 33:23,

45:3, 45:9
**falsified** [1] - 31:10
**falsity** [3] - 7:19, 33:22, 33:25
**falters** [1] - 47:3
**far** [3] - 25:18, 35:22, 41:16
**Farm** [1] - 1:13
**favor** [1] - 13:18
**February** [1] - 38:12
**federal** [1] - 4:25
**felt** [1] - 41:15
**few** [3] - 16:21, 38:11, 47:12
**figure** [2] - 37:13, 39:8
**file** [2] - 9:15, 33:3
**filed** [2] - 46:4, 46:5
**files** [1] - 49:5
**filing** [1] - 23:20
**fill** [1] - 14:9
**Financial** [1] - 7:7
**financial** [1] - 11:2
**finish** [1] - 32:16
**finite** [3] - 29:6, 36:3, 38:1
**Firefighters** [1] - 15:9
**firm** [1] - 3:10
**Firm** [1] - 4:5
**FIRM** [1] - 1:18
**first** [7] - 5:17, 19:11, 24:17, 28:25, 38:11, 38:20, 41:10
**firsthand** [1] - 15:12
**five** [1] - 48:2
**five-page** [1] - 48:2
**flag** [1] - 30:2
**flawed** [2] - 6:24, 7:22
**Floor** [1] - 2:7
**fly** [1] - 17:18
**focused** [1] - 22:15
**folks** [5] - 8:20, 20:23, 28:22, 48:10, 49:5
**follow** [3] - 5:19, 14:12, 14:13
**following** [3] - 12:22, 42:12, 42:22
**Fonden** [1] - 16:2
**foolproof** [1] - 7:15
**FOR** [1] - 1:2
**forced** [1] - 39:1
**forecast** [1] - 7:5
**forecasting** [1] - 11:17
**forever** [1] - 27:17
**form** [5] - 21:25, 23:18, 41:17, 41:22, 41:23
**Form** [7] - 13:22, 13:23, 13:25, 14:2, 14:25, 46:5, 46:8
**formula** [1] - 5:14

**forth** [7] - 9:18, 9:25, 13:5, 16:5, 16:23, 23:8, 29:2
**forward** [8] - 15:18, 36:3, 36:10, 37:14, 39:12, 41:5, 41:16, 46:20
**fourth** [1] - 23:14
**fraud** [13] - 16:17, 22:14, 22:17, 24:7, 27:5, 30:4, 30:5, 30:14, 31:3, 33:25, 34:14, 37:8, 39:18
**fraudulent** [2] - 44:22, 44:24
**fraught** [1] - 16:4
**frequency** [3] - 5:9, 8:10, 9:24
**Friedlander** [1] - 1:23
**friedlanderreporter @gmail.com** [1] - 1:23
**friendly** [1] - 37:6
**fully** [1] - 9:22
**fundamentally** [2] - 24:11, 24:12
**future** [4] - 7:5, 8:10, 11:18, 17:13

## G

**GAAP** [4] - 9:6, 9:15, 9:17, 9:19
**game** [1] - 23:13
**gap** [1] - 14:9
**Gateway** [1] - 1:20
**GELLER** [1] - 1:15
**Geller** [1] - 3:11
**General** [1] - 16:2
**general** [4] - 20:1, 29:11, 29:12, 43:11
**generally** [1] - 37:6
**generate** [1] - 25:11
**given** [3] - 10:21, 30:25, 33:23
**glaring** [1] - 38:4
**goal** [1] - 22:10
**GOLDBERG** [1] - 1:19
**Goldberg** [2] - 4:5, 4:8
**goodness** [1] - 13:15
**granted** [1] - 46:21
**gripe** [1] - 16:13
**Gronborg** [1] - 3:12
**GRONBORG** [1] - 1:15
**group** [1] - 21:1
**guess** [4] - 21:10, 31:8, 35:1, 48:13
**guy** [1] - 17:14

## H

**half** [1] - 43:19
**hand** [1] - 39:9
**handle** [1] - 48:25
**handling** [1] - 3:13
**hang** [2] - 42:14
**healthy** [1] - 49:10
**hear** [4] - 21:22, 23:1, 24:16, 49:6
**heard** [1] - 37:18
**hearing** [1] - 3:4
**heart** [3] - 11:24, 46:23
**held** [1] - 15:5
**help** [1] - 18:16
**herring** [1] - 45:2
**hide** [1] - 40:10
**high** [1] - 16:23
**higher** [2] - 17:5, 27:3
**highest** [2] - 16:25
**highlight** [1] - 4:18
**hindsight** [6] - 22:17, 26:7, 48:16
**historic** [1] - 23:17
**historical** [36] - 4:22, 5:7, 5:15, 6:17, 9:24, 10:17, 11:25, 12:4, 15:21, 22:19, 23:21, 24:2, 24:3, 25:24, 28:23, 29:6, 29:23, 30:25, 31:12, 31:22, 32:12, 34:6, 34:21, 35:10, 35:13, 36:1, 36:6, 40:15, 41:9, 41:11, 41:18, 42:1, 45:23, 46:24
**historically** [2] - 17:10, 45:14
**hit** [2] - 13:12
**hold** [4] - 13:16, 14:14, 43:7, 44:4
**Holdings** [5] - 1:4, 2:11, 3:5, 3:23, 7:3
**holdings** [1] - 13:2
**honest** [1] - 16:10
**Honor** [51] - 3:9, 3:16, 3:19, 3:23, 4:1, 4:4, 4:12, 4:17, 6:8, 6:14, 6:15, 10:3, 16:10, 19:1, 22:8, 23:1, 23:11, 24:9, 24:13, 24:15, 24:19, 24:21, 26:13, 27:15, 28:17, 30:6, 31:5, 32:15, 33:10, 33:16, 34:12, 35:6, 35:18, 36:19, 37:10, 37:18, 38:5, 39:11, 39:20, 40:12, 41:10, 42:4, 43:6,

43:10, 44:2, 44:24, 45:17, 47:23, 48:12, 49:7, 49:9
**HONORABLE** [1] - 1:9
**horse** [1] - 35:5

## I

**ifs** [1] - 34:9
**ignore** [1] - 25:21
**ignored** [2] - 31:9, 31:11
**ill** [1] - 13:6
**illuminate** [2] - 44:18, 44:19
**illuminating** [1] - 10:6
**imagination** [2] - 15:22
**immaterial** [1] - 35:14
**impact** [2] - 5:8, 10:24
**impacted** [1] - 11:3
**implied** [1] - 7:19
**importance** [1] - 24:15
**important** [7] - 11:19, 31:1, 31:2, 35:7, 35:8, 36:21, 36:22
**impression** [1] - 24:23
**improper** [2] - 15:3, 46:19
**inability** [2] - 9:1, 14:10
**inadequate** [1] - 5:18
**incentive** [3] - 14:19, 14:20, 15:1
**inclination** [1] - 27:1
**inclined** [2] - 41:2, 41:4
**including** [1] - 9:11
**incredibly** [1] - 17:17
**incurred** [2] - 42:15, 42:23
**indeed** [1] - 9:20
**indicated** [1] - 31:22
**indicates** [1] - 28:7
**indications** [1] - 27:7
**individual** [3] - 19:23, 20:7, 46:11
**individuals** [4] - 13:2, 15:5, 15:20, 21:2
**indulgence** [1] - 25:2
**industry** [1] - 9:23
**inflation** [3] - 5:11, 9:11, 9:25
**information** [29] - 12:17, 12:18, 26:23, 29:18, 29:21, 30:12, 31:24, 32:4, 32:6, 32:7, 32:18, 32:22, 34:16, 34:21, 35:3, 39:1, 40:7, 40:14,

40:15, 40:19, 40:21, 42:13, 42:23, 43:1, 43:2, 43:12, 43:13, 43:17
**informed** [2] - 29:4, 46:9
**informing** [1] - 46:6
**inherent** [3] - 10:21, 11:15, 11:21
**inherently** [2] - 6:24, 11:18
**inquiry** [3] - 20:9, 21:4, 21:5
**instead** [1] - 7:9
**institution** [1] - 37:5
**insurance** [2] - 9:9, 25:6
**insurer** [1] - 18:25
**integral** [1] - 7:25
**integrally** [1] - 5:2
**intentional** [1] - 16:17
**intentionally** [2] - 15:4, 15:21
**interaction** [1] - 38:16
**interest** [1] - 21:17
**interested** [2] - 29:21, 29:23
**interesting** [3] - 7:24, 10:2, 11:8
**internal** [2] - 11:10, 28:22
**interpret** [1] - 20:22
**interpretation** [1] - 19:9
**interpreted** [2] - 12:17, 20:5
**interrupt** [1] - 41:15
**introduction** [1] - 45:20
**invested** [1] - 7:3
**investing** [1] - 18:14
**investment** [1] - 32:24
**investor** [4] - 23:18, 29:23, 33:5, 34:7
**investor's** [1] - 35:13
**investors** [19] - 7:3, 18:14, 21:22, 28:3, 28:19, 29:4, 29:9, 29:21, 30:12, 31:24, 32:3, 32:23, 34:23, 35:7, 36:15, 36:21, 39:23, 40:10, 45:21
**invests** [2] - 18:4, 18:5
**involving** [1] - 5:6
**ipso** [4] - 6:17, 12:4, 22:19, 24:4
**issue** [10] - 26:22, 36:4, 36:11, 37:25, 38:1, 39:6, 39:7, 39:21, 40:24, 44:8

**issues** [2] - 16:4, 37:4
**items** [2] - 28:11, 30:17

### J

**Jacob** [3] - 3:22, 4:5, 4:8
**JACOB** [2] - 1:19, 2:6
**JERSEY** [1] - 1:2
**Jersey** [1] - 2:4
**job** [2] - 20:19, 24:7
**John** [1] - 3:21
**JOHN** [1] - 2:3
**joined** [1] - 3:11
**JUDGE** [1] - 1:10
**Judge** [8] - 6:7, 13:23, 30:8, 42:8, 42:19, 44:7, 48:12
**judgement** [1] - 7:10
**judgment** [2] - 41:1, 41:5
**judgments** [1] - 5:6
**judicial** [1] - 8:10
**jury** [5] - 22:24, 37:10, 37:11, 40:25

### K

**Karen** [1] - 1:23
**Karp** [2] - 4:5, 4:8
**KARP** [3] - 1:19, 4:4, 4:8
**keep** [2] - 32:10, 36:11
**keeps** [1] - 48:8
**Kevin** [1] - 3:19
**KEVIN** [1] - 2:2
**kind** [4] - 18:6, 38:4, 48:20, 48:22
**knowing** [3] - 12:13, 12:16, 29:23
**knowingly** [1] - 7:20
**knowledge** [2] - 18:12, 25:15
**known** [1] - 26:22

### L

**lack** [1] - 16:4
**LAE** [3] - 42:16, 42:23, 42:24
**laid** [1] - 21:4
**language** [1] - 9:7
**large** [1] - 21:11
**larger** [2] - 21:21
**largest** [1] - 22:25
**last** [3] - 12:12, 12:13, 12:16
**LAW** [1] - 1:18
**law** [10] - 3:10, 27:10,

27:14, 29:1, 29:8, 29:16, 37:9, 42:5, 43:5, 43:6
**Law** [1] - 4:5
**law's** [1] - 27:17
**Lawrence** [2] - 2:11, 3:22
**laws** [7] - 5:1, 27:5, 27:14, 32:17, 34:14, 40:13, 43:14
**lawsuit** [1] - 33:3
**lay** [1] - 21:25
**lead** [1] - 3:10
**left** [5] - 14:10, 23:14, 40:25, 47:10
**lengthy** [1] - 48:5
**less** [2] - 14:24, 46:25
**letter** [2] - 38:22, 46:6
**letters** [1] - 26:7
**level** [1] - 24:8
**levels** [1] - 11:11
**liability** [3] - 8:11, 9:9, 33:18
**lied** [3] - 22:20, 31:9, 33:22
**lies** [2] - 36:19, 40:22
**life** [1] - 37:15
**light** [1] - 30:12
**limited** [2] - 5:15, 41:6
**Limited** [2] - 2:11, 3:23
**limitless** [1] - 41:13
**limits** [1] - 24:9
**line** [3] - 22:10, 22:11, 25:9
**lines** [5] - 19:6, 19:23, 20:7, 21:2, 46:11
**listen** [1] - 27:8
**literally** [1] - 12:1
**litigation** [1] - 5:12
**Litigation** [1] - 1:5
**live** [1] - 46:23
**LLP** [2] - 1:15, 2:5
**loan** [6] - 7:8, 7:9, 7:14, 7:21, 10:13, 43:20
**loans** [1] - 7:11
**look** [24] - 5:4, 7:25, 8:2, 8:4, 9:6, 10:16, 11:17, 12:3, 12:9, 13:22, 13:23, 13:24, 14:14, 17:21, 20:10, 21:18, 21:23, 22:12, 25:24, 26:11, 27:9, 38:9
**looked** [5] - 10:18, 28:10, 30:19, 34:18, 34:20
**looking** [12] - 7:6, 7:24, 11:15, 13:15,

15:9, 16:14, 17:24, 25:18, 37:4, 42:5, 42:7, 46:3
**lose** [1] - 6:6
**loses** [1] - 17:14
**loss** [94] - 4:22, 4:24, 5:5, 5:14, 5:18, 5:20, 5:23, 6:17, 6:18, 6:22, 7:8, 7:9, 7:14, 7:18, 7:19, 7:21, 8:13, 9:22, 10:8, 10:11, 10:13, 10:17, 11:12, 11:25, 12:3, 12:4, 14:11, 15:4, 15:20, 15:21, 15:23, 19:4, 19:20, 19:23, 20:7, 21:17, 22:19, 23:22, 24:2, 24:3, 24:4, 25:13, 26:11, 27:1, 27:8, 28:8, 28:13, 28:14, 28:23, 29:6, 29:23, 30:25, 31:12, 31:23, 31:25, 32:1, 32:12, 32:19, 34:6, 34:21, 35:10, 38:18, 40:15, 41:9, 41:11, 42:2, 43:20, 44:3, 44:11, 45:7, 45:8, 45:9, 45:10, 45:12, 45:13, 45:15, 45:16, 45:21, 45:22, 45:23, 46:7, 46:24
**losses** [9] - 4:25, 8:6, 13:14, 16:14, 42:15, 42:23, 42:24, 44:6, 45:14
**lost** [2] - 25:24, 46:11
**lower** [1] - 28:14
**Ltd** [1] - 1:5
**lump** [1] - 41:24
**lump-sum** [1] - 41:24
**lumping** [1] - 19:16

### M

**Madison** [1] - 2:7
**Maiden** [14] - 1:4, 2:11, 3:5, 3:23, 7:3, 21:25, 25:4, 25:7, 38:16, 38:21, 45:22, 46:6, 46:7, 46:9
**majority** [2] - 40:16, 40:17
**management** [1] - 11:10
**management's** [1] - 7:10
**manipulated** [2] - 15:14, 15:17
**MARIE** [1] - 1:9

**MARINO** [38] - 2:2, 2:2, 3:19, 4:1, 4:12, 4:17, 6:3, 6:7, 6:14, 11:6, 13:10, 18:18, 18:20, 19:4, 19:13, 20:5, 20:15, 24:19, 37:18, 41:10, 41:20, 42:8, 42:12, 42:15, 42:19, 42:22, 43:22, 44:4, 44:7, 44:9, 44:14, 44:18, 45:16, 45:19, 47:23, 48:1, 48:12, 49:7
**Marino** [13] - 3:19, 3:20, 4:3, 4:11, 4:14, 6:1, 6:5, 6:6, 18:16, 37:20, 42:17, 47:8, 47:12
**market** [2] - 17:1, 17:5
**material** [20] - 8:7, 21:8, 26:23, 29:17, 29:20, 30:11, 32:18, 34:6, 34:16, 34:21, 35:2, 35:11, 37:11, 40:13, 40:18, 40:19, 40:22, 43:12, 43:13
**materiality** [7] - 33:10, 35:3, 35:7, 35:15, 35:18, 36:20, 40:23
**matter** [7] - 7:9, 22:13, 23:9, 23:10, 26:24, 29:16, 30:11
**matters** [1] - 10:24
**MAY** [1] - 3:1
**mean** [20] - 8:23, 10:20, 12:10, 12:17, 17:18, 18:11, 30:7, 32:8, 33:21, 33:24, 35:5, 35:16, 36:14, 37:2, 39:7, 40:17, 41:15, 43:16, 44:12, 48:7
**means** [4] - 4:25, 5:14, 16:16, 34:21
**measurable** [1] - 10:14
**measured** [3] - 35:7, 36:20, 36:21
**mechanical** [1] - 1:25
**method** [3] - 5:19, 7:14, 7:15
**methodology** [4] - 6:23, 6:24, 10:8, 10:13
**Metz** [2] - 2:11, 3:23
**MICHAEL** [1] - 2:6
**Michael** [1] - 3:22
**middle** [1] - 12:14
**might** [3] - 7:11, 10:24, 34:6

**migration** [1] - 15:15
**mind** [2] - 38:20, 46:3
**mind-boggling** [1] - 46:3
**minutes** [1] - 25:2
**misled** [1] - 45:21
**misrepresentation** [1] - 8:18
**misrepresenting** [1] - 15:20
**missing** [2] - 48:14, 48:15
**misspeaking** [1] - 41:23
**misspoke** [1] - 24:22
**mistake** [1] - 16:17
**misunderstanding** [1] - 38:15
**mixed** [1] - 37:9
**model** [3] - 5:19, 14:12, 18:2
**modeling** [4] - 10:21, 11:16, 11:17, 17:17
**models** [4] - 9:23, 10:22, 11:1, 16:3
**modify** [1] - 9:13
**moment** [2] - 20:19, 36:9
**moments** [1] - 47:13
**Monday** [4] - 16:13, 22:16, 23:12, 39:13
**money** [3] - 12:24, 12:25, 22:5
**months** [2] - 38:11
**morning** [9] - 3:3, 3:9, 3:16, 3:19, 16:13, 22:16, 23:12, 24:21, 39:13
**most** [2] - 12:17
**motion** [10] - 4:19, 13:24, 35:17, 35:18, 35:21, 40:24, 41:4, 42:9, 47:24, 49:4
**motive** [3] - 13:6, 15:3
**move** [1] - 41:11
**MR** [98] - 3:9, 3:16, 3:19, 4:1, 4:4, 4:8, 4:12, 4:17, 6:3, 6:7, 6:8, 6:11, 6:14, 11:6, 13:10, 18:18, 18:20, 19:4, 19:13, 20:5, 20:15, 24:19, 24:20, 25:22, 26:2, 26:13, 26:16, 26:21, 27:12, 27:14, 27:17, 27:19, 27:21, 27:23, 28:6, 28:10, 28:13, 28:17, 29:10, 29:15, 30:1, 30:6, 30:8, 31:5, 31:20, 32:15, 32:22,

33:9, 33:16, 34:10, 34:12, 35:6, 35:17, 36:19, 37:2, 37:9, 37:17, 37:18, 37:19, 37:21, 38:5, 38:7, 38:14, 39:11, 39:20, 40:4, 40:6, 40:12, 41:10, 41:20, 42:8, 42:12, 42:15, 42:19, 42:22, 43:10, 43:16, 43:22, 43:24, 44:2, 44:4, 44:5, 44:7, 44:8, 44:9, 44:10, 44:14, 44:18, 44:23, 45:1, 45:6, 45:16, 45:19, 47:23, 48:1, 48:12, 49:7, 49:9
**multifactor** [1] - 15:14
**must** [1] - 46:22
**myopically** [1] - 25:18

### N

**nature** [1] - 45:25
**need** [3] - 9:18, 22:15, 38:18
**negligence** [1] - 39:18
**negligent** [1] - 16:10
**negligently** [1] - 16:12
**net** [1] - 42:24
**never** [7] - 12:6, 27:14, 32:11, 33:18, 35:13, 40:7, 43:14
**NEW** [1] - 1:2
**New** [2] - 2:4, 2:7
**new** [8] - 19:9, 19:12, 19:13, 19:22, 20:6, 20:19, 46:7, 46:12
**Newark** [1] - 1:21
**nice** [2] - 3:17, 36:15
**night** [1] - 17:15
**nighttime** [1] - 17:12
**NJ** [2] - 1:13, 1:21
**nonconformance** [1] - 10:12
**none** [1] - 21:9
**nonetheless** [1] - 31:7
**nonsense** [1] - 23:15
**notably** [1] - 25:14
**note** [1] - 43:13
**nothing** [10] - 6:20, 12:20, 13:11, 13:19, 14:8, 15:25, 17:7, 32:17, 43:18, 45:7
**notion** [2] - 6:16, 7:1
**nowhere** [1] - 5:22
**nuance** [1] - 35:24
**nuanced** [6] - 28:6, 29:15, 30:3, 30:5, 30:9, 46:15

**NUMBER** [1] - 1:4
**number** [2] - 3:6, 21:21
**numbers** [3] - 12:4, 22:18, 42:1
**NY** [1] - 2:7

### O

**objective** [4] - 7:9, 10:14, 17:15, 48:21
**obligation** [4] - 27:5, 28:2, 37:12, 41:13
**obligations** [1] - 11:13
**observer** [1] - 48:21
**obviously** [1] - 33:22
**occurred** [2] - 38:10, 38:24
**oddly** [1] - 38:23
**OF** [1] - 1:2
**offensive** [1] - 22:21
**Official** [1] - 1:23
**offs** [1] - 43:20
**Oklahoma** [1] - 15:9
**OLSTEIN** [1] - 1:12
**omission** [3] - 21:8, 37:11, 38:4
**Omnicare** [3] - 16:22, 23:6, 34:23
**one** [19] - 5:24, 11:16, 12:24, 13:2, 15:13, 17:20, 17:21, 24:4, 31:8, 31:18, 33:13, 35:25, 41:4, 41:8, 46:4, 48:5, 48:16, 48:21
**One** [1] - 1:20
**one-on-one** [1] - 24:4
**operations** [1] - 5:10
**opinion** [18] - 7:2, 7:10, 16:7, 16:23, 23:6, 26:22, 27:4, 28:14, 28:24, 30:23, 31:25, 32:5, 32:13, 33:14, 34:25, 35:4, 37:8
**opinions** [6] - 31:6, 31:16, 31:25, 33:15, 33:25, 36:18
**opportunity** [1] - 23:2
**opposite** [1] - 20:16
**oral** [4] - 3:13, 4:3, 48:11, 49:2
**ORAL** [1] - 1:6
**order** [1] - 25:10
**ordinary** [1] - 38:3
**outcome** [1] - 15:23
**outcome-determinative** [1] - 15:23

**outer** [1] - 24:9
**overall** [1] - 40:21
**overwhelming** [1] - 13:16
**own** [1] - 37:15

### P

**P.C** [2] - 1:12, 2:2
**p.m** [1] - 49:12
**Page** [7] - 8:5, 10:20, 11:6, 11:8, 11:9, 11:14, 42:10
**page** [2] - 11:5, 48:2
**Pages** [1] - 1:7
**pages** [1] - 48:10
**paid** [4] - 14:20, 22:3, 25:7, 42:24
**painted** [1] - 21:21
**Paragraph** [3] - 38:10, 42:5, 46:3
**paragraphs** [1] - 9:7
**pardon** [2] - 11:9, 41:22
**part** [6] - 5:6, 13:21, 28:2, 29:5, 31:10, 40:11
**particular** [2] - 17:10, 39:8
**particularity** [1] - 24:8
**particularized** [1] - 24:6
**particularly** [1] - 15:5
**parties** [2] - 4:19, 41:3
**PARTIES** [1] - 3:1
**partner** [1] - 3:21
**passed** [1] - 20:20
**past** [3] - 9:12, 9:13, 14:17
**patently** [1] - 22:22
**pause** [1] - 6:2
**Pause** [2] - 6:4, 6:13
**paying** [1] - 14:20
**payment** [1] - 26:19
**pending** [1] - 47:24
**penthouse** [1] - 15:7
**percent** [12] - 13:2, 13:3, 15:6, 22:1, 22:2, 23:22, 25:13, 25:20, 25:25, 27:7, 28:4
**perfectly** [1] - 49:1
**perform** [2] - 15:14, 15:17
**perhaps** [7] - 7:15, 11:3, 24:13, 35:24, 36:15, 37:25, 49:1
**period** [3] - 31:19, 42:25, 45:21
**permit** [1] - 17:9

**permitted** [1] - 19:25
**perspective** [1] - 24:1
**persuade** [1] - 36:13
**pertinent** [1] - 32:5
**picture** [2] - 21:19, 21:22
**piece** [1] - 22:4
**pitched** [1] - 17:11
**pitcher** [1] - 17:10
**place** [1] - 5:3
**plain** [3] - 8:12, 9:15, 12:10
**plainly** [2] - 5:4, 5:13
**plaintiff** [6] - 3:8, 20:12, 23:17, 33:2, 47:21, 49:5
**plaintiff's** [5] - 15:22, 34:3, 44:15, 47:14, 48:8
**Plaintiffs** [3] - 1:14, 1:17, 1:21
**plaintiffs** [14] - 3:8, 3:10, 3:14, 4:6, 4:10, 8:14, 10:6, 16:2, 16:5, 22:9, 26:9, 26:10, 36:14, 47:7
**planning** [2] - 14:2, 14:5
**pleading** [2] - 16:6, 31:10
**point** [12] - 6:15, 8:16, 10:2, 10:3, 20:20, 21:5, 22:25, 29:15, 38:14, 42:4, 44:1, 45:8
**pointed** [1] - 38:17
**pointing** [2] - 21:10, 40:14
**portion** [2] - 7:11, 21:25
**position** [2] - 18:23, 27:4
**possibly** [1] - 8:7
**potential** [1] - 23:18
**pre** [1] - 35:21
**pre-motion** [1] - 35:21
**precise** [1] - 47:10
**precludes** [1] - 32:17
**predicting** [1] - 17:13
**prediction** [1] - 7:4
**prejudice** [1] - 23:2
**premium** [1] - 25:6
**premiums** [1] - 22:2
**prepared** [2] - 16:9, 16:11
**PRESENT** [1] - 2:10
**presented** [2] - 21:19, 43:1
**press** [1] - 28:16
**pretty** [2] - 26:9, 46:3

**previously** [1] - 21:6
**problem** [4] - 24:8, 35:19, 35:20, 39:25
**problems** [1] - 43:18
**Proceedings** [1] - 1:25
**process** [6] - 5:5, 5:7, 7:21, 8:20, 17:17, 29:2
**processes** [2] - 29:9, 29:11
**produced** [1] - 1:25
**profit** [1] - 25:11
**projections** [2] - 5:8, 8:8
**prong** [1] - 34:23
**proof** [2] - 13:5, 13:6
**properly** [1] - 14:22
**proposition** [1] - 30:10
**prospectus** [2] - 18:7, 23:20
**prove** [2] - 12:19, 36:24
**proved** [1] - 12:19
**proven** [1] - 7:15
**provide** [2] - 20:22, 32:23
**provision** [1] - 11:12
**public** [1] - 12:2
**publicly** [1] - 29:16
**pure** [1] - 22:1
**purpose** [1] - 14:24
**purposes** [3] - 14:2, 14:5, 14:25
**pursuant** [1] - 25:5
**put** [3] - 9:18, 22:9, 23:13
**puts** [1] - 30:12
**putting** [1] - 13:5

### Q

**quarter** [5] - 12:12, 12:13, 12:14, 12:16, 23:14
**quarterback** [2] - 22:17, 23:13
**quarterbacking** [2] - 16:14, 39:14
**questions** [3] - 4:16, 10:4, 24:13
**quick** [1] - 6:2
**QUINN** [1] - 2:5
**Quinn** [1] - 3:21
**quite** [2] - 5:4, 48:6
**quote** [7] - 7:7, 7:16, 10:20, 15:12, 16:3, 25:5, 46:5
**quotes** [1] - 8:1

## R

raise [1] - 14:18
raised [2] - 14:18, 15:1
raising [1] - 14:20
ran [1] - 13:15
ratio [19] - 25:13, 27:8, 28:8, 28:13, 28:14, 29:24, 30:25, 31:12, 31:23, 31:25, 34:22, 41:9, 41:11, 45:9, 45:10, 45:11, 45:13, 45:15, 45:16
rationally [1] - 29:22
ratios [17] - 4:22, 6:17, 22:19, 25:24, 26:11, 27:1, 28:23, 29:6, 32:19, 34:6, 44:3, 44:11, 45:7, 45:8, 45:10, 45:13, 45:22
Rauschbaum's [1] - 14:3
re [1] - 3:5
Re [1] - 1:4
read [9] - 4:13, 4:18, 4:19, 18:9, 20:17, 20:18, 26:6, 48:21
reading [3] - 11:14, 13:13
reality [3] - 23:25, 46:21, 47:2
really [32] - 9:3, 9:5, 10:16, 10:18, 12:12, 17:2, 17:25, 18:1, 20:18, 21:13, 21:15, 21:23, 22:13, 24:7, 25:25, 27:7, 28:4, 28:16, 30:4, 30:24, 31:18, 34:3, 35:23, 35:24, 36:5, 37:24, 44:17, 46:15, 48:6, 48:19
reason [1] - 23:4
reasonable [2] - 11:12, 32:4
reasonably [1] - 15:13
recent [2] - 12:17, 12:18
recently [1] - 13:23
recklessly [1] - 16:7
record [1] - 3:5
recorded [1] - 1:25
red [2] - 30:2, 45:2
reduce [1] - 4:21
refer [3] - 9:7, 11:20, 12:9
reference [1] - 11:25
references [1] - 8:2
referring [1] - 19:2

reflect [3] - 7:10, 19:23, 20:7
reflected [1] - 19:5
reflects [1] - 19:21
regard [1] - 45:9
regarding [4] - 34:21, 35:15, 38:16, 40:23
regardless [2] - 33:6, 33:18
Regions [1] - 7:7
registration [2] - 18:6, 23:19
regulation [1] - 18:17
regulatory [3] - 5:11, 30:21, 34:8
reign [3] - 36:3, 36:11, 37:13
reinsurance [5] - 18:4, 22:1, 42:24, 42:25, 46:12
related [2] - 5:2, 34:16
relationship [2] - 6:17, 24:5
relevant [3] - 35:16, 36:5, 36:18
relied [2] - 33:23, 34:9
relief [1] - 46:20
rely [1] - 8:14
remarkable [1] - 14:23
remember [1] - 18:5
render [1] - 29:18
rendered [2] - 8:17, 8:18
RENÉE [1] - 1:9
replead [1] - 23:2
reply [1] - 32:20
Reporter [1] - 1:23
reporting [2] - 19:14, 21:6
represents [2] - 42:12, 42:22
request [1] - 38:20
require [1] - 20:6
required [6] - 6:18, 19:9, 38:22, 43:1, 46:10, 46:13
res [1] - 16:25
reserve [7] - 10:12, 10:13, 11:11, 15:20, 26:11, 42:1, 49:4
reserves [39] - 4:23, 4:24, 5:5, 5:14, 5:18, 5:20, 5:23, 6:18, 6:22, 7:8, 7:9, 7:15, 7:18, 7:20, 7:21, 8:7, 8:13, 8:21, 9:22, 10:8, 12:1, 12:3, 12:5, 14:11, 15:4, 15:11, 15:21, 15:23, 16:4, 16:15, 16:18,

17:25, 21:18, 23:23, 24:3, 29:13, 45:22, 46:10
reserving [3] - 5:7, 21:20, 47:23
resolution [3] - 16:24, 17:1, 17:5
resolve [1] - 36:11
respect [3] - 14:3, 26:13, 34:12
respectfully [1] - 34:13
respectively [1] - 15:6
respond [2] - 45:17, 48:9
response [4] - 18:19, 33:21, 38:20, 49:5
restate [1] - 10:4
restroom [1] - 6:9
results [1] - 11:2
retained [2] - 13:2, 13:3
revealing [1] - 21:20
revenues [2] - 40:17, 40:18
review [2] - 5:7, 19:17
reviewed [1] - 11:11
revised [1] - 18:24
riding [1] - 21:12
rise [1] - 15:2
risk [4] - 18:13, 22:1, 29:12
Road [1] - 1:13
Robbins [1] - 3:11
ROBBINS [1] - 1:15
rode [2] - 13:17, 15:6
roseland [1] - 1:13
ROSEN [1] - 1:18
Rosen [1] - 4:5
rosier [2] - 21:19, 21:21
rub [3] - 26:24, 36:19, 40:23
RUDMAN [1] - 1:15
Rudman [1] - 3:12
rule [16] - 18:24, 19:9, 19:12, 19:13, 19:22, 19:25, 20:6, 20:17, 20:22, 27:11, 33:17, 38:25, 39:3, 46:17
rules [5] - 20:20, 20:22, 38:18, 46:8, 46:13

## S

safe [1] - 49:10
sale [3] - 14:9, 36:8, 37:25
sales [11] - 12:23,

12:25, 13:20, 14:3, 14:15, 14:17, 14:23, 38:3, 38:10, 38:24, 39:3
San [1] - 1:17
sands [3] - 44:13, 46:3, 47:13
sat [3] - 30:18, 30:19
satisfied [1] - 39:13
save [1] - 8:15
scenario [1] - 16:12
scheme [1] - 40:21
Schmidt [1] - 14:4
science [1] - 18:3
scienter [4] - 13:6, 37:22, 37:25, 39:21
scores [2] - 12:1, 14:6
SDNY [1] - 16:1
SEC [14] - 14:2, 19:8, 20:3, 20:9, 20:14, 20:18, 27:13, 38:17, 38:22, 39:1, 46:6, 46:7, 46:9
SEC's [2] - 19:9, 38:20
Second [1] - 7:6
second [6] - 11:4, 21:5, 29:1, 37:24, 43:8, 44:4
secret [1] - 48:13
Section [7] - 18:7, 18:8, 22:14, 24:23, 24:24
securities [13] - 4:25, 22:14, 27:5, 30:3, 30:5, 30:13, 31:3, 32:17, 33:25, 34:14, 37:8, 39:18, 40:12
Securities [1] - 1:5
see [16] - 3:3, 3:17, 4:20, 11:9, 20:24, 21:2, 31:3, 36:7, 36:15, 36:16, 38:18, 39:5, 48:14, 48:16, 48:22, 49:4
seem [1] - 26:10
sees [1] - 17:23
segment [2] - 42:25, 46:12
sell [1] - 37:6
sense [2] - 12:7, 16:19
sent [1] - 46:6
sentence [3] - 31:18, 48:5, 48:6
sentences [2] - 47:22
separate [1] - 38:22
September [1] - 20:9
serious [1] - 16:4
set [8] - 4:2, 6:18, 8:13, 15:4, 16:3, 17:25, 21:16, 29:2

setting [5] - 4:22, 5:18, 7:14, 16:18, 25:3
settling [1] - 9:10
severity [3] - 5:10, 8:10, 9:24
shall [2] - 9:9, 38:7
shape [1] - 23:18
Shapiro [1] - 7:13
share [3] - 13:16, 25:5, 39:22
shareholders [1] - 36:25
shares [2] - 14:1, 14:5
sharing [1] - 34:22
sharp [1] - 32:13
sheds [1] - 30:12
shift [1] - 47:16
shifted [2] - 47:10, 48:22
shifting [3] - 44:13, 46:2, 47:13
shortcut [1] - 37:23
show [2] - 14:7, 35:3
showed [1] - 31:19
showing [1] - 21:1
shown [1] - 31:20
shows [1] - 30:16
side [2] - 37:4, 37:6
significance [2] - 23:9, 23:10
significantly [1] - 11:3
simple [7] - 17:14, 19:19, 23:5, 27:4, 33:10, 35:25, 41:8
simply [6] - 5:1, 6:15, 7:23, 27:6, 29:15, 39:12
single [7] - 4:21, 7:14, 14:22, 19:6, 19:21, 33:5, 45:8
sitting [1] - 35:12
situation [2] - 8:16, 12:10
Sjunde [1] - 16:1
Sjunde-AP [1] - 16:1
sky [1] - 20:23
slowed [1] - 39:2
Smith [13] - 3:12, 3:13, 3:15, 4:10, 6:8, 24:18, 28:15, 32:25, 43:9, 44:1, 44:12, 44:20, 44:21
SMITH [58] - 1:16, 3:16, 24:20, 25:22, 26:2, 26:13, 26:16, 26:21, 27:12, 27:14, 27:17, 27:19, 27:21, 27:23, 28:6, 28:10, 28:13, 28:17, 29:10,

29:15, 30:1, 30:6, 30:8, 31:5, 31:20, 32:15, 32:22, 33:9, 33:16, 34:10, 34:12, 35:6, 35:17, 36:19, 37:2, 37:9, 37:17, 37:19, 37:21, 38:5, 38:7, 38:14, 39:11, 39:20, 40:4, 40:6, 40:12, 43:10, 43:16, 43:24, 44:2, 44:5, 44:8, 44:10, 44:23, 45:1, 45:6, 49:9

**snapshot** [1] - 39:5
**social** [2] - 5:10, 9:25
**societal** [1] - 9:11
**sold** [3] - 13:14, 14:1, 14:5
**solely** [2] - 20:3, 34:3
**someone** [3] - 17:4, 18:4, 18:5
**sometimes** [1] - 17:19
**somewhat** [1] - 34:17
**sorry** [11] - 3:4, 4:4, 6:1, 6:7, 19:15, 27:23, 42:6, 42:8, 42:19, 44:7, 48:12
**sort** [10] - 6:16, 11:16, 15:3, 20:12, 20:23, 21:1, 30:2, 35:5, 37:15, 38:1
**sought** [1] - 19:8
**sound** [1] - 39:17
**sounds** [7] - 29:3, 34:4, 34:11, 39:17, 39:18, 44:13
**Southern** [2] - 2:3, 15:10
**speaking** [2] - 27:24, 44:8
**specific** [1] - 9:23
**specifically** [2] - 9:7, 46:9
**speculation** [1] - 34:9
**spell** [3] - 27:18, 27:20, 27:21
**spelling** [1] - 27:24
**spells** [1] - 34:24
**spend** [1] - 25:2
**staff** [1] - 11:10
**stage** [1] - 35:17
**stands** [1] - 30:10
**start** [7] - 3:7, 5:4, 7:1, 11:8, 12:9, 23:12, 37:2
**starter** [1] - 23:14
**state** [5] - 8:17, 8:18, 9:4, 27:4, 46:20
**statement** [12] - 12:15, 16:7, 16:22, 18:6,

23:6, 23:19, 26:24, 29:19, 30:13, 33:21, 45:3
**statements** [7] - 5:3, 9:18, 18:10, 26:19, 33:18, 45:9
**STATES** [2] - 1:2, 1:10
**states** [2] - 47:19, 48:3
**stating** [1] - 31:25
**statistical** [1] - 5:8
**status** [1] - 32:1
**stay** [2] - 22:15, 49:10
**stenography** [1] - 1:25
**step** [3] - 20:11, 21:23, 26:17
**stepped** [1] - 6:9
**stick** [1] - 47:1
**still** [2] - 30:22, 31:15
**stock** [12] - 12:23, 12:25, 13:3, 13:20, 14:9, 14:15, 14:17, 14:23, 15:6, 21:12, 36:9, 38:24
**stockholders** [1] - 21:12
**stocks** [3] - 13:16, 37:25, 38:3
**stop** [2] - 33:2
**story** [1] - 8:24
**strong** [4] - 12:12, 18:22, 18:23, 40:19
**strongly** [2] - 23:3, 23:4
**struggling** [1] - 35:1
**subjective** [3] - 5:6, 7:19, 10:11
**submissions** [2] - 4:14, 4:19
**succeed** [2] - 22:6, 22:7
**suffers** [1] - 47:2
**sufficient** [2] - 4:24, 45:5
**suggest** [2] - 21:13, 42:4
**suggesting** [2] - 33:17, 35:9
**suggestion** [4] - 13:14, 15:2, 34:18, 42:3
**Suite** [2] - 1:16, 1:20
**SULLIVAN** [1] - 2:5
**sum** [1] - 41:24
**summarize** [1] - 4:15
**summary** [2] - 41:1, 41:4
**summed** [1] - 47:8
**sums** [1] - 47:13
**supplemental** [1] -

20:8
**supplementary** [1] - 43:2
**support** [3] - 18:22, 18:23, 42:9
**suppose** [1] - 35:5
**Supreme** [3] - 16:21, 26:21, 34:24

---

## T

**table** [5] - 25:3, 42:12, 42:22, 45:7, 45:12
**tax** [3] - 14:2, 14:5, 14:25
**techniques** [5] - 10:21, 10:22, 11:16, 11:20, 11:22
**television** [3] - 16:24, 17:1, 17:5
**terms** [9] - 27:16, 27:18, 27:20, 27:21, 27:24, 29:11, 29:12, 37:24, 39:10
**test** [1] - 33:8
**THE** [2] - 1:2, 1:9
**The Court** [91] - 3:3, 3:15, 3:17, 3:25, 4:2, 4:7, 4:9, 4:13, 6:1, 6:5, 6:10, 6:12, 10:9, 11:5, 13:7, 18:11, 18:19, 19:3, 19:11, 20:2, 20:12, 24:16, 25:17, 25:20, 25:23, 26:3, 26:5, 26:15, 26:20, 27:10, 27:13, 27:16, 27:18, 27:20, 27:22, 27:25, 28:9, 28:12, 28:15, 28:18, 29:14, 29:25, 30:2, 30:7, 30:15, 31:6, 32:14, 32:21, 32:25, 33:11, 33:20, 34:11, 35:1, 35:16, 35:19, 36:23, 37:7, 37:13, 37:20, 37:23, 38:6, 38:13, 39:4, 39:12, 39:24, 40:5, 40:9, 41:2, 41:18, 42:6, 42:11, 42:14, 42:17, 42:20, 43:7, 43:15, 44:1, 44:12, 44:15, 44:20, 44:25, 45:4, 45:18, 47:5, 47:9, 47:18, 47:25, 48:2, 48:13, 49:8, 49:10
**themselves** [1] - 11:21
**theories** [1] - 8:11
**theory** [1] - 48:8
**therefore** [2] - 24:4, 24:5

**they've** [6] - 32:19, 33:22, 33:23, 47:10
**thicket** [2] - 22:9, 23:12
**thinking** [1] - 29:2
**Third** [2] - 7:13, 30:10
**this-therefore-that** [1] - 24:4
**thoughts** [1] - 36:1
**three** [3] - 34:23, 47:21, 47:22
**throughout** [1] - 45:20
**Thursday** [1] - 1:8
**tied** [1] - 3:4
**timeframe** [1] - 20:18
**timing** [5] - 13:9, 14:7, 14:8, 14:24, 38:2
**today** [3] - 3:11, 20:17, 35:12
**together** [3] - 19:16, 22:9, 30:4
**took** [1] - 9:22
**topic** [3] - 34:15, 34:16, 43:12
**TOR** [1] - 1:15
**Tor** [1] - 3:12
**TORTORELLA** [2] - 2:2, 2:3
**Tortorella** [2] - 3:20, 3:21
**totally** [1] - 46:19
**transcript** [2] - 1:25, 48:21
**transcription** [1] - 1:25
**transmogrify** [1] - 17:16
**transparent** [3] - 43:20, 43:22, 44:16
**trends** [9] - 5:9, 5:11, 8:10, 9:13, 9:23, 9:24, 9:25, 30:21, 34:7
**triangle** [2] - 43:18, 44:2
**tried** [2] - 21:13, 22:7
**Trig** [1] - 3:12
**TRIG** [1] - 1:16
**trigger** [1] - 27:5
**troubled** [2] - 21:16, 34:17
**true** [4] - 13:10, 29:19, 29:20, 33:21
**truth** [1] - 15:25
**try** [5] - 9:1, 42:4, 42:11, 42:17, 48:23
**trying** [5] - 8:15, 16:20, 17:16, 20:20, 39:8
**tune** [1] - 43:19

**turn** [2] - 12:22, 37:21
**two** [5] - 13:1, 15:5, 21:11, 30:4, 34:20
**type** [1] - 14:21
**types** [2] - 33:18, 36:25
**Tyre** [2] - 4:5, 4:8
**TYRE** [3] - 1:19, 4:4, 4:8
**Tyre-Karp** [2] - 4:5, 4:8
**TYRE-KARP** [3] - 1:19, 4:4, 4:8

---

## U

**ultimate** [1] - 9:10
**ultimately** [4] - 7:11, 35:11, 43:19, 47:3
**unable** [1] - 14:14
**unaudited** [1] - 43:1
**uncertain** [1] - 11:18
**uncertainty** [4] - 10:21, 11:15, 11:20, 11:21
**unclear** [1] - 27:23
**undefined** [1] - 41:13
**under** [5] - 15:2, 23:6, 24:24, 27:5, 34:15
**Underland** [2] - 10:3, 10:5
**underlined** [1] - 41:6
**undermines** [1] - 11:23
**understate** [1] - 11:1
**understated** [1] - 15:11
**undisclosed** [1] - 45:23
**unfair** [1] - 26:14
**UNITED** [2] - 1:2, 1:10
**unlawful** [1] - 21:7
**unless** [1] - 18:14
**unlike** [3] - 8:14, 10:9, 10:11
**unpaid** [2] - 9:9, 11:12
**untrue** [2] - 8:18, 22:22
**unusual** [1] - 14:8
**up** [10] - 3:4, 9:1, 12:1, 28:20, 30:2, 30:22, 31:15, 40:16, 47:8, 47:13
**upper** [2] - 27:2
**urge** [2] - 23:3, 23:4
**URQUHART** [1] - 2:5
**utter** [1] - 31:25
**uttering** [1] - 32:13

---

| V | Z |
|---|---|
| **vacuum** *[1] - 25:19*<br>**vagaries** *[1] - 23:5*<br>**validation** *[1] - 16:5*<br>**value** *[1] - 22:3*<br>**variables** *[1] - 5:6*<br>**variety** *[1] - 10:24*<br>**various** *[1] - 5:9*<br>**vast** *[2] - 40:16, 40:17*<br>**versus** *[3] - 7:7, 10:5, 16:2*<br>**VIDEOCONFERENC E** *[1] - 3:1*<br>**view** *[1] - 21:17*<br>**violated** *[2] - 4:25, 9:17* | **ZOOM** *[1] - 3:1* |

**W**

**wait** *[5] - 6:10, 21:5, 42:6, 43:7, 44:12*
**WALDMAN** *[1] - 2:6*
**Waldman** *[1] - 3:22*
**well-known** *[1] - 26:22*
**West** *[1] - 1:16*
**whatsoever** *[2] - 5:17, 17:7*
**whole** *[2] - 21:16, 22:11*
**wins** *[1] - 17:14*
**withheld** *[1] - 30:16*
**withhold** *[2] - 30:11, 43:13*
**withholding** *[3] - 29:17, 29:20, 40:13*
**witness** *[3] - 8:19, 15:16, 15:19*
**witnesses** *[1] - 15:12*
**Wolfson** *[1] - 13:23*
**won** *[1] - 17:10*
**word** *[2] - 30:9, 46:25*
**words** *[4] - 5:13, 6:21, 10:15, 41:23*
**worst** *[1] - 16:11*
**worst-case** *[1] - 16:11*
**write** *[1] - 43:20*
**write-offs** *[1] - 43:20*
**wrongdoing** *[1] - 14:15*

**Y**

**years** *[3] - 25:24, 26:11, 39:6*
**yielded** *[1] - 7:21*
**York** *[1] - 2:7*