[Dkt. No. 61, 74]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| MICHAEL WIGGLESWORTH, | Civil Action No. 19-5296 (RMB/SAK) |
| Plaintiff, | |
| v. | **OPINION** |
| MAIDEN HOLDINGS, LTD. et al | |
| Defendants. | |

**BUMB**, District Judge

This matter comes before the Court upon a Motion by Defendants Maiden Holdings, Ltd. ("Maiden"), Arturo M. Raschbaum ("Raschbaum"), Karen L. Schmitt ("Schmitt"), and John M. Marshaleck ("Marshaleck")[1] to dismiss the Amended Complaint filed by lead Plaintiffs Boilermaker-Blacksmith National Pension Trust and Taishin International Bank Co. Ltd. ("Plaintiffs"), pursuant to Federal Rule of Civil Procedure 9(b), 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the reasons set forth below, Defendants' motion will be denied, in part. The Court will allow the matter to proceed on a narrow basis as described herein.

**I.   Background**

**A.   Procedural History**

Plaintiff Michael Wigglesworth commenced this action on February 11, 2019,

---

[1] Marshaleck, Raschbaum, and Schmitt are referred to herein as the "Individual Defendants," and the Individual Defendants and Maiden are referred to collectively as the "Defendants."

alleging claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, as well as Section 20(a) of the Exchange Act alleging control-person liability against all Defendants. [Dkt. No. 1, ¶¶ 109, 114]. The Court appointed Plaintiffs Boilermaker-Blacksmith National Pension Trust and Taishin International Bank Co., Ltd. as lead plaintiffs on February 19, 2020. [Dkt. No. 35]. More than a year later, Plaintiffs filed an Amended Complaint on May 1, 2020. [Dkt. No. 43].

After a pre-motion conference on July 28, 2020, in accordance with this Court's Rules and Procedure, Defendants filed this Motion to Dismiss the Amended Complaint on September 11, 2020. [Dkt. No. 61]. Plaintiffs responded in opposition on October 26, 2020 [Dkt. No. 65], and Defendants filed a reply brief on November 23, 2020. [Dkt. No. 69]. The parties appeared before the Court for oral argument via Zoom on May 13, 2021. [Dkt. No. 75, 76]. At the conclusion of oral arguments and concerned that Plaintiffs had either failed to state a claim or that their claims were "moving targets," the Court requested supplemental briefing from the parties. Specifically, because it was difficult to ascertain Plaintiffs' allegations, the Court ordered Plaintiffs to summarize their claim in three sentences and to submit a brief of no more than five pages supporting the allegations that constitute their claims. [Dkt. No. 75]. Plaintiffs filed a supplemental brief on May 24, 2021 [Dkt. No. 77] and Defendants filed a supplemental letter in response on June 3, 2021.[2] [Dkt. No. 80].

**B. The Amended Complaint**

Distilled to its essence, and as best this Court can ascertain even after numerous

---

[2] The Court reserved its decision on the Motion to Dismiss pending these supplemental filings.

conferences and an amendment to the pleadings, Plaintiffs assert in their one-hundred twenty-nine page Amended Complaint essentially two broad allegations against Defendants: a violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for failure to disclose certain historical loss ratios that differed from their current loss reserves (described more fully below), and a violation of Section 20(a) of the Exchange Act as a result of alleged stock sales by Defendant Maiden executives. Amended Complaint at ¶¶ 215, 220. As common stockholders of Defendant Maiden Holdings, Ltd., Plaintiffs bring these claims after the price of Maiden's stock, which at one time was an allegedly promising and lucrative holding, suffered a dramatic loss of value between February 2017 and November 2018. *Id.* at ¶ 17.

According to the Amended Complaint, Maiden was founded by George Karfunkel, Michael Karfunkel, and Barry Zyskind as a reinsurance provider in 2007. *Id.* at ¶ 3. At the time of Maiden's founding, these three individuals were also executive officers and directors of a separate insurance business, AmTrust Financial Services, Inc. ("AmTrust"). *Id.* To supplement its business with other customers, Maiden entered into an agreement with AmTrust in 2007 where Maiden would receive roughly 40% of certain premiums paid by AmTrust insurance customers, and in return, Maiden would pay AmTrust a commission based on the volume of the premiums and assume 40% of the liabilities associated with the policies. *Id.* at ¶ 4. Essentially, Maiden agreed to absorb the liabilities of AmTrust customers for a fee, and consequently took on the duty to reimburse those customers if actionable insurance events and claims occurred. Described in the Amended Complaint as the "AmTrust Quota Share Agreement." Plaintiffs' allegations of malfeasance primarily stem from this arrangement.

Plaintiffs rely heavily on the alleged significance of the AmTrust Quota Share Agreement and the Maiden – AmTrust business relationship in general throughout their briefing, arguing that the quota sharing agreement with AmTrust accounted for 72% of Maiden's total earned revenue by 2016. *Id.* at ¶ 5. It is the significance of the AmTrust arrangement to Maiden's overall business, Plaintiffs argue, that leads to the central issue in this case: the calculation of loss reserves. Loss reserves represent the amount of money held by an insurer to cover its liability for unpaid losses and loss adjustment expenses that may, or may not, occur over time. Loss ratios "are measures of an insurance company's estimated incurred claim losses relative to the net premiums earned on the same policies." *Id.* at ¶ 50. Although Plaintiffs are highly critical of Defendant's calculations of loss reserves, Plaintiffs themselves acknowledge that such a task for a business like Maiden comes with a certain amount of educational guesswork. It is a complicated exercise that is, at once, both backward and forward-looking. Looking backward, loss ratios from past accident years (the year an insured loss occurs) reflect the average amount of incurred losses relative to net premiums earned on the same insurance policies. Evaluating this historic information—along with other data—aids a business in determining its estimated loss ratios for the forthcoming year. This process, in turn, informs the amount of loss reserves set aside by the business.

In general, Plaintiffs argue that Maiden committed securities fraud and violated the Exchange Act by making untrue statements and omitting material information regarding Maiden's loss reserve methodology and the historical loss ratios related to the AmTrust business. *Id.* at ¶ 120. Specifically, Plaintiffs allege that Defendants failed to establish a loss reserve amount reflective of, or theoretically based upon, AmTrust's historical loss data.

According to Plaintiffs, by establishing and using a different, lower, estimated loss ratio amount, Defendants showed that they were "motivated to understate Maiden's loss reserves against the AmTrust business in order to inflate the Company's net income, overstate its profitability ratios and create the appearance that it was well-capitalized." *Id.* at ¶ 6. Because AmTrust was such a large part of Maiden's business, and because Maiden possessed AmTrust's historical financial information (including previous loss reserve amounts and historical loss ratios), Plaintiffs argue that Maiden should have known that a higher amount of loss reserves was required to insulate the business from potential future risk.

More pointedly, Plaintiffs argue that Defendants should have disclosed the historical loss ratios of the AmTrust book of business. It is this sole allegation that appears to be Plaintiffs' theory of the case. "The Exchange Act Required them [Defendants] to disclose the material, adverse historical data of which they had actual knowledge and which is identified in the Complaint." Supplemental Briefing, Dkt. No. 77 at page 1. Notably, Plaintiffs "do not allege that Defendants were not allowed to use the lower loss ratios." Rather, Plaintiffs argue that the historical loss ratios related to the AmTrust book of business constituted material information required by the Exchange Act[3] to be disseminated to shareholders. *Id.*

---

[3] *See* Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.")

Plaintiffs build on their theory of the case with inferences upon inferences. As described below, the Amended Complaint is scant on facts and full of generalizations. "Defendants had access to and knowledge of historical loss data clearly indicating that Maiden's reserve approach with respect to the AmTrust book of business was unreasonably aggressive, inconsistent, failed to provide adequate reserves and, thus, violated GAAP." Amend. Compl. at ¶ 86. Plaintiffs go so far as to acknowledge the thinness of their case, advising that "viewing the facts holistically, the inference of fraudulent intent is at least equally as cogent and compelling as any non-culpable inference...The inference that Defendants chose not to disclose the historical loss data because it contradicted Maiden's reported loss ratios is at least as cogent and compelling as any non-fraudulent inference." *Id.* at ¶ 4. How Plaintiffs attempt to state their case is described as follows.

1. **Historical Loss Data**

Plaintiffs allege that Defendants "made false and misleading statements to investors, claiming that its reserves, profitability ratios and reserving methodologies for the AmTrust business were adequate, prudent and disciplined." *Id.* at ¶ 8. The basis of their claim is a disparity between the historical loss ratios for AmTrust insurance claims, which were between 70% and 80%, and the estimated loss ratios set by Maiden for AmTrust claims after entering the arrangement in 2007, which were in the 50% range. *Id.* This disparity, according to Plaintiffs, reflects an "intentional or reckless under-reporting of loss reserves" that is the central tenet of their argument. *Id.* at ¶ 9. Plaintiffs argue that "[w]hen Maiden does not establish an adequate loss reserve, or improperly reduces existing reserves that are required to adequately provide for losses on insured risks, it is overstating its net income and understating liabilities. If any of Maiden's loss reserves are inadequate, it is required to

increase them, resulting in a commensurate reduction in net income in the period in which the inadequacy is identified and corrected." *Id.* at ¶ 25.

Within the Amended Complaint, Plaintiffs supply a number of charts to illustrate this claim. According to Plaintiffs, "[a]s the pink shading in the consolidated table below reflects, Defendants had grossly underestimated their AmTrust reserves between 2012 and 2018 (in $1,000s):"

| AmTrust QS - Sum of Disclosed Biz Lines Accident Year | Adverse (Favorable) Development | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2012 - 2018 |
| 2008 | $ 7,801 | $ 2,997 | $ 799 | $ 1,588 | $ 3,778 | $ 1,277 | $ 1,925 | $ 20,165 |
| 2009 | $ 21,003 | $ (3,756) | $ 10,759 | $ (301) | $ 946 | $ 4,134 | $ 2,964 | $ 35,749 |
| 2010 | $ 28,108 | $ 23,473 | $ (4,617) | $ 9,602 | $ (828) | $ 5,783 | $ 4,372 | $ 65,893 |
| 2011 | $ 16,392 | $ 40,639 | $ 25,018 | $ (3,535) | $ 22,384 | $ 5,616 | $ 4,044 | $ 110,558 |
| 2012 | | $ 60,347 | $ 22,503 | $ 33,754 | $ (7,363) | $ 8,349 | $ 40,372 | $ 157,962 |
| 2013 | | | $ 33,707 | $ 35,380 | $ 30,181 | $ 25,083 | $ 45,215 | $ 169,566 |
| 2014 | | | | $ 1,926 | $ 51,686 | $ 73,403 | $ 74,841 | $ 201,856 |
| 2015 | | | | | $ 4,462 | $ 101,751 | $ 59,929 | $ 166,142 |
| 2016 | | | | | | $ 54,318 | $ 105,122 | $ 159,440 |
| 2017 | | | | | | | $ 92,029 | $ 92,029 |
| 2018 | | | | | | | N/A | N/A |
| Total (CY) | $ 73,304 | $ 123,700 | $ 88,169 | $ 78,414 | $ 105,246 | $ 279,714 | $ 430,813 | $ 1,179,360 |

Amend. Compl. at ¶ 58.

Read left to right, the bottom row of the chart reflects that "the magnitude of the adverse developments experienced by Maiden between 2012 and 2018 ranged anywhere from $73 million for the year ended 2012, to $430 million during 2018." *Id.* These "adverse developments" refer to expenditure charges made by Maiden to cover client insurance payouts. *See* Amend. Compl. at 9 ("*i.e.,* charges to reflect the fact that its loss reserves for prior years were deficient.") In short, the chart allegedly shows the amount of required payouts growing substantially over time between 2012 and 2018. Plaintiffs do not provide an explanation for the green shading, but the math suggests that those entries represent positive instances where insurance premiums superseded payouts.

Plaintiffs also provide a chart that details the historical loss ratios for the AmTrust book of business between 2011 and 2017.

| AmTrust QS: WC, CA, GL & Other SC/SP | Incurred Loss + LAE/Earned Premiums, as of December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| Accident Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2008 | 68.5% | 71.7% | 72.9% | 73.2% | 73.9% | 75.4% | 76.0% |
| 2009 | 62.0% | 70.4% | 68.9% | 73.2% | 73.0% | 73.4% | 75.1% |
| 2010 | 59.5% | 69.8% | 78.3% | 76.6% | 80.1% | 79.8% | 81.9% |
| 2011 | 50.9% | 65.4% | 74.8% | 78.5% | 78.2% | 79.6% | 82.2% |
| 2012 | | 48.6% | 63.3% | 69.2% | 71.8% | 72.8% | 76.1% |
| 2013 | | | 52.1% | 55.4% | 60.5% | 62.1% | 67.2% |
| 2014 | | | | 55.3% | 55.2% | 60.4% | 67.6% |
| 2015 | | | | | 55.9% | 56.3% | 63.2% |
| 2016 | | | | | | 56.4% | 59.6% |
| 2017 | | | | | | | 62.1% |

Amend. Compl. at ¶ 69.

Plaintiffs argue that "[a]s the above-table demonstrates, by reading accident year rows from left to right, it is clear that Defendants knew of or claimed to have access to data showing a clear pattern that incurred losses for each accident year in the AmTrust book of business would eventually balloon from the low-to mid-50% range in the first year or two of a particular accident year claims process, to the 70% to 80% range as the Company obtained more historical information regarding the true loss profile of the AmTrust book of business. As of December 31, 2013, for example, Defendants had data indicating that prior accident year loss ratios (that is, 2008 through 2012), were actually in the range of 63.3% to 78.3%. Amend. Compl. at ¶ 70. As indicated by the chart, loss ratio percentages increased as more time passed from the initial accident year. As they suggest, "Maiden had a consistent pattern of establishing artificially low loss reserves in the early years of an accident year's claims administration, followed by a significant increase to the loss reserves in the later years of loss development, when more data made it harder to justify or conceal the

inadequate reserves." Amend. Compl. at ¶ 71.

Plaintiffs attempt to provide further support for their claims with a laundry list of occurrences in which, they allege, Defendants put forth false and misleading statements about Maiden's profitability throughout numerous press releases, earnings calls, investment conferences, and other public occurrences. Paragraphs 87 through 167 contain details of instances where, Plaintiffs allege, Defendants put forth allegedly false information or omitted material information to investors. The fifty-plus pages of alleged misrepresentations repeat the same point: Plaintiffs detail a public event or a filed document in which Maiden discusses profits based on estimated loss ratios in the 50% range, while it "had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums were greater" than the estimated 50% amount. *Id.* at ¶ 90. To bolster their claims of alleged fraudulent statements, Plaintiffs cite Maiden press releases (¶¶ 87, 108, 142, 160), earnings conference calls (¶¶ 88, 97, 100, 106, 109, 116, 118, 120, 124, 133, 136, 139, 143, 150, 153, 157, 161), signed SEC Form 10-K documents (¶¶ 91, 112, 127, 146, 164), a *Barron's* articles (¶ 99), and transcripts from insurance conferences for analysts and investors (¶¶ 103, 105) as supporting evidence of the extent of Defendant's malfeasance. Essentially, Plaintiffs allege that Defendants put forth false and misleading information in every press release, earnings conference call, SEC Form 10-K, and industry conference that occurred or was filed over the course of approximately four years. According to Plaintiffs, the information put forth, or withheld, by the Defendants was fraudulent due to the discrepancy between Maiden's lower estimated loss reserves and the higher historical loss ratios for AmTrust's business. Despite what seems to be an unnecessary litany of calls, examples, charts, and data—after all, repetition makes a fact seem more true—Plaintiffs'

allegation is simple: the discrepancy between historical loss ratios and estimated loss reserves, and Defendant's failure to disclose the historical information, without more, constitutes securities fraud.

In Plaintiffs' parlance, the "truth emerges" starting in February 2017 when Defendants issued a press release disclosing that it would need to take a reserve charge of roughly $120 million related to incurred losses from previous years. *Id.* at ¶ 169. The result of these disclosures ultimately led Maiden's stock price to fall by 85%, from $16.65 per share in February 2017 to $2.40 per share in November 2018. *Id.* at ¶ 185.

Plaintiffs also reference a rule change in 2017 that, they argue, supports their contention that Maiden misrepresented its financial position. The Securities and Exchange Commission developed new disclosure rules in 2017[4], and the agency informed Maiden that it was required to further disaggregate its disclosures for reserves and loss adjustment expenses by the individual lines of business within the AmTrust reinsurance segment. *Id.* at ¶ 34. Maiden declined to provide additional disclosure information to the SEC, but eventually complied with this request and filed a letter on September 17, 2017, containing the disaggregated data. Motion to Dismiss at page 12. Plaintiffs allege that investors were unable to properly evaluate Maiden's financial position, and were unable to calculate the historical loss reserve data, until Defendants were forced to make these disclosures by the SEC. Amend. Compl. at ¶ 67.

Defendants strongly demur otherwise. As argued in their Motion to Dismiss,

---

[4] *See* SEC Disclosure Update and Simplification Rule, 17 C.F.R. § 210, 229, 230, 239, 240, 249, and 274 (2018). https://www.sec.gov/rules/final/2018/33-10532.pdf.

Defendant contends that Maiden's estimated loss reserves constitutes an opinion, and unfortunately, "some of what Maiden predicted when it estimated its loss reserves turned out to be incorrect." Motion at page 2. Defendants argue that the estimated loss reserves were calculated after a complex, multi-faceted analysis that involved numerous levels of review, actuarial oversight, and subjective judgment. Historic loss reserve amounts, they explain, constituted only a <u>part</u> of the overall analysis. Indeed, in the Amended Complaint, Plaintiffs include a portion from Maiden's SEC filings that details the multiple factors involved with setting loss reserves.[5] Defendants argue that "Plaintiffs isolate a single factor – the historical performance of Maiden's reserves – and assert that, <u>in hindsight</u>, Maiden should have given that factor additional weight in estimating loss reserves for the AmTrust business." *Id.* Through this flawed and improper analysis, they argue, Maiden is "attempting to do nothing less than predict the future" in determining how much money to keep on hand to cover potential future losses. *Id.* at page 10. Or to put it another way, Defendants argue this case is nothing more than a case of hindsight judgment.

Defendants argue that Plaintiffs fail to satisfy the necessary requirements to state a claim under Section 10(b) of the 1934 Act and SEC Rule 10b-5 – that is, they fail to plead false statements. Relying on *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, Defendants argue that Plaintiffs fail to allege either that (i) the statements were both

---

[5] "According to the Company's SEC filings, throughout the Class Period, Maiden considered four groups of information in determining reserves and loss and combined ratios for the AmTrust business: (a) information obtained from internal or external sources to make meaningful estimates of likely future performance; (b) loss and exposure information provided by the ceding company, AmTrust, to derive meaningful estimates of loss; (c) historic loss development as being indicative of future loss development and trends; and (d) significant emergence (or lack thereof) of losses or types of losses that are not represented in the information supplied by ceding companies." Amend. Compl. at 51.

11

objectively false and subjectively false (i.e., not genuinely believed at the time they were made), or (ii) that the defendant omitted material facts underlying the basis for the opinion and those facts conflict with what a reasonable investor would take from the statement itself. 575 U.S. 175, 186 (2015).  To their point, Defendants focus on Plaintiffs' failure to provide any facts suggesting that Maiden failed to review and consider the historical data.  At best, they argue, Plaintiffs' claim is a "disagreement" with Maiden over how to incorporate historical data into the estimation of loss reserves.

2. **Stockholder Sales**

In addition, Plaintiffs allege scienter of the alleged activities through insider stock sales, incentive-based compensation, and Defendants' securities offerings.  According to Plaintiffs, Raschbaum and Schmitt sold 16% and 12% of their stock, respectively, "weeks" before the stock reached an all-time high of $16.65 per share and three months before the first corrective disclosure of the stock.  Amend. Compl. at ¶ 188.  While nearly one hundred pages of the Amended Complaint focuses upon allegations and discussion of loss reserve discrepancies, Plaintiffs devote only a few paragraphs to bring forth allegations of scienter against these Defendants.

In response to these allegations of scienter, Defendants argue that these stock sales – by either amount or timing – fail to raise a plausible inference of scienter.  "Far from demonstrating scienter, Plaintiffs' allegations strongly suggest a lack of any intent to commit fraud."  Motion at page 28.  Defendants argue that the amount of stock sold represented only a small fraction of what the Individual Defendants owned, and the fact that Defendants held onto the majority of their stock through the period of declining stock value further implies their lack of intent to "profit from artificially inflating the Company's stock

price." *Id.* at page 30.

In their Opposition Brief to Defendant's Motion to Dismiss, Plaintiffs argue that scienter is "strong and straight forward" in this case. Opposition at page 2. Specifically, Plaintiffs argue that in securities cases, the facts used to prove falsity office suffice to prove scienter. *Id.* at page 27. "That is particularly true in a case, like this one, where there is no real dispute that Defendants knew the facts that rendered their statements false and misleading." *Id.*

## II. Motion to Dismiss

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[A]n unadorned, the defendant-unlawfully harmed-me accusation" does not suffice to survive a motion to dismiss. *Id.* at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In reviewing a plaintiff's allegations, the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them,

and construe those allegations in the light most favorable to the plaintiff." *Bistrian v. Levi*, 696 F.3d 352, 358 n. 1 (3d Cir.2012). Only the allegations in the complaint, and "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case" are taken into consideration. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 2 (3d Cir.1994) (citing *Chester Cty. Intermediate Unit v. Pennsylvania Blue Shield*, 896 F.2d 808, 812 (3d Cir.1990)).

### III.    Analysis

It is an unnecessarily long Amended Complaint that, in essence, as described above, boils down to a narrow claim against Maiden: The estimated loss reserves used for the most recent accident years were substantially lower than actual historical loss ratios for prior accident years.  From this, Plaintiffs leap to the claim that Defendants intentionally or recklessly omitted the historical loss data to avoid having to explain the contradiction between their estimates and historical loss data.  To be clear, Plaintiffs do not allege that Defendants were not allowed to use the lower loss ratios.  Rather, Plaintiffs pin their entire case on the idea that that Defendants should have disclosed the historical AmTrust data, which they claim was "material" and "adverse."  The Amended Complaint mashes together instances of changing stock prices, a Generally Accepted Accounting Principles (GAAP) analysis, updated SEC rule interpretations, snippets from earnings call transcripts, and more, all in an attempt to paint a picture that, in hindsight, is indicative of Defendants' alleged fraud.  When much of the Amended Complaint's surplusage is omitted, it becomes evident that, Plaintiffs rely upon inferences as well as inferences upon inferences to support their claim.  Defendants, on the other hand, suggest that AmTrust's historical loss ratios were just <u>one</u> factor they considered in formulating their estimated loss ratios for the

future—and Plaintiffs have nothing to contradict that.  Defendants are correct.  The problem for Defendants, however, is that this matter is before the Court on a Motion to Dismiss, where no discovery has occurred.  Certainly, if the evidence demonstrated that Defendants considered the historical loss ratios as part of their analysis, Defendants' point is well-taken.  And the inferences upon inferences constructed by Plaintiffs would likely tumble.  It would be difficult to find that the alleged undisclosed data contradicted the statements made by Maiden.  *See*, *e.g.*, *Oklahoma Fire Fights Pension and Retirement System v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32-33 (S.D.N.Y. 2019).

Clearly, Plaintiffs' theory of the case is thin, by their own admission: "viewing the facts holistically, the inference of fraudulent intent is at least equally as cogent and compelling as any non-culpable inference...The inference that Defendants chose not to disclose the historical loss data because it contradicted Maiden's reported loss ratios is at least as cogent and compelling as any non-fraudulent inference." Supp. Br. at page 4. Plaintiffs pile on information throughout the Amended Complaint, including excerpts from every quarterly earnings call and Form 10-K made by Maiden over the course of four years, to add substance to their allegations, but it is much of the same.  Plaintiffs impugn a fraudulent intent on the part of Defendants in their omission of the historical loss data.  First, they infer that by omitting such data it alleviated the burden of Maiden having to explain why it contradicted its estimates.[6]  In addition, Plaintiffs cast judgment that by

---

[6] Moreover, historical data that contradicted loss ratios by 40-60%, they say, is not "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." [Supp. Brief, at 5 citing *Adams* 381 F.3d 267, 274-75 (3d Cir. 2004).]  The *Adams* opinion predates *Omnicare*, 575 U.S. 175, 186 (2015), which presents a different, and controlling, new standard. "…[A]s we have shown, a sincere statement of pure opinion is not an "untrue statement of material fact," regardless whether an investor can ultimately prove the belief wrong. That clause…does not allow investors to second-guess inherently

15

omitting such data, Defendants improperly conveyed that Maiden's loss ratios aligned with historical data.  This latter argument, however, is made in a vacuum, and discovery showing otherwise may well disprove Plaintiff's point.  *See*, *e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (investors not "entitled to so much information as might have been desired to make their own determinations [even though investors] would have acted otherwise had the [information] been disclosed.")

Moreover, some of the conclusory statements that Plaintiffs have made cause concern.  For example, Plaintiff claims that Defendants, have, in fact, conceded they knew that the information (the historical loss data) contradicted their statements to investors.  *See* Supp. Br. at page 3, Footnote 4.  Plaintiff takes counsel's statement entirely out of context. As another example, Plaintiffs' accusation that Defendants failed to provide investors with the required historical ratios until 2018 omits a key fact that the Securities and Exchange Commission regulations did not require such information until then.  Furthermore, Defendants made two negative disclosures to investors in February 2017 [Amend. Compl. at ¶ 169] and August 2017 [*Id.* at ¶ 173] indicating that adverse developments had occurred that would require Maiden to make insurance payouts, lowering its bottom. These events caused the stock to lower in value even before the SEC contacted Defendants about additional disclosures of disaggregated information. Plaintiffs out of context inferences and thinly veiled accusations is conduct that the Court will scrutinize.[7]

---

subjective and uncertain assessments. In other words, the provision is not…an invitation to Monday morning quarterback an issuer's opinions."

[7] The Court reminds the parties that pleadings are to be made in good faith under Federal Rule of Civil Procedure 11.  Going forward, if it is determined that the allegations constituting this case were made in bad faith and without foundation, the Court will award attorney's fees and costs to the opposing party.

The Court has previously expressed its concern that the towering inferences used by Plaintiffs to constitute their claims are shaky at best, and at worst, alleged in bad faith. The basis for such claims will be explored in discovery. If it turns out that Plaintiffs had no good faith basis to assert that Defendants fraudulently failed to disclose the historical loss ratios, the Court will address the issue. For now, Plaintiffs have pressed their claims based upon reasonable—barely—inferences, and the Court will allow <u>limited discovery</u> to proceed. The Court does so in an effort to prevent this litigation from turning into a securities fishing expedition. Plaintiffs aver that Defendants fraudulently failed to disclose the historical loss ratios—and that will be the focus of discovery. If it turns out that there is a differing expert opinion, it is hard to see how this case moves forward, as this Court has previously discussed. *See*, *e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) ("In other words, a statement of opinion is not misleading just because external facts show the opinion to be incorrect. Reasonable investors do not understand such statements as guarantees...")

In its final analysis, the Court will permit the case to proceed, but under the following conditions: Plaintiffs shall within fourteen (14) days file an amended complaint that eliminates surplusage. A 125-page Complaint is unnecessary. It is burdensome not only to the opposing adversary, but to the Court. Much of the information included is unnecessary as well. For example, excerpts from *Barron's* articles [*Id.* at ¶¶ 62, 99, 103] and discussions surrounding those articles are not helpful to the Court. Additionally, discovery will be limited. The parties shall meet and confer and propose to the Magistrate Judge a limited discovery schedule which deals with the sole claim against Maiden: was there an intentional decision made by the Defendants to omit AmTrust's historical loss ratio

information from the view of investors?  If the evidence proves that there was not, then the case appears to be what Defendants have claimed, one of hindsight judgment.

For similar reasons, the Court will allow limited discovery as to the stockholders' sales:  did Maiden executives sell stocks outside of their usual pattern and practice?  While Plaintiffs allege that "Defendants' concession that they knew the information contradicting their statements is sufficient, itself, to establish a strong inference of scienter," further evidence and investigation into the stock holding and selling patterns of executives will be useful to the Court in evaluating Plaintiff's claims of scienter.  Supp. Br. at page 3.

### IV.     Conclusion

For the foregoing reasons, Plaintiff is directed to file an Amended Complaint, minus surplusage, within fourteen (14) days.  Additionally, the parties are ordered to meet and confer and propose a limited discovery schedule to the Magistrate Judge addressing the two limited issues of historical loss data and stock sales.  An appropriate Order follows.


Date: August, 6, 2021                                  /s/ Renée Marie Bumb
                                                       RENÉE MARIE BUMB
                                                       UNITED STATES DISTRICT JUDGE