THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: 973/313-1887
973/833-0399 (fax)
lrosen@rosenlegal.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

*Co-Lead Counsel*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re MAIDEN HOLDINGS, LTD. SECURITIES LITIGATION | ) ) ) Master File No. 1:19-cv-05296-RMB-SAK |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) CLASS ACTION ) ) ) PLAINTIFFS' SECOND AMENDED ) COMPLAINT FOR VIOLATION OF ) THE FEDERAL SECURITIES LAWS ) ) DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW .......................................................1

JURISDICTION AND VENUE ..............................................................9

PARTIES.........................................................................................10

    Plaintiffs.................................................................................10

    Defendants ..............................................................................11

FACTUAL BACKGROUND ...............................................................16

    Maiden Holdings, Ltd. ..............................................................16

    The AmTrust Quota Share Agreement ..........................................19

    Accurate Loss Reserves and Relevant Financial Metrics Are Critical
        to Maiden's Business ..........................................................20

    Maiden's Historical Loss Ratios Conflicted With the Reserves
        Defendants Reported for the AmTrust Business...............................22

    Maiden's Undisclosed Claims and Loss Data Conflicted With the
        Loss Reserves and Loss Ratios Defendants' Reported During
        the Class Period ................................................................25

    Maiden's Loss Ratio Was a Critical Reported Metric ......................29

DEFENDANTS' FALSE AND MISLEADING STATEMENTS…… .........…….32

THE TRUTH EMERGES ...................................................................42

INSIDER TRADING AND EXECUTIVE COMPENSATION
    ALLEGATIONS.........................................................................50

    Executive Compensation ...........................................................51

MAIDEN SELLS SECURITIES DURING THE CLASS PERIOD......................53

**Page**

THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..................54

APPLICABILITY OF THE PRESUMPTION OF RELIANCE ............................55

CLASS ACTION ALLEGATIONS ........................................................................56

LOSS CAUSATION/ECONOMIC LOSS .............................................................58

COUNT I...................................................................................................................60

COUNT II .................................................................................................................62

PRAYER FOR RELIEF .........................................................................................63

JURY DEMAND ......................................................................................................64

4812-7962-7451.v1

## INTRODUCTION AND OVERVIEW

1.      Pursuant to the Court's August 6, 2021, Opinion (Dkt. No. 82), denying, in part, Defendants' Motion to Dismiss the Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 43), Co-Lead Plaintiffs Boilermaker-Blacksmith National Pension Trust and Taishin International Bank Co. Ltd. (collectively, "Plaintiffs") file this Second Amended Complaint to conform to the Court's Opinion. Plaintiffs reserve all rights with respect to allegations they asserted in the Amended Complaint for Violations of the Federal Securities Laws. Plaintiffs bring this action on behalf of themselves and all other persons or entities who purchased or otherwise acquired the common stock of Maiden Holdings, Ltd. ("Maiden" or the "Company") between February 19, 2014 and November 9, 2018, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are Maiden, Arturo M. Raschbaum ("Raschbaum"), Maiden's former Chief Executive Officer ("CEO"), and Karen L. Schmitt ("Schmitt") and John M. Marshaleck ("Marshaleck"), Maiden's former Chief Financial Officers ("CFOs") (collectively, "Defendants"), present or former executive officers of Maiden and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)). Plaintiffs seek to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

- 1 -

2.      Plaintiffs allege upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the ongoing investigation of their counsel, Robbins Geller Rudman & Dowd LLP and The Rosen Law Firm, P.A. (collectively, "Counsel"). This investigation includes, *inter alia*, a review and analysis of: (a) public filings by Maiden with the U.S. Securities and Exchange Commission ("SEC"); (b) public reports and news articles; (c) research reports by securities and financial analysts; (d) securities prices and price movements; (e) transcripts of investors calls and conferences in which Defendants participated; (f) consultation with forensic and economic experts; (g) interviews with former Maiden employees; and (h) other publicly available material and data identified herein. Counsel's investigation of the facts underlying this action continues, and Counsel further believes that relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.      Maiden provides reinsurance solutions, products and services to U.S. and European insurance companies that specialize in products offering coverage at low limits or insuring risks that are believed to be low hazard, predictable and generally not susceptible to catastrophe claims. Founding shareholders of Maiden included George Karfunkel ("G. Karfunkel"), Michael Karfunkel ("M. Karfunkel")

- 2 -

and M. Karfunkel's son-in-law, Barry Zyskind ("Zyskind"). At the time of Maiden's founding, G. Karfunkel, M. Karfunkel and Zyskind were executive officers and/or directors of AmTrust Financial Services, Inc. ("AmTrust"). At all relevant times, the Karfunkel family and Zyskind maintained significant beneficial ownership of Maiden stock, and Zyskind served as Maiden's Chairman of the Board of Directors ("Board").

4.      In 2007, AmTrust and Maiden entered into the "AmTrust Quota Share Agreement" by which AmTrust ceded approximately 40% of certain insurance premiums to Maiden. In exchange, Maiden agreed to pay AmTrust a commission based on the volume of premiums and assume 40% of the policy liabilities. In March 2013, the parties amended the AmTrust Quota Share Agreement, extending it until July 2016 and agreeing to automatic renewal for three, successive three-year periods unless either Maiden or AmTrust terminated with nine months' notice prior to the expiration of any such three-year period.

5.      Between 2007 and 2016, Maiden reported that its net earned premiums, attributable to the AmTrust book of business, grew from $247 million to $1.8 billion. By 2016, the $1.8 billion in AmTrust net earned premiums accounted for 72% of Maiden's consolidated net earned premiums (or revenue) of $2.5 billion.

6.      The liability for unpaid losses and loss adjustment expenses (or "loss reserves") Maiden established – particularly for the substantial business assumed

- 3 -

from AmTrust – is critical information to the Company and its investors. In essence, each dollar added to loss reserves in a given reporting period is an equal dollar removed from operating income. In accordance with Generally Accepted Accounting Principles ("GAAP"), an insurer's loss reserves must reflect the ultimate cost of settling claims that the insurer will be liable for. Insurance companies must establish reserves that are sufficient to cover claims-related costs that will arise from claims already filed by their insureds, as well as the costs associated with claims that may have been incurred but have not yet been reported ("IBNR"). Further, the strength of an insurer is often determined by investors, prospective insurance customers and rating agencies based on the insurer's surplus, which is the amount by which its assets exceed its liabilities (the largest of which typically being loss reserves). As alleged herein, Defendants were motivated to lower Maiden's loss reserves against the AmTrust business in order to inflate the Company's reported net income, increase its profitability ratios and create the appearance that it was well-capitalized.

7.     Because AmTrust accounted for well over 50% of Maiden's annual net earned premiums throughout the Class Period, it was critical that the Company appropriately assess the potential risks and liabilities of the business assumed from AmTrust, including for the purpose of accounting for and disclosing loss reserves. And, throughout the Class Period, Defendants informed investors that they had done

- 4 -

just that. Defendants regularly made assurances to investors that, in determining the reserves for the AmTrust business, they received a "lot of detailed actuarial data from AmTrust" and that Maiden "maintains a robust process" of analyzing AmTrust premium liabilities "to better understand [AmTrust's] loss development," including "active and ongoing claims management." Throughout the Class Period, moreover, Defendants assured investors that Maiden regularly conducted audits of the AmTrust book of business to ensure investors, *inter alia*, that reserves and profitability ratios were reliable.

8.     During the Class Period, in the context of disclosing and discussing loss reserves, Defendants omitted that estimated loss ratios Maiden used for the most recent accident years were substantially lower than actual loss ratios for all prior accident years and conflicted with the loss estimates on which Defendants based Maiden's reserves. Indeed, Defendants estimated Maiden's loss ratios in the range of 50% for the most recent accident years notwithstanding that historical claims and actuarial data established an average loss ratio of between 70% and 80% for the AmTrust business for seasoned years of the AmTrust Quota Share Agreement.

9.     By omitting from Maiden's disclosures adverse historical loss ratios, Defendants improperly conveyed that Maiden's loss ratios for the AmTrust business aligned with historical loss data when it did not, conflicting with the conclusion that the loss reserves properly accounted for the historical loss ratios.

10.     Not only did Defendants know of or have access to claim and historical loss ratios that conflicted with their stated reserves for the AmTrust business, but they were motivated to commit securities fraud. During the Class Period, Defendants conducted public offerings of over 12 million shares of Maiden stock, for net proceeds exceeding $300 million. In June 2017, Maiden conducted a public offering of debt for net proceeds of $110 million. The offering documents for each of these Class Period offerings incorporated by reference the Company's SEC filings, which contained false and misleading statements about Maiden's loss reserves and loss ratios. But for misleading investors about the status of Maiden's operating results during these offerings, Maiden would have received less public financing on materially worse terms. Defendants Raschbaum and Schmitt took advantage of the artificial inflation in Maiden's stock price –the result of Defendants' unlawful conduct – by engaging in over $1.2 million in unusual and suspicious insider trading. Defendants Raschbaum, Schmitt and Marshaleck were further motivated to mislead investors because receipt of millions of dollars of their executive compensation depended on hitting specific income and loss ratio targets during the Class Period.

11.     It was only after the Class Period that Maiden disclosed the full details of its historical experience with incurred losses associated with the AmTrust book of business. Specifically, the Company's post-Class Period SEC filings revealed that throughout the Class Period, Defendants had access to, or were aware of, historical

claims and actuarial data from AmTrust indicating that for every $1.00 of earned premium under the AmTrust Quota Share Agreement, Maiden would incur claims-related costs of approximately $0.70 to $0.80.

12.    Nonetheless, in setting their reserves, Defendants had estimated Maiden would incur claims-related costs of approximately $0.50 on its most recent accident year vintages of AmTrust ceded net earned premiums. Defendants engaged in this deceptive conduct throughout the Class Period, all the while knowing of or recklessly disregarding the prior history of AmTrust claims-related costs ultimately falling in the $0.70 to $0.80 range. These reckless or deliberate failures to disclose material, adverse, historical information that conflicted with their estimates misled investors and ultimately led to the increasing adverse loss developments Maiden announced during 2017 and 2018. Indeed, shortly after the AmTrust quota share net premium growth rate flattened out in 2015, Maiden began recognizing hundreds of millions of dollars in adverse development charges for the business it assumed from AmTrust.

13.    As the Company disclosed these charges and investors realized that Maiden had been misrepresenting its risk profile by omitting its historical loss ratios, the Company's publicly traded securities experienced significant stock price drops. After the close of the market on February 14, 2017, Maiden announced that it was taking a reserve charge of approximately $120 million, $52 million of that amount

attributable to 2011-2014 underwriting years in the AmTrust Reinsurance segment. As a result of this disclosure, the Company's common stock price dropped by 10% on February 15, 2017, on abnormally high trading volume.

14.     After the market close on February 28, 2017, Maiden issued its press release for its 2016 financial results, confirming the $52 million adverse development charge against AmTrust earned premiums and reporting AmTrust's loss ratio for the fourth quarter of 2016 ("4Q 2016") to be 76.1%, or 10% higher than what had been reported the prior year. As a result of this news, the Company's common stock price dropped 6.4% the next day, on abnormally high trading volume.

15.     After the market close on August 8, 2017, Maiden issued its press release for its second quarter of 2017 ("2Q 2017") financial results. The Company reported it had suffered an additional net adverse development charge of $29.4 million against AmTrust earned premiums and caused Maiden to report a net loss of $22.4 million (or $55.3 million less than the Company's reported net income for the second quarter of 2016 ("2Q 2016")). As a result of this news, the Company's stock price plummeted 31.3% the next day, from $9.55 to $6.56 per share, on abnormally high trading volume.

16.     On November 8, 2017, the Company announced another adverse development for the AmTrust Reinsurance segment of $61.1 million. On this news, Maiden's stock price dropped another 21% on abnormally high trading volume. On

February 27 and 28, 2018, Maiden announced yet another $139 million in adverse developments for the AmTrust Reinsurance segment. On February 28, 2018, the Company' stock price suffered a 16.6% stock price drop. By November 9, 2018, the Company had disclosed another $238.8 million in adverse development for AmTrust and additional stock price declines.

17.     Between February 2017 and November 2018, as Maiden reported repeated material adverse development charges, the Company's stock price dropped from $16.50 per share to under $2.50. For the two years following the end of the Class Period, Maiden's stock price never exceeded $2.50 per share.

## JURISDICTION AND VENUE

18.     Plaintiffs assert claims on behalf of themselves and the Class under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction over the Exchange Act claims is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as conduct giving rise to the violations of the Exchange Act alleged herein occurred in this District, including the dissemination of false and misleading statements into this District. Defendants reside or transact business within this District, and Maiden maintains the primary offices of its U.S. subsidiary,

Maiden Reinsurance North America, Inc. ("Maiden NA"), at 6000 Midlantic Drive,

Suite 200 South, Mount Laurel, New Jersey, 08054.

20.     In connection with the acts alleged in this Complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, the Internet, interstate telephone

communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

21.     Lead Plaintiff Boilermaker-Blacksmith National Pension Trust

("Pension Trust") is a collectively bargained and jointly trusteed Labor-Management

Trust that provides benefits primarily to union members located in 100+ local lodges

of The International Brotherhood of Boilermakers. Pension Trust was founded in

1960, is headquartered in Kansas City, Kansas, and has over $7.0 billion in assets.

The Pension Trust purchased Maiden common stock during the Class Period, and

suffered damages as a result of Defendants' unlawful conduct. ECF No. 15-2.

22.     Lead Plaintiff Taishin International Bank Co. Ltd. ("Taishin Bank") is

a commercial banking institution headquartered in Taipei, Taiwan. The bank offers

services for personal banking, micro-enterprises, corporate finance and corporate

trusts. Taishin Bank is the trustee of client trust accounts – and the nominal owner

of the trust property of those accounts – that purchased Maiden preferred stock

during the Class Period and suffered damages as a result of Defendants' unlawful conduct. ECF No. 27-3.

**Defendants**

23.   Defendant Maiden is a Bermuda-based holding company, with principal executive offices located at 94 Pitts Bay Road, Pembroke HM 08, Bermuda. Maiden maintains the primary offices of its U.S. subsidiary, Maiden NA, at 6000 Midlantic Drive, Suite 200 South, Mount Laurel, New Jersey, 08054. Maiden provides reinsurance to its customers through its wholly-owned subsidiaries, including Maiden NA. During the Class Period, Maiden's business primarily focused on serving the needs of regional and specialty insurers in the United States, Europe and other global markets by purportedly offering innovative reinsurance solutions to support the insurers' capital needs. Throughout the Class Period, Maiden's common stock traded on the NASDAQ Global Select Market – an efficient market – under the ticker symbol "MHLD."

24.   Defendant Arturo M. Raschbaum was the CEO and President of Maiden from November 2008 through September 2018. In August 2018, the Company announced that Raschbaum would be "retiring" from Maiden and, on September 30, 2018, he signed a separation agreement in which Raschbaum agreed to forfeit all his outstanding equity in exchange for a release payment of $2.2 million. Throughout the Class Period, Raschbaum regularly participated in the Company's

- 11 -

earnings calls and certified the purported accuracy of the Company's financial statements. At all relevant times, Raschbaum had ultimate authority and control over the Company's public statements, including the contents of regulatory filings, and whether and how to communicate the contents of the filings to the investing public.

25.     Defendant Karen L. Schmitt served as the CFO of Maiden from May 13, 2014 through September 2018. Prior to May 2014, Schmitt had worked at Maiden NA for at least 15 years, maintaining a close working relationship with Raschbaum. In August 2018, the Company announced that Schmitt, like Raschbaum, would be retiring from Maiden, but would remain on as an executive vice president until March 1, 2019. After the announcement of her "retirement," it was revealed that Schmitt signed a separation agreement, in which she agreed to forfeit unvested performance restricted share units in exchange for release payments of $2.0 million on August 31, 2018, and $1.3 million in March 2019. Between May 2014 and August 2018, Schmitt regularly participated in the Company's earnings calls and certified the purported accuracy of the Company's financial statements. During that same time period, Schmitt had ultimate authority and control over the Company's public statements, including the content of regulatory filings, and whether and how to communicate the contents of the filings to the investing public.

26.     Defendant John M. Marshaleck served as the CFO of Maiden between August 2009 and May 13, 2014. Marshaleck served as a director of several of the Company's wholly-owned subsidiaries between 2009 and his retirement in 2014. Prior to serving as CFO, Marshaleck had served as Chief Operating Officer ("COO") of Maiden from January 2009. Between February 19, 2014 and May 13, 2014, Marshaleck participated in the Company's earnings calls, and certified the purported accuracy of the Company's financial statements. During that same time period, Marshaleck had ultimate authority and control over the Company's public statements, including the content of regulatory filings, and whether and how to communicate the contents of the filings to the investing public.

27.     According to Maiden's Code of Business Conduct and Ethics, it was vital that Raschbaum, Schmitt, and Marshaleck communicate open, clear, consistent, accurate and appropriate information to the investing public. In order to facilitate Marshaleck's responsibilities, the Company maintained an IAD, which was responsible for assisting Marshaleck to report reliable and accurate financial results. In performing internal audit reports, the IAD had full, free and unrestricted access to all activities and records (in paper and electronic format) necessary to ensure the Company was reporting accurate financial results. The IAD's ultimate responsibility was to provide senior management (including Marshaleck) and the Company's audit committee with the information necessary to execute its and management's ultimate

responsibility of ensuring that Maiden's Class Period financial results were open, clear, consistent and accurate.

28.    For allegations relating to false and misleading statements made between February 20, 2014, and May 12, 2014, "Defendants" refers to Maiden, Raschbaum and Marshaleck, collectively. For allegations relating to false and misleading statements made after May 12, 2014, "Defendants" refers to Maiden, Raschbaum and Schmitt, collectively. Defendants Raschbaum, Schmitt and Marshaleck are referred to herein as the "Individual Defendants."

29.    During the Class Period, Defendants operated Maiden as hands-on managers overseeing the Company's operations and finances and made the materially false and misleading statements alleged herein. As detailed herein, Defendants directly participated in the day-to-day operations and affairs of the Company at the highest levels, were privy to confidential proprietary information regarding the Company and had intimate knowledge of the core operations and financial performance of Maiden, including knowledge of critical contracts and sources of premium revenue – particularly with, and from, AmTrust. Defendants were personally involved with and knowledgeable of the Company's risk management and underwriting policies and practices. Defendants were also fully involved with and responsible for deciding which disclosures Maiden would make to the investing public. Defendants, because of their positions of control and

authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company discussed herein.

30.     Throughout the Class Period, Defendants were responsible for ensuring the accuracy of Maiden's public filings and other public statements, and they personally attested to and certified the accuracy of Maiden's financial statements. For each quarterly report on Form 10-Q and annual report on Form 10-K during the Class Period, Raschbaum and Marshaleck or Raschbaum and Schmitt, signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), stating that the particular report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." These certifications were materially false and misleading when made.

31.     In addition, The Individual Defendants participated in preparing, reviewing, approving and/or certifying consolidated financial statements for Maiden during the Class Period that purported to conform with applicable regulatory requirements and GAAP. These financial statements were filed with the SEC, and disseminated to the public, through *inter alia*, Company press releases, reports on Form 8-K, quarterly reports on Form 10-Q and annual reports on Form 10-K, and in

other communications with investors, credit rating agencies, bank lenders and securities analysts. The financial information contained therein misrepresented that Maiden's financial statements were accurate.

## FACTUAL BACKGROUND

**Maiden Holdings, Ltd.**

32.     Throughout the Class Period, Maiden primarily focused on serving the needs of regional and specialty insurers in the United States, Europe and select other global markets by providing reinsurance solutions designed to support their capital needs. Maiden specialized in reinsurance solutions that purportedly optimized financing and risk management by providing coverage within the more predictable and actuarially credible lower layers of coverage and/or reinsuring risks that are believed to be lower hazard, more predictable and generally not susceptible to catastrophe claims. Maiden provided its reinsurance through several wholly owned subsidiaries, including Maiden Reinsurance Ltd. and Maiden U.S., and maintained operations in Bermuda, the United States, Europe and other geographic markets.

33.     Because Maiden is a reinsurance company, it is of central importance to investors that Maiden accurately assess and disclose potential risks and liabilities related to these underlying policies. Of no less importance, it was critical for Maiden to appropriately price its reinsurance policies to account for such risks, establish adequate loss reserves and minimize adverse development charges in future periods.

- 16 -

34.    Maiden has two reportable operating segments: (i) Diversified Reinsurance; and (ii) AmTrust Reinsurance. The Diversified Reinsurance segment consists of a portfolio of predominantly property and casualty reinsurance business focusing on regional and specialty property and casualty insurance companies. The AmTrust Reinsurance segment includes all business ceded by AmTrust to Maiden.

35.    AmTrust and Maiden are closely related entities, with Maiden noting in financial filings that it "may be deemed an affiliate of AmTrust." AmTrust was founded in 1998 by the brothers M. Karfunkel and G. Karfunkel. AmTrust underwrites and provides various niche property and casualty insurance products.

36.    Similarly, Maiden was formed in 2007 by M. Karfunkel, G. Karfunkel and Zyskind, primarily to provide reinsurance services to AmTrust. At all relevant times, Zyskind was the Chairman of the Board, as well as the CEO, President and Chairman of AmTrust. At all relevant times, members of the Karfunkel family were principal stockholders of AmTrust and owned or controlled about 50% of AmTrust's outstanding common shares.

37.    During the Class Period, AmTrust was Maiden's largest customer, and the companies engaged in substantial commercial dealings with one another. At times during the Class Period, AmTrust represented over 70% of Maiden's net earned premiums, reinsuring up to 40% of AmTrust's written premiums net of reinsurance with unaffiliated reinsurers. As AmTrust was Maiden's largest and most

- 17 -

important client, it was especially critical that the Company appropriately assess and disclose to investors the potential risks and liabilities of the AmTrust policies that it reinsured and that Maiden disclose and appropriately account for these risks in its policy pricing and loss reserves. In light of AmTrust's importance to Maiden, the companies' close and historical relationship and ongoing business dealings, and the nature of reinsurance underwriting, Maiden claimed to have received detailed policy data from AmTrust that allowed it to know the truth about the risks and likelihood of loss associated with the AmTrust insurance policies it reinsured before and during the Class Period.

38.    For example, defendant Schmitt, Maiden's CFO, stated that Maiden received a "lot of detailed actuarial data from AmTrust" in order to set its "own reserves" for reinsured AmTrust policies. Similarly, Maiden's CEO, defendant Raschbaum, stated that "Maiden maintains a robust process of working with our clients" – including AmTrust, the Company's most important client – "to better understand the underlying dynamics of their loss development," which "includes active and ongoing claims management with additional case reserves posted by our claims professionals as necessary and auditing activities, as well as account-specific actuarial analyses that all help to shape our view of ultimate exposure." In fact, the companies' businesses were so closely interrelated that, when Raschbaum was asked by an analyst during an earnings conference call if AmTrust and Maiden should

reach "consensus" on setting the appropriate reserves for overlapping segments of their portfolios, defendant Raschbaum responded, "Absolutely."

**The AmTrust Quota Share Agreement**

39.     With respect to a quota share reinsurance arrangement (also known as pro-rata reinsurance, proportional reinsurance or participating reinsurance), the reinsurer shares a proportional part of the original premiums of the reinsured. In return, the reinsurer (here, Maiden) assumes a proportional share of the losses incurred by the cedant (here, AmTrust). The reinsurer pays the company a ceding commission, which is generally based on the ceding company's cost of acquiring the business being reinsured (including broker commissions, premium taxes, assessments and miscellaneous administrative expenses) and may also include a profit sharing arrangement. Under quota share arrangements, ceding commission can be adjustable and subject to minimum and maximum levels based upon loss experience which potentially reduces earnings volatility under such arrangements.

40.     On July 1, 2007, Maiden and AmTrust executed the AmTrust Quota Share Agreement. The agreement allowed Maiden to reinsure particular types of insurance policies held by AmTrust. In exchange for AmTrust ceding premiums to Maiden, the Company was required to pay a commission of approximately 30%, to AmTrust. The agreement was set for a term of three years and automatically renewed but for advanced notification of termination by either party.

41.     Under the terms of the AmTrust Quota Share Agreement, Maiden was entitled to access to "all papers, books, accounts, documents, claims files and other records" of AmTrust. This right of access existed throughout the term of the agreement and continued to exist after termination. Defendants repeatedly informed investors that Maiden had the right to audit AmTrust's records regarding ceded premiums and used this access to obtain critical information regarding the risk profile of the ceded AmTrust book of business.

**Accurate Loss Reserves and Relevant Financial Metrics Are Critical to Maiden's Business**

42.     As a reinsurance Company, Maiden's success depends not only on growing premiums, but also on its ability to accurately assess and manage risk and estimate liabilities for the policies it shares in under its reinsurance agreements. In most cases, time elapses between the occurrence of an insured loss, the reporting of the loss to Maiden, and the Company's eventual payment of that loss. To recognize liabilities for the ultimate payment of all policy losses and related expenses, insurers like Maiden must establish loss reserves as balance sheet liabilities with corresponding income statement charges (expense) representing estimates of amounts that will be paid in the future. For Maiden, reported loss reserves were one of the most important measures of its financial health, as they represent expected future losses that the Company will be required to pay out for claims on the insurance

policies it had reinsured as of the date of Maiden's publicly filed financial statements.

43.    The establishment of loss reserves is meant to ensure that a sufficient portion of the premiums received in connection with a line of business will be available to ultimately cover the claims filed and related expenses that relate to that line of business. Maiden establishes loss reserves for both known and unknown losses which have been incurred as of the financial reporting date on all policies active or expired. At a minimum, the reserves consist of provisions for: (a) reported but unpaid claims (called case reserves); (b) estimates of claims not yet reported; and (c) loss adjustment expenses ("LAE") associated with claim settlement, such as claim investigation and legal fees. For the level of the reserves established in connection with a given group of policies to be adequate, the reserves must be based upon actuarial analysis of accurate underlying data concerning historical claims experience and expectations within each insurance business line.

44.    Providing the appropriate level of reserves directly impacts Maiden's financial reporting. For every dollar in loss reserve, the Company is required to deduct one dollar from its operating income and net income before taxes. Understated loss reserves overstate net income and understats liabilities. Loss reserves are thus a key metric that drives Maiden's profitability.

**Maiden's Historical Loss Ratios Conflicted With the Reserves Defendants Reported for the AmTrust Business**

45.    GAAP requires that insurance companies develop and disclose loss development tables in their annual filings. **Loss development** is the difference between the liability an insurance company initially recorded for incurred losses for an "accident year" (the year the insured loss occurs) and the re-estimated liability for that same accident year, in later reporting periods. Loss development tracking by policy type or business line is important as it is not unusual for losses incurred in a particular accident year to have claims continued to be filed, settled or paid-out over several years, and different types of policies or business lines often have different settlement timeframes.

46.    To track and update loss development over subsequent financial reporting periods, insurers construct and update a schedule called a "loss development table" for each separate line of business. The loss development table compares the amount incurred for each accident year, as re-estimated at each FY end. For example, an insurer may track and reevaluate loss development for the pool of 2010 year accidents associated with workers compensation policies at subsequent 12-month intervals over the course of the next five years. This means the insurer will examine (and re-examine) the loss development of the accident year 2010 policy losses a year later in 2011, again in 2012 and so on until 2015. As claims for accident year 2010 losses are subsequently received, paid or adjusted, the company will

accumulate data that will help it refine its estimate of the ultimate cost of the losses incurred in the prior accident year 2010. These subsequent period refinements are re-estimates of the original reserve requirement and are each recorded in the loss development table. This historical loss experience data is particularly important as it allows the insurer to continually assess the accuracy of its earlier accident year loss reserve estimates against the actual subsequent period claim payouts. This information is vital as it allows a company to more accurately predict and set more appropriate loss reserves going forward.

47.     If the cost of settling claims stemming from the original accident year are determined to be higher than had been expected in the prior year (*i.e.*, higher than the original reserve estimate), increased reserves are required to cover such "deficiencies" or an "**adverse development**." Fewer or smaller claims than originally expected are referred to as "redundancies" or a "**favorable development**."

48.     These changes in the required reserves to reflect adverse development during a reporting period also had a corresponding negative impact on Maiden's loss ratio and combined ratio. If Maiden underestimated its prior year reserve estimate, the increase in loss and LAE necessary in the current FY to recognize the "adverse development" also unfavorably increased loss expenses and thus, the numerator of the loss ratio, resulting in a higher loss ratio and lower operating and net income.

4812-7962-7451.v1

49.     After the Class Period, the Company disclosed in SEC filings its loss development history for the AmTrust business, broken down by the various business lines of AmTrust's policies for which Maiden received ceded net premiums. As the pink shading in the consolidated table below reflects, Defendants had grossly underestimated their AmTrust reserves between 2012 and 2018 (in $1,000s):

| AmTrust QS - Sum of Disclosed Biz Lines | Adverse (Favorable) Development | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Accident Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2012 - 2018 |
| 2008 | $ 7,801 | $ 2,997 | $ 799 | $ 1,588 | $ 3,778 | $ 1,277 | $ 1,925 | $ 20,165 |
| 2009 | $ 21,003 | $ (3,756) | $ 10,759 | $ (301) | $ 946 | $ 4,134 | $ 2,964 | $ 35,749 |
| 2010 | $ 28,108 | $ 23,473 | $ (4,617) | $ 9,602 | $ (828) | $ 5,783 | $ 4,372 | $ 65,893 |
| 2011 | $ 16,392 | $ 40,639 | $ 25,018 | $ (3,535) | $ 22,384 | $ 5,616 | $ 4,044 | $ 110,558 |
| 2012 | | $ 60,347 | $ 22,503 | $ 33,754 | $ (7,363) | $ 8,349 | $ 40,372 | $ 157,962 |
| 2013 | | | $ 33,707 | $ 35,380 | $ 30,181 | $ 25,083 | $ 45,215 | $ 169,566 |
| 2014 | | | | $ 1,926 | $ 51,686 | $ 73,403 | $ 74,841 | $ 201,856 |
| 2015 | | | | | $ 4,462 | $ 101,751 | $ 59,929 | $ 166,142 |
| 2016 | | | | | | $ 54,318 | $ 105,122 | $ 159,440 |
| 2017 | | | | | | | $ 92,029 | $ 92,029 |
| 2018 | | | | | | | N/A | N/A |
| Total (CY) | $ 73,304 | $ 123,700 | $ 88,169 | $ 78,414 | $ 105,246 | $ 279,714 | $ 430,813 | $ 1,179,360 |

50.     The loss development table indicates that during the Class Period, Maiden's loss reserves had been understated by hundreds of millions of dollars between December 31, 2013 and December 31, 2018. Not only does the loss development table reflect a pattern of deliberate or reckless under-reserving over time, but the magnitude of the adverse developments experienced by Maiden between 2012 and 2018 ranged anywhere from $73 million for the year ended 2012, to $430 million during 2018.

**Maiden's Undisclosed Claims and Loss Data Conflicted With the Loss
Reserves and Loss Ratios Defendants' Reported During the Class Period**

51.     Defendants repeatedly informed investors that Maiden had access to
AmTrust claims and loss data as part of the process of determining loss reserves and
loss ratios during the Class Period. In addition, Defendants repeatedly assured
investors that AmTrust was very cooperative in providing Maiden with detailed
actuarial data for the purpose of allowing Maiden to establish its loss reserves and
loss ratios.

52.     Defendants also informed investors that Defendants relied on this
historical data in calculating Maiden's reserve estimates. For example, in Maiden's
2015 Form 10-K, Defendants stated tthat the "majority of the exposure in the
[AmTrust] book of business has significant seasoning, and allows for a significant
amount of credibility in using parameters derived from historical experience to
calculate reserve estimates." Further, Defendants assured investors that "[b]ecause
of the refinement of the data, [it] allows [us] greater use of the loss development
method earlier on in the maturity of the book than would ordinarily occur."

53.     GAAP required that Maiden consider relevant factors such as past
experience and historical trends when estimating the ultimate cost establishing
reserves for claims settlement. Specifically, ASC 944-40-30-1 prescribes that "[t]he
liability for unpaid insurance claims shall be based on the estimated ultimate cost of
settling the claims (including the effects of inflation and other societal and economic

- 25 -

factors), ***using past experience adjusted for current trends, and any other factors that would modify past experience***." (Emphasis added.) Additionally, the American Institute of Certified Public Accountants' Audit and Accounting Guide, Property Liability Insurance Entities, describes that an insurance company's historical adequacy or inadequacy of reserves is one of the most important factors informing the setting of sufficient loss reserve: "***For purposes of establishing an appropriate financial statement reserve, the most important factors to consider are (a) the historical adequacy or inadequacy of total reserves***, (b) the consistency in the reserving approach followed by the entity, and (c) the availability of an actuarial or a statistical analysis of reserves." (Emphasis added.)

54.    Throughout the Class Period, Maiden established loss reserves using loss ratio assumptions in the 50% range when historical loss ratios showed losses materially higher, in the range of 70% and 80%.

55.    After the Company filed its 2016 Form 10-K, the SEC sent Maiden a letter informing it that the agency believed that Maiden had not complied with new loss development disclosure rules in its 2016 Form 10-K. Specifically, the SEC informed Maiden that the Company was required to further disaggregate its disclosures for reserves and loss adjustment expenses by the individual lines of business within the AmTrust Reinsurance segment, as the new disclosure rules required. Maiden initially declined to provide additional disclosure to the SEC, but

ultimately agreed, producing some disaggregated data (for years 2007 through 2016) in letter format on September 17, 2017. When Maiden belatedly reported its historical loss development tables by individual AmTrust business lines in the Company's 2017 Form 10-K (filed March 1, 2018), however, the numbers in the tables had changed significantly.

56.     In the Company's 2017 Form 10-K, filed with the SEC on March 1, 2018, Maiden revealed what its actual historical incurred losses had been for both the AmTrust book of business and its underlying individual business lines since 2008. This was the first time the Company disclosed this level of information to investors in Maiden's periodic SEC filings, because the historical incurred losses for both the AmTrust Reinsurance segment and its individual business lines had changed after Maiden responded to the SEC's 2017 inquiries.

57.     After Maiden filed its 2017 Form 10-K with the SEC on March 1, 2018, it then became possible to calculate the history of Maiden's cumulative incurred losses for each accident year as a percentage of AmTrust net earned premiums for accident years ending 2008 through 2017. While Maiden publicly reported its loss ratio for a particular accounting period for the overall AmTrust business, the accident year loss ratio is a progressive measure of the cumulative losses to date for a particular accident year, in each subsequent year. Defendants' accident year loss

ratio picks from 2011 through 2017 for the AmTrust quota share business, for accident years all the way back to 2008, were as follows:

| AmTrust QS: WC, CA, GL & Other SC/SP | Incurred Loss + LAE/Earned Premiums, as of December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Accident Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2008 | 68.5% | 71.7% | 72.9% | 73.2% | 73.9% | 75.4% | 76.0% |
| 2009 | 62.0% | 70.4% | 68.9% | 73.2% | 73.0% | 73.4% | 75.1% |
| 2010 | 59.5% | 69.8% | 78.3% | 76.6% | 80.1% | 79.8% | 81.9% |
| 2011 | 50.9% | 65.4% | 74.8% | 78.5% | 78.2% | 79.6% | 82.2% |
| 2012 | | 48.6% | 63.3% | 69.2% | 71.8% | 72.8% | 76.1% |
| 2013 | | | 52.1% | 55.4% | 60.5% | 62.1% | 67.2% |
| 2014 | | | | 55.3% | 55.2% | 60.4% | 67.6% |
| 2015 | | | | | 55.9% | 56.3% | 63.2% |
| 2016 | | | | | | 56.4% | 59.6% |
| 2017 | | | | | | | 62.1% |

58.     As the above-table demonstrates, Defendants knew of or recklessly disregarded data showing a pattern that incurred losses for each accident year in the AmTrust book of business would eventually balloon from the low- to mid-50% range in the first year or two of a particular accident year claims process, to the 70% to 80% range as the Company obtained more historical information regarding the true loss profile of the AmTrust book of business. As of December 31, 2013, for example, Defendants had data indicating that prior accident year loss ratios (that is, 2008 through 2012), were actually in the range of 63.3% to 78.3%.

59.     The loss ratios in the table above materially conflicted with the loss reserves Defendants reported during the Class Period. Throughout the Class Period, Defendants had, or had access to, the AmTrust loss development data for previous years demonstrating that the accident year loss ratio would end up at 75% or higher

- 28 -

for any particular year. Notwithstanding this information, Defendants reported loss reserves year after year during the Class Period that were in conflict with the historical loss data they possessed. The AmTrust book of business was, at best, a 75% accident year loss ratio business, not a 50% range accident year loss ratio business (let alone 48.6%).

**Maiden's Loss Ratio Was a Critical Reported Metric**

60.    In addition to closely following Maiden's loss reserves and net income, analysts tracking the Company's performance also paid close attention to Maiden's reported loss ratios, which are measures of an insurance company's estimated incurred claim losses relative to the net premiums earned on the same policies. Maiden consistently reported two key loss ratios in its quarterly and annual earnings press releases during the Class Period:

(a)    **Net loss and LAE ratio**, or simply the "**loss ratio**." Calculated by dividing the Company's incurred net losses (case reserves, IBNR losses and LAE) by the sum of net earned premiums in the applicable reporting period. For example, if a company earns $1,000 in premiums on a group of policies, but pays out of reserves a total of $600 for incurred losses on the same policies, the loss ratio is expressed as 60%. The loss ratio is important to investors as it indicates, from an underwriting perspective, whether a company is incurring and paying more in claims than it is receiving in actual premiums on those same claims. An increasing loss ratio

over time means a company is paying out a bigger and bigger share of the premium it earns, in claims expense. Maiden reported loss ratios for both the Diversified Reinsurance and AmTrust Reinsurance segments during the Class Period.

(b)   **Combined ratio**. This ratio is calculated by adding up Maiden's incurred net losses, commission, acquisition and general and administrative expenses for a particular period, and dividing that sum by the net earned premiums in the same reporting period. Accordingly, the combined ratio includes additional expenses that the loss ratio does not, and is important to investors because it indicates whether or not the company is actually earning a profit on its entire core insurance operations, without taking into account any investment returns it may have achieved on the premiums it invested. A combined ratio of more than 100% means that an insurance company had more losses plus expenses than net earned premiums, and therefore, lost money on its core insurance operations. Maiden reported the combined ratio for both the Diversified Reinsurance and AmTrust Reinsurance segments during the Class Period.

61.   According to the Company's SEC filings, throughout the Class Period, Maiden considered four groups of information in determining reserves and loss and combined ratios for the AmTrust business: (a) information obtained from internal or external sources to make meaningful estimates of likely future performance; (b) loss and exposure information provided by the ceding company, AmTrust, to derive

meaningful estimates of loss; (c) historic loss development as being indicative of future loss development and trends; and (d) significant emergence (or lack thereof) of losses or types of losses that are not represented in the information supplied by ceding companies.

62.     For fiscal year ("FY") 2012 through FY 2018, in quarterly and annual financial reports, Maiden reported the following consolidated loss and combined ratios as of December 31 in the Company's annual reports filed with the SEC:

| Year | Loss Ratio | Combined Ratio |
|------|-----------|----------------|
| 2012 | 69.5% | 99.5% |
| 2013 | 67.0% | 97.6% |
| 2014 | 66.1% | 98.0% |
| 2015 | 66.9% | 99.3% |
| 2016 | 70.6% | 103.2% |
| 2017 | 78.8% | 113.3% |
| 2018 | 92.3% | 127.7% |

63.     For FY 2012 through FY 2018, in quarterly and annual financial reports, Maiden reported the following AmTrust loss and combined ratios as of December 31 in the Company's annual reports filed with the SEC:

| Year | Loss Ratio | Combined Ratio |
|------|-----------|----------------|
| 2012 | 68.0% | 95.8% |
| 2013 | 66.0% | 95.7% |
| 2014 | 64.9% | 95.4% |
| 2015 | 63.8% | 95.3% |
| 2016 | 66.5% | 98.4% |
| 2017 | 78.4% | 110.8% |
| 2018 | 94.4% | 126.8% |

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

64.     After the market close on February 19, 2014, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2013 ("4Q 2013") and FY 2013. As CEO and CFO of Maiden, Raschbaum and Marshaleck reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release. The press release reported reserve for loss and loss adjustment expenses of $1.957 billion as of December 31, 2013.

65.     On February 20, 2014, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2013 and FY 2013 results. Raschbaum and Marshaleck participated in the call. During his opening remarks, Raschbaum stated the "Combined ratios from the AmTrust Quota Share segment are essentially in line with the 2012 year, with a combined ratio of 95.7% for the year compared to 95.8% in 2012."

66.     On March 4, 2014, the Company issued its 2013 annual financial results on SEC Form 10-K. Raschbaum and Marshaleck signed the 2013 Form 10-K pursuant to the requirements of the Exchange Act. For FY 2013, Defendants reported the AmTrust loss ratio was 66.0%, and the AmTrust combined ratio was 95.7%. The 2013 Form 10-K also reported a consolidated reserve for loss and loss adjustment expenses of $1.957.8 billion as of December 31, 2013.

67.    On May 8, 2014, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter of 2014 ("1Q 2014") results. Raschbaum and Marshaleck participated in the call. During his opening remarks, Raschbaum stated: "In the AmTrust segment our combined ratio improved slightly from 95.9% in the first quarter of 2013 to 95.3% in the first quarter of 2014."

68.    On August 7, 2014, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's second quarter of 2014 ("2Q 2014") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "AmTrust continued to perform at or better than target with a combined ratio for the first six months of 2014 coming in at 95.3%, an improvement over the 95.7% combined ratio that was posted in the first six months of 2013." During the August 7, 2014 earnings call, Schmitt also repeated that "[t]he AmTrust segment reported a combined ratio of 95.3% in the second quarter of 2014 compared to 95.5% in the second quarter of 2013."

69.    On November 6, 2014, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter of 2014 ("3Q 2014") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "Of course, AmTrust continues to be a very profitable contributor to Maiden's results with a combined ratio of 95.6% in the first three

quarters of 2014, which is largely unchanged from the same period last year, and remaining better than target."

70.     After the market close on February 18, 2015, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2014 ("4Q 2014") and FY 2014. As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release. The press release reported reserve for loss and loss adjustment expenses of $2.195 billion as of December 31, 2014.

71.     On February 19, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2014 and FY 2014 results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "Our AmTrust business was better than target, resulting in a combined ratio of 95.4%." During the February 19, 2015 earnings call, Schmitt stated that the AmTrust "loss ratio of 64.8% was lower than the 66.8% reported in the fourth quarter of 2013" and "[t]he AmTrust Reinsurance segment reported a combined ratio of 94.8% in the fourth quarter of 2014 compared to 96.2%, and 95.4% for the full year versus 95.8% in the prior year."

72.     On March 13, 2015, the Company issued its 2014 annual financial results on SEC Form 10-K. Raschbaum and Schmitt signed the 2014 Form 10-K pursuant to the requirements of the Exchange Act. For FY 2014, Defendants reported

the AmTrust loss ratio was 64.8%, and the AmTrust combined ratio was 95.4%. The 2014 Form 10-K also reported a consolidated reserve for loss and loss adjustment expenses of $2.195.4 billion as of December 31, 2014.

73.     On May 6, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter of 2015 ("1Q 2015") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "AmTrust combined ratio has continued to perform better than target with the first quarter coming in at 94.6% benefitting from improving Workers Comp rates and a business mix trending toward higher-margin business."

74.     On August 5, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's second quarter of 2015 ("2Q 2015") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "The AmTrust segment performed well, with a combined ratio of 95.2% for the quarter, an improvement versus 95.7%, largely reflecting changes in business mix." We continue to benefit significantly from their profitable growth." During the August 5, 2015 call, Schmitt repeated Raschbaum's reporting of the AmTrust segment's combined ratios for 2Q 2015.

75.     On November 5, 2015, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter of 2015 ("3Q 2015") results. Raschbaum and Schmitt participated in the call. During the

November 5, 2015 call, Schmitt stated: "The AmTrust reinsurance segment reported a combined ratio of 95.5% in the third quarter of 2015, compared to 95.6% in the third quarter of 2014."

76.    After the market close on February 22, 2016, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2015 ("4Q 2015") and FY 2015. As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release. The press release reported reserve for loss and loss adjustment expenses of $2.271 billion as of December 31, 2015.

77.    On February 23, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2015 and FY 2015 results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "The AmTrust-reinsurance segment produced a combined ratio of 95.3% [sic] in the year ended December 31, 2015, compared to 95.4% in 2014." During the February 23, 2016 call, Schmitt stated: "The AmTrust-reinsurance segment reported combined ratio of 95.8% in the fourth quarter, compared to 94.9% [in fourth quarter 2014], due to business mix as well as a higher booking rate for select portions of the segment."

78.    On March 1, 2016, the Company issued its 2015 annual financial results on SEC Form 10-K. Raschbaum and Schmitt signed the 2015 Form 10-K pursuant

to the requirements of the Exchange Act. For FY 2015, Defendants reported the AmTrust loss ratio was 63.8%, and the AmTrust combined ratio was 95.3%. The 2015 Form 10-K also reported a consolidated reserve for loss and loss adjustment expenses of $2.439 billion as of December 31, 2015.

79. On May 5, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter 2016 ("1Q 2016") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "In the AmTrust segment, we continue to see strong underwriting results. Our combined ratio for the quarter in this segment was 95.3% versus 94.6% in the first quarter of 2015. While loss ratios and combined ratios for the quarter are modestly higher, this reflects a combination of business mix changes and a higher initial booking ratio." During the May 5, 2016 call, Schmitt also stated: "The AmTrust Reinsurance segment reported a combined ratio of 95.3% in the first quarter, compared to 94.6% in the first quarter of 2015."

80. On August 5, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 2Q 2016 results. Raschbaum and Schmitt participated in the call. During the August 5, 2016 call, Schmitt stated: "The AmTrust Reinsurance segment reported a combined ratio of 94.9%, compared to 95.2

81.     On November 3, 2016, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter 2016 ("3Q 2016") results. Raschbaum and Schmitt participated in the call. During his opening remarks, Raschbaum stated: "The combined ratio in the quarter for the AmTrust segment was 95.9% as compared to 95.4% in the prior-year, across the underwriting portfolio we remain focused on enhancing underwriting results absent the impact of adverse commercial audit development across the portfolio, our core underwriting performance is in line with our expectations." During the November 3, 2016 call, Schmitt also stated "[t]he AmTrust Reinsurance segment combined ratio was 95.9% in the third quarter, compared to 95.4%."

82.     Prior to market open on February 28, 2017, Maiden issued a press release reporting the Company's financial results for 4Q 2016 and FY 2016. As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release. The press release reported reserve for loss and loss adjustment expenses of $2.896 billion as of December 31, 2016.

83.     On February 28, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2016 and FY 2016 results. Raschbaum and Schmitt participated in the call. During the February 28, 2017 call, Schmitt also stated: "The AmTrust segment combined ratio was 108.1% in the fourth

quarter, compared to 95.8%, as net adverse development of auto and general liability reserves, primarily related to AmTrust specialty program business unit, reduced profitability of the segment by $52 million. If we exclude the reserve charge in the fourth quarter of 2016, the AmTrust combined ratio would have been 96%."

84.    On March 6, 2017, the Company issued its 2016 annual financial results on SEC Form 10-K. Raschbaum and Schmitt signed the 2016 Form 10-K pursuant to the requirements of the Exchange Act. For FY 2016, Defendants reported the AmTrust loss ratio was 66.5%, and the AmTrust combined ratio was 98.4%. The 2016 Form 10-K also reported a consolidated reserve for loss and loss adjustment expenses of $2.896 billion as of December 31, 2016.

85.    On May 9, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's first quarter of 2017 ("1Q 2017") results. Raschbaum and Schmitt participated in the call. During the May 9, 2017 call, Schmitt stated: "The AmTrust Reinsurance segment combined ratio was 99.8% in the first quarter of 2017, compared to 95.3% [in first quarter of 2016], partially due to higher initial loss ratio on the master quota share as well as adverse development of approximately $10 million."

86.    On August 9, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 2Q 2017 results. Raschbaum and

Schmitt participated in the call. During the August 9, 2017 call, Schmitt stated: "The AmTrust Reinsurance segment combined ratio was 101.5%, compared to 94.9%."

87.    Defendants' Class Period statements regarding Maiden's loss reserves and the combined ratios and loss ratios for the AmTrust business, set forth above in ¶¶64-86, were materially misleading because they failed to disclose that the estimated loss ratios used for the most recent accident years were substantially lower than actual loss ratios for all prior accident years. Specifically, Defendants included loss ratio estimates in the 50% range for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums had historically normalized to 70% to 80% over time. The omission of the 70% to 80% historic loss ratio for the AmTrust business from Defendants' statements was particularly misleading because Maiden was required to pay AmTrust a 30% commission for each dollar in ceded net earned premiums. Accordingly, when the AmTrust book of business experienced a loss ratio of 70% or higher, it would result in an earnings loss for Maiden investors.

88.    On November 9, 2017, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's third quarter of 2017 ("3Q 2017") results. Raschbaum and Schmitt participated in the call. During the

November 9, 2017 call, Schmitt stated: "AmTrust Reinsurance segment combined ratio was 113.3% in the third quarter of 2017 compared to 95.9%."

89.     After the market close on February 27, 2018, Maiden issued a press release reporting the Company's financial results for the fourth quarter of 2017 ("4Q 2017") and FY 2017. As CEO and CFO of Maiden, Raschbaum and Schmitt reviewed the press release for accuracy and maintained ultimate authority over the content and statements made in the press release. The press release reported reserve for loss and loss adjustment expenses of $3.547 billion as of December 31, 2017.

90.     On February 28, 2018, Maiden conducted an earnings conference call for analysts and investors to discuss the Company's 4Q 2017 and FY 2017 results. Raschbaum and Schmitt participated in the call. During the February 28, 2018 call, Schmitt stated that for FY 2017 "the combined ratio in the AmTrust segment was 110.8% compared to 98.4% in 2016," that "[t]he combined ratio in the AmTrust Reinsurance segment was 131.1% in the fourth quarter compared to 108.1% in the fourth quarter of 2016," and "[e]xcluding the adverse development, the AmTrust segment combined ratio would have been 100.8% in the fourth quarter …."

91.     On March 1, 2018, the Company issued its 2017 annual financial results on SEC Form 10-K. The 2017 Form 10-K repeated the loss and combined ratios for Maiden and AmTrust, which Raschbaum and Schmitt disseminated to analysts and

investors during the 4Q 2017 earnings conference call and reported a consolidated loss reserve of $3.547 billion as of December 31, 2017.

92.    Defendants' Class Period statements regarding Maiden's loss reserves and the combined ratios, and loss ratios for the AmTrust business, set forth above in ¶¶88-91, were materially misleading because they failed to disclose that the estimated loss ratios used for the most recent accident years were substantially lower than actual loss ratios for all prior accident years. Specifically, Defendants continued to include loss ratio estimates materially below historical estimates for the AmTrust business for the most recent vintage of earned premiums while Defendants had access to, or were aware of, historical claim and actuarial data that indicated the loss ratio for all vintages of earned premiums had historically normalized to 70% to 80% over time. The omission of the 70% to 80% historic loss ratio for the AmTrust business from Defendants' statements was particularly misleading because Maiden was required to pay AmTrust a 30% commission for each dollar in ceded net earned premiums. Accordingly, when the AmTrust book of business experienced a loss ratio of 70% or higher, it would result in an earnings loss for Maiden investors.

**THE TRUTH EMERGES**

93.    As specified below, beginning in February 2017 and running through November 2018, Maiden was forced to make a series of negative disclosures regarding adverse developments in the Company's AmTrust Reinsurance segment.

Over this period, and largely as a result of these disclosures, Maiden's share price dropped from $16.50 per share to under $2.50 per share. Maiden's share price continued to trade below $2.50 per share for two years after the Class Period.

94.    Following the close of the market on February 14, 2017, Maiden issued a press release disclosing that the Company would have to take a reserve charge of approximately $120 million and that the charge primarily emanated from losses related to adverse developments from the 2011-2014 underwriting years. The press release stated that Maiden's management would provide additional details regarding the reserve charge on a conference call schedule for February 28, 2017.

95.    As a result of the disclosure of the reserve charge, Maiden's stock price fell nearly 10%, from $16.65 to $15.02 per share, on February 15, 2017, on abnormally high trading volume of 1,075,400 shares.

96.    Following the close of the market on February 27, 2017, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Fourth Quarter and Year-End 2016 Financial Results." The press release disclosed that $52 million of the previously announced $120 million reserve charge stemmed from Maiden's AmTrust Reinsurance segment, and an additional $11.5 million of the charge reflected reserves for Maiden's reinsurance of National General Holdings Corporation, another related insurance company controlled by the Karfunkels. The release also disclosed that, due to the reserve charge, Maiden suffered a net loss of

$74.7 million for 4Q 2016 alone, and that net income for FY 2016 was reduced by 89%, from $135.7 million to $15.2 million. The release further disclosed that the loss ratio for 4Q 2016 for the AmTrust Reinsurance segment was 76.1%, more than 10% higher than what was reported the prior year. Prior to the market opening on February 28, 2017, Maiden hosted a conference call with analysts to discuss the 4Q 2016 and FY 2016 results. During the call, Raschbaum and Schmitt acknowledged the impact of the large reserve charge on Maiden's earnings and warned that, as a result of audit procedures concerning the charge, Maiden might be forced to delay filing the Company's Form 10-K on a timely basis.

97.     As a result of the disclosures in the February 27, 2017, press release and February 28, 2017, conference call regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell an additional 6.4%, from $14.58 to $13.65 per share, on February 28, 2017, on abnormally high trading volume of 1,131,900 shares.

98.     After the close of the market on August 8, 2017, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Second Quarter 2017 Financial Results." The press release disclosed that Maiden suffered net adverse developments in 2Q 2017 of $29.4 million from the AmTrust Reinsurance segment. The release also disclosed that, primarily due to the adverse developments in the AmTrust segment, Maiden suffered a net loss of $22.4 million in 2Q 2017, $53.3 million less

than the Company's reported net income in 2Q 2016. Prior to the market opening on August 9, 2017, Maiden hosted a conference call with analysts to discuss the 2Q 2017 results. During the call, Raschbaum acknowledged that the adverse developments in the AmTrust segment largely reflected ongoing diligence and active management of Maiden's relationship with AmTrust.

99.     As a result of the disclosures in the August 8, 2017 press release and August 9, 2017 conference call regarding adverse developments in the AmTrust Reinsurance segment and Maiden's financial results, Maiden's stock price plummeted 31.3%, from $9.55 to $6.56 per share, by the close of the market on August 10, 2017. This stock price decline was on abnormally high trading volume of 2,132,600 shares on August 9 and 1,821,900 shares on August 10.

100.    Following the close of the market on November 8, 2017, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Third Quarter 2017 Financial Results." The press release disclosed that "[n]et adverse loss reserve development in the third quarter of 2017 was $77.7 million. Primarily emanating from the AmTrust reinsurance segment." The release further provided that the net adverse development emanating from the AmTrust business was $61.1 million and that the loss ratio for the AmTrust segment was 81.4%, up significantly from the 63.9% loss ratio reported for 3Q 2016. As a result of the adverse developments reported for the AmTrust segment, Maiden suffered a net loss of $63.6 million in 3Q

- 45 -

2017, a decline of more than $95 million from the reported income in 3Q 2016. Prior to the market opening on November 9, 2017, Maiden hosted a conference call with analysts to discuss the 3Q 2017 results. During the call, Raschbaum conceded that "Maiden's results were most significantly impacted by prior period development[s], primarily emanating from the AmTrust Reinsurance segment."

101.   As a result of the disclosures in the November 8, 2017 press release and November 9, 2017 conference call regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell once again, from $7.75 to $6.07 per share, a one day decline of 21.7% on abnormally high trading volume of 2,497,000 shares.

102.   On February 27, 2018, after the close of the market, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Fourth Quarter and Full Year 2017 Financial Results." The press release disclosed that net adverse loss reserve developments in just 4Q 2017 totaled $171 million, largely from the AmTrust Reinsurance segment. The release further provided that the loss ratio for the AmTrust segment had increased to 98.4%. As a result of the disclosed adverse developments, Maiden suffered a net loss of $133.6 million in 4Q 2017 alone. Prior to the market opening on February 28, 2018, Maiden hosted a conference call with analysts to discuss the 4Q 2017 results. During the call, Raschbaum disclosed that $139 million of the adverse loss reserve development in 4Q 2017 emanated from the AmTrust Reinsurance segment. The $171 million adverse development charge taken

in 4Q 2017 was more than the entire reserve charge in 2016, and brought the total adverse development reserves for FY 2017 to $311.3 million, 77% of which emanated from the AmTrust segment.

103.   As a result of the disclosures in the February 27, 2018, press release and February 28, 2018 conference call regarding losses in the AmTrust reinsurance segment and Maiden's financial results, Maiden's stock price suffered a one day decline of 16.6%, from $6.79 to $5.66 per share, on abnormally high trading volume of 2,498,200 shares.

104.   Prior to the opening of the market on August 9, 2018, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Second Quarter 2018 Financial Results – Company provides update on strategic review." The press release disclosed that Maiden had to record an additional $36.4 million in adverse loss development, of which $28.4 million, 78%, emanated from the AmTrust segment. As a result of the adverse loss development, Maiden also had to report that the Company suffered a net loss of $5.9 million for the second quarter of 2018 ("2Q 2018"). Following the string of disclosures uncovering their previous misstatements and causing the precipitous decline in Maiden's stock price, it was also announced on August 9, 2018, that defendants Raschbaum and Schmitt were leaving the Company. As a result of the true facts emerging about the AmTrust Reinsurance segment, Maiden was also forced to disclose that the Company's dividend payment

- 47 -

would be cut by two-thirds. Defendants declined to hold a conference call after the August 9, 2018 press release.

105.   As a result of the disclosures in the August 9, 2018, press release regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell sharply from $7.37 to $4.32 per share, a one-day decline of 41.4%, on abnormally high trading volume of 2,516,900 shares.

106.   Shortly after August 9, 2018, Maiden disclosed in a series of announcements that it had entered into a number of agreements to sell a large portion of its business to competitors, effectively divesting the Company's U.S. reinsurance treaty operations. After these divestitures, Maiden was left with significantly reduced business. The Company, however, maintained its AmTrust business, which continued to form a significant majority of the Company's source of revenue.

107.   Finally, after the close of the market on Friday, November 9, 2018, Maiden issued a press release titled "Maiden Holdings, Ltd. Announces Third Quarter 2018 Financial Results – Company enters loss portfolio transfer for AmTrust loss reserves." The press release disclosed that Maiden had to record a massive adverse loss development of $210.4 million for the AmTrust Reinsurance segment. The release also disclosed that the loss ratio for Maiden's AmTrust Reinsurance segment had increased to 117.9%. As a result of these belated

disclosures regarding the AmTrust Reinsurance segment, Maiden suffered a net loss of $308.8 million in 3Q 2018.

108.   As a result of the disclosures in the November 9, 2018 press release regarding the AmTrust segment and Maiden's financial results, Maiden's stock price fell sharply the following trading day, November 12, 2018. On that day, Maiden's share price dropped 31.8%, from $3.52 to $2.40 per share, on abnormally high trading volume of 2,874,400 shares.

109.   On January 3, 2019, Maiden announced that it had amended its AmTrust Quota Share Agreement with AmTrust, which would result in Maiden returning approximately $700 million in gross unearned premium to AmTrust. Rather than a return to profitability, the shoddy underwriting practices of Maiden, in particular with respect to related-party AmTrust, had eviscerated the value of the Company and left the Company's shareholders holding the bag. In addition, Maiden disclosed that, as part of its renegotiated deal, the Company had agreed to pay an additional five points of ceding commission to AmTrust for a dramatically slimmed down book of business. Typically, cedants that inflict heavy losses on their reinsurers are obliged to offer significant reductions in ceding commissions. Maiden's acceptance of an even worse deal with an entity that had just caused it to suffer hundreds of millions of dollars in losses, rather than simply terminating the

- 49 -

agreement, is indicative of the improper extent to which Maiden was beholden to AmTrust, its largest and most important client.

110.    From the trading price immediately before the first corrective disclosures of Defendants' fraud, Maiden's stock price had dropped 86% by November 12, 2018, from $16.65 to $2.40 per share.

## INSIDER TRADING AND EXECUTIVE COMPENSATION ALLEGATIONS

111.    Defendants Raschbaum and Schmitt collectively sold more than $1.275 million of their Maiden stock while in possession of material, nonpublic information about Maiden's failure to appropriately account for AmTrust Reinsurance segment loss reserves and the resulting inflation of Maiden's financial results. As reflected in the chart below, Raschbaum sold 70,000 shares of his Maiden stock for proceeds of $956,200 and Schmitt sold 20,000 of her shares for proceeds of $319,700. Based on the Forms 4 filed with the SEC following these sales, Raschbaum sold 16% of his Maiden stock and Schmitt sold 12% of the Maiden stock she held.

| Date | Number of Shares | Share Price | Total Proceeds |
|---|---|---|---|
| Raschbaum | | | |
| 11/7/2016 | 70,000 | $13.66 | $956,200 |
| **Total** | **70,000** | | **$956,200** |
| Schmitt | | | |
| 11/11/2016 | 10,000 | $15.57 | $155,700 |
| 11/14/2016 | 10,000 | $16.40 | $164,000 |
| **Total** | **20,000** | | **$319,700** |

112.   Raschbaum and Schmitt's insider sales occurred only weeks before Maiden's stock price hit a Class Period and all-time high of $16.65 per share and only three months before the first corrective disclosure, on February 14, 2017, when the truth about the AmTrust segment began to emerge. Raschbaum and Schmitt did not engage in any insider trading in the 12 months before the Class Period began, and they did not sell any stock during the remainder of the Class Period once the truth began to emerge about their misstatements and omissions.

**Executive Compensation**

113.   The Individual Defendants were also incentivized to conceal the problems with the AmTrust Reinsurance segment and overstate Maiden's financial results because a significant portion of their compensation was performance-based and varied materially depending on the Company's financial performance. According to Maiden's SEC filings, the Individual Defendants' compensation packages were based on "the creation of shareholder value, and bonuses and share-based awards that are dependent on, and strictly tied to, the Company's performance and paid upon the achievement of business goals and key business metrics."

114.   Schmitt and Marshaleck were eligible to earn annual incentive compensation that was primarily based on hitting targeted operating return on equity (40% of incentive compensation basis) and achievement of combined ratio objectives (30% of basis). As a result of misrepresentations regarding Maiden's

financial results, these defendants were able to secure significant incentive bonuses. For FY 2013, defendant Marshaleck received an incentive bonus of $540,000, equivalent to 90% of his annual salary. For FY 2013, FY 2014, and FY 2015, defendant Schmitt was awarded incentive compensation equivalent to 70%, 119% and 85%, respectively, of her annual salary ($420,626 for FY 2013; $711,000 for FY 2014; and $510,000 for FY 2015). In comparison, as the truth emerged about the AmTrust segment and Maiden's financial results, Schmitt's incentive compensation dropped to just 29% of her salary for FY 2016 and 31% of her salary for FY 2017, and she was not awarded incentive compensation for FY 2018.

115. Defendant Raschbaum was similarly incentivized to misrepresent Maiden's results. According to Maiden's SEC filings, during the Class Period Raschbaum received incentive compensation totaling $5,160,000 for, among other things: (a) record annual reported earnings (before February 2017); (b) a capital raise resulting in capital growth of $165 million; (c) continued enhancement of an effective risk-management framework; and (d) refinancing $110 million Senior Notes which reduced the cost of capital. For FY 2014, FY 2015 and FY 2016, Raschbaum was awarded incentive compensation equivalent to 180%, 140% and 146%, respectively, of his annual salary ($1.8 million for FY 2014; $1.4 million for FY 2015; and $1.46 million for FY 2016). In comparison, as the truth emerged about the AmTrust segment and Maiden's financial results, Raschbaum's incentive

compensation dropped to 25% of his salary for FY 2017 and 25% of his salary for FY 2018.

### MAIDEN SELLS SECURITIES DURING THE CLASS PERIOD

116.   Maiden's SEC filings throughout the Class Period show that it funded its capital requirements through securities and debt offerings to investors. The prospectus for each of these offerings incorporated false and misleading statements Defendants had made during the Class Period about the AmTrust Reinsurance segment and Maiden's financial results. The success of each of the offerings identified below was dependent on maintaining Maiden's inflated common stock price and positive earnings and obfuscating the true facts regarding the AmTrust segment. Collectively, through these securities and debt offerings, Defendants were able to raise over $410 million in capital.

117.   On November 25, 2015, Maiden sold 6.6 million Series C shares at a price of $25 per share. The offering prospectus incorporated by reference Maiden's misleading 2014 Form 10-K. As a result of this securities offering, Maiden collected $159.6 million in net proceeds. According to the offering prospectus, these funds were needed to support the development of Maiden's reinsurance business and other general corporate purposes.

118.   On June 14, 2016, Maiden made a public debt offering of $110 million for net proceeds of $106.3 million. The offering prospectus incorporated by

reference Maiden's misleading 2015 Form 10-K. According to the offering prospectus, the offering was needed to fully redeem the Company's previously-issued 2011 Senior Notes, thus lowering its cost of capital.

119.   On June 15, 2017, Maiden sold six million Series D shares at a price of $25 per share. The offering prospectus incorporated by reference Maiden's misleading 2016 Form 10-K. As a result of this securities offering, Maiden collected $144.9 million in net proceeds. A portion of the proceeds from this offering were needed to redeem its previously-issued 2012 Senior Notes.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

120.   Maiden's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability and do not shield from liability statements regarding purported historical results.

121.   To the extent any of Defendants' false or misleading statements are deemed to be forward-looking, Defendants are liable for those statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Maiden who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they

were not made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on those historic or present tense statements when made.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE

122.   At all relevant times, Maiden's common stock traded in an efficient market for the following reasons, among others:

(a)   Maiden met the requirements for listing, and was listed and actively trade on the NASDAQ Global Select Market, a highly efficient and automated market;

(b)   As a regulated issuer, Maiden filed periodic public reports with the SEC and NASDAQ;

(c)   Maiden regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Maiden was followed by multiple securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public market.

123.   As a result of the foregoing, the market for Maiden stock promptly digested statements and information regarding Maiden from publicly available sources and reflected such statements and information in the price of the stock. Under these circumstances, all purchasers of Maiden common stock during the Class Period suffered similar injury through their purchases of the stock at artificially inflated prices and the fraud-on-the-market presumption of reliance applies.

124.   A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there is a duty to disclose.

## CLASS ACTION ALLEGATIONS

125.   Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class. Excluded from the Class are Defendants and their families, the officers and directors of Maiden, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

126.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period,

Maiden common stock was actively traded on the NASDAQ Global Select Market, one of the largest stock exchanges in the world. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. During the Class Period, there were more than 82 million shares of Maiden common stock outstanding and the average daily trading volume was 505,163 shares. Record owners and other members of the Class may be identified from records maintained by Maiden or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

127.   There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts;

(c)     whether the price of Maiden stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

128.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

129.   Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel who are experienced in securities and class action litigation. Plaintiffs have no interests which conflict with those of the Class.

130.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

131.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Maiden stock and operated as a fraud or deceit on Class Period purchasers of Maiden stock by misrepresenting and omitting material information

about the AmTrust book of business. As Defendants' prior misrepresentations and omissions were disclosed to the market, Maiden's stock price fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Maiden stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

132.   Defendants' misleading statements and omissions of material fact, identified herein, caused Maiden stock to trade at artificially inflated prices during the Class Period.

133.   As a direct result of the corrective disclosures from February 14, 2017, to November 9, 2018, Maiden's stock price suffered a significant decline. The declines in Maiden's stock price on February 15, 2017, February 28, 2017, August 9-10, 2017, November 9, 2017, February 28, 2018, August 9, 2018 and November 12, 2018, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market. The average daily trading volume for Maiden on the days following these corrective disclosures was 2,103,814 shares, compared to an average daily trading volume during the Class Period of 505,163 shares

134.   The economic losses suffered by Plaintiffs and other members of the Class were a direct result of Defendants' fraudulent scheme to inflate Maiden's stock

price and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

## COUNT I

### For Violations of §10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

135.   Plaintiffs incorporate ¶¶1-134 by reference.

136.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

137.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Maiden securities during the Class Period.

138.   In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, the Defendants had a duty to promptly disseminate truthful information with respect to the AmTrust book of business and Maiden's financial results that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's earnings trends, so that the market prices of the Company's securities would be based on truthful, complete and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

139.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases of Maiden common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Maiden stock and experienced losses when the artificial inflation was released from Maiden stock as a result of the revelations and price declines detailed herein. Plaintiffs and the Class would not have purchased Maiden securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

140.   By virtue of the foregoing, each of the Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

- 61 -

## COUNT II

### For Violations of §20(a) of the
### Exchange Act Against All Defendants

141.   Plaintiffs incorporate ¶¶1-140 by reference.

142.   During their tenures as officers and/or directors of Maiden, Defendants were controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions of control and authority as officers of Maiden, these Defendants had the power and authority to cause Maiden to engage in the conduct complained of herein. The Individual Defendants were able to, and did, control, directly and indirectly, the decision-making of Maiden, including the content and dissemination of Maiden's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein. Maiden exercised control over and directed the actions of its senior officers, managers, directors and agents, including the Individual Defendants. Maiden controlled the Individual Defendants and all of its employees and subsidiaries.

143.   In their capacities as senior corporate officers of Maiden, and as more fully described herein, the Individual Defendants participated in the misstatements and omissions set forth above. Indeed, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Maiden's deceptive business practices.

- 62 -

Defendants had the ability to influence and direct and did so influence and direct the activities of Defendants in their violation of §10(b) of the Exchange Act and Rule 10b-5.

144.   As a result, Defendants were control persons within the meaning of §20(a) of the Exchange Act.

145.   As set forth above, Maiden violated §10(b) of the Exchange Act. By virtue of its position, and as a result of its aforementioned conduct and culpable participation, Maiden is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Individual Defendants are liable to Plaintiffs and the other members of the Class. Maiden exercised control over the Individual Defendants and all of its employees and subsidiaries and, as a result of its aforementioned conduct and culpable participation, is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Individual Defendants are liable to Plaintiffs and the other members of the Class.

146.   This claim is brought within the applicable statute of limitations.

147.   By reason of the foregoing, Defendants violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on their own behalf and on behalf of the Class, respectfully pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, and certifying Plaintiffs as Class Representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other costs and disbursements; and

D.     Such equitable, injunctive or other and further relief as the Court may deem just and proper, including, but not limited to, rescission.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: August 20, 2021          **THE ROSEN LAW FIRM, P.A.**

_/s/ LAURENCE M. ROSEN_
LAURENCE M. ROSEN
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: 973/313-1887
973/833-0399 (fax)
lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
JACOB GOLDBERG (pro hac vice pending)
DANIEL TYRE-KARP (pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: 212/686-1060
212/202-3827 (fax)
jgoldberg@rosenlegal.com
dtyrekarp@rosenlegal.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

*Co-Lead Counsel*

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
JAMES E. CECCHI
DONALD A. ECKLUND
5 Becker Farm Road
Roseland, NJ 07068
Telephone: 973/999-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel*