THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN
One Gateway Center, Suite 2600
Newark, NJ  07102
Telephone:  973/313-1887
973/833-0399 (fax)
lrosen@rosenlegal.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

Co-Lead Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re MAIDEN HOLDINGS, LTD. SECURITIES LITIGATION | Master File No. 1:19-cv-05296-RMB-MS |
| | CLASS ACTION |
| This Document Relates To: | ELECTRONIC DISCOVERY ORDER |
| ALL ACTIONS. | |

Error! Unknown document property name.

## I.    PURPOSE

Discovery requests and subpoenas served in the Action may call for the production of hard-copy documents and electronically stored information. This Order will govern how the Parties manage electronic discovery in the above-captioned case.

## II.    DEFINITIONS

1.    "Action" means the above-captioned action.

2.    "Document" has the broadest possible meaning ascribed to it in Federal Rule of Civil Procedure 34(a)(1)(A).  The term "Document" shall include Hard-Copy Documents and ESI as defined herein.

3.    "Email" means electronic messages sent or received asynchronously via messaging applications, services, or platforms, including but not limited to: Microsoft Outlook and Office 365, Google Gmail, Yahoo Mail, and Apple Mail (iCloud).

4.    "Email Threading" means a single Email conversation that starts with an original Email (the beginning of the conversation), and includes all subsequent replies and forwards pertaining to that original Email.

5.    "ESI" is an abbreviation of "electronically stored information," which has the broadest possible meaning ascribed to it in Federal Rule of Civil Procedure 34(a)(1)(A).

6.    "ExtractedText" means text extracted from a Native Format file and includes at least all headers, footers, Document body information, and any hidden text, if available.  The Extracted Text must not include text of characters that were not part of the text of the original Native Format file, including but limited to, Bates numbers and Endorsements (except in the cases of redactions as detailed in Section 4.4).

7.    "Hard-Copy Document" means Documents existing in paper form at the time of collection.

8.    "Hash Value" means the unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm, such as MD5 and SHA, applied to the characteristics of the data set.

9.    "Instant Messages" means real-time communications sent via chat application, platform, or client or via SMS, XMPP, or any similar standard, including but not limited to Bloomberg Chat, Slack, Google Talk, Google Chat, Google Hangouts, Apple iMessage, WhatsApp, WeChat, QQ, Facebook Messenger, Microsoft Teams, Skype, Zoom, Discord, Snapchat, Signal, Line, Telegram, or any proprietary instant messaging system or standard.

10.    "Load File" means an electronic file that is used to import all required production information into a Document database, including, if available, Document

2

images, Extracted Text or OCR text, Native Format files where required by this Order, and Metadata, as well as information indicating Document breaks, and Document relationships such as those between an Email or Instant Message and its attachments, and a Document and information related to embedded content.

11.    "Maiden" means Defendant Maiden Holdings, Ltd.

12.    "Metadata" means (i) structured information about ESI that is created by the file system or application that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file, embedded in the Document or Email and sometimes modified through ordinary business use; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system; (iii) information, such as Bates numbers, created during the course of processing Documents or ESI for production; and (iv) information collected during the course of collecting Documents or ESI, such as the name of the Media device on which it was stored, or the custodian or non-custodial data source from which it was collected. Metadata of the ESI describes, *inter alia*, the characteristics, origins, usage, and validity of the collected ESI.

13.    "Native Format" means the format of ESI in the application in which such ESI was originally created.

14.    "OCR" means the optical character recognition technology used to read paper Documents or electronic images of Documents and output such Documents to a searchable text format.  The latter text is also referred to as the "OCR text" or simply "OCR."

15.    "Party" means any party to the Action, including all of its officers, directors, and employees.

16.    "Producing Party" means any Party or Third-Party in the Action that produces Documents.

17.    "Receiving Party" means a Party in the Action to whom Documents are produced.

18.    "Responsive Document" means any Document that is responsive to any discovery request or subpoena served on the Producing Party in the Action and which the Producing Party has agreed or been ordered to produce, subject to the limitations set forth in the Federal Rules of Civil Procedure and/or Court order.

19.    "Tagged Image File Format" (or "TIFF") refers to the CCITT Group IV graphic file format for storing bit-mapped images of ESI or paper Documents.

20.    "Third Party" means any other person or entity that is served a subpoena pursuant to Federal Rule of Civil Procedure 45.

## III.    PRESERVATION

Consistent with the Parties' obligations under Rule 26(f) of the Federal Rules of Civil Procedure and Local Civil Rule 26.1(d), the Parties have met and conferred, and will continue to meet and confer, regarding:

> (a) Preservation and production of digital information; procedures to deal with inadvertent production of privileged information; whether restoration of deleted digital information may be necessary; whether back up or historic legacy data is within the scope of discovery; and the media, format, and procedures for producing digital information;

> (b) Who will bear the costs of preservation, production, and restoration (if necessary) of any digital discovery.

D.N.J. Local Civ. R. 26.1(d).

## IV.    IDENTIFICATION OF RESPONSIVE DOCUMENTS

The Parties shall meet and confer in good faith in an effort to conduct discovery in a proportional manner.  To identify and cull potentially responsive documents for further review, Parties may propose search terms, custodians, file types, or date ranges or propose other solutions such as predictive coding/technology-assisted-review.  The Parties shall thereafter meet and confer regarding such proposals.

### A.    Sources of ESI

If a Party elects to cull potentially responsive ESI, that Party will disclose and discuss the custodial and non-custodial data sources from which that data will be culled.  Bearing the proportionality principles in mind, the Parties retain the right,

upon reviewing the initial production of documents and conducting other investigation and discovery, to request that files from additional custodial or non-custodial sources be searched and to meet and confer regarding such request. The Parties will use best efforts to make follow-up requests with sufficient time to allow for a reasonable review and production to be made within the discovery schedule.

If a Producing Party learns that responsive ESI that once existed was lost, destroyed, or is no longer retrievable as a result of acts or circumstances not occurring in the ordinary course of business, the Producing Party shall comply with its obligations under the Federal Rules of Civil Procedure concerning that ESI.

## V.    DOCUMENTS PRODUCED WITHOUT THE USE OF SEARCH TERMS

The Producing Party will indicate which categories of documents are being produced with and without the use of search terms or other advanced search methodology. The parties will also endeavor to identify in good faith known, readily retrievable responsive documents and produce them (or log them if withheld on privilege) regardless of whether they fall within the Parties' agreed-upon search parameters.

### A.    Search Terms

The Parties shall meet and confer regarding proposed search terms, if applicable, discussing among other things whether any of the terms are not proportional to the needs of the case. To the extent the Producing Party objects to

6

including any proposed terms on any basis other than relevance, the Producing Party will provide the hit counts for all of the proposed search terms after global de-duplication (including the number of documents that hit on each term, the number of unique documents that hit on each term, and the total number of documents that would be returned by using the proposed search term list, including families).

If disputed terms still exist at the end of the meet-and-confer process, the Party seeking to add disputed search terms may seek relief from the Court concerning the disputed terms.

### B.    Technology-Assisted-Review

No Party shall use predictive coding/technology-assisted-review for the purpose of culling the documents to be reviewed or produced without notifying the opposing Party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

## VI.    PRODUCTION OF HARD-COPY DOCUMENTS – FORMAT

Hard-copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database Load File (*i.e.*, .dat).    The database Load File should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME" and "CUSTODIAN."    The documents should be logically unitized (*i.e.*, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records)

and be produced in the order in which they are kept in the usual course of business. If an original document contains color, and the color is necessary to understand the meaning or content of the document, the document shall be produced as single-page, 300 DPI JPG images with JPG compression and a high-quality setting so as to not degrade the original image. Multi-page OCR text for each document should also be provided. The OCR software shall maximize text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

## VII.  PRODUCTION OF ESI

### A.    Format

The Parties will produce ESI in single-page, black and white, TIFF Group IV, 300 DPI TIFF images with the exception of Microsoft Excel and other spreadsheet files, including comma or tab delimited text files, Microsoft Access and other database files, video files, audio files, animation files, and documents with tracked changes in the metadata, which shall be produced in Native Format. If an original document contains color, the document should be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. The Parties are under no obligation to enhance an image beyond how it was kept in the usual course of business. TIFFs/JPGs will show any and all text and images that would be visible to the reader using the native software that created the document. For example, TIFFs/JPGs of Email messages should include

8

the BCC line. If the image does not accurately reflect the document as it was kept in the usual course of business, including all comments, edits, tracking, etc., the Parties agree to meet and confer in good faith on production format options.

If a document is produced in Native Format, a single-page Bates stamped image slip sheet stating the document has been produced in native format should be provided, with the exception of PowerPoint presentations. PowerPoint documents should be produced in native format along with single-page, 300 DPI TIFF/JPG images which display both the slide and speaker's notes. To protect the confidentiality of files produced in Native Format, any confidentiality designations pursuant to a protective order must appear on the associated slip sheet in no less than 10-point font. Files produced in Native Format shall be given file names identical to the Document Number, followed by the file extension and include the confidentiality designation after the file number, *e.g.*, TAL00000000_CONF.xlsx. Each Native Format file should be named according to the Bates number it has been assigned and should be linked directly to its corresponding record in the Load File using the NATIVELINK field. To the extent that any Party believes that specific documents or classes of documents, not already identified within this Agreement, should be produced in Native Format, the Parties agree to meet and confer in good faith.

9

## B.    De-Duplication

Each Party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level.  Attachments should not be eliminated as duplicates for purposes of production, unless the parent Email and all attachments are also duplicates.  Attachments to Emails, Instant Messages, or other Documents shall not be disassociated from the parent Email, Instant Message, or Document even if they are exact duplicates of another Document in the production, and paper Documents shall not be eliminated as duplicates of responsive ESI.  The Parties agree that an Email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an Email that does not include content in those fields, even if all remaining content in the Email is identical.  Near-duplicate documents will not be removed from production without review and Email thread suppression will not be used to reduce the number of documents produced absent further agreement among the Parties or an order of the Court.  De-duplication will be done across the entire collection (global de-duplication).  The Parties will included separate metadata fields in the Load File, one listing the document CUSTODIAN and other listing any DUPLICATE-CUSTODIANS.  The Parties will also include the Load File, a field listing the document's FILEPATH.  Should the CUSTODIAN or FILEPATH metadata fields become outdated due to rolling productions, the Producing Party will

notify the Requesting Party within thirty (30) days and the Parties will meet and confer to discuss the production of an overlay file.

### C.    Unitization and Scanning

In scanning paper Documents, Documents are to be produced as they are kept. Distinct, logical document breaks should be defined as such in a standard Load File as described herein.  In the case of an organized compilation of separate Documents (*e.g.*, a binder containing several separate Documents behind numbered tabs) the Document behind each tab should be scanned separately, but any Document or family relationship among the scanned Documents in the compilation should be reflected in the data Load File at the appropriate standard fields. For Documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages containing post-it notes or other detachable notes that obscure the underlying Document should be scanned once with the detachable note intact, and then again without it, and made part of the same Document.  The Producing Party will use best efforts to unitize Documents correctly (*i.e.*, distinct Documents should not be merged into a single record, and a single Document should not be split into multiple records), and maintain Document relationships (*i.e.*, attachment status).  Original Document orientation (*i.e.*, portrait v. landscape) should be maintained.

**D.    Metadata**

All ESI will be produced with a standard Concordance delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.  The metadata produced should have the correct encoding to enable preservation of the documents' original language.

For ESI other than Email and Documents that do not conform to the metadata listed in Table 1, such as Instant Messages, as defined herein, the Parties will meet and confer as to the appropriate metadata fields to be produced.

For redacted items which were originally ESI, all Metadata fields will be provided and will include all non-privileged non-redacted data.   Redacted Documents shall be identified as such in the Load File provided with the production. Nothing herein shall require a Producing Party to create or produce Metadata that does not exist, cannot be generated by ESI processing software, or is not reasonably or technically accessible.  If the Producing Party is unable to produce Metadata for a particular field or ESI Document, it will provide an explanation of that inability with its Document production.  The Parties shall then meet and confer to attempt to resolve the problems.

**E.    Embedded Objects**

Embedded files will be produced as attachments to the document that contained the embedded file, with the parent/child relationship preserved.  The

embedded files will be marked with a "YES" in the load file under the "Is Embedded" metadata field. The Parties agree logos need not be extracted as separate documents as long as they are displayed in the parent document.

### F.    Email Threading

Where Email Threading is available as a review tool, producing Parties agree that it can be employed in the review process but not to remove lesser included Emails in an Email thread from productions since this destroys the ability to search the To/From/CC/SentDate/SentTime/Subject Metadata Fields of the individual lesser-included Emails.

### G.    Attachments

The Parties agree that if any part of an Email or its attachments is responsive, the entire Email and attachments will be produced, except any attachments that must be withheld or redacted on the basis of privilege. The Parties will meet and confer about whether there is an appropriate basis for withholding a family document for any reason other than attorney-client or work product privilege. The attachments will be produced sequentially after the parent Email. If the production contains emails with links that appear to contain responsive data, the Requesting Party may make reasonable requests for the Producing Party to use best efforts to collect and produce the documents to which the email links.

13

### H.    Compressed Files Types

Compressed file types (*e.g.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

### I.    Structured Data

To the extent a response to discovery requires production of electronic information stored in a database, the Parties will meet and confer regarding methods of production.  The Parties will consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.

### J.    Exception Report

The Producing Party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type and the file location.

### K.    Encryption

The Parties will make reasonable efforts to ensure that all encrypted or password-protected Documents are successfully processed for review and production under the requirements of this Order, and if produced in Native Format, the decrypted Document is produced.  To the extent encrypted or password-protected Documents are successfully processed according to the requirements of this Order, the Parties have no duty to identify the prior encrypted status of such Documents but will produce the processed Document as a Native Format overlay.  If Documents are not successfully processed despite use of reasonable efforts, a placeholder TIFF

14

image will be produced stating the file is password protected.  Upon request from either Party, the Parties shall meet and confer in good faith regarding reasonable efforts or mechanisms to remove such security protection or the production of available Metadata. To maximize the security of information in transit, any media on which documents are produced shall be encrypted.  In such cases, the Producing Party shall transmit the encryption key or password to the Receiving Party, under separate cover, contemporaneously with sending the encrypted media.

**L.    Redactions**

If Native Format spreadsheets require redactions, the Parties shall meet and confer regarding how to implement redactions.

Unless otherwise agreed, the Parties will not make any redactions based upon the purported irrelevance of all or part of a Document.

**M.    Production Media**

The Producing Party shall produce Document images, Native Format files, load files, and Metadata on hard drives, CDs, DVDs, secure FTP, or other mutually agreeable media ("Production Media").  Each piece of Production Media shall include a unique identifying label corresponding to the identity of the Producing Party, the date of the production of Documents on the Production Media, and the Document Number ranges of the Documents in that production (*e.g.*, "MHLD Production June 1, 2021, MHLD000123-MHLD000456").  To the extent that the

15

Production Media includes any confidential information protected under any protective order filed with the Court, the label on such Production Media shall indicate that the Production Media includes information so designated as required under the terms of any protective order entered in this Action. Production Media shall include text referencing the case name and number. Further, any replacement Production Media shall cross-reference the original Production Media, clearly identify that it is a replacement, and cross-reference the Document Number range that is being replaced. All Production Media that is capable of write protection should be write-protected before production. All Production Media may be encrypted, with the Producing Party to provide a decryption key at the time of production. Productions should be accompanied by a cover letter identifying the custodians whose files are present in the production, if applicable, or otherwise describing the source(s) of the Documents present in the production.

### N.    Confidentiality

Documents produced in the Action shall be subject to the terms of any protective order agreed upon by the Parties, and entered by the Court, as well as Federal Rule of Civil Procedure 26(b)(5)(B).

### O.    Privilege

The terms of this Order are subject to the privilege provisions of any protective order entered in this Action. The Parties agree that any privilege logs

16

exchanged will comply with Federal Rule of Civil Procedure 26(b)(5) and be provided within 30 calendar days of each production tranche in a format to be agreed upon by the Parties.

**P.    Amendment of Order**

Nothing herein shall preclude the Parties from agreeing to amend the terms of this Order, and nothing herein shall preclude any Party from moving the Court to amend the terms of this Order for good cause shown, provided, however, that no Party may seek relief from the Court concerning compliance with the Order until it has met and conferred in good faith with any Parties involved in the dispute.

**STIPULATED AND AGREED TO BY**:

DATED:  September 14, 2021          THE ROSEN LAW FIRM, P.A.
                                    LAURENCE M. ROSEN


                                    _____*/s/ Laurence M. Rosen*_____
                                    Laurence M. Rosen

                                    One Gateway Center, Suite 2600
                                    Newark, NJ  07102
                                    Telephone:  973/313-1887
                                    973/833-0399 (fax)
                                    lrosen@rosenlegal.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Co-Lead Counsel

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
JAMES E. CECCHI
DONALD A. ECKLUND
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
decklund@carellabyrne.com

Additional Counsel

18

DATED:  September 14, 2021

**MARINO, TORTORELLA & BOYLE, P.C.**

By:  */s/ Kevin H. Marino*
    Kevin H. Marino
    John D. Tortorella
    437 Southern Boulevard
    Chatham, NJ 07928-1488
    Telephone:  (973) 824-9300
    Facsimile:   (973) 824-8425
    kmarino@khmarino.com
    jtortorella@khmarino.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
    Michael B. Carlinsky (*pro hac vice*)
    Rollo Baker (*pro hac vice*)
    Jacob J. Waldman (*pro hac vice*)
    Jesse Bernstein (*pro hac vice* pending)
    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    Telephone:  (212) 849-7000
    Facsimile:   (212) 849-7100
    michaelcarlinsky@quinnemanuel.com
    rollobaker@quinnemanuel.com
    jacobwaldman@quinneamnuel.com
    jessebernstein@quinnemanuel.com

IT IS SO ORDERED.

DATED:  9/20/21

_____
THE HONORABLE SHARON A. KING
UNITED STATES MAGISTRATE JUDGE

19