UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MICHAEL WIGGLESWORTH, et al,      )    19-CV-5296
                                  )
          Plaintiff,              )
     vs.                          )
                                  )
MAIDEN HOLDINGS, LTD., et al,     )    Camden, NJ
                                  )    December 9, 2021
          Defendants.            )


TRANSCRIPT OF DISCOVERY DISPUTE HEARING
BEFORE THE HONORABLE SHARON A. KING
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:        DANIEL TYRE-KARP, ESQUIRE
                          BRENT LAPOINTE, ESQUIRE
                          THE ROSEN LAW FIRM, PA
                          609 W. South Orange Avenue
                          Suite 2P
                          South Orange, NJ  07079


                          TOR GRONBORG, ESQUIRE
                          ROBBINS, GELLER, RUDMAN & DOWD, LLP
                          655 West Broadway
                          Suite 1900
                          San Diego, CA  92101


For the Defendants:       KEVIN HARRY MARINO, ESQUIRE
                          JOHN D. TORTORELLA, ESQUIRE
                          MARINO TORTORELLA & BOYLE, PC
                          437 Southern Boulevard
                          Chatham, NJ 07928-1488


                          JACOB J. WALDMAN, ESQUIRE
                          QUINN, EMANUEL, URQUHART &
                          SULLIVAN, LLP
                          51 Madison Avenue, 22nd Floor,
                          New York, New York 10010

2

Audio Operator:          Marnie Maccariella

Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Office:  (856) 435-7172
                         Fax:     (856) 435-7124
                         Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

<u>I N D E X</u>

<u>ARGUMENTS</u>:                                                        <u>PAGE</u>

Ref: Production of documents regarding Request 1A, B and C

  By Mr. Gronborg                     7, 12, 17, 19, 22, 33, 38

  By Mr. Marino                        13, 18, 20, 25, 28, 36

  By Mr. Waldman                                              37


<u>BY THE COURT</u>:                                                   <u>PAGE</u>

Ref: Statement by plaintiffs in 11/22/21 letter

  By Judge King                                               11

Ref: Ruling by the Court

  By Judge King                                           32, 39


**\*\*\*\* Transcriber's note -- (Inaudibles are due to parties speaking over each other, which tends to cancel out words.**

Colloquy                                          4

(The following telephone conference was heard as follows:)

THE COURT: Good afternoon, everyone, this is Judge King. We are here for a discovery dispute conference in Wigglesworth vs. Maiden Holdings, Limited, et al, Docket Number 19-5296. We are on the record.

Once again, can I have the appearances on behalf of plaintiff, please?

MR. GRONBORG: Good afternoon, Your Honor, this is Tor Gronborg from the Robbins, Geller Firm on behalf of the plaintiffs, and I'll allow my colleagues to introduce themselves.

MR. TYRE-KARP: Good afternoon, Your Honor, this is --

THE COURT: Good afternoon.

MR. TYRE-KARP: -- this is Daniel Tyre-Karp from The Rosen Law Firm on behalf of plaintiffs, and I am joined by my colleague, Brent LaPointe.

THE COURT: All right, good afternoon, Mr. Gronborg, Mr. Tyre-Karp, and Mr. LaPointe. Can I also have the appearance on behalf of defendants.

MR. MARINO: Good afternoon, Your Honor, Kevin Marino, Marino, Tortorella and Boyle, for Maiden Holdings. With me on the call is my partner, John Tortorella -- T-O-R-T-O-R-E-L-L-A, and my colleague from Quinn, Emanuel, Jacob

Waldman, W-A-L-D-M-A-N.

THE COURT:  Good afternoon, Mr. Marino, Tortorella and Waldman.  So we -- we are here again trying to resolve some discovery issues.  We first attempted this -- I believe it was -- if I can see my notes, back on December 21st (sic).  At that time, we went through some document requests that were made by the plaintiffs.

The Court made some rulings on some of those requests.  Some of the others, the Court decided that I would hold off on making any rulings because it appeared as if the defendants had documents ready to be produced that would have addressed a lot of the requested documents.

To that end, I allowed -- I allowed defense counsel to turn over the documents that they purported would respond to a lot of the items requested by the plaintiffs, and I allowed plaintiffs the opportunity to supplement the discovery dispute letter.

I did receive a supplemental letter dated November 12th, and my expectation was that items specifically identified in the document production request -- which was filed as Document Number 101-1 on the record -- would have been addressed, so it makes the process a little cumbersome, as the individual items were not identified with a "yes, these documents were produced," or "no, we still need additional information."

Colloquy                                          6

So with that being said, I'll do my best to get through the document requests to see what remains outstanding, if anything, and we'll try to have this wrap -- wrapped today. I believe this process has taken significantly longer than was initially intended, and I don't intend to make this into an unnecessary fishing expedition.

So I will start with, do both parties have the initial document request that was filed as Document 101 on the docket?

UNIDENTIFIED SPEAKER:  We do, Your Honor.

THE COURT:  Okay.  So we can start by item six.  I'm looking at page 14 and the first request on the subsection (a) was for internal and external information and data, including Maiden's historical data and loss experience with AmTrust -- AmTrust's book of business, and it was my understanding that that information would have been included in the documents provided by the defendants.  Was it?

MR. GRONBORG:  It was not, Your Honor.

MR. MARINO:  That is --

MR. GRONBORG:  This is Tor Gronborg on behalf of plaintiffs, and it was not --

MR. MARINO:  Hold on --

MR. GRONBORG:  And, Mr. Marino --

THE COURT:  I'll hear from the plaintiffs.

MR. GRONBORG:  -- if you'd please allow me, I  --

THE COURT:  I'll hear from the plaintiffs.

MR. MARINO:  Hold on, hold on --

THE COURT:  I'll hear from plaintiffs, please.

MR. GRONBORG:  I do think the point of it is for our impression of what was produced, and you'll get your opportunity to speak to it.  The -- and, Your Honor, as opposed to going point-by-point, this Request Number 1 really is a huge part of the substance here and that's why we focused on it in the letter and on what defendants have said.

And what they told the Court on September 21st is that they are going to produce Maiden's internal actuarial analyses, Committee records, and the periodic AmTrust statements concerning premiums, losses and expenses.

Now, it's our understanding that the Court ordered them, and defendants said they were going to produce the documents responsive to Request Number 1A, and they said with respect to the documents regarding Request Number 1B and C, that those would be subsumed in the production.

They didn't produce this.  They produced a subset of them, but not all the documents.  And if you look at their December 3rd, 2021 letter to the Court, what they -- they don't say we produced all the documents responsive to 1A, B and C.  They say sort of vaguely that we've produced documents from the heart of Maiden's actuarial analysis and documents that account for substantial historical data.

That is significantly different from saying we've produced all the documents responsive to 1A, B and C.  And we've had multiple meet and confer discussions on this point. We have identified for defendants where the gaps are in the production, and this is why the gaps matter, and they matter because the fundamental issue here is is there a basis for plaintiffs' allegations.

That's what Judge Bumb wanted us to look into.  And the specific allegation at the root of the matter is the defendants knew but failed to disclose the AmTrust business historical loss ratios were materially worse than the loss reserve rights that those defendants publicly spoke about. That's what we're getting at with Request Number 1.

And there's -- we talked last time, there's a chart at paragraph 57 of plaintiffs' second amended complaint.  That is the chart that identifies the historical loss ratios that defendants are alleged to have known or had access to but failed to disclose.

And what we had -- what we should have received in response to Request Number 1 is the contemporaneous documents that would have shown what those actual historical loss ratios were at the time defendants were making their statements. Those documents were not produced.

Now, we asked -- in the meet and confer calls, we asked defendants, "Have you produced the documents that allow

us to identify what those historical loss ratios were at the time they made the statements." Basically, have you given the documents in response to Request Number 1, and specifically 1A, B and C, that would allow us to recreate that loss triangle.

Initially they refused to answer it and then they effectively answered it "no" by saying it was never their intent to produce those documents. So the documents in response to Request Number 1 would answer them, and before we move on to that, why, we also retained two experts.

We -- we did ask and we appreciate a little extra time was provided because we -- we brought in two expert consultants with acturial and loss reserve expertise, and we asked them to review the material that was produced by the defendants, and we asked them, can you recreate that loss ratio triangle with the material that was available at the time.

In other words, were the historical documents that defendants produced sufficient to be able to identify what those historical loss ratios were on -- for each -- for each year when they were making their statements about the loss reserves. They said no, that they cannot do that.

And so what we get to next is December -- the December 3rd letter. I -- I'm not sure what Mr. Marino's going to argue now, but in the December 3rd letter, defendants

suggested that further discovery -- and the discovery is not needed because -- I'm going to use their words -- they say, "In fact, plaintiffs' claims are pleaded on the basis of historical loss ratios already disclosed by Maiden."

And so defendants are referring to that chart at paragraph 57 of the complaint, and those are historical figures that are pulled from a Maiden disclosure, but it was a disclosure at the end of the class period.

It wasn't a disclosure that was contemporaneous with their alleged false statements, and defendants have never conceded that those results -- the ones that are in the chart, the ones that are pulled from their 2018 SEC filing, are what they had at the time of the class -- at the time they made their false statements.

At their motion to dismiss, they seemed to suggest that wasn't the case which raised this issue whether there was a basis for plaintiffs' allegations.  In our meet and confers, they never said that's the case.  If -- if defendants want to stipulate now that what's in paragraph 57 of the complaint, that those are the historical loss ratios that they had at the time they were making alleged false statements, that would be great.

That could short-circuit a lot of this.  But they haven't done it, and frankly, I'd be surprised if they do do it.  And so that's -- that is the fundamental problem with the

production to date.  We simply do not have the documents that allow us to identify the historical loss ratios the defendant had at the time they made their statements or the underlying data that would allow us to calculate those --

THE COURT:  Thank you.

MR. GRONBORG:  -- and that is what was called for in Request Number 1.

THE COURT:  I'll hear from Mr. Marino in a minute, but before I do, I just want to address a comment that was made in a statement in plaintiffs' November 22nd, 2021 letter. The very last sentence on page one indicates that, "The Court has yet to resolve Judge Bumb's limited discovery to either plaintiffs' sole remaining claim or to the factual predicate of plaintiffs' remaining claim:  whether defendants possessed historical information during the class period that rendered defendants public -- publicly -- public plea disclosure about the AmTrust business loss reserve false or misleading."

To the extent it has not been clear in the past, I just want to make it clear that the Court is ruling as to the limits on discovery, and that is the first option provided by plaintiffs in the -- in this letter, and that comes from Judge Bumb's opinion on page seven, "Was there an intentional decision made by the defendants to omit AmTrust's historical loss ratio information from the view of investors."  So the Court has not --

UNIDENTIFIED SPEAKER:  Your --

THE COURT:  -- extended discovery to the factual predicate of plaintiffs' remaining claim.  I just wanted to clarify that to the extent the plaintiffs indicated that the Court has not resolved the limitations of discovery issues.

MR. GRONBORG:  Your Honor, if I could address that, because it is -- I'm not sure that that changes the matter at all.  You're using the word "intent" and what the intent of defendants are.  In a securities litigation case under the Securities Exchange Act, which is what this is, the equivalent of the intent element is scienter.

And under that element, scienter is measured by what did the defendants know or have access to at the time they were making the alleged false statements.  In other words, this discovery is not about did defendants send an email and say let's not tell investors about X.  Defendants have a duty under the law to -- when they -- when they choose to speak, they have a duty to disclose material information.

And so scienter -- which is effectively the intent element -- scienter goes to what did defendants know or have access to when they spoke.  That is exactly what the discovery in Request Number 1A, B and C is going to.  It is exactly what --

THE COURT:  And that's why --

MR. GRONBORG:  -- that that chart --

THE COURT:  -- the Court did order -- the Court did order that discovery, and my --

MR. GRONBORG:  Well then -- then I -- then which is why this may be a distinction without a difference, is we read it as the Court ordering the discovery on, you know, RFP-1A, B and C.  And as I just went over, that's not what we received.  We did not receive the complete set of documents that would be responsive to those requests.

THE COURT:  Mr. Marino, can I hear from you with regard to the production of items that were ordered under 1A, B, and C?

MR. MARINO:  Yes, Your Honor.  We quite disagree with the position that Mr. Torborg (sic) has -- has expressed.  I'm looking at the Judge's opinion in which she said, "Defendants suggest that AmTrust's historical loss ratios were just one factor they considered in formulating their estimated loss ratios for the future, and plaintiffs have nothing to contradict that."

"Defendants are correct.  The problem is the matter is before the Court on a motion to dismiss with no discovery.  If the evidence demonstrated that defendants considered the historical loss ratios as part of their analysis, defendants' point is well taken and the inferences upon inferences constructed by plaintiffs would likely tumble.  It would be difficult to find that the alleged undisclosed data

Marino - Argument                                    14

contradicted the statements made by me," and citing Oklahoma Firefighters Pension and Retirement System vs. Lexmark.

So we have absolutely produced the documents that Your Honor ordered produced, consistent with that limitation, okay?  Pursuant to this clear instruction from Judge Bumb, we produced:  number one, our chief actuary's work product, and number two, minutes of Committee meetings attended by our upper management including our Chief Executive Officer and our Chief Financial Officer that considered this analysis.

We also produced sessions statements and SOX-related documents concerning actuarial procedure.  That already consists of hundreds of documents and thousands of rows of actuarial data.  Those documents all demonstrate that we considered historical information in making our loss reserve estimates.

What you are hearing in what counsel said is an attempt to revisit the ruling Judge Bumb made.  They want to alter what she has ordered.  What she ordered was to discovery directed at a single issue -- whether we considered historical information in making our loss reserve estimate.  We did. Documents Bates stamped MHLD1652 to 1702 make that clear.

The Third Quarter 2017 Reserve Committee Meeting Loss Reserves Presentation, there's more than 20 pages of dense spreadsheets addressing individual AmTrust business lines.  Page six, for example, includes information for every

accident year going back to 2007, although we were only obligated to produce documents since 2014. The -- the notion that this evidence that we have produced does not more than dispense with Judge Bumb's question about whether we considered and discussed historical information and data is nonsense.

And what you heard about the two experts, yes, they brought two fishermen in -- two more fishermen came in to assist in the fishing expedition that Judge Bumb explicitly said she would not tolerate, and that Your Honor indicated of course you wouldn't either.

Moreover, for every year, there are columns that represent different loss development method approaches, including the paid loss development method, the incurred loss development method, the expected loss ratio method, the incurred loss ratio method. Every one of those methods considers historical data to an extent depending upon the method, and the documents we produced make that clear.

Those methods support an ultimate reserve estimate in another column on the same spreadsheet. And MHLD1703, that's another document which was produced in native form as a spreadsheet, is another complex spreadsheet prepared for our actuarial analysis. Part of the exhibit package that went along with the document just discussed was presented to the Booking Committee on October 19th, 2017.

It includes numerous worksheets of data, including a worksheet relating to AmTrust that is a series of triangles. These resemble Maiden's public triangle disclosures.  They go back to 2007.  These also indicate consideration of historical loss data.  This, respectfully -- no, we don't have to go through each and every one of these points because counsel is right, this first issue that he raised is the whole ball game.

What he's wrong about is what Judge Bumb said.  What she said was, these guys have said they considered historical loss data.  The plaintiffs have not come forward with a word to contradict it.  The problem for defendants though is this is just at the pleading stage, let them have a little discovery and see what they came up with -- come up with.

We gave them that discovery, and all we had to do was give them discovery showing that we in fact considered historical loss data.  We certainly did that in spades.  This is the end of the road.  The case is over.  It's absolutely over.  There's nothing here.

For them to be permitted to drag us through this expedition and without apparent irony to say we brought in two experts and they say they should have done A, B, C, D -- that's not what this is about.  This is about whether we considered historical loss data and we unequivocally did, that's it, game, set, match.  Thank you, Your Honor.

MR. GRONBORG:  Your Honor, let's first note what Mr.

Marino failed to address.  He failed to address the point that the documents they have produced do not identify the historical loss ratios that are at the heart of the allegations.  He -- it is a concession by silence that the documents that produced do not allow us to identify whether those allegations in the complaint are correct.  And we can look at --

THE COURT:  Well, let's --

MR. GRONBORG:  -- Judge Bumb's order.

THE COURT:  -- take a pause for a minute --

MR. GRONBORG:  In the order --

THE COURT:  Let's take a pause for a minute --

MR. GRONBORG:  Sorry, I'm sorry, Your Honor, what is it?

THE COURT:  I need you to pause because I am going to ask Mr. Marino --

MR. GRONBORG:  Okay.

THE COURT:  -- did you provide any historical loss ratio documents?

MR. MARINO:  Yes, we did.

MR. GRONBORG:  And, Your Honor, I agree they provided some.

MR. MARINO:  And they know that --

UNIDENTIFIED SPEAKER:  Your Honor, that --

MR. MARINO:  And they -- Judge, they know this. They -- hold on --

MR. GRONBORG:  We don't --

MR. MARINO:  -- they know this.

MR. GRONBORG:  Your Honor, I think we said just that --

MR. MARINO:  No, no, hold -- hold on --

MR. GRONBORG:  -- that they provided an incomplete --

MR. MARINO:  Hold on --

UNIDENTIFIED SPEAKER:  Hold on a second --

MR. GRONBORG:  -- they provided an incomplete set --

MR. MARINO:  Hold --

MR. GRONBORG:  -- of the historical data.

MR. MARINO:  Hold -- hold on -- hold on -- hold on a second.

MR. GRONBORG:  I'm agreeing with you, Mr. Marino --

MR. MARINO:  Hold -- I --

MR. GRONBORG:  -- on the part.

MR. MARINO:  Just when you have the floor, you have the floor.  Let's just hold on one second, okay?  I would just ask Your Honor -- I was going to ask Your Honor to ask Mr. Gronborg the -- the same question.  That's -- when he says yes, we did, that's it, O-V-E-R, that's the end.  They want it to be something different, but it's not something different.

Judge Bumb was completely unimpressed with their complaint, said she would not permit a fishing expedition,

didn't see anything to contradict our assertion that we in fact relied on historical loss information, and said the problem is there's no discovery that has been taken, so give him some discovery. He just admitted that the very thing that Judge -- Judge Bumb said we had to do, we've done. That's the end. That's the end. (Inaudible) --

MR. GRONBORG: Mr. Marino, what I did was I answered the --

MR. MARINO: -- (inaudible) and raising the voice, all the --

THE COURT: My question now is --

MR. MARINO: -- (inaudible) and raising the voice --

THE COURT: -- to Mr. Gronborg. You said there was an --

MR. GRONBORG: Yes, I'm -- excuse me.

THE COURT: -- incomplete set provided. Can you tell me what -- what makes it incomplete, and what is missing that would make it complete?

MR. GRONBORG: Yes, Your Honor, there were certain documents that identified what the historical loss ratios were at certain points in time. In other words, you could partially fill out the triangle that is on paragraph 57 of the complaint, but it is partial. It is incomplete. The -- the disclosures that were provided, the documents that were provided do not allow you to complete that triangle to

identify what all the loss ratios were at the times that the historical loss ratios were at the time they were speaking.

And so our experts are not fishermen, they reviewed the data with that question in mind to say can we recreate it. So where my agreement was -- and I think Mr. Marino knows this perfectly well -- was we said that there was some data. We did this in the meet and confer calls, we said it here, it's some. It's incomplete.

And the (inaudible) that is happening is that there is no answer and the answer must be no, they know they did not produce the complete set of data that would allow us, the plaintiffs, and the Court, to evaluate what those historical loss ratios were at the time they made their statements. And that information --

THE COURT: Well, I'll (inaudible) --

MR. MARINO: It doesn't matter, Your Honor -- respectfully, it doesn't matter. That isn't what Judge Bumb ordered. That's what they wanted her to order, that's not what she ordered. What she said was very clear. The only question presented is whether we considered historical loss data as one of the criteria.

We did. They know it. They know it in spades because we've produced documents reflecting it. That's the end for them. I don't know how to say it any more clearly. They -- they want to get into an analysis, they want to

substitute their judgment for ours.  This isn't about deceiving the investing public, this is about their 20-20 hindsight assessment of our consideration and of the value that we attached to this historical data.

That's not what Judge Bumb ordered, that's not what the law requires, that's it and that's where the rubber meets the road.  So, you know, this has been way longer and way more expensive than it ever should have been and respectfully, way more expensive than either Judge Bumb or Your Honor indicated it should be.

We have bent over backwards to show what we knew we could show right along.  Of course we considered historical loss data, yes, we did.  They don't like the value we attached to it.  Okay, great.  That does not a securities case make.

MR. GRONBORG:  Your Honor, may I address that?

THE COURT:  I want you to address with regard to the intent, because that's something that Judge Bumb wanted to -- that the parties were allowed to flesh out, and based on what I heard from Mr. Marino that they -- that you were provided with minutes -- minutes of the meetings, the chief actuary work product, actuarial analysis, and from my understanding, those documents would show the analysis that went into reaching the conclusion and it would show the intent.  Do you disagree with Mr. Marino that those documents were not provided?

MR. GRONBORG:  I disagree that they provided the complete set.  They provided some actuarial work product. They provided some, but not all, of the meeting minutes.  They provided some session statements which they have told the SEC were incomplete.  And we should be clear here, because we're not just reading one line of Judge Bumb's order.

Judge Bumb on that same page -- 17 -- says, "Plaintiffs aver the defendants fraudulently failed to disclose the historical loss ratios, and that will be the focus of discovery."  What we are talking here is the historical loss ratios.  We are seeking discovery --

THE COURT:  And what --

MR. GRONBORG:  -- to show that the alleged historical loss ratios, what we alleged in the complaint, are accurate.  Everything that you are hearing now is no, we have not given them the documentation that will show that.  Why? Because we don't think we need to, we just need to show them that we considered some of it.

It's not some of it, it is what did they consider when they made the statement.  And again, you asked me about intent.  The issue of intent in a Securities Exchange Act case revolves around what defendants knew or had access to at the time they made the statement.

If a defendant considered material information at the time they made the statement but didn't disclose it,

that's scienter.  They have violated the Securities laws.
There's no magic in considering something.  If someone could
just say well, I considered it but didn't say it, then nobody
would commit Securities fraud.  Everybody would just say well
yeah, I considered that negative news, but I didn't consider
(sic) it.  And to go to the last point --

THE COURT:  My reading --

MR. GRONBORG:  -- the notion that --

THE COURT:  -- of Judge Bumb's --

MR. GRONBORG:  Sorry, go ahead.

THE COURT:  My reading of Judge Bumb's opinion which
asked that she didn't want any hindsight judgment so she is
not allowing plaintiff to reevaluate what should have been
reported and what should not have been reported, so to the
extent if the information was considered, she's satisfied.
I'm sorry --

MR. GRONBORG:  Your Honor, I disagree with you.
When she said no hindsight judgment, the issue was don't
second-guess the opinion.  That is not -- Mr. Marino knows
perfectly well because we have clarified it multiple times,
the issue in this case is not was the loss reserve -- the
statement of opinion that they gave -- wrong or right.

Nobody's second-guessing that, there's no hindsight
judgment on it.  The question is, is when they made that
statement of opinion, did they have material information

suggesting that historical loss ratios were worse than what the statement suggested, and should they have also disclosed those historical loss ratios.  To address that question -- that is the question.

And the intent element of that -- scienter -- never requires that the parties address the issue of what they knew. And all we're seeking is what they knew about the historical loss ratios.  None of this is a hindsight judgment, none of this is trying to rewrite the reserves.  The reserves are what they are.

Nobody in this case is alleging that the reserves themselves are false.  What the reserves did, they are statements of opinion that triggered a duty to disclose negative material information.  We plainly have a right to the discovery of that negative information.

And I'm going to read again, the Judge says, "Plaintiffs aver defendants fraudulently failed to disclose the historical loss ratios.  That will be the focus of discovery."  We are focused on the historical loss ratios. That is what we're asking.

And honestly, the last time we were here, defendants said and the court order said we're going to produce the documents responsive to Request Number 1A, B and C, and you have just heard that's not what they did.  They said well, we're going to produce the documents responsive to those,

filtered through our view of giving you just enough to decide whether or not we considered something.  That's not what they said on September 21st.

They said we're going to produce the documents. We're asking them to produce what they said they were going to produce here, not filter it through the -- well, we'll decide what it is that we -- that is enough to show we considered something.

THE COURT:  Mr. Marino?

MR. MARINO:  If I may just -- yes, Your Honor, just very briefly.  Mr. Gronborg disagrees with Your Honor and he disagrees with me and he disagrees with Judge Bumb.  But disagreeing with me, that's -- that's part of the game. Disagreeing with you, that's something else altogether. Disagreeing with Judge Bumb, that's something else altogether.

The fact is this -- you asked the question about intent, this is exactly where Judge Bumb was when she said they've done nothing to contradict what Maiden has said.  The problem is we haven't had any discovery.  Let's have discovery into what is a single, simple question, whether they considered historical loss ratios as part of their analysis.

Produce documents suggesting that they have, and that will be the end of the game.  We did it.  He can disagree with you and he can disagree with Judge Bumb, but that doesn't get you very far.  You don't want to be disagreeing with the

person who is wearing the robe.  I agree with Your Honor, I disagree with Mr. Gronborg.  I think it's over and I think we just need at this point to finally put a nail in the coffin that buries this misbegotten case that Judge Bumb correctly described as "piled inference upon inference upon inference," but now we find the proof is in the pudding.  We've produced evidence demonstrating that we considered historical loss data -- that's the end of the story.  Thank you, Your Honor.

MR. GRONBORG:  Your Honor, I -- one, I don't disagree --

THE COURT:  Mr. Gronborg, I want you to hone --

MR. GRONBORG:  -- and I think --

THE COURT:  -- I want you to hone in on what you believe is missing, and I -- I am not sure if you're talking about a time line, the relevant time period, because you said only some loss ratio information was provided.  What is your anticipation that should have been provided?

MR. GRONBORG:  We think defendants should have provided -- well one, I think they should have provided what was called for by 1A, B and C, which is the internal-external information and data, including historical data and loss experience with the AmTrust book of business that they considered or had access to.  That is -- and I am far from disagreeing with the Court -- that is what the Court ordered them to produce --

THE COURT:  And Mr. --

MR. GRONBORG:  -- on September 21st.

THE COURT:  And Mr. Marino said --

MR. GRONBORG:  The Court did not order them to --

THE COURT:  -- that it was reviewed.  Mr. Marino said that was --

MR. GRONBORG:  What's that?

THE COURT:  I am just trying to get a handle on what you think was omitted.

MR. GRONBORG:  Well, so let me -- again, that was not what Mr. (inaudible) would produce, he said we produced some of that, just enough to show what we considered, not we produced all of it in this.  What we considered is something that came along after and is not in the Court's prior transcript with what they were supposed to produce, and what we had --

THE COURT:  Is there a time line?  Are you looking for a time line for dates certain that you would have received those documents?

MR. GRONBORG:  We are asking for all of the documents sufficient for us to identify what the historical loss ratios were at the various times the defendants made their statements, and so that is why I keep pointing to the triangle, because what we were -- what we had asked them to produce is give us the documents that reflect the information

that is in the loss ratio triangle that you made public in 2018, give us the contemporaneous documents at every stage in the class period -- relevant period that shows what those historical loss ratios are.  And it's either going to be a document (inaudible) or the document that allow you to create them.

MR. MARINO:  Judge, the Judge ordered limited discovery.  We provided exactly what she contemplated and clearly expressed in her opinion.  You and Judge Bumb both underscored the point that it would be limited.  What he's looking for, asking for, is all the discovery he could conceivably get in this case -- full-blown, full-on discovery, and then he wants to have his experts analyze it so that he can advance a theory that is completely at odds with what Judge Bumb has made very clear was the only question presented.

They don't have a theory that gets them past the 12(b)(6) motion if we have considered historical loss information.  They want to argue with us about whether we attached enough significance to it.  It's completely backward-looking, the back end of the -- rear end of the telescope.  They want to now come back and say well, this didn't pan out the right way.

Yeah, obviously it didn't pan out the right way, right?  But the question isn't whether you -- you don't judge

what we did by looking after the fact and saying well, it didn't work out.  You know what?  They were by definition forecasts.  The question that Judge Bumb allowed them to take discovery on was whether we considered historical loss data and we considered it, and now have proven -- which arguably is more than we even should be have to be required to do under 12(b)(6).

But our approach is when the Judge says do it, we do it.  And the Judge said to do that, so we did it.  They don't like it.  They want more.  They want to have a case.  This is a case in search of any scintilla of evidence to support it. It does not exist.

I don't mean to be going round and round and repeating myself, but I have to make the point, Judge Bumb was quite clear, their complaint piles inference upon inference. She intimated it might be sanctionable, for goodness sakes. At the end of the day, no, we don't have to give them full-blown discovery that they could take throughout the course of the case.

It's not what the Judge contemplated, and it doesn't make any sense.  That's not what happens at this stage of the proceedings.  What happens is if the Judge wants to -- as she did -- give a plaintiff every opportunity to take what appears to be a threadbare claim and which the Judge made very clear, this is one where there isn't anything to support it, but

let's take -- let them take some discovery, let's see if this seminal question -- whether they considered historical loss data as they said they did, and it makes clear what we said -- we've provided Committee meeting minutes, we've provided actuarial tables -- what did we say?

We said we considered this as one of a number -- one of a number of factors.  You look at what we did in this with respect to this set of forecasts -- what we did was disclose completely what our approach would be.  They want to take issue with the substantive answers, they want to differ with our conclusions.  That's not what this is about.

MR. GRONBORG:  Your Honor --

UNIDENTIFIED SPEAKER:  Your Honor --

MR. GRONBORG:  -- far --

THE COURT:  I am about to rule --

MR. GRONBORG:  -- far from --

THE COURT:  I am about to rule.  I'll let Mr. Gronborg make one final point.

MR. GRONBORG:  Far from this --

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

MR. GRONBORG:  -- supposed far-flung discovery, we just identified that what we are seeking are the documents sufficient to identify what the actual historical loss ratios were at the time the defendants were making the statements. That is what's at the heart of this case.  That is what Judge

Marino - Argument                                    31

Bumb refers to when she says, "Plaintiffs aver that defendants fraudulently failed to disclose the historical loss ratios. That will be the focus of discovery."  That is what the focus is here.

Defendants' suggestion that somehow all that has to be is that they considered this material and that that resolves the case doesn't make sense in this context, and that is because plaintiffs alleged that defendants knew and had access to the historical data.

That's plaintiffs' allegation.  If that was enough to get the case dismissed, then the case would have been dismissed on plaintiffs' own allegations.  It wouldn't have continued, it wouldn't have survived a motion to dismiss.  We alleged that they knew this information.

Again, if defendants wanted to stipulate at the time we made our statements we knew the historical loss ratios that are identified in the complaint, great.  We can short-circuit a whole lot of this.  But they didn't do it.  So this notion that the only thing is that we provide a few -- some documents here that show we considered historical information, it doesn't make any sense.

That's what we pled -- we alleged that.  The question and what Judge Bumb stated -- and it's on 17 -- when she's talking about historical loss ratios is do the discovery to identify what those actual historical loss ratios are

because defendants wouldn't accept that the ones that were pled in the complaint were accurate.  They seem to be challenging the fact that the historical loss ratios were escalating up to 80 percent and above 70 percent over time. That's what we're trying to figure out, are those allegations correct.

We don't need some limitation on did they consider it, we pled it.  We pled they knew and had access to the data. It's the -- it's what is the data.  And so again, far from anything excessive, we're asking them, produce what you said you were going to produce with regard to Request 1A, B and C, and make sure it includes the documents that are sufficient enough to identify what those historical loss ratios are.

THE COURT:  So the Court is satisfied that the documents ordered and ordered to be produced in Request Number 1A, B and C has been produced.  Mr. Gronborg stated that he did receive historical loss ratio information which indicates that AmTrust did consider this information.

The plaintiffs' request to receive all the loss ratio goes to second-guessing the conclusions made by AmTrack -- AmTrust, which is not what the -- Judge Bumb ordered.  So to that extent, I find that the discovery produced has been satisfactory to comply with Judge Bumb's information -- I'm sorry, Judge Bumb's authorization of limited discovery information.

Is there anything else in dispute?

MR. MARINO:  Thank you --

MR. GRONBORG:  Your Honor, I would like to --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- make --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- the record --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- clear --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- that we --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- did not --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- we did not --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- concede --

MR. MARINO:  I --

MR. GRONBORG:  I'm sorry, go ahead, Mr. Marino.

MR. MARINO:  No, no, please, I didn't mean to interrupt you.

MR. GRONBORG:  I was saying, Judge, we would just like the record clear that we did not concede or agree that defendants had produced the historical data.  What we said was that they had produced some, an incomplete set of historical

Gronborg - Argument                           34

data, did not produce all of it and certainly did not produce what the Court had previously ordered them to produce on September 21st.

As stated, I think the statement about second-guessing, I'm happy to readdress why none of this is second-guessing because it is only going to historical data, but we have been over that.

THE COURT:  And the Court is aware that you said "some" historical loss ratio information documents have been produced.  But it appears as if plaintiffs are seeking all. And from my understanding of what I heard today, plaintiff wants to know what the defendants knew at the time they made their assessment, and that is where I get the second-guessing from, that if you're looking for all the information that they knew to decide whether they should have come up to a different conclusion, that is second-guessing, which Judge Bumb was not permitting.

Mr. Marino --

MR. MARINO:  Nothing further from defendants.

THE COURT:  -- was there something else you wanted to say?

MR. MARINO:  No, no, nothing further from defendants was all I was going to say, Your Honor, in response to your question.  I didn't mean to -- to speak over counsel and thank you for your time this afternoon.

THE COURT:  Mr. Gronborg, was that the only -- the only issue, items 1A, B and C?

MR. GRONBORG:  Well, Your Honor, those are -- they are the key issues.  I do want to address the second issue which is defendants continue to say well, we're producing documents that we considered.  And the other -- the issue that we raised in our letter is they failed to -- you know, they failed to search for or produce any communications -- they failed to identify whether or not actually the documents, even those documents that they have produced, were those created by, sent by, received by defendants.

There are some meeting minutes -- again, they are incomplete -- some meeting minutes, and those have attendee names on it.  But for the majority of documents, they don't.  They don't have a name, they don't say anything.  Apparently we're supposed to take defendants' word about it that we produced it, and therefore we considered.

We asked them, are you just stipulating and saying all of these materials were considered by defendants?  They said no.  Are you going to search and provide emails that show whether or not they received the documents?  We got no.  In the letter they come out and suggest we never asked for that, and we're happy to submit the correspondence where we said give us the communications.

We asked for the metadata.  Defendants say oh, we --

Marino - Argument                                          36

we gave them the metadata.  Well, it's required under the ESI protocol -- the electronic discovery protocol.  But the metadata they gave lists every custodian effectively as Maiden, the company, and not the individual, which is why we had said look, even for these documents you produced, there is not a record of whether in fact they were received by or considered by the individual defendants.

So that, now that is part and parcel of the other, but honestly even in their claim -- well, this shows we considered the materials -- we're still left with an abundance of their self-selected documents that they're not saying whether or not it was considered.

MR. MARINO:  So, Your Honor --

THE COURT:  So, Mr. Marino,  I would like --

MR. MARINO:  -- when counsel says --

THE COURT:  -- you to address the point --

MR. MARINO:  Judge, when counsel says "part and parcel," those are part and parcel of what is requested in 1A, B and C, he's right, it is part and parcel, and we have already produced exactly what Judge Bumb ordered and what Your Honor ordered.  He's asking now for more.

Now he wants to -- to bring someone in to sign a blood oath to say having these in our possession and having them spoken about at minute meetings is not enough, we now want you to sign a blood oath that they were considered and

Waldman - Argument                                    37

the extent to which they were considered and what value was placed upon them. We're just re-plowing the ground Your Honor has already decided.

MR. WALDMAN: Your Honor, this is -- this is Jacob Waldman. I just wanted to make a quick point also. Mr. -- or two points here --

UNIDENTIFIED SPEAKER: Jacob, you're -- Jacob, Jacob, Jacob, Jacob, you're going to make a point now?

THE COURT: Go ahead, Mr. Waldman.

UNIDENTIFIED SPEAKER: Why don't you let -- why don't we --

MR. WALDMAN: I was just going to --

UNIDENTIFIED SPEAKER: Jake, Jake, you take it from -- Jake, you take it -- Jake, you take it from here, all right?

MR. WALDMAN: Okay, Your Honor, I was just going to -- going to add that the -- the metadata that Mr. Gronborg is talking about, about just indicating Maiden, is -- is incorrect. We produced additional metadata that, to the extent available, that indicates the custodians for the documents.

That was actually produced before their letter to the Court, so I don't know why they continue to insist that the only metadata they have indicates that Maiden produced the documents. And, it's worth noting again, the actuarial

analysis was -- was prepared by our chief actuary.  That's not difficult to find, and the minutes indicate who was at the meetings.  So there's plenty of data to indicate who possessed what documents at what time, and that's the only point I wanted to make.  Thank you, Your Honor.

MR. GRONBORG:  And I appreciate Mr. --

THE COURT:  You're welcome.

MR. GRONBORG:  All right, I appreciate that comment, but the fact is that for the vast majority of documents, the metadata does not identify who received the document, does not identify whether defendants actually considered it, and the irony here of course is that defendants are saying what we are giving you is our self-selected set of material that was considered by them.

They're not producing -- they've said it over and over, they said it again, we're not going to -- we're not actually producing to you all of the documents called for by Request Number 1A, B and C.

I understand the -- the Court has now ordered that they don't need to do that, but that they need to produce some set of the documents that they considered.  So we -- we are hard-pressed to understand why it is that defendants have produced documents that they claim they considered during the class period, and then subsequently have been so reluctant to say or provide any information about whether in fact they did

consider those documents.

THE COURT:  Based on -- while the Court has already ruled, I am not going to revisit that.  I -- my issue, I think properly we're addressing the metadata information, and it appears as if you did receive that metadata information.  It also appears that you may not be satisfied with what the metadata shows, but it appears that the metadata has been provided to you.

I am not inclined to order any email information.  I think that takes us further into the fishing expedition.  With regard to information and who attended the meeting, it also appears that minutes were produced indicating who was in attendance at the meeting.

I am just satisfied for purposes of Judge Bumb's order that the information that she thought may be relevant to plaintiffs' supplement in their pleadings on the motion to dismiss has been provided.

Anything else from either party?

MR. TYRE-KARP:  Your Honor, this is Daniel Tyre-Karp from The Rosen Law Firm.  I -- earlier you had stated that you were limiting discovery, that you're ordering discovery limited to the sole issue identified by Judge Bumb which was, was there an intentional decision made by the defendants to omit AmTrust's historical loss ratio information from the view of investors.

And I -- I just wanted to clarify whether you are also limiting the scope of any motion that -- any dispositive motion that defendants may file in -- in January as they're contemplating to that sole issue as well.

THE COURT:  I am not going to limit that, but it's my understanding that that's Judge Bumb's limitation.  I believe this may be Judge O'Hearn's case at this point.  I don't think Judge Bumb is still assigned to this case, but I can imagine that the Court is only going to address issues based on what was limited in Judge Bumb's opinion, and that's the bottom of page 17.

"Was there an intentional decision made by the defendants to omit AmTrust's historical loss ratio information."

MR. TYRE-KARP:  Thank you.  I just wanted to clarify.

THE COURT:  And that's my understanding, but I'm sure that this (inaudible) -- you can try to file in a motion. I would suggest that you maybe write the Court for clarification on that.

MR. TYRE-KARP:  Thank you.  I just wanted to clarify that the sole remaining issue was the intentional decision to omit the information, and not whether or not defendants considered the information.

THE COURT:  That's my understanding, yes.

MR. TYRE-KARP:  Thank you, Your Honor.

THE COURT:  There was another issue that at one of our earlier status conferences the parties decided it was no longer in dispute, and that's on page 18 of the opinion where the Court said she would allow limited discovery (inaudible) as to stockholder sale (phonetic), that is that Maiden executives sell stock outside of their usual pattern and practice.

And at one of our last conferences it was indicated that the parties did not believe that issue was in dispute, or at least discovery and that issue is in dispute.

UNIDENTIFIED SPEAKER:  That is correct, Your Honor.

THE COURT:  All right --

MR. GRONBORG:  And, Your Honor, if I could address --

THE COURT:  All right, thank you, everyone.

MR. GRONBORG:  -- if I could address that, Your Honor, just briefly because I -- I hope it is not we received a production of documents -- Mr. Waldman was good enough to produce some additional documents to us yesterday on the insider trading issue.

We haven't had a chance to review those, but I anticipate the first step is we'll review those and revert back to him if there are issues, so I -- I would not say on the record that the issue is resolved.  I am hopeful, given

Colloquy                                    42

our past correspondence, though that we will be able to resolve it.

THE COURT:  It's my recollection -- it's in my notes that it was not an issue in dispute, but if you do have any issues, write the Court and I will take a look at it.  And I will give you two weeks to write the Court on that issue if there are any -- if in fact there are issues resolving insider trading.  Thank you very much, everyone --

MR. MARINO:  And, Your Honor, Kevin Marino, just -- just this one question, Your Honor, one point.  So we will -- when that issue is resolved, we'll renew our motion and I guess that will be renewed in front of Judge O'Hearn now, as Your Honor's correct, it's been reassigned to her, so we'll -- we -- and we may just make that motion as soon as this math issue is buttoned up.

THE COURT:  All right, and if I hear nothing from the parties in two weeks with regard to the insider trading issue, I will issue a text order just indicating the new deadline for reopening the motion to dismiss before Judge O'Hearn.

MR. GRONBORG:  That's fine, Your Honor --

MR. MARINO:  Perfect.  Thank you very much.

MR. GRONBORG:  -- though we do have (inaudible) in a letter, Your Honor, we do have pending interrogatories that where defendants' responses are due on December 20th, so we

Colloquy                                        43

will look at those again.  It may be possible that we will be able to resolve issues with those if there are objections, but that is -- that is a piece of discovery that is outstanding that the parties haven't yet addressed because the deadline for responses and objections is not yet due.

THE COURT:  All right, then I (inaudible) without looking at a calendar.  At some point once the discovery period is completed, I will enter a text order giving a new deadline to reopen the motion to dismiss.

MR. GRONBORG:  That -- that's great, Your Honor, we will await that text order and wish the Court happy holidays and thanks for your time today.

THE COURT:  Happy holidays to everyone -- to everyone --

UNIDENTIFIED SPEAKER:  Happy holidays.

ALL COUNSEL:  Thank you, Your Honor.  Bye now.

(Telephone conference concluded at this time.)

* * *

44

# C E R T I F I C A T I O N

I, Diane Gallagher, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


    /s/Diane Gallagher          December 10, 2021

DIANE GALLAGHER                DATE

DIANA DOMAN TRANSCRIBING, LLC