# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re MAIDEN HOLDINGS, LTD. SECURITIES LITIGATION | ) Master File No. 1:19-cv-05296-CPO-SK |
| | ) |
| | ) CLASS ACTION |
| | ) |
| This Document Relates To: | ) DECLARATION OF LAURENCE M. |
| | ) ROSEN IN SUPPORT OF LEAD |
| ALL ACTIONS. | ) PLAINTIFFS' APPEAL FROM NON- |
| | ) DISPOSITIVE ORDERS OF |
| | ) MAGISTRATE JUDGE |
| | ) |
| | ) ORAL ARGUMENT REQUESTED |
| | ) |
| | ) MOTION DATE: February 7, 2022 |
| | ) |

1

Laurence M. Rosen, an attorney duly admitted to practice law before this Court, hereby states:

1.      I am the managing partner of The Rosen Law Firm, P.A., Co-Lead Counsel for Plaintiffs in the above-titled action. I submit this declaration in support of Lead Plaintiffs' Appeal From Non-Dispositive Orders Of Magistrate Judge. I have personal knowledge of the following and, if called as a witness, could and would testify competently thereto.

2.      Attached as Exhibit A is a true and correct copy of the transcript of the September 21, 2021 discovery conference in this action.

3.      Attached as Exhibit B is a true and correct copy of The transcript of the December 8, 2021, discovery conference in this action.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 27, 2021 in the State of New Jersey.

/s/   Laurence M. Rosen
Laurence M. Rosen

2

# EXHIBIT A

                        UNITED STATES DISTRICT COURT
                         DISTRICT OF NEW JERSEY

MICHAEL WIGGLESWORTH, ET AL,      .  CIVIL ACTION
                                  .
            Plaintiff,            .
                                  .
            v.                    .  No. 1:19-cv-05296-RMB-SAK
                                  .
MAIDEN HOLDINGS, LTD, ET AL,      .  TELEPHONE CONFERENCE
                                  .
                                  .  September 21, 2021
            Defendant.            .
. . . . . . . . . . . . . . . . . .

                         Camden, New Jersey

                            - - - - -

              BEFORE THE HONORABLE JUDGE SHARON A. KING
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:          JACOB A. GOLDBERG, ESQ.
                            DANIEL TYRE-KARP, ESQ.
                            THE ROSEN LAW FIRM, PA
                            609 W. South Orange Ave.
                            Suite 2P
                            South Orange, NJ    07079

                            TRIGG SMITH, ESQ.
                            ROBBINS GELLER RUDMAN & DOWD
                            655 West Broadway, Suite 1900
                            San Diego, CA    92101

For the Defendant:          KEVIN HARRY MARINO, ESQ.
Maiden Holdings, LTD.       JOHN D. TORTORELLA, ESQ.
                            MARINO TORTORELLA & BOYLE, P.C.
                            437 Southern Boulevard
                            Chatham, NJ    07928-1488

                            JACOB J. WALDMAN, ESQ.
                            QUINN EMANUEL URQUHART & SULLIVAN
                            51 Madison Ave., 22nd Floor
                            New York, NY    10010

Audio Operator:             Marnie Maccariella

```
Transcriber:              DIANA DOMAN TRANSCRIBING
                          P. O. Box 129
                          Gibbsboro, NJ    08026-0129

                          Telephone: (856) 435-7172
                          Fax:       (856) 435-7124
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

3

I N D E X

ARGUMENTS:                                              PAGE

        by Mr. Goldberg . . . . . . . . . . . . . . . .    6

        by Mr. Marino . . . . . . . . . . . . . . . .    6

        by Mr. Waldman  . . . . . . . . . . . . . . .   22


DECISIONS BY THE COURT:

        Re:   1A . . . . . . . . . . . . . . . . . .   24

        Re:    B . . . . . . . . . . . . . . . . . . .   27

        Re:    C . . . . . . . . . . . . . . . . . . .28, 29

        Re:    E . . . . . . . . . . . . . . . . . .   34

        Re:    Request 1 . . . . . . . . . . . . . . .   38

4

THE COURT:  We're here in the matter of --

MR. GOLDBERG:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.  We're here in the matter of In Re:  Maiden Holdings Limited Securities Litigation, Docket Number 19-05296.  We are on the record.

Can I have the appearances of counsel, please?

MR. GOLDBERG:  Good morn -- good afternoon, Your Honor.  On behalf of co-lead plaintiffs, Jacob Goldberg of the Rosen Law Firm.  And with me are my colleague Daniel Tyre-Karp.  And also with us are co-lead counsel Robbins, Geller, Rudman, and Dowd, Trig Smith on behalf of Robbins Geller.

THE COURT:  Good afternoon, all.  And appearance on behalf of the defendants, please.

MR. MARINO:  Good afternoon, Your Honor.  Kevin Marino, Marino, Tortorella, and Boyle, for Maiden Holdings.  With me on the phone is my partner John Tortorella, and our colleague from Quinn Emanuel Jacob Waldman, W-A-L-D-M-A-N.

THE COURT:  Once again, good afternoon.  How is everyone doing this afternoon?

MR. MARINO:  Very well, Your Honor.  How are you?

UNIDENTIFIED:  Doing well, thank you.

THE COURT:  I am well.  Thank you for asking.

So the purpose of this conference is to resolve some discovery disputes by the parties.  On August 6th Judge Bumb entered an opinion, and within that opinion she permitted the

5

parties to have limited discovery on two areas.  On page 17 of her opinion she permitted discovery as to was there an intentional decision made by the defendants to omit Amtrust historical loss ratio information from the view of investors. She also permitted discovery as to the stockholder sales specifically.  Did Maiden executives sell stocks outside of their usual pattern and practice?

Now, based on my review of the discovery dispute letters, it appears that the second discovery area is not in dispute.  That is with regard to the stockholder sales.  Am I correct?

MR. MARINO:  That's correct.

MR. GOLDBERG:  Your Honor, this is Jason Goldberg. You are correct.

THE COURT:  Okay.  So let's delve into the first area, which is was there an intentional decision made by the defendants to omit Amtrust historical loss ratio information from the view of investors.

I did review the request for production, and my strategy today is just to go one by one, and we'll address each request as they appear.  So beginning with Request Number 1, there are numerous -- I'm sorry, somebody wanted to say something?

MR. GOLDBERG:  Your Honor?

THE COURT:  Yes.

6

MR. GOLDBERG:  Yes, if I may, Your Honor.  This is Jacob Goldberg on behalf of co-lead plaintiffs.  We are happy to go through discovery requests one by one.  But this is the second conference in a row in which we -- we need to, for both the duration of the discovery period and the discovery to which plaintiffs are entitled, and which defendants must produce.  We sort of have to figure out what the scope of discovery is before we talk about each individual request.  And we're certainly prepared to do that, and would like to present to the Court why what defendants say is incorrect and what we say is correct with respect to scope.  And I think that as a springboard -- as a springboard, Your Honor, that may help us to get through the individual requests.

MR. MARINO:  If I may, Your Honor, this is Kevin Marino for Maiden Holdings.  And obviously we defer to how Your Honor wishes to proceed.  You're quite correct that the second issue is not in dispute.  The first issue whether defendants intentionally concealed Amtrust's historical loss ratio information from investors, as Your Honor indicated, that's what Judge Bumb said she'd allow limited discovery on at page 17 of her opinion.  We've offered to provide internal actuary analyses, committee records, periodic Amtrust statements concerning premiums, losses, and expenses under the Amtrust policies we reinsured.  That those -- that discovery responds to the Court's question.

7

And this idea that I believe plaintiffs are attempting to advance again today, that they're entitled to broad and expansive discovery into how we considered historical information and set our loss reserves and ratios, what our procedures were and what our communications with regulators were, that's exactly what Judge Bumb said she would not permit. And one doesn't have to spend a lot of time --

MR. GOLDBERG:  Ironically, Your Honor -- ironically, Your Honor -- this is Jacob Goldberg.  And (inaudible)

THE COURT:  Mr. Goldberg, can you let Mr. Marino finish?

MR. GOLDBERG:  We'd like Mr. Marino not to filibuster, Your Honor.

MR. MARINO:  Your Honor.  Your Honor.  Your Honor.

THE COURT:  Can Mister -- Mr. Marino, you can finish. And Mr. Goldberg, you can speak next.

MR. MARINO:  Thank you very much, Your Honor.  I would respectfully direct the Court's attention to page 17 again.  And frankly, to the entire opinion, which not only does -- does Judge Bumb use the term securities fishing expedition, for which she -- in stating exactly what she would not permit, right?

But she makes it very clear.  This is -- this particular issue is whether we considered historical loss ratio as part of the analysis.  Not about how we did it.  Not about

8

what our procedures were.  Not about what our communications were.  This is not an opportunity for fishing.

The Judge could -- I don't think I've ever read an opinion in which the Court more clearly derided the plaintiffs' complaint, but allowed it to go forward, being extraordinarily clear about how limited the discovery would be, and -- and really setting the contours of it in cement and quite clearly. So from my perspective, certainly we think we can go through this in whatever way Your Honor wishes.  That's normally how we proceed.  We do it exactly the way the Judge wants to do it. But I don't know that there's a lot to talk about.

THE COURT:  The Court will allow Mr. Goldberg to speak as to the scope of discovery that he understands it to be.  But I have to let you know that to me it's very narrow. It's very clear.  And my intentions are to stick with what Judge Bumb said on page 17 was the unintentional decision.  And you are allowed to explore intentional as well as the historical loss ratio.  But outside of that, I don't think there is too much that's permitted.  But I'll hear from you, Mr. Goldberg.

MR. GOLDBERG:  Thank you so much, Your Honor.  Your Honor, let's do the first thing first, which is the historical loss ratios.  Paragraph 87 of the complaint, and Her Honor's opinion, make clear that the sole claim remaining is whether -- I'm reading now from page 14 of her opinion.  "Estimated loss

9

reserves used for the most recent accident years were substantially lower than actual historical loss ratios for prior accident years."

Judge Bumb continued, Judge King.  She says on -- again on page 14, "Plaintiffs pin their entire case on the idea that defendants should have disclosed the historical Amtrust data which they claim was material and adverse."

So Your Honor, when you focus on the historic loss ratios, the question is, is Paragraph 87 of the complaint, which says that -- which alleges that defendants used 50 percent for most recent accident years, when historically normalized loss ratios were 70 to 80 percent.  Whether that claim about the historic loss -- loss ratios is correct.

If it is correct, Your Honor, and we don't know because we don't have the information yet.  Even as the defendants have disclosed certain information which points to the 70 to 80 percent loss ratio over time, we need to be able to prove that.  Defendants have denied it.

When Judge Bumb speaks of historic loss ratio information, Your Honor, that's what she's referring to.  So when defendants point to page 15 of Her Honor's opinion, and say that Her Honor says that if the evidence demonstrated that defendants consider the -- the historical loss ratios as part of their analysis, they may be able to exculpate themselves.  But the historical loss ratios in that context, Your Honor, are

10

the material adverse information that defendants didn't disclose.  And as a factual predicate, we must be able to get all information that typically goes into the calculation of those loss reserves so we can show that the historical loss ratios defied what defendants disclosed publicly or else we don't have a claim based on Paragraph 87 of our -- of our complaint.

So when Judge Bumb refers to the historical loss ratios, she's referring to the material adverse information that she discussed on the prior page.  What defendants are trying to do, Your Honor, is say that if they considered any historical loss ratio information, that they're exculpated. But that cannot be the claim.  We must be able to prove the factual predicate here that historically normalized rates were 70 to 80 percent, and that defendants were using far lower rates and enabling them to disclose loss ratios, for example Your Honor, in 2015 of 63.8 percent, which is well below historically normalized results.

So when Mr. Marino tells you that we're seeking the how, what we're actually seeking, Your Honor, is the what. What were the proper loss ratios here?  And to do that we need all of the information that typically goes into calculating loss reserves.

If we are correct that historically normalized results were 70 to 80 percent, and defendants had no business,

11

or certainly that that information conflicts with the loss ratios they disclosed, well then now we're talking about the -- the defendants' recklessness, or their intentional failure to disclose that conflicting information.

But first we must be able to determine what the conflicting information is, not just take defendants' word for it, that they considered some, or any, historical results, because that doesn't even remotely address Paragraph 87, which I will repeat, Your Honor. Defendants deny. If we can't show what we've pleaded in Paragraph 87, Your Honor, what they considered isn't important. But if we can, then -- then the question is what did they consider?

So we must resolve the --

MR. MARINO: Your Honor --

MR. GOLDBERG: We must resolve the scope here before we can get to individual requests.

MR. MARINO: Your Honor --

THE COURT: The scope would relate to intentional. I think that's where the focus is, and not simply whether the information was omitted, or whether it was simply omitted, but whether that omission was intentional. I think Judge Bumb stated in her opinion that if it was considered that that might be evidence that the information was considered in good faith.

So I do believe the best way to address this is to identify item by item and discuss whether it's relevant, and --

12

and discuss the relevancy of each item.

MR. GOLDBERG:  Your Honor, this is Jacob Goldberg again.  I'm happy to do that.  But as we discuss each individual request, what I'd like you to focus in on is what is the "it."  So yes, the question is whether defendants had a fraudulent state of mind, reckless or intentional conduct, in omitting the information.  But what is the information?  What is "it?"  We must be able to discover the "it."

When Judge Bumb limited discovery here, Your Honor, what she did was she limited it to the sole claim, not to things defendants believe are relevant about the sole claim.  It's (inaudible).

MR. MARINO:  Your Honor, respectfully, counsel is just repeating what he has said at length.  Your Honor has now made clear twice that you have actually read Judge Bumb's opinion, which could not be clearer, and could not be more explicit in its determination that precisely the type of securities fishing expedition the plaintiffs envision will not occur.

MR. GOLDBERG:  And as clear as the opinion is, Your Honor, Mr. Marino continues to misrepresent it.

THE COURT:  Let's begin with Request Number 1.

MR. MARINO:  That's -- that's uncalled for and wrong, period.

THE COURT:  We'll begin with Request Number 1,

13

starting with Subsection A.  There's a request for internal and external information and data, including Maiden's historical data and loss experience with the American Trust book of business.

When I look at the defense letter, it appears that they have conceded that certain information will be disclosed.  And I thought the internal Maiden's historical data and loss experience with Amtrust -- Amtrust book of business is not being challenged by the defendant.

And I'll hear from you first, Mr. Marino.  Am I interpreting that correctly?

MR. MARINO:  Yes you are, Your Honor.  We offered to provide internal actuarial analysis, committee records, and periodic Amtrust statements concerning premiums, losses, and expenses under the Amtrust policy's Maiden reinsured.  That's absolute -- you're absolutely correct about that.  And that goes directly to, and consumes actually, the question that Judge Bumb allowed discovery to go forward on, which is whether we intentionally concealed our historical loss ratio information from investors.

MR. GOLDBERG:  Your Honor --

THE COURT:  Do the parties have Document Number 101, which is the September 10th letter from the defendants?  Because I will be focusing a lot on the paragraph --

MR. MARINO:  Yes.

14

THE COURT:  -- that discusses what the defendants proposes to turn over.  So on page 2 of that document, Roman numeral II discusses what's going to be proposed.  So I, in reviewing these requests, I believe some of them have already been agreed to.  So that's why I'm trying to do a line by line to figure what's actually contested and what is not.

So Mr. Goldberg, do you agree that Item A will be produced by the defendants based on Mr. Marino's letter?

MR. GOLDBERG:  Jacob Goldberg, Your Honor.  No -- no, we do not.  Mr. Marino -- defendants, not Mr. Marino.  I apologize, Your Honor.  Defendants attempt to self-exculpate by producing what is effectively bottom-line information.  So if I may, Your Honor, because the defendants -- much of Requests A through E -- not much of.  These come directly from defendants' SEC filing.

But let me just focus you on Letter C right now. That, C, the internal and external actuarial studies, that may be included in what defendants call internal quarterly actuarial analysis.  That's C.

But again, Your Honor, if we could -- if we could figure out what the "it" is in this case, then I think A is absolutely not included in what Mr. Marino just recounted on behalf of his clients.  Internal --

THE COURT:  Okay.  What are you looking for --

MR. GOLDBERG:  Sure.

15

THE COURT:  -- when you ask for Maiden's historical data and loss experience?  What are you looking for?

MR. GOLDBERG:  Every premium, every -- every data point related to claims and claims expenses called loss adjustment expenses, LAE, Your Honor.  Every single data point with respect to the Amtrust book.  We need to be able to reconstruct what the reserve -- what the historical loss ratios were in each year from the time Amtrust began servicing -- or I beg your pardon.  From the time Amtrust began seeding business to Maiden.

Your Honor, we plead this in our complaint in Paragraph 57 and the chart.  Defendants have effectively disclosed some of this information, but we need every piece of data on which one typically bases an assessment of a loss reserve.

MR. MARINO:  Absolutely not, Your Honor.  Absolutely not even remotely close.  That's their dream sequence.

THE COURT:  Mr. Marino, before you -- before you proceed I just want to clarify.  You talked about a relevant period of January 1, 2014 to November 9, 2018.  Do the parties at least agree that that's the relevant period?  Mr. Marino, do you agree that that's the relevant period?

MR. MARINO:  I'm going to defer to my colleague Mr. Waldman on the -- on the period.  I believe that's right. Jacob, is that -- am I correct on that period?

16

MR. WALDMAN:  Yes.  This is Jacob Waldman of Quinn Emanuel, Your Honor.  That -- that's correct.  We agree that we would produce documents created within that time period, because that time period reflects the class period.

THE COURT:  Okay.  So Mr. Goldberg, when you asked about documents from the inception, are you referring to January 1, 2014 or before that point?

MR. GOLDBERG:  Your Honor, the relevant period is January of 2014.  But I have to add a caveat to that.  The problem with this case is, to project a loss reserve for any given year -- I beg your pardon.  To -- to calculate a loss ratio for any given year, and -- and as we all know, Your Honor, the loss ratio is the net loss and the expense divided by the premium that Amtrust seeded.  To -- to define that for any given year requires historical information.

So while certainly the relevant period is 2014 on, that's the class period, effectively, as the defendants describe in their 10K, they've had so much experience with the Amtrust data that they use historical information as a primary component of establishing loss ratios and reserves.  And as such, information that relates to -- to claims that were made in prior years is relevant to calculating a loss ratio in any given year during the class period.  This is in no way --

MR. MARINO:  Your Honor.

MR. GOLDBERG:  Let me just respond to Mr. Marino if I

17

may, Your Honor.  This is in no way part of a fishing expedition.  This is the "it" to which we're referring.  And that is over time, do the seasoned years show that normalized annually the loss ratio should be 70 to 80 percent.  That's what we need to be able to show.  This is the "it," Judge.

THE COURT:  It appears that --

MR. MARINO:  Your Honor.

THE COURT:  -- we are moving the goalpost, because when I read this document I thought we were discussing a time period of January 1, 2014 to November 9, 2018.  And now I hear that you're extending that period.

MR. MARINO:  Your Honor, if I may respond to -- to what counsel said.

MR. GOLDBERG:  Well --

MR. MARINO:  And -- and I have a suggestion, I believe, that may be of assistance to the Court.  We have offered to produce, and it's set forth quite clearly in both our September 10th letter and in our -- and in our September 17th letter.  We have offered to produce our internal quarterly actuarial analysis and exhibits, committee records reflecting the company's evaluation of that analysis in support of its reserve estimates, periodic statements provided to the company by Amtrust concerning premiums, losses, and expenses under the Amtrust policies we reinsured.  All of that goes to the only issue the judge permitted discovery on.

18

Why don't we produce that material to them, allow them to review it, and then come before Your Honor and try to show us how they possibly were left wanting in any of the ways that Judge Bumb dictated they should not be left wanting. I don't believe they'll be able to do that. Let them get the discovery that we produced as we've offered to produce it, which is, I assure you, perfectly consistent with Judge Bumb's opinion, and allow them to come back and show Your Honor ways in which we have fallen short. I don't believe we'll fall short in any way.

But I think what we're going to hear throughout this conference for as long as it continues is a radically different view. Your Honor used the phrase "moving the goalpost." I couldn't agree with that more completely. I think that's what this is about. It's an attempt to take the narrow kernel of discovery that Judge Bumb permitted in allowing this case to proceed, and making it very clear what her concerns were, and expand that into full-blown discovery to attempt to make the case they were unable to plead and will never be able to plead.

I'd just ask Your Honor to -- to direct that we produce what we've offered to produce, allow them to review it, and that perhaps will be the best way to put the meat on the bones of this dispute for Your Honor.

THE COURT: Mr. Goldberg, what do you think about that? Do you think that would help you narrow the issue, help

19

you find the "it" that you're seeking to find if you start by reviewing the material that was presented?

MR. GOLDBERG:  Your Honor, thank you very much. Absolutely not.  Nowhere in Her Honor's opinion does she do anything but limit discovery to the sole remaining claim.  We have asked for discovery related to the sole remaining claim. Nothing in the federal rules of civil procedure or in any case defendant cited, which by the way are all motion to dismiss cases and we're beyond that point.  Nothing allows defendants to construct the discovery they choose to produce as opposed to responding to the discovery plaintiffs seek.

We seek discovery on issues related to what the historical loss ratios were.  They want to produce the how they considered, whatever data they may have considered we don't know.  But Your Honor, given the discovery schedule here, we need to be able to establish the factual predicate that they deny.

And I can't accept a world in which defendants can determine what discovery they are going to produce to enable a plaintiff to -- to prove a claim it has sufficiently pleaded. And that's why we're here.

THE COURT:  I am understanding it a little differently.  I think Mr. Marino is suggesting that this is the starting point.  The Court certainly would not foreclose your opportunity to come back and say well, you know, item in

20

Request Number 1-D was not included, and then we can really fine tune and narrow what areas we need to discuss.

To be honest with you, when I look at the description from Mr. Marino, I have no idea, for instance, what's included in internal quarterly actuarial analysis and exhibits.  And maybe you'll see that, and maybe you'll decide that some of the information that's needed is there but some isn't.  But the Court will give you an opportunity to follow up after reviewing these initial disclosures, somewhat akin to a Rule 26 disclosure, in a limited capacity, and come back, and then we can probably have a more productive discussion as to what is relevant and why.

MR. MARINO:  That is what I envision, Your Honor.  You have correctly stated it exactly as I envisioned it.  We'll produce what we've told them we're going to produce, and they can come back to Your Honor and try to show you ways in which that does not completely comply with Judge Bumb's order of limited discovery.

MR. GOLDBERG:  Your Honor, this is Jacob Goldberg.  The defendants have just told you that they absolutely, positively refuse to produce documents responsive to 1A because it's not within Her Honor's order.  It is within Her Honor's order, and they have no reason not to produce it.

We need to resolve the scope issue, Your Honor, because Mr. Marino has it exactly backwards.  He's trying to

21

tell you because of how they did something as a bottom-line analysis that the "what" they relied upon is irrelevant.  It's exactly backwards.  We need to be able to prove Paragraph 87.  Mr. Marino just told us, Your Honor, I'm not giving them that, and he said it with emphasis.

MR. MARINO:  What I'm saying with em -- what I'm saying with emphasis --

MR. GOLDBERG:  Let me finish.  Let me finish.

MR. MARINO:  You said the same thing five times.  What I'm saying with emphasis, just to be clear, this -- where you have it quite wrong is this is not the starting block.  Judge Bumb has issued a ruling.  You may read that opinion any way you wish.  But I don't think it's fair to read it as saying anything other than you get limited discovery after piling inference upon inference upon inference.  You get limited discovery to show the Court that there's some "there" there.  That's what we're going to do.

What I've just proposed to Judge King is to obviate this process, which I could envision it going on for quite some time, to obviate this by simply saying here's what we're producing, come back to the Court, and show the Court why that is not exactly what Judge Bumb said we had to produce.  If there's something missing that Judge Bumb's opinion says we should have produced, Judge King is well capable of ordering us to produce it.  I haven't refused to do --

22

THE COURT:  Mr. Marino.

MR. MARINO:  I haven't refused to do anything.

THE COURT:  Mr. Marino, can we go back to Item 1A? And can you tell me if the information sought in Item 1A, which is -- and I am focusing on internal.  I am not inclined to require anything external.  But internal Maiden historical data and loss experience.  Is it your thought -- is it your contemplation that documents responsive to this is included in your proposal?

MR. MARINO:  I believe that it is.  And again, I'll invite my colleague Mr. Waldman to correct me if I'm wrong. But no, I do believe that that is included in that.

THE COURT:  Mr. Waldman?

MR. WALDMAN:  Yes, Your Honor.  Thank you.  The -- the document that we propose to produce and our understanding of them is that they, by their very nature, they are actuarial analysis, which takes into account numerous factors and data in arriving at estimates.  That includes historical data and loss experience of the Amtrust book of business.  It does not include, just to be -- to be clear, it does not include what Mr. Goldberg characterizes, every, you know, every scrap of data, every single item that Maiden ever considered over the course of, you know, several years in putting together these estimates.  But it is analysis that accounts for that information.

23

Similarly, the minutes that we are discussing, that we offer to produce, evaluate -- are another step in the company's evaluation of that actuarial analysis. And those minutes also will consider, among other factors, historical information and historical data and exhibits that reflect historical information and historical data that are contained in the actuarial analysis. That's my -- that's my --

MR. MARINO: Which is why -- which is why I proposed proceeding in this fashion, Your Honor. I -- I think that it occupies the field. If they say that it doesn't, they will show you ways in which they say that it doesn't. And when I say "the field," I don't mean the sun, the moon, and the stars. I mean the field as defined by Judge Bumb, limited discovery into a narrow issue.

THE COURT: All right. In order to move this process along, because I can envision us here for another four hours and not making significant progress. So I am going to go through the items. There is some information that I believe that's clearly not relevant and beyond the scope, and I will identify that.

With regard to the other items, I will ask Mr. Marino to produce those documents. And whether it's within the scope of what's offered, then I'll hear back from Mr. Goldberg as to the information that he received, just didn't cover everything that the Court ordered, or that he still believes he's entitled

24

to.

So for Item 1A, I think the plaintiffs are entitled to internal Maiden historical data and loss experience with the Amtrust book of business.  So I am going to order that to be produced with the understanding that it's covered in the items that Mr. Marino has already proposed to be produced.

MR. MARINO:  Thank you, Your Honor.

THE COURT:  With regard -- sure.  With regard to B, combination of quarterly and annual data, I just see that's beyond the scope.  And before I rule against it, Mr. Goldberg, I'll hear from you as to why it's relevant and why it's within the scope of Judge Bumb's permitted discovery.

MR. GOLDBERG:  Thank you, Your Honor.  First, if I could -- if I could go back to A.  The -- the quota sharing agreement between Amtrust -- this is all about Amtrust, Judge.  The quota sharing agreement between Amtrust and Maiden entitles Maiden to get information from Amtrust.  So when you say internal, this may be information, and is likely information that Maiden received from Amtrust which is external, even though Amtrust controls Maiden as an affiliate.

So I'm -- the -- the limitation to internal seems to me to defy the claims here with respect to everything we've pleaded and the quote share -- the quota sharing agreement between Maiden and Amtrust.

THE COURT:  Well (inaudible)

25

MR. MARINO:  I can assure you we'll be --

THE COURT:  -- from Maiden as well as Amtrust.  So it was my understanding that Maiden and Amtrust information would be included.  I am reluctant to extend that to anything beyond Maiden and Amtrust, and that's why I said I was going to strike external from the request.

MR. MARINO:  Thank you, Your Honor.

MR. GOLDBERG:  So Your Honor --

THE COURT:  Going back to --

MR. GOLDBERG:  Yes, go ahead.  I apologize.

THE COURT:  Go ahead.

MR. GOLDBERG:  No, so with respect to B, combinations of quarterly and annual data, effectively in the 10K the defendant said we, in constructing our loss ratios for Amtrust, we have more precise data that we use because it's so well seasoned.  So they use what they -- and this is a quotation, "combinations of quarterly and annual data," right?  So this is something that they specifically say is -- is included in the process of determining loss ratios and reserves.  This is their words, not ours.  And therefore, we believe that because they refer to these combinations of quarterly and annual data, they should produce it.

THE COURT:  Mr. Marino, do you --

MR. MARINO:  Your Honor.

THE COURT:  -- use quarterly and annual data in

26

coming up with loss ratios?

MR. MARINO:  I'll defer to Mr. Waldman on that.

THE COURT:  When I say you, of course I mean your client.

MR. MARINO:  I know what you mean.  I'll defer to Mr. Waldman on that.

MR. WALDMAN:  Thank you, Your Honor.  I think that that -- that category that they're identifying is a single phrase.  Culminations of quarterly and annual data is a single phrase within a list of -- of items that Maiden used -- uses to prepare its actuarial analysis.  So to the extent that that information is relevant or necessary in a given quarter, it should be reflected within the actuarial analysis that we're talking about.  It should also be subsumed.

So again, rather than demanding, as plaintiffs have, that the production of every single scrap of information and data that was considered, which we consider to be an over-broad request, again, we think we should begin with what we've already offered to produce, which is the -- essentially the later or the final result of the analysis that is undertaken, and the analysis that we represent is undertaken in the 10K.

What plaintiffs have done, and I think you'll hear again and again as you go through the line items is they have -- they have taken out individual phrases from the 10K in a longer list of -- of things that are considered in preparing

27

the actuarial analysis.  And so for them to now go back and say okay, well we need B, we need C, we need D is essentially just arguing against, I think, what Your Honor has already said, which is why don't we produce the actuarial analysis that -- that takes those things into account, and see where we are after that.

THE COURT:  Based on the representation by Mr. Waldman, I would grant the request for this information on the standing that it's subsumed in the other production -- production of documents that the defendants have proposed to produce.

Let's go to C, internal and external actuary studies and analysis.  And I do find that to be relevant.  And am I correct in understanding that that's also subsumed in the information that's been offered to be produced?

MR. MARINO:  That's correct, Your Honor.

MR. GOLDBERG:  Um, the --

MR. WALDMAN:  With one caveat, Your Honor.  The internal actuarial analysis is what we were referring to and what we've offered to produce specifically.  External actuarial analysis is -- is reflected to an extent in the documents because it -- external actuarial analysis provides an independent assessment of the actuarial work and the reserving estimates made by Maiden on a quarterly basis.  And Maiden operates within a narrow range as set forth in the external

28

actuarial analysis.  But beyond that, I wouldn't say -- I wouldn't represent to the Court that the external actuarial analyses which are prepared by a third party are -- are subsumed within the production that we've offered.

THE COURT:  And as with Subsection A, the Court is also going to strike external because I do find that to be beyond the scope.

MR. GOLDBERG:  Your Honor, this is Jacob Goldberg. This is the heart of the matter.  Maiden has very few employees.  If they hired external actuaries to perform analysis, those may be the very analyses that they used.  As Mr. Waldman just said, the actuary -- the external actuaries provide a range, and Maiden tries to get within that range.  I can't think of anything that -- that is more relevant except fo the underlying data on which those actuaries, whichever actuaries, base their conclusions.

I think, Your Honor, we're going to find that all we're getting here is conclusions with no underlying data that enables us actually to prove the claim that our clients have brought.

MR. WALDMAN:  Let me just -- sorry, this is Jacob Waldman again.  Let me just clarify.  When I'm referring to external actuarial analysis, I'm not referring to Maiden outsourcing its actuarial analysis.  They have, obviously, their own actuarial team, and their chief actuary who arrives,

29

who makes quarterly estimates.

The external that I'm referring to is the third party that Maiden uses, and I think probably is required to use, to verify Maiden's own internal actuarial estimates.  And they -- the -- I don't know exactly the time period, whether it's on a quarterly or a yearly basis.  But it's not an outsourced actuary who does the analysis for Maiden.  It's a third -- independent third party who confirms the analysis.

THE COURT:  So for purposes of Section C, analysis that's outsourced by Maiden shall be included.  Let's move on to D.

Information and data detailing class of business, stated claim counts, frequency and severity.  I'm not sure exactly what you're looking for, Mr. Goldberg.  But my first sense is that this is way beyond the scope.  Tell me why it's relevant.

MR. GOLDBERG:  Okay.  So Your Honor, in -- in Maiden's 10K they discuss that Amtrust has different lines of business and -- and losses occur in different places, right?  So -- so all of this information underlies what the loss ratio should be.  It underlies the loss ratio calculation.

So for example, with respect to class of business, if it's an older line of business, which is the majority of Amtrust's business, then -- then historical losses are -- are - - are far more predicted.  So just getting information without

30

understanding the class of business is -- is unhelpful to showing that overall, or that Amtrust should not have used 50 percent, as we alleged, for more recent accident years.  Class of business is absolutely critical to understanding whatever top line or bottom line results the defendants ultimately produced.

THE COURT:  Mr. Marino or Mr. Waldman?

MR. WALDMAN:  Thanks, Your Honor.  It's Jacob Waldman.  This is, as I was saying, this is a category like the other categories that are listed in the disclosure, is that the actuarial analysis takes into account.  You know, I can't say for certain without having the specific actuarial analysis, and probably without an actuary, exactly, you know, how this particular kind of data is taken into account from quarter to quarter.  It undoubtedly varies depending on a host of other factors, which is how the actuarial analysis is put together, why it's not a static thing.

So the actuarial analysis will have, as disclosed by Maiden, will have accounted for losses in different lines of business, will have accounted for how those losses are developing over time, depending on how relevant that data is from quarter to quarter.

So I think again this is something that will be -- that will be subsumed under the actuarial analysis that we -- that we produce.  And like Mr. Marino has said, if plaintiffs

31

disagree, or they think they need more information, they can always dispute that point.  But these are the kinds of things that the actuarial analysis that we are offering, which is -- which is detailed and robust, would take into account.

THE COURT:  How about Item E?  Would that also be included in the actuarial analysis?

MR. WALDMAN:  This is Jacob Waldman again.  The -- as to Item E, the session statements that are referred to, we've actually offered to produce.  The bordereau reports, my understanding is are -- are just basically very large amounts of data, I think on the order of thousands of lines of data, and multiply that by, you know, many quarters.  That's at least my -- my basic understanding.

So broadly speaking, you know, the answer -- I believe the answer is yes, that the actuary will have considered this data, or the actuary's team, in arriving at the final analysis.  But you know, again from quarter to quarter it's difficult to say exactly how -- exactly how that data was considered at a given time, or how it was calcu -- or how it -- how it kind of entered into the calculations given that the actuary is always considering all the other factors that go into reserving estimates.

MR. GOLDBERG:  Your Honor, this is Jacob Goldberg.  Effectively what Mr. Waldman is telling you, what our friend Mr. Waldman is telling you, is that defendants are going to

32

produce documents that summarize data and that support what they disclosed as opposed to producing the underlying data which -- which could, as we've alleged, show something completely different and materially conflicting with the results that they disclosed, the loss ratios they disclosed.

The bordereau is case in point.  There's no more important document in my -- as I've been told, Your Honor, there's no more important document that the seeding insurance company provides to the reinsurer.  That has much of the data we seek.  And this is not something that should be difficult for them to produce.

So I'm not -- there's certainly no burden here.  It's clearly relevant data.  To avoid defendant simply giving us information that -- that is what they disclosed has nothing to do with whether there is material adverse information that contradicts that.

THE COURT:  Well, they (inaudible).  What's -- what about the bordereau report?  What exactly is that report?  And why do you believe that it's not being -- why is it relevant?

MR. GOLDBERG:  Well, as Mister -- as Mr. Waldman just said, Your Honor -- as Mr. Waldman just said, the bordereau report has much of the underlying data related to data related to the losses that Amtrust policies that it seeded to Maiden suffered.  It -- it's an important document to understanding exactly the point we've made, that is that seasoned years

33

normalize to 70 to 80 percent losses.  The data in the bordereau will help us to show that.

MR. WALDMAN:  And -- this is -- this is Jacob Waldman, Your Honor.  The -- I think what this -- this reflects what has already been stated in our letters, and so I won't belabor it.  But that this is the kind of fishing expedition that the Court expressly rejected.  The opportunity essentially to comb through every scrap of data to find something that plaintiffs believe is contrary to what Maiden -- what Maiden disclosed, or Maiden's reserving estimates.

And again, I think it's -- it's presum -- it's premature for plaintiffs to say we need this in order to evaluate the analysis that Maiden is offering to produce, because the analysis that Maiden is offering to produce is pretty -- is pretty robust and detailed, and is what they -- I think what plaintiffs themselves described as the heart of the matter, is the actuarial analysis.

And so I think that producing reams and reams of data before plaintiffs even have an opportunity to look at what we have produced is -- is premature.  And as Your Honor said --

MR. MARINO:  And that was -- that was the point I was -- I'm sorry.  That was the point I was trying to make to Your Honor when I suggested that we be permitted to produce what we've offered to produce and allow them to come forward and explain why anything else would be relevant.

34

THE COURT:  Understood.  So Item E will be subject to the same requirements, that if it's not contained in the documents that's produced, then I will hear from Mr. Goldberg and the other plaintiffs as to what's missing and why it's within the scope of Judge Bumb's opinion.

MR. GOLDBERG:  Your Honor, if I may, with respect to --

THE COURT:  (inaudible)

MR. GOLDBERG:  I'm sorry.  Go ahead.

THE COURT:  I was going to move on to Item F.

MR. GOLDBERG:  Well, can I ask please then that -- this is critical, Your Honor.  Effectively with respect to E and the bordereau report, what I hear the Court instruct is that if it's not within what Mr. Waldman said he's going to produce, then we don't get it, and we can tell you why we should get it later.

May I suggest, Your Honor, that Mr. Waldman produce a bordereau report --

MR. MARINO:  No.

MR. GOLDBERG:  -- with what he intends to produce from the class period.  You know, randomly, so that we can --

MR. MARINO:  Your Honor, I don't think that -- I don't think it's appropriate.  And I think what we've proposed makes all the sense in the world.  No one is foreclosing them from coming in later and saying this should have been produced.

35

MR. GOLDBERG: But -- but Your Honor, if I may, what my friend tells you right now is plaintiffs are blind now, and they will be blind later, and will have to come in and say what they cannot see. There's no harm to defendants.

MR. MARINO: (inaudible)

MR. GOLDBERG: Wait. Let me finish. There's no burden, Your Honor, to defendants to produce a bordereau report so that we can see one.

MR. MARINO: The problem is --

MR. GOLDBERG: All of this is -- all of this is confidential.

MR. MARINO: Your Honor, the problem is this discovery discussion is occurring against the backdrop of an opinion that made it enormously clear that we are to have very limited discovery into narrow, narrow issues. This is expanding the field into precisely what Judge Bumb said she would not permit.

THE COURT: Are the bordereau reports used in determining loss ratio?

MR. GOLDBERG: Your Honor, this is Jacob Goldberg. We believe yes.

THE COURT: This is directed to Mr. Marino or Mr. Waldman.

MR. MARINO: I'm sorry. And I'm going to ask Mr. Waldman. He's closer to that issue than I am.

36

MR. WALDMAN:  This is -- this is Jacob Waldman.  To the extent that they are -- I'm not an expert on the actuarial process.  I expect that they are taken into account in some fashion.  I couldn't explain exactly how.  They are -- they are, you know, they are essentially -- what I have been told is that they are -- they represent significant sort of repositories of raw data that is provided by the -- provided by the insurer, or by the seeding company, which is Amtrust.  So my understanding is that in some fashion they likely are taken into account, Your Honor.

THE COURT:  Okay.  The Court's going to reserve ruling on the bordereau report.  I am afraid that we're getting into the fishing expedition that Judge Bumb did not want us to get into.  It appears as if the plaintiff is trying to reassess every single claim and nitpick as to, you know, how the results and the loss ratio came about.  And I think it's -- it's my impression that Judge Bumb was close to granting a motion to dismiss, and she is permitting limited discovery for purposes of if either party has information to make their claim, or make their defense, then you know, she will rule on that.  But it seems as if we're trying to get into an entire discovery process which was not required by the Court.  And this is not your typical discovery under the rules.  I think it is simply for the purpose of determining whether the plaintiffs -- I'm sorry, whether the defendants' motion to dismiss should be

37

granted.

MR. GOLDBERG:  Your Honor --

MR. MARINO:  I'm sorry, Your Honor --

MR. GOLDBERG:  -- Judge Bumb said.

MR. MARINO:  Your Honor, it is what Judge Bumb said. And may I ask Your Honor, and I apologize, I have to -- to enter into another conference at -- at 2:30.  And I apologize, I thought we would be done within an hour.  But I don't know how much longer Your Honor would entertain this.  But may I re-raise the issue of allowing us to produce what you've directed us to produce, and allowing them to come back and show us -- show Your Honor why that's insufficient?

I think that you're exactly correct.  It's a fishing expedition.  This is not what Judge Bumb envisioned in any way. And it's very troubling that it would be expanded, the field would be expanded in this fashion.

THE COURT:  Okay.  With regard to Item A, and the Court also has another appointment that starts at 2:45, so I have limited time on this call.  But with regard to Item 1, I will allow the defendants to produce the documents that's offered.

Mr. Goldberg, you can come back and say such and such should have been produced, but it has not been.  I will address it at that time.

Request Number 2 and Request Number 3 I just see them

38

as beyond the scope altogether.  So I would like to hear from Mr. Goldberg as to, you know, why Request Number 2 and Request should -- Number 3 should not be struck.

MR. GOLDBERG:  Your Honor, the defendants are going to give us documents that show how they created certain things without respect to the raw underlying data.  We've just established that.  They're not going to produce even one bordereau so we can see it.

If there is a policy that tells them how to do this that they did not follow when we should be able, with the policies, to understand whether they followed it in the analysis that they are purportedly going to give us.  This is not burdensome in any way, and relates directly to what they're about to give us.

The same is true with respect to Number 3 for any communications that defendants have about historical loss ratios, that's the full claim, with any regulator, be it American or Bermudian.  If they discussed historical loss ratios with regulators, either how they calculate them or the actual ratios, that's directly related to the claim, the sole claim, that Her Honor allowed to proceed.

THE COURT:  Number 3 I believe it's beyond the scope, and the defendants do not have to produce the documents in Number 3.

With regard to Number 2, is there a policy?  This is

39

directed to the defendant.  Is there a policy used by the defendants for setting loss ratio?

MR. WALDMAN:  Your Honor, this is Jacob Waldman. We've actually -- I've been discussing this with my -- with my client.  We are thus far not aware of a specific document that sets out all of the requirements of the reserve estimating process.  And --

MR. MARINO:  And we can look -- we can look into that, Your Honor, and revert.

MR. WALDMAN:  I'm not certain why -- why plaintiffs necessarily expect it to exist.  They have actuaries, they have auditors, they have outside actuaries who are all working on and supervising this process.  It is -- it is very well -- it is very well supervised.

With respect to Number 2, I would also just add, Your Honor, that the issue seems to me to be what Maiden did.  And specifically, did it have a process that it followed for -- for making actuarial estimates.  And that that process is not open to second guessing, and it's the notion that what Maiden -- that that astatic document that sets out guidelines, even if it does exist, is relevant on any given -- at any given quarter to exactly what Maiden did consider, which seems to be the heart of the issue, I think (inaudible).

MR. MARINO:  Why don't we -- why don't we leave it there.  Why don't we leave it there and allow the Judge to --

40

THE COURT:  Yeah.  I'm just going to make one more point.  I -- what I'm hearing from Mr. Goldberg is that he wants to see whether a policy existed and if Maiden deviated from that policy.  If there was a deviation, it may go towards the intent that the plaintiffs need to prove.  So I will ask you to continue to look.  And if there is a policy or a series of policies relating to how loss ratio is set, that that policy or policies be disclosed.

And with that being said, how much time do the defendants need to produce the documents?

MR. GOLDBERG:  Your Honor, can I make a suggestion before -- this is Jacob Goldberg.  May I make a suggestion before --

MR. MARINO:  Your Honor, if I may just -- if I may just --

Jacob, do you know how long it would take us to -- to produce that, how much time we need?

MR. WALDMAN:  I don't know offhand.  I was anticipating having until, you know, what is prescribed in the discovery schedule, but obviously given the Court's ruling we can do -- I expect that we can do considerably sooner than that.  I'd like a little bit of time just to consult with my client to make sure I have an exact timing.  But I understand the timing, and I think we can do it -- I think we can do it relatively quickly.  I just don't have an exact date.

41

THE COURT:  Mr. Goldberg, I think you were going to say something.

MR. GOLDBERG:  I -- I am, Your Honor.  I'd like to propose two things.  First of all, I think it's important to have a written order of today's proceeding which detail exactly what the Court is ruling so that we have that as a -- as a guidepost.

But Your Honor, I want to -- I want to propose this.  I'd like to propose that -- that we -- that the Court vacate the scheduling order pending Mr. Waldman's informing us how long it's going to take his client to produce.  Because we've just added this new wrinkle where we're going to come back and say why this isn't necessary.  And that may include our producing an expert report on how the historical loss ratios should be calculated, and what information is missing.  So I think it's important to allow this process to play out as the Court has -- has outlined it, for the Court to vacate the current discovery schedule, and allow us to go through the process as the Court has outlined it.

THE COURT:  All right.  I will ask Mr. Marino or Mr. Waldman if you can get back to me within the next couple of days --

MR. MARINO:  Yes, Your Honor.

THE COURT:  -- as to how much time you need to produce the documents.

42

MR. MARINO:  Yes.

THE COURT:  Based on that I will schedule -- I will revise the scheduling order and schedule another status conference.

MR. MARINO:  I will respond to Your Honor forthwith. And if Your Honor believes it's appropriate to have an order indicating the rulings from today, what I would suggest is that we order a transcript of the proceeding, and then we'll propose a form of order for Your Honor's consideration.

THE COURT:  Sounds good.  I think the transcript will be more accurate.

MR. MARINO:  Great.  All right.  Your Honor, would that -- does that bring our proceeding to -- to a close?  And I certainly don't mean to rush the Court.

THE COURT:  No.  I know you do have another appointment, as do I.  So the next order of business would be a letter from the defendants as to how much time is needed to get the documents over to plaintiffs.  And based on that, I'll adjust the scheduling order and schedule another status conference.

MR. MARINO:  Thank you very much.  Thank you, Your Honor.  Much appreciated.

MR. GOLDBERG:  Your Honor, this is Jacob Goldberg. It's highly inappropriate to allow Mr. Marino and Mr. Waldman to write the Court's order.

43

MR. MARINO:  Hold on.  Hold it.  Hold it.  Hold it.

MR. GOLDBERG:  The transcript may be --

MR. MARINO:  I didn't suggest it.

MR. GOLDBERG:  Hey Kevin.  Hey Kevin.  I'm addressing the Court.  It's my time.

MR. MARINO:  I suggested that we would order the transcript, and we'll --

MR. GOLDBERG:  If you need to get off, get off.

MR. MARINO:  I suggested that we would order the transcript --

MR. GOLDBERG:  Your Honor, if I may.  If I may, Your Honor.

MR. MARINO:  -- and draft a proposed form of order.

MR. GOLDBERG:  If I may, Your Honor.

MR. MARINO:  I'm happy to run it -- my goodness.

MR. GOLDBERG:  If I may, Your Honor.  It's inappropriate for Mr. Marino to draft the Court's order in this case given that it is so important properly to define the scope and to -- to alert the parties.  It's exactly what defendants must produce and what the next steps are.

MR. MARINO:  Your Honor --

MR. GOLDBERG:  That's -- that's something the Court needs to do.

MR. MARINO:  I don't think -- I don't think anyone needs to be concerned about Mr. Goldberg not screaming foul if

44

he feels a foul has been committed.  I was intending to order the transcript (inaudible) form of order.  If we can't agree on it, we can submit competing orders to Your Honor.  If we can agree, as I've been able to do in about 99 percent of the cases, we'll submit an agreed order for Your Honor's consideration.  But I certainly don't --

THE COURT:  That's fair.  The Court did contemplate a consent order based on the transcript.  I would not give Mr. Marino or Mr. Waldman unilateral control in drafting the order.  So it was contemplated by the Court that there would be plaintiffs' consent.

MR. MARINO:  Of course.

THE COURT:  And if the parties aren't able to agree, then the Court will read the transcript and create an order on its own.

MR. MARINO:  Thank you very much, Your Honor.

THE COURT:  Anything else?

MR. GOLDBERG:  Your Honor, thank you.  Yes.  This is Jacob Goldberg.  There's one more piece of business, and that is at some point in the near future we -- we shall need to define the scope of defendants' summary judgment motion as well, because --

THE COURT:  That's going to be before Judge Bumb.  I have no say in that.  I was given limited -- this direction to oversee the discovery, the limited discovery.

45

MR. MARINO:  Thank you.  That was our understanding, Your Honor.

MR. GOLDBERG:  Understood, Your Honor.

THE COURT:  All right.  Thank you, everyone.  I'll look out for Mr. Marino's letter, and then we'll take it from there.

MR. MARINO:  Thank you, Judge.

MR. GOLDBERG:  Thank you very much, Your Honor.

MR. MARINO:  Thank you for your time today.

THE COURT:  Yes.  Bye-bye.

(Off the record)


CERTIFICATION


"I, SUE M. WYNNE, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter."


/s/ Sue M. Wynne                              9/23/2021
    SUE M. WYNNE                                  DATE

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MICHAEL WIGGLESWORTH, et al,      )    19-CV-5296
                                  )
        Plaintiff,                )
    vs.                           )
                                  )
MAIDEN HOLDINGS, LTD., et al,     )    Camden, NJ
                                  )    December 9, 2021
        Defendants.               )


TRANSCRIPT OF DISCOVERY DISPUTE HEARING
BEFORE THE HONORABLE SHARON A. KING
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:          DANIEL TYRE-KARP, ESQUIRE
                            BRENT LAPOINTE, ESQUIRE
                            THE ROSEN LAW FIRM, PA
                            609 W. South Orange Avenue
                            Suite 2P
                            South Orange, NJ  07079


                            TOR GRONBORG, ESQUIRE
                            ROBBINS, GELLER, RUDMAN & DOWD, LLP
                            655 West Broadway
                            Suite 1900
                            San Diego, CA  92101


For the Defendants:         KEVIN HARRY MARINO, ESQUIRE
                            JOHN D. TORTORELLA, ESQUIRE
                            MARINO TORTORELLA & BOYLE, PC
                            437 Southern Boulevard
                            Chatham, NJ 07928-1488


                            JACOB J. WALDMAN, ESQUIRE
                            QUINN, EMANUEL, URQUHART &
                            SULLIVAN, LLP
                            51 Madison Avenue, 22nd Floor,
                            New York, New York 10010

2

Audio Operator:                Marnie Maccariella


Transcribed by:                DIANA DOMAN TRANSCRIBING, LLC
                               P.O. Box 129
                               Gibbsboro, New Jersey   08026-0129
                               Office:   (856) 435-7172
                               Fax:      (856) 435-7124
                               Email:    dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

I N D E X

ARGUMENTS:                                              PAGE

Ref: Production of documents regarding Request 1A, B and C

  By Mr. Gronborg                 7, 12, 17, 19, 22, 33, 38

  By Mr. Marino                       13, 18, 20, 25, 28, 36

  By Mr. Waldman                                          37


BY THE COURT:                                           PAGE

Ref: Statement by plaintiffs in 11/22/21 letter

  By Judge King                                           11

Ref: Ruling by the Court

  By Judge King                                       32, 39


**\*\*\*\* Transcriber's note -- (Inaudibles are due to parties
speaking over each other, which tends to cancel out words.**

Colloquy                                        4

(The following telephone conference was heard as follows:)

THE COURT:  Good afternoon, everyone, this is Judge King.  We are here for a discovery dispute conference in Wigglesworth vs. Maiden Holdings, Limited, et al, Docket Number 19-5296.  We are on the record.

Once again, can I have the appearances on behalf of plaintiff, please?

MR. GRONBORG:  Good afternoon, Your Honor, this is Tor Gronborg from the Robbins, Geller Firm on behalf of the plaintiffs, and I'll allow my colleagues to introduce themselves.

MR. TYRE-KARP:  Good afternoon, Your Honor, this is --

THE COURT:  Good afternoon.

MR. TYRE-KARP:  -- this is Daniel Tyre-Karp from The Rosen Law Firm on behalf of plaintiffs, and I am joined by my colleague, Brent LaPointe.

THE COURT:  All right, good afternoon, Mr. Gronborg, Mr. Tyre-Karp, and Mr. LaPointe.  Can I also have the appearance on behalf of defendants.

MR. MARINO:  Good afternoon, Your Honor, Kevin Marino, Marino, Tortorella and Boyle, for Maiden Holdings. With me on the call is my partner, John Tortorella -- T-O-R-T-O-R-E-L-L-A, and my colleague from Quinn, Emanuel, Jacob

Colloquy                                    5

Waldman, W-A-L-D-M-A-N.

THE COURT:  Good afternoon, Mr. Marino, Tortorella and Waldman.  So we -- we are here again trying to resolve some discovery issues.  We first attempted this -- I believe it was -- if I can see my notes, back on December 21st (sic).  At that time, we went through some document requests that were made by the plaintiffs.

The Court made some rulings on some of those requests.  Some of the others, the Court decided that I would hold off on making any rulings because it appeared as if the defendants had documents ready to be produced that would have addressed a lot of the requested documents.

To that end, I allowed -- I allowed defense counsel to turn over the documents that they purported would respond to a lot of the items requested by the plaintiffs, and I allowed plaintiffs the opportunity to supplement the discovery dispute letter.

I did receive a supplemental letter dated November 12th, and my expectation was that items specifically identified in the document production request -- which was filed as Document Number 101-1 on the record -- would have been addressed, so it makes the process a little cumbersome, as the individual items were not identified with a "yes, these documents were produced," or "no, we still need additional information."

Colloquy                                    6

So with that being said, I'll do my best to get through the document requests to see what remains outstanding, if anything, and we'll try to have this wrap -- wrapped today. I believe this process has taken significantly longer than was initially intended, and I don't intend to make this into an unnecessary fishing expedition.

So I will start with, do both parties have the initial document request that was filed as Document 101 on the docket?

UNIDENTIFIED SPEAKER:  We do, Your Honor.

THE COURT:  Okay.  So we can start by item six.  I'm looking at page 14 and the first request on the subsection (a) was for internal and external information and data, including Maiden's historical data and loss experience with AmTrust -- AmTrust's book of business, and it was my understanding that that information would have been included in the documents provided by the defendants.  Was it?

MR. GRONBORG:  It was not, Your Honor.

MR. MARINO:  That is --

MR. GRONBORG:  This is Tor Gronborg on behalf of plaintiffs, and it was not --

MR. MARINO:  Hold on --

MR. GRONBORG:  And, Mr. Marino --

THE COURT:  I'll hear from the plaintiffs.

MR. GRONBORG:  -- if you'd please allow me, I  --

THE COURT:  I'll hear from the plaintiffs.

MR. MARINO:  Hold on, hold on --

THE COURT:  I'll hear from plaintiffs, please.

MR. GRONBORG:  I do think the point of it is for our impression of what was produced, and you'll get your opportunity to speak to it.  The -- and, Your Honor, as opposed to going point-by-point, this Request Number 1 really is a huge part of the substance here and that's why we focused on it in the letter and on what defendants have said.

And what they told the Court on September 21st is that they are going to produce Maiden's internal actuarial analyses, Committee records, and the periodic AmTrust statements concerning premiums, losses and expenses.

Now, it's our understanding that the Court ordered them, and defendants said they were going to produce the documents responsive to Request Number 1A, and they said with respect to the documents regarding Request Number 1B and C, that those would be subsumed in the production.

They didn't produce this.  They produced a subset of them, but not all the documents.  And if you look at their December 3rd, 2021 letter to the Court, what they -- they don't say we produced all the documents responsive to 1A, B and C.  They say sort of vaguely that we've produced documents from the heart of Maiden's actuarial analysis and documents that account for substantial historical data.

That is significantly different from saying we've produced all the documents responsive to 1A, B and C.  And we've had multiple meet and confer discussions on this point. We have identified for defendants where the gaps are in the production, and this is why the gaps matter, and they matter because the fundamental issue here is is there a basis for plaintiffs' allegations.

That's what Judge Bumb wanted us to look into.  And the specific allegation at the root of the matter is the defendants knew but failed to disclose the AmTrust business historical loss ratios were materially worse than the loss reserve rights that those defendants publicly spoke about. That's what we're getting at with Request Number 1.

And there's -- we talked last time, there's a chart at paragraph 57 of plaintiffs' second amended complaint.  That is the chart that identifies the historical loss ratios that defendants are alleged to have known or had access to but failed to disclose.

And what we had -- what we should have received in response to Request Number 1 is the contemporaneous documents that would have shown what those actual historical loss ratios were at the time defendants were making their statements. Those documents were not produced.

Now, we asked -- in the meet and confer calls, we asked defendants, "Have you produced the documents that allow

us to identify what those historical loss ratios were at the time they made the statements." Basically, have you given the documents in response to Request Number 1, and specifically 1A, B and C, that would allow us to recreate that loss triangle.

Initially they refused to answer it and then they effectively answered it "no" by saying it was never their intent to produce those documents. So the documents in response to Request Number 1 would answer them, and before we move on to that, why, we also retained two experts.

We -- we did ask and we appreciate a little extra time was provided because we -- we brought in two expert consultants with acturial and loss reserve expertise, and we asked them to review the material that was produced by the defendants, and we asked them, can you recreate that loss ratio triangle with the material that was available at the time.

In other words, were the historical documents that defendants produced sufficient to be able to identify what those historical loss ratios were on -- for each -- for each year when they were making their statements about the loss reserves. They said no, that they cannot do that.

And so what we get to next is December -- the December 3rd letter. I -- I'm not sure what Mr. Marino's going to argue now, but in the December 3rd letter, defendants

suggested that further discovery -- and the discovery is not needed because -- I'm going to use their words -- they say, "In fact, plaintiffs' claims are pleaded on the basis of historical loss ratios already disclosed by Maiden."

And so defendants are referring to that chart at paragraph 57 of the complaint, and those are historical figures that are pulled from a Maiden disclosure, but it was a disclosure at the end of the class period.

It wasn't a disclosure that was contemporaneous with their alleged false statements, and defendants have never conceded that those results -- the ones that are in the chart, the ones that are pulled from their 2018 SEC filing, are what they had at the time of the class -- at the time they made their false statements.

At their motion to dismiss, they seemed to suggest that wasn't the case which raised this issue whether there was a basis for plaintiffs' allegations.  In our meet and confers, they never said that's the case.  If -- if defendants want to stipulate now that what's in paragraph 57 of the complaint, that those are the historical loss ratios that they had at the time they were making alleged false statements, that would be great.

That could short-circuit a lot of this.  But they haven't done it, and frankly, I'd be surprised if they do do it.  And so that's -- that is the fundamental problem with the

By the Court                              11

production to date.  We simply do not have the documents that allow us to identify the historical loss ratios the defendant had at the time they made their statements or the underlying data that would allow us to calculate those --

THE COURT:  Thank you.

MR. GRONBORG:  -- and that is what was called for in Request Number 1.

THE COURT:  I'll hear from Mr. Marino in a minute, but before I do, I just want to address a comment that was made in a statement in plaintiffs' November 22nd, 2021 letter. The very last sentence on page one indicates that, "The Court has yet to resolve Judge Bumb's limited discovery to either plaintiffs' sole remaining claim or to the factual predicate of plaintiffs' remaining claim:  whether defendants possessed historical information during the class period that rendered defendants public -- publicly -- public plea disclosure about the AmTrust business loss reserve false or misleading."

To the extent it has not been clear in the past, I just want to make it clear that the Court is ruling as to the limits on discovery, and that is the first option provided by plaintiffs in the -- in this letter, and that comes from Judge Bumb's opinion on page seven, "Was there an intentional decision made by the defendants to omit AmTrust's historical loss ratio information from the view of investors."  So the Court has not --

UNIDENTIFIED SPEAKER:  Your --

THE COURT:  -- extended discovery to the factual predicate of plaintiffs' remaining claim.  I just wanted to clarify that to the extent the plaintiffs indicated that the Court has not resolved the limitations of discovery issues.

MR. GRONBORG:  Your Honor, if I could address that, because it is -- I'm not sure that that changes the matter at all.  You're using the word "intent" and what the intent of defendants are.  In a securities litigation case under the Securities Exchange Act, which is what this is, the equivalent of the intent element is scienter.

And under that element, scienter is measured by what did the defendants know or have access to at the time they were making the alleged false statements.  In other words, this discovery is not about did defendants send an email and say let's not tell investors about X.  Defendants have a duty under the law to -- when they -- when they choose to speak, they have a duty to disclose material information.

And so scienter -- which is effectively the intent element -- scienter goes to what did defendants know or have access to when they spoke.  That is exactly what the discovery in Request Number 1A, B and C is going to.  It is exactly what --

THE COURT:  And that's why --

MR. GRONBORG:  -- that that chart --

THE COURT:  -- the Court did order -- the Court did order that discovery, and my --

MR. GRONBORG:  Well then -- then I -- then which is why this may be a distinction without a difference, is we read it as the Court ordering the discovery on, you know, RFP-1A, B and C.  And as I just went over, that's not what we received.  We did not receive the complete set of documents that would be responsive to those requests.

THE COURT:  Mr. Marino, can I hear from you with regard to the production of items that were ordered under 1A, B, and C?

MR. MARINO:  Yes, Your Honor.  We quite disagree with the position that Mr. Torborg (sic) has -- has expressed.  I'm looking at the Judge's opinion in which she said, "Defendants suggest that AmTrust's historical loss ratios were just one factor they considered in formulating their estimated loss ratios for the future, and plaintiffs have nothing to contradict that."

"Defendants are correct.  The problem is the matter is before the Court on a motion to dismiss with no discovery.  If the evidence demonstrated that defendants considered the historical loss ratios as part of their analysis, defendants' point is well taken and the inferences upon inferences constructed by plaintiffs would likely tumble.  It would be difficult to find that the alleged undisclosed data

contradicted the statements made by me," and citing <u>Oklahoma Firefighters Pension and Retirement System vs. Lexmark</u>.

So we have absolutely produced the documents that Your Honor ordered produced, consistent with that limitation, okay? Pursuant to this clear instruction from Judge Bumb, we produced: number one, our chief actuary's work product, and number two, minutes of Committee meetings attended by our upper management including our Chief Executive Officer and our Chief Financial Officer that considered this analysis.

We also produced sessions statements and SOX-related documents concerning actuarial procedure. That already consists of hundreds of documents and thousands of rows of actuarial data. Those documents all demonstrate that we considered historical information in making our loss reserve estimates.

What you are hearing in what counsel said is an attempt to revisit the ruling Judge Bumb made. They want to alter what she has ordered. What she ordered was to discovery directed at a single issue -- whether we considered historical information in making our loss reserve estimate. We did. Documents Bates stamped MHLD1652 to 1702 make that clear.

The Third Quarter 2017 Reserve Committee Meeting Loss Reserves Presentation, there's more than 20 pages of dense spreadsheets addressing individual AmTrust business lines. Page six, for example, includes information for every

accident year going back to 2007, although we were only obligated to produce documents since 2014.  The -- the notion that this evidence that we have produced does not more than dispense with Judge Bumb's question about whether we considered and discussed historical information and data is nonsense.

And what you heard about the two experts, yes, they brought two fishermen in -- two more fishermen came in to assist in the fishing expedition that Judge Bumb explicitly said she would not tolerate, and that Your Honor indicated of course you wouldn't either.

Moreover, for every year, there are columns that represent different loss development method approaches, including the paid loss development method, the incurred loss development method, the expected loss ratio method, the incurred loss ratio method.  Every one of those methods considers historical data to an extent depending upon the method, and the documents we produced make that clear.

Those methods support an ultimate reserve estimate in another column on the same spreadsheet.  And MHLD1703, that's another document which was produced in native form as a spreadsheet, is another complex spreadsheet prepared for our actuarial analysis.  Part of the exhibit package that went along with the document just discussed was presented to the Booking Committee on October 19th, 2017.

It includes numerous worksheets of data, including a worksheet relating to AmTrust that is a series of triangles. These resemble Maiden's public triangle disclosures. They go back to 2007. These also indicate consideration of historical loss data. This, respectfully -- no, we don't have to go through each and every one of these points because counsel is right, this first issue that he raised is the whole ball game.

What he's wrong about is what Judge Bumb said. What she said was, these guys have said they considered historical loss data. The plaintiffs have not come forward with a word to contradict it. The problem for defendants though is this is just at the pleading stage, let them have a little discovery and see what they came up with -- come up with.

We gave them that discovery, and all we had to do was give them discovery showing that we in fact considered historical loss data. We certainly did that in spades. This is the end of the road. The case is over. It's absolutely over. There's nothing here.

For them to be permitted to drag us through this expedition and without apparent irony to say we brought in two experts and they say they should have done A, B, C, D -- that's not what this is about. This is about whether we considered historical loss data and we unequivocally did, that's it, game, set, match. Thank you, Your Honor.

MR. GRONBORG: Your Honor, let's first note what Mr.

Marino failed to address.  He failed to address the point that the documents they have produced do not identify the historical loss ratios that are at the heart of the allegations.  He -- it is a concession by silence that the documents that produced do not allow us to identify whether those allegations in the complaint are correct.  And we can look at --

THE COURT:  Well, let's --

MR. GRONBORG:  -- Judge Bumb's order.

THE COURT:  -- take a pause for a minute --

MR. GRONBORG:  In the order --

THE COURT:  Let's take a pause for a minute --

MR. GRONBORG:  Sorry, I'm sorry, Your Honor, what is it?

THE COURT:  I need you to pause because I am going to ask Mr. Marino --

MR. GRONBORG:  Okay.

THE COURT:  -- did you provide any historical loss ratio documents?

MR. MARINO:  Yes, we did.

MR. GRONBORG:  And, Your Honor, I agree they provided some.

MR. MARINO:  And they know that --

UNIDENTIFIED SPEAKER:  Your Honor, that --

MR. MARINO:  And they -- Judge, they know this.  They -- hold on --

Marino - Argument                    18

MR. GRONBORG:  We don't --

MR. MARINO:  -- they know this.

MR. GRONBORG:  Your Honor, I think we said just that --

MR. MARINO:  No, no, hold -- hold on --

MR. GRONBORG:  -- that they provided an incomplete --

MR. MARINO:  Hold on --

UNIDENTIFIED SPEAKER:  Hold on a second --

MR. GRONBORG:  -- they provided an incomplete set --

MR. MARINO:  Hold --

MR. GRONBORG:  -- of the historical data.

MR. MARINO:  Hold -- hold on -- hold on -- hold on a second.

MR. GRONBORG:  I'm agreeing with you, Mr. Marino --

MR. MARINO:  Hold -- I --

MR. GRONBORG:  -- on the part.

MR. MARINO:  Just when you have the floor, you have the floor.  Let's just hold on one second, okay?  I would just ask Your Honor -- I was going to ask Your Honor to ask Mr. Gronborg the -- the same question.  That's -- when he says yes, we did, that's it, O-V-E-R, that's the end.  They want it to be something different, but it's not something different.

Judge Bumb was completely unimpressed with their complaint, said she would not permit a fishing expedition,

didn't see anything to contradict our assertion that we in fact relied on historical loss information, and said the problem is there's no discovery that has been taken, so give him some discovery. He just admitted that the very thing that Judge -- Judge Bumb said we had to do, we've done. That's the end. That's the end. (Inaudible) --

MR. GRONBORG: Mr. Marino, what I did was I answered the --

MR. MARINO: -- (inaudible) and raising the voice, all the --

THE COURT: My question now is --

MR. MARINO: -- (inaudible) and raising the voice --

THE COURT: -- to Mr. Gronborg. You said there was an --

MR. GRONBORG: Yes, I'm -- excuse me.

THE COURT: -- incomplete set provided. Can you tell me what -- what makes it incomplete, and what is missing that would make it complete?

MR. GRONBORG: Yes, Your Honor, there were certain documents that identified what the historical loss ratios were at certain points in time. In other words, you could partially fill out the triangle that is on paragraph 57 of the complaint, but it is partial. It is incomplete. The -- the disclosures that were provided, the documents that were provided do not allow you to complete that triangle to

identify what all the loss ratios were at the times that the historical loss ratios were at the time they were speaking.

And so our experts are not fishermen, they reviewed the data with that question in mind to say can we recreate it. So where my agreement was -- and I think Mr. Marino knows this perfectly well -- was we said that there was some data. We did this in the meet and confer calls, we said it here, it's some. It's incomplete.

And the (inaudible) that is happening is that there is no answer and the answer must be no, they know they did not produce the complete set of data that would allow us, the plaintiffs, and the Court, to evaluate what those historical loss ratios were at the time they made their statements. And that information --

THE COURT: Well, I'll (inaudible) --

MR. MARINO: It doesn't matter, Your Honor -- respectfully, it doesn't matter. That isn't what Judge Bumb ordered. That's what they wanted her to order, that's not what she ordered. What she said was very clear. The only question presented is whether we considered historical loss data as one of the criteria.

We did. They know it. They know it in spades because we've produced documents reflecting it. That's the end for them. I don't know how to say it any more clearly. They -- they want to get into an analysis, they want to

substitute their judgment for ours.  This isn't about deceiving the investing public, this is about their 20-20 hindsight assessment of our consideration and of the value that we attached to this historical data.

That's not what Judge Bumb ordered, that's not what the law requires, that's it and that's where the rubber meets the road.  So, you know, this has been way longer and way more expensive than it ever should have been and respectfully, way more expensive than either Judge Bumb or Your Honor indicated it should be.

We have bent over backwards to show what we knew we could show right along.  Of course we considered historical loss data, yes, we did.  They don't like the value we attached to it.  Okay, great.  That does not a securities case make.

MR. GRONBORG:  Your Honor, may I address that?

THE COURT:  I want you to address with regard to the intent, because that's something that Judge Bumb wanted to -- that the parties were allowed to flesh out, and based on what I heard from Mr. Marino that they -- that you were provided with minutes -- minutes of the meetings, the chief actuary work product, actuarial analysis, and from my understanding, those documents would show the analysis that went into reaching the conclusion and it would show the intent.  Do you disagree with Mr. Marino that those documents were not provided?

MR. GRONBORG:  I disagree that they provided the complete set.  They provided some actuarial work product.  They provided some, but not all, of the meeting minutes.  They provided some session statements which they have told the SEC were incomplete.  And we should be clear here, because we're not just reading one line of Judge Bumb's order.

Judge Bumb on that same page -- 17 -- says, "Plaintiffs aver the defendants fraudulently failed to disclose the historical loss ratios, and that will be the focus of discovery."  What we are talking here is the historical loss ratios.  We are seeking discovery --

THE COURT:  And what --

MR. GRONBORG:  -- to show that the alleged historical loss ratios, what we alleged in the complaint, are accurate.  Everything that you are hearing now is no, we have not given them the documentation that will show that.  Why?  Because we don't think we need to, we just need to show them that we considered some of it.

It's not some of it, it is what did they consider when they made the statement.  And again, you asked me about intent.  The issue of intent in a Securities Exchange Act case revolves around what defendants knew or had access to at the time they made the statement.

If a defendant considered material information at the time they made the statement but didn't disclose it,

that's scienter.  They have violated the Securities laws.

There's no magic in considering something.  If someone could

just say well, I considered it but didn't say it, then nobody

would commit Securities fraud.  Everybody would just say well

yeah, I considered that negative news, but I didn't consider

(sic) it.  And to go to the last point --

THE COURT:  My reading --

MR. GRONBORG:  -- the notion that --

THE COURT:  -- of Judge Bumb's --

MR. GRONBORG:  Sorry, go ahead.

THE COURT:  My reading of Judge Bumb's opinion which

asked that she didn't want any hindsight judgment so she is

not allowing plaintiff to reevaluate what should have been

reported and what should not have been reported, so to the

extent if the information was considered, she's satisfied.

I'm sorry --

MR. GRONBORG:  Your Honor, I disagree with you.

When she said no hindsight judgment, the issue was don't

second-guess the opinion.  That is not -- Mr. Marino knows

perfectly well because we have clarified it multiple times,

the issue in this case is not was the loss reserve -- the

statement of opinion that they gave -- wrong or right.

Nobody's second-guessing that, there's no hindsight

judgment on it.  The question is, is when they made that

statement of opinion, did they have material information

suggesting that historical loss ratios were worse than what the statement suggested, and should they have also disclosed those historical loss ratios. To address that question -- that is the question.

And the intent element of that -- scienter -- never requires that the parties address the issue of what they knew. And all we're seeking is what they knew about the historical loss ratios. None of this is a hindsight judgment, none of this is trying to rewrite the reserves. The reserves are what they are.

Nobody in this case is alleging that the reserves themselves are false. What the reserves did, they are statements of opinion that triggered a duty to disclose negative material information. We plainly have a right to the discovery of that negative information.

And I'm going to read again, the Judge says, "Plaintiffs aver defendants fraudulently failed to disclose the historical loss ratios. That will be the focus of discovery." We are focused on the historical loss ratios. That is what we're asking.

And honestly, the last time we were here, defendants said and the court order said we're going to produce the documents responsive to Request Number 1A, B and C, and you have just heard that's not what they did. They said well, we're going to produce the documents responsive to those,

Marino - Argument                                      25

filtered through our view of giving you just enough to decide whether or not we considered something.  That's not what they said on September 21st.

They said we're going to produce the documents. We're asking them to produce what they said they were going to produce here, not filter it through the -- well, we'll decide what it is that we -- that is enough to show we considered something.

THE COURT:  Mr. Marino?

MR. MARINO:  If I may just -- yes, Your Honor, just very briefly.  Mr. Gronborg disagrees with Your Honor and he disagrees with me and he disagrees with Judge Bumb.  But disagreeing with me, that's -- that's part of the game. Disagreeing with you, that's something else altogether. Disagreeing with Judge Bumb, that's something else altogether.

The fact is this -- you asked the question about intent, this is exactly where Judge Bumb was when she said they've done nothing to contradict what Maiden has said.  The problem is we haven't had any discovery.  Let's have discovery into what is a single, simple question, whether they considered historical loss ratios as part of their analysis.

Produce documents suggesting that they have, and that will be the end of the game.  We did it.  He can disagree with you and he can disagree with Judge Bumb, but that doesn't get you very far.  You don't want to be disagreeing with the

person who is wearing the robe.  I agree with Your Honor, I disagree with Mr. Gronborg.  I think it's over and I think we just need at this point to finally put a nail in the coffin that buries this misbegotten case that Judge Bumb correctly described as "piled inference upon inference upon inference," but now we find the proof is in the pudding.  We've produced evidence demonstrating that we considered historical loss data -- that's the end of the story.  Thank you, Your Honor.

MR. GRONBORG:  Your Honor, I -- one, I don't disagree --

THE COURT:  Mr. Gronborg, I want you to hone --

MR. GRONBORG:  -- and I think --

THE COURT:  -- I want you to hone in on what you believe is missing, and I -- I am not sure if you're talking about a time line, the relevant time period, because you said only some loss ratio information was provided.  What is your anticipation that should have been provided?

MR. GRONBORG:  We think defendants should have provided -- well one, I think they should have provided what was called for by 1A, B and C, which is the internal-external information and data, including historical data and loss experience with the AmTrust book of business that they considered or had access to.  That is -- and I am far from disagreeing with the Court -- that is what the Court ordered them to produce --

THE COURT:  And Mr. --

MR. GRONBORG:  -- on September 21st.

THE COURT:  And Mr. Marino said --

MR. GRONBORG:  The Court did not order them to --

THE COURT:  -- that it was reviewed.  Mr. Marino said that was --

MR. GRONBORG:  What's that?

THE COURT:  I am just trying to get a handle on what you think was omitted.

MR. GRONBORG:  Well, so let me -- again, that was not what Mr. (inaudible) would produce, he said we produced some of that, just enough to show what we considered, not we produced all of it in this.  What we considered is something that came along after and is not in the Court's prior transcript with what they were supposed to produce, and what we had --

THE COURT:  Is there a time line?  Are you looking for a time line for dates certain that you would have received those documents?

MR. GRONBORG:  We are asking for all of the documents sufficient for us to identify what the historical loss ratios were at the various times the defendants made their statements, and so that is why I keep pointing to the triangle, because what we were -- what we had asked them to produce is give us the documents that reflect the information

that is in the loss ratio triangle that you made public in 2018, give us the contemporaneous documents at every stage in the class period -- relevant period that shows what those historical loss ratios are.  And it's either going to be a document (inaudible) or the document that allow you to create them.

MR. MARINO:  Judge, the Judge ordered limited discovery.  We provided exactly what she contemplated and clearly expressed in her opinion.  You and Judge Bumb both underscored the point that it would be limited.  What he's looking for, asking for, is all the discovery he could conceivably get in this case -- full-blown, full-on discovery, and then he wants to have his experts analyze it so that he can advance a theory that is completely at odds with what Judge Bumb has made very clear was the only question presented.

They don't have a theory that gets them past the 12(b)(6) motion if we have considered historical loss information.  They want to argue with us about whether we attached enough significance to it.  It's completely backward-looking, the back end of the -- rear end of the telescope. They want to now come back and say well, this didn't pan out the right way.

Yeah, obviously it didn't pan out the right way, right?  But the question isn't whether you -- you don't judge

what we did by looking after the fact and saying well, it didn't work out.  You know what?  They were by definition forecasts.  The question that Judge Bumb allowed them to take discovery on was whether we considered historical loss data and we considered it, and now have proven -- which arguably is more than we even should be have to be required to do under 12(b)(6).

But our approach is when the Judge says do it, we do it.  And the Judge said to do that, so we did it.  They don't like it.  They want more.  They want to have a case.  This is a case in search of any scintilla of evidence to support it.  It does not exist.

I don't mean to be going round and round and repeating myself, but I have to make the point, Judge Bumb was quite clear, their complaint piles inference upon inference.  She intimated it might be sanctionable, for goodness sakes.  At the end of the day, no, we don't have to give them full-blown discovery that they could take throughout the course of the case.

It's not what the Judge contemplated, and it doesn't make any sense.  That's not what happens at this stage of the proceedings.  What happens is if the Judge wants to -- as she did -- give a plaintiff every opportunity to take what appears to be a threadbare claim and which the Judge made very clear, this is one where there isn't anything to support it, but

Marino - Argument                                          30

let's take -- let them take some discovery, let's see if this seminal question -- whether they considered historical loss data as they said they did, and it makes clear what we said -- we've provided Committee meeting minutes, we've provided actuarial tables -- what did we say?

We said we considered this as one of a number -- one of a number of factors.  You look at what we did in this with respect to this set of forecasts -- what we did was disclose completely what our approach would be.  They want to take issue with the substantive answers, they want to differ with our conclusions.  That's not what this is about.

MR. GRONBORG:  Your Honor --

UNIDENTIFIED SPEAKER:  Your Honor --

MR. GRONBORG:  -- far --

THE COURT:  I am about to rule --

MR. GRONBORG:  -- far from --

THE COURT:  I am about to rule.  I'll let Mr. Gronborg make one final point.

MR. GRONBORG:  Far from this --

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

MR. GRONBORG:  -- supposed far-flung discovery, we just identified that what we are seeking are the documents sufficient to identify what the actual historical loss ratios were at the time the defendants were making the statements.  That is what's at the heart of this case.  That is what Judge

Marino - Argument                                31

Bumb refers to when she says, "Plaintiffs aver that defendants fraudulently failed to disclose the historical loss ratios. That will be the focus of discovery."  That is what the focus is here.

Defendants' suggestion that somehow all that has to be is that they considered this material and that that resolves the case doesn't make sense in this context, and that is because plaintiffs alleged that defendants knew and had access to the historical data.

That's plaintiffs' allegation.  If that was enough to get the case dismissed, then the case would have been dismissed on plaintiffs' own allegations.  It wouldn't have continued, it wouldn't have survived a motion to dismiss.  We alleged that they knew this information.

Again, if defendants wanted to stipulate at the time we made our statements we knew the historical loss ratios that are identified in the complaint, great.  We can short-circuit a whole lot of this.  But they didn't do it.  So this notion that the only thing is that we provide a few -- some documents here that show we considered historical information, it doesn't make any sense.

That's what we pled -- we alleged that.  The question and what Judge Bumb stated -- and it's on 17 -- when she's talking about historical loss ratios is do the discovery to identify what those actual historical loss ratios are

because defendants wouldn't accept that the ones that were pled in the complaint were accurate.  They seem to be challenging the fact that the historical loss ratios were escalating up to 80 percent and above 70 percent over time.  That's what we're trying to figure out, are those allegations correct.

We don't need some limitation on did they consider it, we pled it.  We pled they knew and had access to the data.  It's the -- it's what is the data.  And so again, far from anything excessive, we're asking them, produce what you said you were going to produce with regard to Request 1A, B and C, and make sure it includes the documents that are sufficient enough to identify what those historical loss ratios are.

THE COURT:  So the Court is satisfied that the documents ordered and ordered to be produced in Request Number 1A, B and C has been produced.  Mr. Gronborg stated that he did receive historical loss ratio information which indicates that AmTrust did consider this information.

The plaintiffs' request to receive all the loss ratio goes to second-guessing the conclusions made by AmTrack -- AmTrust, which is not what the -- Judge Bumb ordered.  So to that extent, I find that the discovery produced has been satisfactory to comply with Judge Bumb's information -- I'm sorry, Judge Bumb's authorization of limited discovery information.

Is there anything else in dispute?

MR. MARINO:  Thank you --

MR. GRONBORG:  Your Honor, I would like to --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- make --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- the record --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- clear --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- that we --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- did not --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- we did not --

MR. MARINO:  -- nothing --

MR. GRONBORG:  -- concede --

MR. MARINO:  I --

MR. GRONBORG:  I'm sorry, go ahead, Mr. Marino.

MR. MARINO:  No, no, please, I didn't mean to interrupt you.

MR. GRONBORG:  I was saying, Judge, we would just like the record clear that we did not concede or agree that defendants had produced the historical data.  What we said was that they had produced some, an incomplete set of historical

Gronborg - Argument                                    34

data, did not produce all of it and certainly did not produce what the Court had previously ordered them to produce on September 21st.

As stated, I think the statement about second-guessing, I'm happy to readdress why none of this is second-guessing because it is only going to historical data, but we have been over that.

THE COURT:  And the Court is aware that you said "some" historical loss ratio information documents have been produced.  But it appears as if plaintiffs are seeking all. And from my understanding of what I heard today, plaintiff wants to know what the defendants knew at the time they made their assessment, and that is where I get the second-guessing from, that if you're looking for all the information that they knew to decide whether they should have come up to a different conclusion, that is second-guessing, which Judge Bumb was not permitting.

Mr. Marino --

MR. MARINO:  Nothing further from defendants.

THE COURT:  -- was there something else you wanted to say?

MR. MARINO:  No, no, nothing further from defendants was all I was going to say, Your Honor, in response to your question.  I didn't mean to -- to speak over counsel and thank you for your time this afternoon.

Marino - Argument                                    35

THE COURT:  Mr. Gronborg, was that the only -- the only issue, items 1A, B and C?

MR. GRONBORG:  Well, Your Honor, those are -- they are the key issues.  I do want to address the second issue which is defendants continue to say well, we're producing documents that we considered.  And the other -- the issue that we raised in our letter is they failed to -- you know, they failed to search for or produce any communications -- they failed to identify whether or not actually the documents, even those documents that they have produced, were those created by, sent by, received by defendants.

There are some meeting minutes -- again, they are incomplete -- some meeting minutes, and those have attendee names on it.  But for the majority of documents, they don't.  They don't have a name, they don't say anything.  Apparently we're supposed to take defendants' word about it that we produced it, and therefore we considered.

We asked them, are you just stipulating and saying all of these materials were considered by defendants?  They said no.  Are you going to search and provide emails that show whether or not they received the documents?  We got no.  In the letter they come out and suggest we never asked for that, and we're happy to submit the correspondence where we said give us the communications.

We asked for the metadata.  Defendants say oh, we --

we gave them the metadata.  Well, it's required under the ESI protocol -- the electronic discovery protocol.  But the metadata they gave lists every custodian effectively as Maiden, the company, and not the individual, which is why we had said look, even for these documents you produced, there is not a record of whether in fact they were received by or considered by the individual defendants.

So that, now that is part and parcel of the other, but honestly even in their claim -- well, this shows we considered the materials -- we're still left with an abundance of their self-selected documents that they're not saying whether or not it was considered.

MR. MARINO:  So, Your Honor --

THE COURT:  So, Mr. Marino,  I would like --

MR. MARINO:  -- when counsel says --

THE COURT:  -- you to address the point --

MR. MARINO:  Judge, when counsel says "part and parcel," those are part and parcel of what is requested in 1A, B and C, he's right, it is part and parcel, and we have already produced exactly what Judge Bumb ordered and what Your Honor ordered.  He's asking now for more.

Now he wants to -- to bring someone in to sign a blood oath to say having these in our possession and having them spoken about at minute meetings is not enough, we now want you to sign a blood oath that they were considered and

the extent to which they were considered and what value was placed upon them.  We're just re-plowing the ground Your Honor has already decided.

MR. WALDMAN:  Your Honor, this is -- this is Jacob Waldman.  I just wanted to make a quick point also.  Mr. -- or two points here --

UNIDENTIFIED SPEAKER:  Jacob, you're -- Jacob, Jacob, Jacob, Jacob, you're going to make a point now?

THE COURT:  Go ahead, Mr. Waldman.

UNIDENTIFIED SPEAKER:  Why don't you let -- why don't we --

MR. WALDMAN:  I was just going to --

UNIDENTIFIED SPEAKER:  Jake, Jake, you take it from -- Jake, you take it -- Jake, you take it from here, all right?

MR. WALDMAN:  Okay, Your Honor, I was just going to -- going to add that the -- the metadata that Mr. Gronborg is talking about, about just indicating Maiden, is -- is incorrect.  We produced additional metadata that, to the extent available, that indicates the custodians for the documents.

That was actually produced before their letter to the Court, so I don't know why they continue to insist that the only metadata they have indicates that Maiden produced the documents.  And, it's worth noting again, the actuarial

analysis was -- was prepared by our chief actuary.  That's not difficult to find, and the minutes indicate who was at the meetings.  So there's plenty of data to indicate who possessed what documents at what time, and that's the only point I wanted to make.  Thank you, Your Honor.

MR. GRONBORG:  And I appreciate Mr. --

THE COURT:  You're welcome.

MR. GRONBORG:  All right, I appreciate that comment, but the fact is that for the vast majority of documents, the metadata does not identify who received the document, does not identify whether defendants actually considered it, and the irony here of course is that defendants are saying what we are giving you is our self-selected set of material that was considered by them.

They're not producing -- they've said it over and over, they said it again, we're not going to -- we're not actually producing to you all of the documents called for by Request Number 1A, B and C.

I understand the -- the Court has now ordered that they don't need to do that, but that they need to produce some set of the documents that they considered.  So we -- we are hard-pressed to understand why it is that defendants have produced documents that they claim they considered during the class period, and then subsequently have been so reluctant to say or provide any information about whether in fact they did

consider those documents.

THE COURT: Based on -- while the Court has already ruled, I am not going to revisit that. I -- my issue, I think properly we're addressing the metadata information, and it appears as if you did receive that metadata information. It also appears that you may not be satisfied with what the metadata shows, but it appears that the metadata has been provided to you.

I am not inclined to order any email information. I think that takes us further into the fishing expedition. With regard to information and who attended the meeting, it also appears that minutes were produced indicating who was in attendance at the meeting.

I am just satisfied for purposes of Judge Bumb's order that the information that she thought may be relevant to plaintiffs' supplement in their pleadings on the motion to dismiss has been provided.

Anything else from either party?

MR. TYRE-KARP: Your Honor, this is Daniel Tyre-Karp from The Rosen Law Firm. I -- earlier you had stated that you were limiting discovery, that you're ordering discovery limited to the sole issue identified by Judge Bumb which was, was there an intentional decision made by the defendants to omit AmTrust's historical loss ratio information from the view of investors.

Colloquy                                          40

And I -- I just wanted to clarify whether you are also limiting the scope of any motion that -- any dispositive motion that defendants may file in -- in January as they're contemplating to that sole issue as well.

THE COURT:  I am not going to limit that, but it's my understanding that that's Judge Bumb's limitation.  I believe this may be Judge O'Hearn's case at this point.  I don't think Judge Bumb is still assigned to this case, but I can imagine that the Court is only going to address issues based on what was limited in Judge Bumb's opinion, and that's the bottom of page 17.

"Was there an intentional decision made by the defendants to omit AmTrust's historical loss ratio information."

MR. TYRE-KARP:  Thank you.  I just wanted to clarify.

THE COURT:  And that's my understanding, but I'm sure that this (inaudible) -- you can try to file in a motion. I would suggest that you maybe write the Court for clarification on that.

MR. TYRE-KARP:  Thank you.  I just wanted to clarify that the sole remaining issue was the intentional decision to omit the information, and not whether or not defendants considered the information.

THE COURT:  That's my understanding, yes.

Colloquy                                    41

MR. TYRE-KARP:  Thank you, Your Honor.

THE COURT:  There was another issue that at one of our earlier status conferences the parties decided it was no longer in dispute, and that's on page 18 of the opinion where the Court said she would allow limited discovery (inaudible) as to stockholder sale (phonetic), that is that Maiden executives sell stock outside of their usual pattern and practice.

And at one of our last conferences it was indicated that the parties did not believe that issue was in dispute, or at least discovery and that issue is in dispute.

UNIDENTIFIED SPEAKER:  That is correct, Your Honor.

THE COURT:  All right --

MR. GRONBORG:  And, Your Honor, if I could address --

THE COURT:  All right, thank you, everyone.

MR. GRONBORG:  -- if I could address that, Your Honor, just briefly because I -- I hope it is not we received a production of documents -- Mr. Waldman was good enough to produce some additional documents to us yesterday on the insider trading issue.

We haven't had a chance to review those, but I anticipate the first step is we'll review those and revert back to him if there are issues, so I -- I would not say on the record that the issue is resolved.  I am hopeful, given

Colloquy                                42

our past correspondence, though that we will be able to resolve it.

THE COURT:  It's my recollection -- it's in my notes that it was not an issue in dispute, but if you do have any issues, write the Court and I will take a look at it.  And I will give you two weeks to write the Court on that issue if there are any -- if in fact there are issues resolving insider trading.  Thank you very much, everyone --

MR. MARINO:  And, Your Honor, Kevin Marino, just -- just this one question, Your Honor, one point.  So we will -- when that issue is resolved, we'll renew our motion and I guess that will be renewed in front of Judge O'Hearn now, as Your Honor's correct, it's been reassigned to her, so we'll -- we -- and we may just make that motion as soon as this math issue is buttoned up.

THE COURT:  All right, and if I hear nothing from the parties in two weeks with regard to the insider trading issue, I will issue a text order just indicating the new deadline for reopening the motion to dismiss before Judge O'Hearn.

MR. GRONBORG:  That's fine, Your Honor --

MR. MARINO:  Perfect.  Thank you very much.

MR. GRONBORG:  -- though we do have (inaudible) in a letter, Your Honor, we do have pending interrogatories that where defendants' responses are due on December 20th, so we

Colloquy                                    43

will look at those again.  It may be possible that we will be able to resolve issues with those if there are objections, but that is -- that is a piece of discovery that is outstanding that the parties haven't yet addressed because the deadline for responses and objections is not yet due.

THE COURT:  All right, then I (inaudible) without looking at a calendar.  At some point once the discovery period is completed, I will enter a text order giving a new deadline to reopen the motion to dismiss.

MR. GRONBORG:  That -- that's great, Your Honor, we will await that text order and wish the Court happy holidays and thanks for your time today.

THE COURT:  Happy holidays to everyone -- to everyone --

UNIDENTIFIED SPEAKER:  Happy holidays.

ALL COUNSEL:  Thank you, Your Honor.  Bye now.

(Telephone conference concluded at this time.)

* * *

44

**C E R T I F I C A T I O N**


        I, Diane Gallagher, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter.


     /s/Diane Gallagher          December 10, 2021

DIANE GALLAGHER                  DATE

DIANA DOMAN TRANSCRIBING, LLC