# EXHIBIT 3

10-K 1 mhld-20141231x10k2014.htm 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2014**
**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period from  to**
**Commission File Number: 001-34042**

# MAIDEN HOLDINGS, LTD.

(Exact Name of Registrant As Specified in Its Charter)

| | |
|---|---|
| **Bermuda** | **98-0570192** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**131 Front Street**
**Hamilton HM 12, Bermuda**
(Address of Principal Executive Offices and Zip Code)

**(441) 298-4900**
(Registrant's Telephone Number, Including Area Code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Shares, par value $0.01 per share | NASDAQ Global Select Market |
| Series A Preference Shares, par value $0.01 per share | New York Stock Exchange, Inc. |
| Series B Mandatory Convertible Preference Shares, par value $0.01 per share | NASDAQ Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in the definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large Accelerated Filer ☐        Accelerated Filer ☒        Non-Accelerated Filer ☐        Smaller Reporting Company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of voting and non-voting common shares held by non-affiliates of the registrant as of June 30, 2014 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $633.1 million based on the closing sale price of the registrant's common shares on the NASDAQ Global Select Market on that date.

As of March 3, 2015, 73,092,169 common shares were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A with respect to the annual general meeting of the shareholders of the registrant scheduled to be held on April 28, 2015 are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

## MAIDEN HOLDINGS, LTD.

### TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 48 |
| Item 2. | Properties | 48 |
| Item 3. | Legal Proceedings | 49 |
| Item 4. | Mine Safety Disclosures | 49 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 49 |
| Item 6. | Selected Financial Data | 51 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operation | 53 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 92 |
| Item 8. | Financial Statements and Supplementary Data | 94 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 94 |
| Item 9A. | Controls and Procedures | 94 |
| Item 9B. | Other Information | 96 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 96 |
| Item 11. | Executive Compensation | 96 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 96 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 96 |
| Item 14. | Principal Accounting Fees and Services | 96 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 96 |
| Signatures | | 97 |
| Exhibits | | E-1 |
| Consolidated Financial Statements | | F-1 |
| Ex-21.1 | Subsidiaries of the Registrant | |
| Ex-23.1 | Consent of BDO USA, LLP | |
| Ex-31.1 | Section 302 Certification of CEO | |
| Ex-31.2 | Section 302 Certification of CFO | |
| Ex-32.1 | Section 906 Certification of CEO | |
| Ex-32.2 | Section 906 Certification of CFO | |

Table of Contents

## PART I

losses. They can be submitted up to 90 days after the close of the reporting period. Some proportional treaties have specific language requiring earlier notice of serious claims.

For all lines, the Company's objective is to estimate ultimate loss and LAE. Total loss reserves are then calculated by subtracting losses paid. Similarly, IBNR reserves are calculated by subtraction of case reserves from total loss reserves. IBNR is the estimated liability for (1) changes in the values of claims that have been reported to us but are not yet settled, as well as (2) claims that have occurred but have not yet been reported as well as (3) claims that are closed but subsequently reopen. Each claim is settled individually based upon its merits, and particularly for longer-tailed lines of business, it is not unusual for a claim to take years after being reported to settle, especially if legal action is involved. As a result, the reserve for loss and LAE include significant estimates for IBNR reserves.

The reserve for IBNR is estimated by management for each account based on various factors, including our underwriting teams expectations about loss experience, actuarial analysis and loss experience to date. Our actuaries employ standard actuarial methodologies to determine estimated ultimate loss reserves.

In selecting its best estimate, the Company considers the appropriateness of each methodology to the individual circumstances of the treaties and underwriting year for which the projection is made. The methodologies that the Company employs include, but may not be limited to, the Expected Loss Ratio method, the Reported Loss and Paid Loss Development methods and the Incurred and (as applicable) Paid Bornhuetter-Ferguson ("B-F") methods. In addition, the Company uses other methodologies to estimate liabilities for specific types of occurrences. For example, external and vendor catastrophe models may be used in the estimation of loss and LAE at the early stages of catastrophe losses before loss information is reported to the reinsurer.

The reserve methodologies employed by the Company are dependent on data that the Company collects. This data consists primarily of loss amounts and loss payments reported by the Company's cedants, and premiums written and earned reported by cedants or estimated by the Company. The actuarial methods used by the Company to project loss reserves in the Diversified Reinsurance segment that it will pay in the future (future liabilities) do not generally include methodologies that are dependent on claim counts reported, claim counts settled or claim counts open as, due to the nature of the Company's business, this information is not routinely provided by cedants for every treaty. Consequently, actuarial methods relying on this information cannot be used by the Company to estimate loss reserves in the Diversified Reinsurance segment. However, the Company does use actuarial methods in the AmTrust Reinsurance segments that are dependent on claim counts reported, claim counts settled or claim counts open.

The reserve for loss and LAE at December 31, 2014 and 2013 was as follows:

| December 31, | 2014 | 2013 |
|---|---|---|
| | ($ in Millions) | |
| Reserve for reported loss and LAE | $ 1,252.3 | $ 1,087.4 |
| Reserve for losses incurred but not reported | 1,019.0 | 870.4 |
| **Reserve for loss and loss adjustment expenses** | $ 2,271.3 | $ 1,957.8 |

While management believes that our case reserves and IBNR are sufficient to cover losses assumed by us, there can be no assurance that losses will not deviate from our reserves, possibly by material amounts. The methodology and assumptions used to estimate loss reserves are reviewed at least quarterly, with adjustments made as appropriate. To the extent actual reported losses exceed estimated losses, the carried estimate of the ultimate losses will be increased (i.e. unfavorable reserve development), and to the extent actual reported losses are less than our expectations, the carried estimate of ultimate losses will be reduced (i.e. favorable reserve development). We record any changes in our loss reserve estimates and the related reinsurance recoverable in the periods in which they are determined.

Loss reserves do not represent an exact calculation of liability. Rather, loss reserves are estimates of what we expect the ultimate resolution and administration of claims will cost. These estimates are based on actuarial projections and on our assessment of currently available data, as well as estimates of future trends in claims severity and frequency, judicial theories of liability and other factors. Loss reserve estimates are refined as experience develops and as claims are reported and resolved. In addition, the relatively long periods between when a loss occurs and when it may be reported to our claims department for our casualty reinsurance lines of business also increase the uncertainties of our reserve estimates in such lines.

*Actuarial Methods Used to Estimate Loss and Loss Adjustment Expense Reserves*

We utilize a variety of standard actuarial methods in our analysis. The selections from these various methods are based on the loss development characteristics of the specific line of business. The actuarial methods we utilize include:

The Expected Loss Ratio ("ELR") method is a technique that multiplicatively applies an expected loss ratio to earned premium to yield estimated ultimate losses. The ELR assumption is derived most often from the pricing of the business that is being reserved but can be based on historical experience of the business. This method is frequently used for the purpose of stability in the early valuations of an underwriting year with large and uncertain loss development factors. This technique does not take into account

60

Table of Contents

actual loss experience for the underwriting year being projected. As an underwriting year matures and actual loss experience becomes available, other methods may be applied in determining the estimated ultimate losses.

The Loss Development ("LD") method is a common reserving method in which ultimate losses are estimated by applying a loss development factor to actual reported (or paid) loss experience. This method fully utilizes actual experience. Multiplication of underwriting year actual reported (or paid) losses by its respective development factor produces the estimated ultimate losses. The LD method is based upon the assumption that the relative change in a given underwriting year's losses from one evaluation point to the next is similar to the relative change in prior underwriting years' losses at similar evaluation points. In addition, this method is based on the assumption that the reserving and payment patterns as well as the claim handling procedures have not changed substantially over time. When a company has a sufficiently reliable loss development history, a development pattern based on the company's historical indications may be used to develop losses to ultimate values.

The BF reserving technique is commonly used for long-tailed or erratic lines. It is also useful in situations where the reported loss experience is relatively immature and/or lacks sufficient credibility for the application of methods that are more heavily reliant on emerged experience. The BF method is an additive IBNR method that combines the ELR and LD techniques by splitting the expected loss into two pieces - expected reported (or paid) losses and expected unreported (or unpaid) losses. Expected unreported (unpaid) losses are added to the current actual reported (or paid) losses to produce an estimate of ultimate losses by underwriting year. The BF method introduces an element of stability that moderates the impact of inconsistent changes in paid and reported amounts.

With the guidance of the methods above, actuarial judgment is applied in the determination of ultimate losses. In general, the Company's segments have varying levels of seasoning with which the Company has direct experience and as a result, differing methods are utilized to estimate loss and LAE reserves in each segment.

In the Diversified Reinsurance segment, at December 31, 2014, 91.9% of the reserves for loss and LAE in the Diversified Reinsurance segment are associated with the business acquired in the GMAC Acquisition (which includes new business written subsequent to that transaction). The Company's executive and technical management, including claims and underwriting, have significant experience with this book of business, which also has more than 30 years of loss experience associated with it. In general for the Diversified Reinsurance segment we utilize the ELR approach at the onset of reserving an account, the BF method for business with less but maturing loss experience, and as the experience matures the LD Method.

The Company has underwritten the AmTrust Reinsurance segment since July 1, 2007. The majority of the exposure in the underlying book of business has significant seasoning, and allows for a significant amount of credibility in using parameters derived from historical experience to calculate reserve estimates. Some segments of the book are a result of recent acquisitions or newer markets for AmTrust. These segments require a greater level of assumptions and professional judgment in deriving reserve levels, which inherently implies a wider range of reasonable estimates. As a result, we have tended to rely on a weighted approach which primarily employs the LD method for aspects of the segment with ample historical data, while also considering the ELR method for exposure resulting from recent acquisitions, or a relative business with a more limited level of experience. The Company's actuarial analysis of this book of business is more refined in that it utilizes a combination of quarterly and annual data instead of contract period data in totality. Additional data detailing items such as class of business, state, claim counts, frequency and severity is available, further enhancing the reserve analysis. Because of the refinement of the data, this allows for greater use of the loss development method earlier on in the maturity of the book than would ordinarily occur.

*Significant Assumptions Employed in the Estimation of Reserve for Loss and Loss Adjustment Expenses*

The most significant assumptions used at December 31, 2014 to estimate the reserve for loss and LAE within the Company's segments are as follows:

- the information developed from internal and independent external sources can be used to develop meaningful estimates of the likely future performance of business bound by the Company;

- the loss and exposure information provided by ceding companies, insureds and brokers in support of their submissions have been used by Maiden's pricing actuaries to derive meaningful estimates of the likely future performance of business bound with respect to each contract and policy;

- historic loss development and trend experience is assumed to be indicative of future loss development and trends; and

- no significant emergence of losses or types of losses that are not represented in the information supplied to the Company by its brokers, ceding companies and insureds will occur.

The above four assumptions most significantly influence the Company's determination of initial expected loss ratios and expected loss reporting patterns that are the key inputs which impact potential variability in the estimate of the reserve for loss and LAE and are applicable to each of the Company's business segments. These factors are combined with the actuarial judgment exercised by our reserving staff, and validated by the external review of our reserving levels.While there can be no assurance that any of the above assumptions will prove to be correct, we believe that this process represents a realistic and appropriate basis for estimating the reserve for loss and LAE.

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, in Hamilton, Bermuda on March 13, 2015.

**MAIDEN HOLDINGS, LTD.**

By:

/s/ Arturo M. Raschbaum

Name: Arturo M. Raschbaum
Title: President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Arturo M. Raschbaum | President and Chief Executive Officer | March 13, 2015 |
| Arturo M. Raschbaum | (Principal Executive Officer) | |
| /s/ Karen L. Schmitt | Chief Financial Officer | March 13, 2015 |
| Karen L. Schmitt | (Principal Financial and Accounting Officer) | |
| /s/ Barry D. Zyskind | Chairman | March 13, 2015 |
| Barry D. Zyskind | | |
| /s/ Raymond M. Neff | Director | March 13, 2015 |
| Raymond M. Neff | | |
| /s/ Simcha G. Lyons | Director | March 13, 2015 |
| Simcha G. Lyons | | |
| /s/ Yehuda L. Neuberger | Director | March 13, 2015 |
| Yehuda L. Neuberger | | |
| /s/ Steven H. Nigro | Director | March 13, 2015 |
| Steven H. Nigro | | |

97

Table of Contents

**EXHIBIT INDEX**

| Exhibit No. | Description | Reference |
|---|---|---|
| 3.1 | Memorandum of Association (as amended) | (1) |
| 3.2 | Bye-Laws | (2) |
| 4.1 | Form of Common Share Certificate | (2) |
| 4.2 | Registration Rights Agreement by and between Maiden Holdings, Ltd. and Friedman, Billings, Ramsey & Co., Inc., dated as of July 3, 2007 | (2) |
| 4.3 | Form of Indenture for Debt Securities by and among Maiden Holdings North America, Ltd., Maiden Holdings, Ltd., as guarantor, and Wilmington Trust Company, as trustee | (3) |
| 4.4 | First Supplemental Indenture, dated as of June 24, 2011, by and among Maiden Holdings North America, Ltd., Maiden Holdings, Ltd., as guarantor, and Wilmington Trust Company, as trustee | (4) |
| 4.5 | Form of 8.25% Notes due 2041 (included in Exhibit 4.4) | (4) |
| 4.6 | Second Supplemental Indenture, dated March 27, 2012, by and among Maiden Holdings North America, Ltd., Maiden Holdings, Ltd., as guarantor, and Wilmington Trust Company, as trustee | (5) |
| 4.7 | Form of 8.000% Notes due 2042 (included in Exhibit 4.6) | (5) |
| 4.8 | Certificate of Designations of 8.25% Non-Cumulative Preference Shares, Series A, adopted on August 7, 2012 | (6) |
| 4.9 | Form of stock certificate evidencing 8.25% Series A Preference Share (included in Exhibit 4.8) | (6) |